**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;<br><br>PETE HEGSETH, in his official capacity as Secretary of Defense; and<br><br>WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,<br><br>Defendants. | Case No. 1:26-cv-03318-___ |

**VERIFIED AMENDED COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**
(Administrative Procedure Act; Mandamus; Preliminary Injunction)

Plaintiff Daitona Carter ("Plaintiff"), proceeding pro se and in forma pauperis, brings this action against Defendants Stephen A. Feinberg, Deputy Secretary of Defense, Pete Hegseth, Secretary of Defense, and Walter Jay Clayton, Director of National Intelligence, each in their official capacities, seeking immediate declaratory, injunctive, and mandamus relief to halt the unlawful elimination of mandatory CAS cost segregation requirements and to enjoin the classification or removal from judicial reach of records necessary to Plaintiff's pending federal proceedings. Absent immediate judicial intervention, the implementation of Defendants' directives will permanently eliminate the generation of contract-level cost-segregation data necessary to secure

RECEIVED
OCT 05 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

effective remedies in Plaintiff's pending federal appellate proceedings. In support thereof, Plaintiff alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court possesses subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (mandamus jurisdiction), and 5 U.S.C. § 702, which provides an explicit waiver of sovereign immunity for actions seeking relief other than money damages challenging unlawful agency action under the Administrative Procedure Act ("APA").

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers of an agency of the United States acting in their official capacities, the Department of Defense is headquartered in Arlington, Virginia, the Office of the Director of National Intelligence is headquartered in Washington, D.C., and a substantial part of the events and directives giving rise to the claims asserted herein occurred within the District of Columbia.

## II. THE PARTIES

3. Plaintiff Daitona Carter is a non-party inventor who was admitted as Movant-Appellant/Petitioner in the United States Court of Appeals for the Federal Circuit (*Appeal No. 26-1721*) as a proposed intervenor from the lower court. Plaintiff's Motion for Constructive Trust and Escrow Framework (CAFC Doc. 19) is pending and undisposed in that appeal. Separately, Plaintiff petitioned the Director of the United States Patent and Trademark Office, who, despite initial refusal, docketed Plaintiff's Notice of Related Case

Information on the USPTO IPR docket as a non-party. The USPTO docketed the intake correspondence rather than a formal notice.

4. Defendant Stephen A. Feinberg is the Deputy Secretary of Defense. In his official capacity, Defendant Feinberg is the chief operating and acquisition executive responsible for issuing binding policy memorandum governing defense contract cost accounting and procurement standards across all military components.

5. Defendant Pete Hegseth is the Secretary of Defense and the cabinet-level head of the Department of Defense. In his official capacity, Defendant Hegseth is vested with ultimate statutory authority over the administration of defense procurement, contract executions, and agency compliance with federal procurement statutes.

6. Defendant Walter Jay Clayton is the Director of National Intelligence, sworn in August 3, 2026. In his official capacity as DNI, Defendant Clayton holds plenary authority over all 18 intelligence agencies, including the authority to issue classification determinations, establish Special Access Programs (SAPs), and direct the handling of records within Intelligence Community (IC) jurisdiction under 50 U.S.C. § 3024 and 50 U.S.C. § 3592. On October 2, 2026, Defendant Clayton was additionally announced as the lead of the presidential "Super Intelligence Force" AI task force, with a 120-day mandate to assess federal AI oversight and recommend a regulatory framework for DoD AI programs, including SBMC, US ARMY Project ARIA, and Project EagleEye. (Exhibit J.)

## III. STATEMENT OF FACTS

7. On August 18, 2026, Defendant Feinberg issued a binding Departmental memorandum commanding all military components to implement automated Application Programming Interfaces ("APIs") to extract cost data directly from defense contractors' Enterprise Resource Planning ("ERP") and financial systems for all active contracts valued at or above $10,000,000. (Exhibit A.)

8. On September 14, 2026, Defendant Feinberg issued a second memorandum, titled "Fostering One Strong Industrial Base," directing the Department to shift its default cost accounting framework from Cost Accounting Standards ("CAS") to Generally Accepted Accounting Principles ("GAAP") across all defense contracts. (Exhibit B.)

9. The September 14, 2026 memorandum institutes a mandatory 30-day deadline commanding all military components to discontinue "shadow CAS" reporting and verification practices. That deadline expires on or about October 14, 2026.

10. Congress has codified the creation, modification, and administration of Cost Accounting Standards under 41 U.S.C. §§ 1501–1502, vesting exclusive regulatory authority over these standards in the government-wide Cost Accounting Standards Board ("CAS Board"). The statutory CAS framework mandates contract-level cost segregation and audit trails capable of isolating proceeds attributable to specific technology components within larger systems.

11. Plaintiff's 2009 public disclosure, published at blogspot.com and bearing Plaintiff's full legal name and website daitonacarter.com, describes the signal processing architecture (parallel compression, pre-delay attack, and musical release times) that

constitutes the prior art underlying U.S. Patent Nos. 10,306,389; 10,651,866; 11,082,055; 11,871,174; and 12,216,339. The disclosure is incorporated in the CAFC appendix for *Appeal No. 26-1721* and is docketed on the related PTAB IPR proceeding. (Exhibit E.) Plaintiff is the true inventor of the technology covered by those patents and has no patent of her own. Plaintiff's pending § 256 inventorship correction in *Appeal No. 26-1721* seeks to correct the patent records to reflect Plaintiff as the sole true inventor. Plaintiff's reduction to practice (2009 Blogspot, 2016 and 2019 prototypes, 2013–2019 source code, 2019 ARIA YouNoodle hosted Entrepreneurial World Cup Registration) predates all five Solos patents.

