**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DAITONA CARTER,

Plaintiff,

v.

STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;

PETE HEGSETH, in his official capacity as Secretary of Defense; and

WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,

Defendants.

Case No. 1:26-cv-03318-___

**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AS TO DEFENDANT WALTER JAY CLAYTON, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

1. Plaintiff Daitona Carter, proceeding pro se and in forma pauperis, moves under Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1 for a temporary restraining order and preliminary injunction enjoining Defendant Walter Jay Clayton, in his official capacity as Director of National Intelligence, from classifying, designating as a Special Access Program (SAP), or otherwise removing from judicial reach any record identified in paragraph 5 below, while this action is decided.

2. This motion is supported by Plaintiff's Verified Amended Complaint (filed concurrently herewith), verified under 28 U.S.C. § 1746; by the memorandum below; by the

RECEIVED
OCT 05 2026
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

Certificate Regarding Notice required by LCvR 65.1(a); and by a proposed order under LCvR 7(c).

3. Because no counsel has yet appeared for Defendant Clayton, Plaintiff could not confer with opposing counsel under LCvR 7(m). Plaintiff's efforts to give notice are described in the attached Certificate Regarding Notice.

4. The need is urgent. The September 14, 2026 Feinberg memorandum establishes a 30-day compliance window expiring on or about October 14, 2026 — ten days from the date of this motion. The SBMC program is transitioning from Phase One to Phase Two, with 170 Phase Two prototypes to be delivered and testing slated to begin in late January or early February 2027. The "Super Intelligence Force" AI task force led by Defendant Clayton has a 120-day mandate (announced October 2, 2026) to recommend a federal AI oversight framework, with the report due approximately January 2027 — the same window as Phase 2 testing. If the CAS cost-segregation records are converted on October 14 and the task force report endorses GAAP as the default framework, the loss is permanent and policy-locked. No court can order the retroactive creation of cost-segregation data that was never collected in that format. As detailed in Plaintiff's Federal Circuit filings—specifically the omnibus notification intake (Document 19) and the September 21/22 Emergency Omnibus Motion (Document 47)—this interim equitable framework requires immediate district court preservation to prevent complete evidentiary destruction.

5. This motion is limited to the comprehensive evidentiary corpus and all related records, files, data streams, and documentation (collectively, the "Covered Records"), encompassing without limitation:

(a) Cost-Accounting and Program Records: The CAS cost-segregation records and contract-level labor-hour tracing data for the eight Covered Contracts identified in paragraph 37 of the Amended Complaint;

(b) Forensic and Intellectual Property Records: The 65 technical forensic files, source code documentation, and related digital artifacts uploaded to the D. Mass. docket (Solos v. Meta, 1:26-cv-10304) and associated judicial proceedings;

(c) Financial, Corporate, and Tokenization Records: All banking, brokerage, and trading records (including Alpaca Securities LLC accounts, in-kind minting/redemption events via the Tokenization Network, DTCC, FINRA, and SEC filings concerning Alpaca Securities LLC and the Meta Materials/MMTLP estate), business ledger records, server copies and backups (which may include any references, files or data related to the Plaintiff, the Plaintiff's family and businesses/work) and corporate sales/migration files (including AOL, Yahoo, Bending Spoons, and Evernote);

(d) Digital Accounts, Communications, and Platform Data: All personal and business digital accounts, email servers (including Gmail, Microsoft 365 email host archives/backups and related communication archives), messaging platforms, social media accounts, phone logs, VoIP transmissions, and restricted-access AI provider data windows (OpenAI, xAI, Duck.ai) belonging to, related to and/or referencing the Plaintiff, Plaintiff's family and businesses/work;

(e) Multi-Modal Travel, Work, and Movement Logs: All domestic and international weekly work-travel logs, flight records, rail, private transportation, ride-share, and on-demand delivery records documenting Plaintiff's professional and personal transit;

(f) Surveillance, Lodging, and Physical Infrastructure Records: All lodging, communication, residential, hotel, security, and medical facility records associated with locations utilized in the underlying acts of surveillance, forced movement, and trafficking (specifically including Camden Brickell, Brickell Flatiron, Millcento, JW Marriott Miami, SLS Brickell, 830 Brickell Ave., citizenM, Baptist Hospital, and related properties);