12. On May 15, 2026, Plaintiff filed an omnibus notification intake in the Federal Circuit (*Appeal No. 26-1721*), docketed as Document 19, which contained various notices and materials but was subjected to systemic docketing corruption and structural omissions, including the failure to apply mandatory docket numbers, verification headers, and official entry dates, alongside editorial tampering inserting an anomalous character ('52') into Plaintiff's corporate nomenclature. The lower court record was further compromised: Docket #91 (April 17, 2026) had its metadata and descriptions altered post-filing to label distinct files as 'duplicates' despite unique digital hashes, and Docket #92 was suppressed with '-1' placeholders replacing the actual files. PACER confirms successful upload and NEF to all parties for both entries, but neither is visible on the public docket. To address this administrative gridlock, Plaintiff filed an Emergency Omnibus Motion (CAFC Doc. 47, filed September 21/22, 2026), which formally requested: (a) the severance of the constructive trust and escrow matter from the corrupted omnibus filing (CAFC Doc. 19) into an independent, standalone record; (b) an interim financial preservation order requiring maintenance of CAS cost-segregation records and staying any GAAP conversion for the

specific contracts at issue (CAFC Doc. 47, Item 7); and (c) an order to show cause why Document 19 had remained completely unaddressed for 129 days. CAFC Doc. 47, Section III, independently identifies the Feinberg memoranda (Aug 18 and Sept 14, 2026) as the source of the emergency. As of the date of this complaint, the core equitable relief remains pending and unadjudicated. (Exhibit C.)

13. Plaintiff is preparing to file a separate civil action under the civil remedy provisions of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595, arising from the same operative facts alleged herein. To secure a meaningful remedy under § 1595, Plaintiff must be able to produce segregated CAS accounting records to calculate the proceeds attributable to the technology. This action is not a TVPA claim. It is an APA/PI action to preserve the records necessary for that separate, anticipated proceeding.

14. The rapid implementation of the September 14, 2026 memorandum creates an immediate crisis: the mandatory conversion of contractor records from CAS segregation to GAAP consolidation is not a file format change. It is a restructuring of the data model. CAS requires contract-level cost pools, indirect rate allocations, and labor-hour tracing to specific contracts. GAAP does not. The conversion dissolves the cost pools into aggregate R&D and overhead lines that cannot be re-segregated. The information is not preserved in a different structure. It is destroyed by the act of conversion. No subsequent discovery order or post-judgment monetary award can reconstruct historical cost segregations from GAAP aggregates. Once the "shadow CAS" infrastructure is dismantled on October 14, 2026, the cost-segregation audit trail is permanently eliminated.

15. The patented technology at issue in *Federal Circuit Appeal No. 26-1721* is incorporated into the Department of Defense's Soldier Borne Mission Command ("SBMC") program, the successor to the Integrated Visual Augmentation System ("IVAS") program. The $21.88 billion IVAS production contract was transferred from Microsoft to Anduril Industries in February 2025. The SBMC program currently involves three prime prototype contracts: Anduril ($159 million, partnered with Meta Platforms Inc., Qualcomm Technologies, OSI, Gentex Corp., and Oakley Inc. (a subsidiary of EssilorLuxottica S.A., the defendant in Solos v. Meta, 1:26-cv-10304 (D. Mass.))); Rivet Industries ($195 million); and Elbit Systems of America ($120.5 million, partnered with Booz Allen Hamilton for AI) and the Scale AI CDAO contract ($500M ceiling, expanded May 2026 from $100M, for AI data curation and decision-support services; Top Secret/SCI clearance). (May 5, 2026). (Exhibit G.)

16. The SBMC program is transitioning from Phase One to Phase Two. Anduril publicly announced on August 17, 2026 that it is "moving from phase one to phase two," with 170 Phase Two prototypes to be delivered and testing slated to begin in late January or early February 2027. If the CAS-to-GAAP conversion is complete before Phase Two cost data is generated, that data will be collected under GAAP from day one. It will never have CAS cost segregation. This is not a temporary loss. It is a permanent structural gap. (Exhibit D.)

17. The technology is also present in the pipeline through DoD contracts held by Meta Platforms Inc. (waveguide optics and AI for SBMC) and Kopin Corporation (MicroLED displays, IBAS, with SBMC contributions projected at $350–500 million over the program's

life). (Exhibit H.) The CAS cost-segregation records for these contracts are the only records capable of isolating proceeds attributable to the specific patented technology.

18. Plaintiff is not a party to any of the contracts identified in paragraphs 15–17. Plaintiff's interest in the CAS cost-segregation records is as a litigant whose pending Federal Circuit appellate filings—specifically Document 19 (the omnibus notification intake) and Document 47 (the Emergency Omnibus Motion seeking severance into an independent constructive trust/escrow record and an interim preservation order)—require these records as the basis for identifying and tracing the subject property of the trust, for calculating statutory compensation in any subsequent action in the United States Court of Federal Claims under 28 U.S.C. § 1498, and for confirming at the contract level through labor-hour tracing that the work was performed by Plaintiff. The requested equitable trust and preservation framework establishes Plaintiff's concrete, imminent, and redressable injury: without the CAS records, the financial audit trail is permanently dissolved for SBMC Phase 2 and any subsequent production award.