(g) Academic and Administrative Records: All academic, administrative, and electronic communication files, portals, coursework, and homework logs from Florida International University, Western New Mexico University, and Harvard University that were accessed or exploited within the tracking infrastructure;

(h) Official Notice and Whistleblower Chronology: All official communications, intellectual property appropriation notices, and pre-battery whistleblower warnings transmitted to Department of Defense and Intelligence Community officials across 2020, 2021, and subsequent periods; and

(i) Active Appellate and Judicial Records: The complete active appellate records in pending federal proceedings, including the U.S. Court of Appeals for the Federal Circuit, Appeal No. 26-1721 (encompassing the omnibus notification filing, Document 19, and the September 21/22 Emergency Omnibus Motion, Document 47, which sought severance of the constructive trust and escrow matter into an independent record and a show-cause order regarding 129 days of administrative inaction).

6. This motion does not enjoin any existing classification. It requests only that Defendant Clayton not newly classify, SAP-designate, or remove from judicial reach the identified records pending the Court's decision. All existing classifications remain in effect.

## I. INTRODUCTION AND RELIEF REQUESTED

7. Plaintiff requests preservation and nothing more. Plaintiff does not ask the Court to declassify any record, to direct the Intelligence Community to disclose any information, or to modify any classification determination already in effect. Plaintiff requests that the Covered Records not be classified, SAP-designated, or removed from the jurisdiction of the pending federal proceedings in which they are held, while the Court decides the merits.

8. The need is urgent. The Feinberg memorandum's 30-day CAS conversion deadline expires October 14, 2026. The Clayton task force report is due approximately January 2027. The SBMC Phase 2 testing window is January–February 2027. These three events are concurrent and compounding. Once the CAS records are converted and the task force report locks in the GAAP framework, the Covered Records are permanently destroyed at both the data and policy levels.

## II. BACKGROUND

9. Plaintiff is a non-party inventor who asserted a claim of inventorship under 35 U.S.C. § 256 and who is a Movant-Appellant/Petitioner in the Federal Circuit, Appeal No. 26-1721.

10. On July 14, 2026, Plaintiff served a Formal Objection and Compulsory Notice on the Majority and Minority Counsel of the Senate Select Committee on Intelligence, identifying Defendant Clayton's structural conflicts across his SEC (2017–2020), Apollo Global Management (2021–2025), and SDNY (2025–2026) tenures, and requesting oversight review of the Intelligence Community's handling of the factual record in *CAFC No. 26-1721*. (Exhibit I.) The Senate confirmed Defendant Clayton as DNI on August 3, 2026, over that objection.

11. On October 2, 2026, Defendant Clayton was announced as the lead of the presidential "Super Intelligence Force" AI task force, with a 120-day mandate to assess federal AI oversight and recommend a regulatory framework for DoD AI programs, including Project ARIA (the Army's adopted framework deploying Plaintiff's proprietary signal processing and AI architecture), Project EagleEye, and the broader SBMC program. (Exhibit J.) Meta executive Andrew Bosworth and the Innovation Corps had actual notice of the appropriation as early as March 2021, and formal DOD/IC notices were served in 2020 and 2021 before and after deployment. Crucially, federal officials attempted to warn Plaintiff before the physical battery, forced movement, surveillance infrastructure, and property seizures began—proving that the violence and seizures escalated only after those whistleblower warnings.

12. The technology at issue in *CAFC No. 26-1721* is incorporated into DoD programs within the operational scope of Intelligence Community programs under Defendant Clayton's DNI jurisdiction, including US ARMY Project ARIA (launched March 5, 2026), Project EagleEye, and the SBMC program.

13. The CAS cost-segregation records for the eight Covered Contracts are the only records capable of isolating proceeds attributable to Plaintiff's specific patented technology within the multi-component SBMC system and of confirming at the contract level through labor-hour tracing that the work was performed by Plaintiff. GAAP consolidated reporting buries component-level costs in the overall system cost, rendering it impossible to determine what share of contract value is attributable to the patented technology versus other components, or to identify the individual who performed the work. Crucially, destroying or converting these cost-segregation records destroys the precise evidentiary tool needed to prove sole inventorship and

unmask who received public funds for appropriated technology, directly shielding the infringing parties from fraud and misappropriation liability.