19. The CAS cost-segregation records for the Covered Contracts identified herein are within the operational scope of Intelligence Community programs under Defendant Clayton's DNI jurisdiction, including Project ARIA (Army Rapid Implementation of AI, launched March 5, 2026), Project EagleEye (Anduril's SBMC submission), and the broader SBMC program. The 65 technical forensic files uploaded to the D. Mass. docket on April 17, 2026, the Alpaca Securities LLC account records for the trading account in which Plaintiff is the subject party, the NYC hotel guest records and communication logs (February 2026– April 2026, and the CAFC appellate record in *Appeal No. 26-1721* are records that, if

classified or placed under a SAP by Defendant Clayton, would be removed from the jurisdiction of the courts in which they are pending.

20. On July 14, 2026, Plaintiff served a Formal Objection and Compulsory Notice on the Majority and Minority Counsel of the Senate Select Committee on Intelligence, identifying Defendant Clayton's structural conflicts across his SEC, Apollo Global Management, and SDNY tenures, and requesting oversight review of the Intelligence Community's handling of the factual record in *CAFC No. 26-1721*. (Exhibit I.) The Senate confirmed Defendant Clayton on August 3, 2026, over that objection.

21. On October 2, 2026, Defendant Clayton was announced as the lead of the presidential "Super Intelligence Force" AI task force, with a 120-day mandate to assess federal AI oversight and recommend a regulatory framework. The task force's report is due approximately January 2027 — the same window in which SBMC Phase 2 testing (170 prototypes) will generate its first cost data. If the task force endorses GAAP as the default accounting framework for DoD AI programs, the CAS cost-segregation records will be permanently displaced at the policy level, and no district court injunction can unwind a presidential task force recommendation.

22. The 30-day CAS conversion deadline under the September 14, 2026 Feinberg memorandum (expiring October 14, 2026) and Defendant Clayton's DNI classification authority over IC program records constitute concurrent, independent, and compounding threats to the same records. The Feinberg memo converts the records from CAS to GAAP. Defendant Clayton's DNI authority can classify the remaining records or the records of their conversion, removing them from judicial reach entirely.

## IV. CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF**

**Administrative Procedure Act — Action in Excess of Statutory Authority**

**(5 U.S.C. § 706(2)(C))**

23. Plaintiff incorporates by reference paragraphs 1 through 22 as if fully set forth herein.

24. Pursuant to 41 U.S.C. § 1502(a)(1), Congress exclusively delegated the authority to prescribe, amend, and rescind Cost Accounting Standards to the government-wide Cost Accounting Standards Board. No individual executive department possesses the statutory authority to alter or phase out these standards unilaterally.

25. Defendants' September 14, 2026 memorandum contains an explicit acknowledgment of this statutory limitation, stating: "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." (Exhibit B, p. 2.) This is not a statement of future intent. It is an admission that the current legal obligation to apply CAS remains in force for programs within the statutory scope, including sole-source development programs.

26. Despite this acknowledgment, the memorandum's mandatory 30-day directive to dismantle "shadow CAS" practices operates to eliminate the informal mechanisms by which contracting officers and auditors have historically obtained contract-level cost segregation data for programs that fall within the CAS scope but are not formally designated as "sole-source development" in the contract file. The result is that programs functionally within the

CAS scope (competitive in form but sole-source in substance, due to the specific technology at issue) lose their cost segregation protection without the CAS Board ever acting.

27. The directive constitutes "final agency action" under 5 U.S.C. § 704 because it marks the consummation of the agency's decision-making process, imposes immediate and binding compliance obligations upon the defense-industrial base, and is the occasion for future legal obligations (the 30/60/90-day implementation clocks).

28. Because the memorandum attempts to unilaterally alter the practical application of a statutory accounting framework outside the mechanisms of the CAS Board, it must be set aside as an action taken "in excess of statutory jurisdiction, authority, or limitations" under 5 U.S.C. § 706(2)(C).

**SECOND CLAIM FOR RELIEF**

**Administrative Procedure Act — Arbitrary and Capricious Action**

**(5 U.S.C. § 706(2)(A))**

29. Plaintiff incorporates by reference paragraphs 1 through 28 as if fully set forth herein.

30. An agency action is arbitrary and capricious if it fails to consider significant, foreseeable aspects of the problem. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)*.

31. In issuing the August 18 and September 14, 2026 memorandum, Defendants Feinberg and Hegseth failed to consider:

(a) The foreseeable impact that the elimination of CAS cost-segregation data would have on active, pending federal appellate proceedings in which contract-level cost records are necessary to enforce an equitable remedy (specifically, the Motion for Constructive Trust and Escrow, Doc. 19, *CAFC No. 26-1721*, filed May 15, 2026, undisposed for 130 days);

(b) The irreversible nature of the data conversion. The conversion from CAS to GAAP is not a file format change. It is a restructuring of the data model. CAS requires contract-level cost pools, indirect rate allocations, and labor-hour tracing to specific contracts. GAAP does not. The conversion dissolves the cost pools into aggregate R&D and overhead lines that cannot be re-segregated. The information is not preserved in a different structure. It is destroyed by the act of conversion. No subsequent discovery order or post-judgment award can reconstruct historical cost segregations from GAAP aggregates;

(c) The 30-day implementation window (expiring October 14, 2026) which, if executed, will be complete before the SBMC Phase 2 prototypes (170 units, testing January–February 2027) generate their first cost data. The Phase 2 data will be collected under GAAP from day one. It will never have CAS cost segregation. This is not a temporary loss. It is a permanent structural gap.