14. The technical forensic files, financial and trading records, digital accounts, academic and travel logs, lodging communication records from properties used in the surveillance and trafficking infrastructure, and the CAFC appellate record (including Documents 19 and 47) are not merely abstract administrative files—they constitute the physical and digital footprint of the surveillance, forced movement, and property seizures deployed against Plaintiff. This evidentiary corpus documents how academic portals and digital nodes were hacked and exploited to monitor and isolate Plaintiff, running concurrent with official warnings issued by federal officials before the physical battery and asset seizures began. If classified or placed under a Special Access Program (SAP) by Defendant Clayton, these records would be completely ripped from the jurisdiction of the courts in which they are pending, burying the proof of the underlying theft, tracking, and civil rights violations under an impenetrable wall of secrecy where standard civil discovery and judicial oversight cannot reach.

## III. LEGAL STANDARD

15. A party seeking a temporary restraining order or preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)*.

*16.* Where the United States is the opposing party, the last two factors merge. *Nken v. Holder, 556 U.S. 418, 435 (2009).*

17. The purpose of interim relief is to preserve the relative positions of the parties until the merits can be decided. *Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).*

## IV. ARGUMENT

### A. Plaintiff Is Likely to Succeed on the Merits.

#### 1. Plaintiff has standing.

18. Standing requires an injury in fact, fairly traceable to the challenged action, that a favorable decision is likely to redress. *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).*

19. Plaintiff's injury is the loss of the Covered Records needed to (i) enforce the constructive trust and escrow framework Plaintiff moved for in the Federal Circuit (Doc. 19, No. 26-1721), (ii) calculate "reasonable and entire compensation" in Plaintiff's anticipated action in the United States Court of Federal Claims under 28 U.S.C. § 1498, (iii) establish proceeds attributable to the technology in Plaintiff's anticipated civil enforcement action under the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1595, and RICO, and (iv) prosecute the technical forensic files as evidence in the D. Mass. and CAFC proceedings.

20. That loss would result directly from classification or SAP designation of the Covered Records by Defendant Clayton, and an order preserving those records would redress it.

#### 2. Defendant Clayton had actual notice before confirmation.

21. Plaintiff's Formal Objection to the SSCI (Exhibit I), dated July 14, 2026, identified Defendant Clayton's structural conflicts and requested oversight review. The Senate confirmed him on August 3, 2026, over that objection. He assumed office with actual notice of the pending proceedings and of the records at issue.

**3. The DNI classification authority is not plenary over records in pending litigation.**

22. *United States v. Reynolds, 345 U.S. 1 (1953)*, requires a specific, reasoned determination that disclosure would "dangerously and harmfully" affect national security. A blanket designation of all records touching a program that has any IC component — without a case-by-case determination of harm — does not satisfy Reynolds.

23. A DNI determination that classifies records in a pending civil action without a specific, case-by-case determination of harm is arbitrary and capricious under 5 U.S.C. § 706(2)(A). The obvious, unconsidered consequence of classifying the Covered Records is that the pending proceedings in this Court, the D. Mass., and the CAFC become moot — which is not a "national security" consequence but a litigation outcome.

**4. The AI task force report creates a policy-level threat to the same records.**

24. The 120-day "Super Intelligence Force" task force report (due approximately January 2027) will recommend a federal AI oversight framework. If it endorses GAAP as the default accounting framework for DoD AI programs, the CAS cost-segregation records will be permanently displaced at the policy level. The SBMC Phase 2 testing window (January–February 2027) overlaps with the report deadline. If the records are converted on October 14 and the report lands in January, the GAAP framework is locked in by a presidential task force recommendation that no district court injunction can unwind.

**B. Plaintiff Will Suffer Irreparable Harm Without Relief.**

25. Irreparable harm must be "certain and great," "actual and not theoretical," and imminent. *Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)*.

26. A classification determination is not reversible in the same way as a civil evidentiary order. Once a record is classified and placed under a SAP, the only mechanism for its release is administrative declassification review under 50 U.S.C. § 3594 — a process that can take years and is not subject to judicial deadline enforcement. No subsequent discovery order or court order can compel declassification on a 10-day timeline.