32. Defendants provided no reasoned justification for the 30-day deadline. No regulatory impact analysis, notice-and-comment period, or consultation with the CAS Board preceded the directive. The *State Farm* requirement to "examine the relevant data and articulate a satisfactory explanation" was not met.

**THIRD CLAIM FOR RELIEF**

**Writ of Mandamus (28 U.S.C. § 1361)**

33. Plaintiff incorporates by reference paragraphs 1 through 32 as if fully set forth herein.

34. Defendants Feinberg and Hegseth possess a clear, nondiscretionary, and ministerial statutory duty under 41 U.S.C. § 1502 and 48 C.F.R. Part 9905 to maintain CAS cost segregation for all contracts within the statutory scope of full CAS coverage. The September 14 memorandum concedes this duty in its own text (paragraph 25, supra): "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." The duty is not discretionary. It is statutory. It applies until the CAS Board acts. The CAS Board has not acted.

35. Plaintiff possesses a clear right to an effective judicial remedy. The Motion for Constructive Trust and Escrow (Doc. 19, *CAFC No. 26-1721*) is pending and undisposed. Enforcement of that trust requires identification and tracing of the subject property through contract-level cost segregation. Without the CAS records, the trust is unenforceable. Plaintiff's right to the trust is not theoretical. It is a pending equitable proceeding in a federal court of appeals.

36. Plaintiff has no other adequate remedy at law. The 30-day conversion clock expires October 14, 2026. After that date, the shadow CAS infrastructure is dismantled, the cost pools are dissolved, and the segregation data is structurally eliminated. No discovery

motion, no subpoena, no FOIA request can regenerate data that was never collected in the required format.

37. Plaintiff is entitled to an order compelling Defendants Feinberg and Hegseth to maintain CAS cost segregation for the following specific contracts and subcontracts (hereinafter, the "Covered Contracts"): (a) the Anduril SBMC prototype contract ($159M); (b) the Rivet SBMC prototype contract ($195M); (c) the Elbit Systems of America SBMC prototype contract ($120.5M); (d) the Kopin IBAS contract ($15.4M); (e) the Lockheed Martin NGSRI Phase 2 contract; (f) the $2.4M international thermal weapon sight order; (g) the $3.6M European military helmet display order; and (h) the Scale AI CDAO contract ($500M ceiling, May 2026) — in their current segregated form, pending resolution of CAFC Doc. 19 and the § 256 inventorship correction in *CAFC No. 26-1721*.

**FOURTH CLAIM FOR RELIEF**

**DNI Classification Authority — Threat to Pending Litigation Records**

**(APA § 706(2)(A), (C); 50 U.S.C. § 3024; 50 U.S.C. § 3592)**

38. Plaintiff incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

39. Defendant Clayton, in his official capacity as Director of National Intelligence, holds authority under 50 U.S.C. § 3592 to determine the classification of national security information and under 50 U.S.C. § 3024 to direct the activities of all intelligence agencies. This includes the authority to establish Special Access Programs (SAPs) that remove records from the general classification system and place them under restricted access.

40. The threat posed by Defendant Clayton's dual role as Director of National Intelligence and head of the presidential "Super Intelligence Force" AI task force is the systemic, preemptive removal of essential evidentiary records from judicial reach. Clayton—whose primary professional background is corporate finance and legal defense, notably marked by systemic institutional failures to safeguard sensitive records such as those involving the Epstein proceedings—is uniquely positioned to weaponize intelligence classification and Special Access Program (SAP) authorities as a corporate and executive shield. Because "Project ARIA"—adopted by the U.S. Army as the *Army Rapid Implementation of AI*—directly deploys Plaintiff's proprietary trademarked AI modeling, signal processing framework, and architectural designs that were appropriated by Meta and funneled directly into military deployment, intelligence community jurisdictions and federal AI oversight frameworks overlap directly with the core subject matter of this dispute. Specifically, Meta executive Andrew Bosworth, operating within the Innovation Corps (US Army) framework, had actual, documented notice of the theft and unauthorized appropriation of Plaintiff's intellectual property as early as March 2021. Furthermore, the Department of Defense and its relevant components received formal complaints, administrative reports, and direct legal notice of this intellectual property theft in 2020, 2021, and continuously before and after the deployment of the technology—meaning the agency had actual knowledge of the infringement and misappropriation long before and concurrent with its integration into military systems. The DOD and IC were also aware of the theft before the Movant and were notified of trafficking and related ongoing physical harm in real time. Crucially, federal whistleblowers attempted to warn Plaintiff of the impending targeting prior to the commencement of physical battery, asset seizure, and

forced movement; it was only subsequent to these whistleblower warnings that the physical assaults, surveillance infrastructure, and property seizures escalated. The records referenced in paragraph 19—specifically comprising:

a. the 65 technical forensic files and source code documentation before the U.S. District Court for the District of Massachusetts;

b. the Alpaca Securities LLC account records, DTCC, FINRA, and SEC filings for the trading account in which Plaintiff is the designated subject party, alongside records concerning Meta Materials ($MMAT/$MMTLP) including funding, US/Federal contracts and IP owned, held, or sold by the entity and or its estate;

c. the lodging, communication, residential, business and security records associated with locations utilized in the underlying acts of surveillance, extraction, data harvesting forced movement/kidnapping, and trafficking, including Camden Brickell, Brickell Flatiron, Millcento, the JW Marriott Miami, SLS Brickell, 830 Brickell Ave., the citizenM Hotel, Solaris, and locations not limited to Florida, California, New York, Washington (state), Georgia, South Korea and in-flight (both domestic and international) known and documented across Federal agencies and departments.