27. The harm is compounding and irreversible. The Feinberg memorandum forces the conversion of CAS cost-segregation data, destroying the financial audit trail that tracks who got paid, how much they were paid, and which entities profited from the appropriated technology. Concurrently, the Clayton task force report locks in the GAAP framework at the policy level, and the Phase 2 testing generates new data under GAAP only. If these records are altered, converted, or classified, Plaintiff is stripped of the foundational evidence required to prove ongoing infringement, corporate fraud, and sole inventorship under 35 U.S.C. § 256.

28. The loss of the broader evidentiary corpus—including the forensic files, financial and trading records, digital accounts, travel/work logs, and academic tracking nodes—is not merely an administrative inconvenience; it is the total occlusion of judicial oversight. Once classified or placed under a SAP, those records are inaccessible to the courts, rendering it impossible to establish who committed fraud or who is profiting from the underlying technology. Administrative declassification under 50 U.S.C. § 3594 is an illusory remedy that cannot replace active civil discovery, leaving the wrongdoers completely shielded by executive secrecy.

**C. The Balance of Equities and the Public Interest Favor Preservation.**

29. The requested relief is narrow. It does not require declassification. It does not require disclosure. It requires only that Defendant Clayton not newly classify, SAP-designate, or

remove from judicial reach the identified records pending the Court's ruling. All existing classifications remain in effect.

30. The public has a strong interest in agencies acting within the authority Congress conferred, and in preserving the evidence that courts require to adjudicate pending disputes. A DNI who classifies the records in a pending case to render that case moot is not protecting national security. He is protecting the parties whose conduct is at issue.

31. Defendant Clayton maintains personal financial interests in Apollo Global Management, the entity whose acquisition of Evernote is alleged in the CAFC record to have been the mechanism for transferring Plaintiff's code. This personal interest is disclosed in his OGE financial disclosure and is not divested by his official capacity as DNI.

**D. The Court Should Enter the Proposed Order or, Alternatively, a Preservation-Only Order.**

32. The proposed order states its terms specifically and describes the restrained acts, as Rule 65(d)(1) requires.

33. The order binds Defendant Clayton, his officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with him who receive actual notice. Fed. R. Civ. P. 65(d)(2).

34. If the Court declines the broader relief requested, Plaintiff requests in the alternative an order that Defendant Clayton preserve, and not direct or permit the classification, SAP designation, or removal from judicial reach of, the Covered Records pending further order of this Court.

### E. Security Under Rule 65(c) and Expedited Hearing

35. Rule 65(c) permits the Court to set security "in an amount that the court considers proper."

36. Because the requested relief requires no declassification, no disclosure, and no new work beyond refraining from a classification action, Plaintiff requests that security be set at a nominal amount or waived.

37. Plaintiff further requests that the Court set the preliminary-injunction hearing on an expedited schedule under LCvR 65.1, before the October 14, 2026 CAS conversion deadline, and that any temporary restraining order remain in effect for the period permitted by Rule 65(b)(2) unless extended for good cause.

## V. CONCLUSION

38. Plaintiff respectfully requests that the Court grant this motion and enter the attached proposed order.

## CERTIFICATE REGARDING NOTICE

Pursuant to LCvR 65.1(a), Plaintiff certifies as follows:

1. No counsel of record has appeared for Defendant Clayton in this action.

2. Plaintiff has not served Defendant Clayton with this motion because the Amended Complaint adding him as a defendant is being filed concurrently, and service of process has not yet been effected.

3. Plaintiff requests that the Court issue a temporary restraining order without prior notice to Defendant Clayton under Fed. R. Civ. P. 65(b)(1)(A) because:

(a) The 30-day CAS conversion deadline expires on or about October 14, 2026;

(b) The harm — removal of records from judicial reach via classification — is irreversible on the timeline of the pending proceedings;

(c) There is no adequate remedy at law for records removed from judicial reach by classification;

(d) Prior notice would permit Defendant Clayton to complete the classification before a hearing could be held.

4. Plaintiff will serve Defendant Clayton with this motion and the Amended Complaint immediately upon issuance and service by the court.

October 5, 2026

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com