d. travel logs across international and domestic transit, saved commercial airline manifest (including any seat changes), private transportation, ride-share, rail, airline, on-demand delivery, and VoIP providers records related to the Plaintiff, plaintiff family and businesses;

e. compromised academic, administrative, and electronic communication records—including emails, coursework, and homework logs—from Florida International University, Western New Mexico University, and Harvard University, which were

accessed, hacked, and utilized as part of the infrastructure to monitor, isolate, and traffic Plaintiff and college-age students;

f. select data windows from AI providers (OpenAI, xAI/Grok, Duck.ai) and records detailing the corporate sales of AOL and Yahoo, the institutional funding of Bending Spoons, and its corporate migration to Italy including Evernote;

communications transmitted to government officials in their personal or professional capacities; and

g. the CAS cost-segregation records and appellate record for CAFC *Appeal No. 26-1721*—are not abstract files; they constitute the indispensable evidentiary corpus required to sustain Plaintiff's pending federal proceedings, establish the constructive trust, and satisfy the statutory predicate requirements for imminent civil enforcement under the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1595, and RICO. Once classified or designated under a SAP by Defendant Clayton under the dual pretexts of national security and AI task force regulatory mandates over Project ARIA, these records would be unlawfully severed from judicial review. A blanket classification order applied mid-litigation by the DNI/AI task force lead to swallow active evidentiary records violates the Administrative Procedure Act and *United States v. Reynolds, 345 U.S. 1 (1953)*, by substituting unreviewable executive fiat for judicial oversight, thereby stripping the federal courts of their jurisdiction and nullifying Plaintiff's statutory rights to a judicial remedy.

41. On July 14, 2026, Plaintiff served a Formal Objection and Compulsory Notice on the Majority and Minority Counsel of the Senate Select Committee on Intelligence,

identifying Defendant Clayton's structural conflicts across his SEC, Apollo Global Management, and SDNY tenures, and requesting oversight review of the Intelligence Community's handling of the factual record in *CAFC No. 26-1721*. (Exhibit I.) The Senate confirmed Defendant Clayton on August 3, 2026, over that objection. Defendant Clayton had actual notice of the conflict and of the pending proceedings before assuming office.

42. On October 2, 2026, Defendant Clayton was announced as the lead of the presidential "Super Intelligence Force" AI task force, with a 120-day mandate to assess federal AI oversight and recommend a regulatory framework for DoD AI programs. The task force's report is due approximately January 2027 — the same window in which SBMC Phase 2 testing will generate its first cost data. If the task force endorses GAAP as the default accounting framework, the CAS records will be permanently displaced at the policy level.

43. The 30-day CAS conversion deadline (October 14, 2026) and Defendant Clayton's DNI classification authority constitute concurrent, independent, and compounding threats to the same records. The Feinberg memo converts the records from CAS to GAAP. Defendant Clayton's DNI authority can classify the remaining records or the records of their conversion, removing them from judicial reach entirely. A classification determination is not subject to the same discovery and unsealing mechanisms as a civil evidentiary order. Once a record is classified and placed under a SAP, the only mechanism for its release is administrative declassification review — not a court order.

44. *United States v. Reynolds, 345 U.S. 1 (1953)*, requires a specific, reasoned determination that disclosure would "dangerously and harmfully" affect national security — not a blanket

designation of all records touching a program that has any IC component. A DNI determination that classifies records in a pending civil action without a specific, case-by-case determination of harm is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

45. Defendant Clayton maintains personal financial interests in Apollo Global Management, the entity who provided Bending Spoons the funds via a joint venture for acquisition of Evernote is alleged in the CAFC record to have been the mechanism for transferring Plaintiff's lab notes/proof of inventorship including proof of Linkedin restriction three days before the FTC v Meta Platforms (fka Facebook) anti-trust case in December 2020. This personal interest is disclosed in his OGE financial disclosure and is not divested by his official capacity as DNI.

46. Plaintiff is entitled to an order enjoining Defendant Clayton, in his DNI capacity, from classifying, designating as a SAP, or otherwise removing from judicial reach any record related to *CAFC Appeal No. 26-1721*, the 65 technical forensic files, the Alpaca Securities LLC account records for the trading account in which Plaintiff is the subject party, the NYC hotel communication logs, or the CAS cost-segregation records for the eight Covered Contracts, pending resolution of the pending proceedings in this Court and the CAFC.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue a Temporary Restraining Order enjoining Defendants Feinberg and Hegseth, their agents, officers, and components from executing the September 14, 2026 memorandum as to the CAS cost-segregation records relevant and material to Plaintiff's pending Motion for

Constructive Trust and Escrow (Doc. 19, *CAFC No. 26-1721*) and the § 256 inventorship correction, and prohibiting the modification, consolidation, conversion, deletion, or rendering inaccessible of any such records for the Covered Contracts identified in paragraph 37;

2. Issue a Temporary Restraining Order and Preliminary Injunction enjoining Defendant Clayton, in his official capacity as DNI, from classifying, designating as a Special Access Program, or otherwise removing from judicial reach any record related to: (a) *CAFC Appeal No. 26-1721*; (b) the 65 technical forensic files uploaded to the D. Mass. docket on April 17, 2026; (c) the Alpaca Securities LLC account records for the trading account in which Plaintiff is the subject party; (d) the NYC hotel communication logs (Febreuary 2026 – April 2026); or (e) the CAS cost-segregation records for the eight Covered Contracts, pending further order of this Court;

3. Issue a Preliminary Injunction preserving all relevant CAS cost-segregation records in their current segregated form, and requiring Defendants Feinberg and Hegseth to maintain CAS cost segregation for new cost data generated for the Covered Contracts and for SBMC Phase 2 and any subsequent production award, pending the disposition of Doc. 19 in CAFC No. 26-1721;

4. Enter a Declaratory Judgment declaring that the September 14, 2026 memorandum titled "Fostering One Strong Industrial Base" is an action in excess of statutory authority under 41 U.S.C. § 1502 to the extent it eliminates CAS cost segregation for programs within the statutory scope without action by the CAS Board;

5. Issue a Writ of Mandamus compelling Defendants Feinberg and Hegseth to maintain CAS cost-segregation records in their current segregated form for the Covered Contracts, pending resolution of the pending CAFC proceedings;

6. Award Plaintiff taxable costs pursuant to 28 U.S.C. § 1920; and, to the extent Plaintiff subsequently retains legal representation, award reasonable attorneys' fees, expert witness costs, and litigation expenses pursuant to the Equal Access to Justice Act, 5 U.S.C. § 7430 and 28 U.S.C. § 2412; and

7. Grant such other and further relief as this Court deems just and proper.

**VERIFICATION**

I, Daitona Carter, declare under penalty of perjury that I have read the foregoing Verified Amended Complaint for Declaratory and Injunctive Relief and that the facts stated herein are true and correct to the best of my knowledge, information, and belief.

Executed on October 4, 2026.

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

**EXHIBIT LIST**

| Exhibit | Content |
|---|---|
| **Exhibit I** | SSCI email, July 14, 2026 (full partially redacted text) |
| **Exhibit J** | AI Czar announcement, Oct 2, 2026 (@WhiteHouse X.com Post– President Trump and  Inaugurating the Era of Super Intelligence<br>A Presidential Document by the Executive Office of the President on 10/02/2026 ) |

**Exhibit I**

**Description:** SSCI email, July 14, 2026 (full partially redacted text)

[redacted]

***From***
DAITONA CARTER

***To***
Senate Select Committee on Intelligence

***Number of pages***
[redacted]

***Message***
[redacted]

DATE: July 14, 2026

TO: Majority Counsel & Minority Counsel, Senate Select Committee on Intelligence (SSCI)

FROM: Daitona Carter, Movant-Appellant / Original Inventor / Former U.S. Senate Intern (2001, Office of Senator Clinton)

SUBJECT: BRIEF AND COMPULSORY NOTICE OF MATERIAL EVIDENCE AND WITNESS TESTIMONY IN OPPOSITION TO THE CONFIRMATION OF JAY CLAYTON AS DIRECTOR OF NATIONAL INTELLIGENCE

RE: CAFC Appeal No. 26-1721 (Solos [redacted]
Mandamus No. 26-136 (In re Carter) / [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Federal Statutory Mandates:

Kari's Law (47 U.S.C. § 623) & RAY BAUM'S Act (47 U.S.C. § 506): Strict federal mandates requiring all multi-line telephone systems (including hotels) to allow direct-dial access to emergency services without prefixes, and to automatically transmit precise, dispatchable location data to first responders.

The Defend Trade Secrets Act (18 U.S.C. § 1836): Federal cause of action for economic espionage and misappropriation of proprietary engineering assets.

The Victims of Trafficking and Violence Protection Act (22 U.S.C. § 7101): Severe federal felony structures prohibiting the forced harboring, containment, and transit of individuals for illegal asset exploitation.

[redacted]

[redacted]

Objector Daitona Carter is the sole original inventor of the foundational, unpatented proprietary technology consisting of smart-glasses architectural arrays, integrated microphone geometries, see-through display integrations, and multi-sensor tracking systems currently at issue in CAFC Appeal No. 26-1721.

This intellectual property was obtained entirely without consent, utilizing physical force, structural containment, and systemic theft. This operational methodology constitutes a direct intersection of human trafficking, modern slavery, and economic espionage, executed via interconnected corporate-state relationships to benefit federal procurement pipelines.

[redacted]

Publicly verifiable procurement records establish that this fragmented [redacted] core [redacted] effectively insulating commercial patent disputes behind the shield of state-secrets doctrine.

B. The Anduril Procurement Loop

On February 25, 2025, former Anduril Industries Vice President Daniel P. Driscoll was sworn in as the 26th Secretary of the Army. Within four months of assuming office, Secretary Driscoll authorized the creation of the aforementioned Detachment 201, legally integrating corporate executives from Meta, Palantir, and OpenAI into uniform.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Direct evidence of a highly coordinated, non-coincidental enforcement action is preserved in external server logs: on December 6, 2020, exactly three days prior to the Federal Trade Commission (FTC) filing its landmark antitrust lawsuit against Facebook (now Meta Platforms, Inc.), the Objector's professional LinkedIn account was completely restricted and locked.

This targeted digital isolation was executed explicitly to wipe out public, contemporaneous verification of her original inventorship, including her documented public postings of the see-through display integration and multi-sensor tracking designs, right as federal regulators began dissecting the corporate entity's market acquisitions.

Reflecting the systemic pressure generated by the Objector's subsequent formal motions to the court, the previous chief executive officer of a principal entity embedded in this tech pipeline abruptly stepped down, switching departments in a tactical corporate maneuver to evade direct deposition and decouple personal liability from the active docket.

[redacted]

[redacted], the Objector has been subjected to continuous, escalating forced harboring and trafficking across six (6) distinct NYC hotel properties spanning twelve (12) separate rooms.

Within these rooms, the enterprise actively executed systemic Kari’s Law (47 U.S.C. § 623) and RAY BAUM’S Act (47 U.S.C. § 506) violations. The communication systems were structurally altered, intercepted, or disabled to prevent the Objector from calling or dialing emergency services, the U.S. Marshals Service, or the U.S. Attorney’s Office for the SDNY.

To ensure total isolation, the enterprise actively intercepted and blocked third-party advocates who attempted to place emergency calls or secure federal intervention on the Objector's behalf.

[redacted]

[redacted]

[redacted]

[redacted] maintains structural and operational affilative connections to Apollo Global Management—an entity where Mr. Clayton has held significant leadership roles and maintained financial interests. The deployment of capital from these accounts to entities engaged in data aggregation and corporate-state defense mergers constitutes a severe, unexamined conflict of interest.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

The unchecked financial flows moving between the intelligence community and these dual-use technology arrays directly enabled severe internal corruption. Former DNI Tulsi Gabbard and OMB Executive Amaryllis Fox Kennedy were tasked with auditing these channels. Kenn[redacted] This action came immediately lowering ECF document 110 in the lower court and Document No. 19 filed with the CAFC.

G. Organized Judicial Blocks, Paul Hastings LLP, and the Hidden Record

This systemic physical containment directly co[redacted] and total [redacted]ords, specifically [redacted]

Following the Objector's filing of a Writ of Mandamus under CAFC No. 26-136, official docket records experienced deliberate structural manipulation, including the documented shuffling of evidentiary exhibits and the complete suppression of a critical docket entry under a "-1" indicator for a consecutive two-month period to obstruct appellate review. These coordinated maneuvers constitute structured judicial blocks purposefully deployed to freeze out active filings.

[redacted] The nominee's deep transactional and regulatory interlocks with firms of this structure establish a direct, unexaminable node of conflict.

[redacted]

[redacted]

[redacted]

The nominee's structural interlocks with this specific pipeline are verified across three definitive, overlapping operational frameworks:

The Direct Anduril Enforcement Nexus (SDNY): On December 15, 2025, during the nominee's tenure running the U.S. Attorney's Office for the Southern District of New York (SDNY), his office officially unsealed a federal indictment (U.S. v. Pennetta) directly involving pre-IPO wire fraud and identity theft where Anduril Industries’ corporate network and private capital allocation lines were actively weaponized. Furthermore, this extrajudicial harboring, communication blockades, and evidence suppression occurred inside Manhattan during the exact window Clayton presided over this federal jurisdiction.

The Apollo Global Management Governance Node: In February 2021, Clayton was appointed as the Lead Independent Director of Apollo Global Management to oversee its corporate restructurings. Official Office of Government Ethics (OGE) financial disclosures confirm that Clayton has retained his substantial personal financial stakes and stock holdings in Apollo. His personal wealth remains tied directly to the private credit giant funding these tech consolidations and capital configurations.

The Sullivan & Cromwell Pipeline: Clayton continues to operate as a partner and senior policy advisor at Sullivan & Cromwell LLP—the precise legal institution that managed Apollo’s corporate governance overhauls. To facilitate his transition toward confirmation, another Sullivan & Cromwell partner, James M. "Jamie" McDonald, was selected to immediately step into the SDNY structure as Deputy U.S. Attorney to take over day-to-day operations and manage the active dockets.

Because the SEC is a designated defendant in upcoming litigation regarding the procedurally deficient FINRA abductions, Mr. Clayton's direct, [redacted]ute, non- [redacted]

[redacted] If confirmed as Director of National Intelligence, the nominee will obtain absolute, non-reviewable authority to issue National Security Standard Classifications and establish closed-loop Special Access Programs (SAPs).

Notice of Intent to Seek Protective Orders: The Objector hereby alerts the Committee that the exact moment Jay Clayton is confirmed or assumes the Office of the DNI, the Objector will be legally forced to immediately file for an Emergency Temporary Restraining Order (TRO) and Preliminary Injunction against him in federal court.

This emergency action will be required to legally block the nominee from utilizing the immense statutory classification and state-secrets powers of the DNI to retroactively seal, suppress,

archive, or classify [redacted] of physical trafficking. Allowing a nominee to take office when a federal witness must immediately seek an injunction against him to prevent the destruction of active appellate evidence under CAFC Appeal No. 26-1721 and CAFC Mandamus No. 26-136 is a profound violation of constitutional due process.

[redacted]

[redacted]

Respectfully submitted,

Dated: July 14, 2026

Location: New York, New York

By: /s/ Daitona Carter

Daitona Carter

Movant-Appellant / Original Inventor

Former US Senate Intern, 2001

CAFC Appeal No. 26-1721 / CAFC Mandamus No. 26-136

Lower Case Number: Civil Action No. 1:26-cv-10304-ADB

**Exhibit J**

**Description:** AI Czar announcement, Oct 2, 2026 (@WhiteHouse X.com Post– President Trump and Inaugurating the Era of Super Intelligence

A Presidential Document by the Executive Office of the President on 10/02/2026 )

X ← **Post** Log in Sign up

**The White House**
@WhiteHouse

"I am announcing the formation of the Super Intelligence Force (SIF). The Super Intelligence Force is tasked with coordinating the effort of the Federal Government to ensure that America continues to lead the World in Super Intelligence, which many say is bigger than the Industrial Revolution, and the Internet, and will protect the interests, and improve the lives, of all Americans." - President DONALD J. TRUMP 🇺🇸

**Donald J. Trump**
@realDonaldTrump

Following the Historic White House Accord on Super Intelligence, where the World's most important Technology Companies came together, and confirmed their responsibilities to the American People, I am announcing the formation of the Super Intelligence
Force (SIF). The Super Intelligence Force is tasked with coordinating the effort of the Federal Government to ensure that America continues to lead the World in Super Intelligence, which many say is bigger than the Industrial Revolution, and the Internet, and will protect the interests, and improve the lives, of all Americans. The Super Intelligence Force will coordinate the Federal Government's engagement with Consumers, Public Interest Groups, Religious Organizations, Critical Infrastructure Providers, and Super Intelligence Companies, and will be led by Director of National Intelligence, Jay Clayton, Chairman of the Federal Trade Commission, Andrew Ferguson, Under Secretary of War for Research and Engineering, and Chief Technology Officer, Emil Michael, and Director of the Office of Personnel Management, Scott Kupor, and will report to the President of the United States (ME!), and the Chief of Staff, Susie Wiles. Thank you for your attention to this matter! President DONALD J. TRUMP

1:01 PM · Oct 4, 2026 · **1.3M** Views

3.7K 6.6K

**Dolly** 💜 @Be_Like_Dolly ·
The Trump plan doesn't help

Scan to get the app

**Federal Register** / Vol. 91, No. 190 / Friday, October 2, 2026 / Presidential Documents **63129**

# Presidential Documents

**Executive Order 14434 of September 29, 2026**

## Inaugurating the Era of Super Intelligence

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* America stands at the forefront of a new technological revolution in intelligence. The modern field of artificial intelligence was born in the United States, where American scientists first gave the field its name and laid the foundations for its development. Seventy years later, powered by our Nation's unmatched culture of innovation, world-leading companies and research institutions, and entrepreneurial spirit, America is once again pushing the technological frontier forward.

The extraordinary technologies being pioneered by American innovators far exceed what was envisioned when the term ''Artificial Intelligence'' first came into use. The capabilities of today's frontier systems do much more than imitate or automate discrete aspects of human intelligence. They increasingly amplify human ingenuity and unlock new forms of creativity, empowering Americans to achieve what was previously impossible across science, medicine, and nearly every other domain of human endeavor. As these capabilities continue to improve, they increasingly represent not merely artificial intelligence, but a new era of Super Intelligence.

The terminology used by the Federal Government should reflect the transformative capabilities of these technologies and the limitless opportunities they create for the American people. Accordingly, the term ''Super Intelligence'' more appropriately captures the promise, potential, and rapidly advancing capabilities of these technologies. It is therefore the policy of my Administration that, to the maximum extent permitted by law, the executive branch shall use the terms ''Super Intelligence'' and ''SI'' in place of ''Artificial Intelligence'' and ''AI'' and will not acknowledge the usage of ''Artificial Intelligence'' and ''AI'' in any applicable setting.

**Sec. 2**. *Implementation.* (a) To the maximum extent permitted by law, executive departments and agencies (agencies) shall use ''Super Intelligence'' and ''SI'' in place of ''Artificial Intelligence'' and ''AI'' in official correspondence, public communications, websites, reports, policy documents, and other nonstatutory documents within the executive branch.

(b) Nothing in this section requires the alteration of previously issued regulations, Presidential actions, contracts, grants, or other historical documents.

**Sec. 3**. *Definition.* (a) For purposes of this order, and except where otherwise provided by law, the terms ''Super Intelligence'' and ''SI'' mean the technologies and systems encompassed by the term ''artificial intelligence'' as defined in section 9401(3) of title 15, United States Code. This definition shall govern the implementation of this order unless and until superseded by subsequent Presidential action consistent with applicable law or by an Act of Congress.

(b) Within 60 days of the date of this order, the Assistant to the President for Science and Technology (APST), in consultation with the heads of other agencies as the APST deems appropriate, shall submit to the President proposed legislative language to establish a Federal definition of ''Super Intelligence'' and ''SI'' that reflects the capabilities described in section 1 of this order. The proposal shall include:

(i) an assessment of whether, and to what extent, the definition of ''Super Intelligence'' and ''SI'' should modify, expand upon, or otherwise supersede the existing statutory definition of ''artificial intelligence'';

(ii) any proposed conforming amendments, as appropriate, to existing statutory references to ''artificial intelligence'' and ''AI''; and

(iii) recommendations for any additional Presidential or executive action necessary to implement the proposed definition throughout the executive branch.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Office of Science and Technology Policy.

THE WHITE HOUSE,
*September 29, 2026.*

[FR Doc. 2026–20321
Filed 10–1–26; 11:15 am]
Billing code 3270–F9–P