## SUMMARY MATRIX: CLAYTON INSTITUTIONAL FOOTPRINT

| Contested Asset / Tracking Venue | Primary Corporate/Agency Mechanism | Overlooked Clayton Footprint | Court Docket Impact |
|---|---|---|---|
| **Bending Spoons / Evernote Repository** | Allen & Company underwriting matrix and Form D exempt offerings. | Board seat at Apollo Global Management, tied directly to the August 4 Senate Finance Report on technology sheltering. | Implicates Clayton in the capital chain moving the asset prior to the Nasdaq IPO. |
| **SBMC Tactical Display Hardware** | Kopin Corporation $15.4M IBAS milestone and share repurchase. | Chief SDNY Federal Prosecutor governing Wall Street corporate disclosure compliance. | Establishes absolute overlap regarding past regulatory oversight of the tech procurement pipeline. |
| **Automated GAAP Records Conversion** | Feinberg Memo API extractions and automated AI Classification Pilot. | White House AI Czar commanding the intelligence task force alongside the Pentagon CTO. | Places Clayton in direct command of the agency personnel and software executing the data model changes. |

## COMPREHENSIVE CITATION INDEX FOR CASE REPORT SUPPLEMENTS

- **Federal Docket Anchor (APA / D.D.C.):** *Daitona Carter v. Stephen A. Feinberg, Pete Hegseth, and Walter Jay Clayton*, No. 1:26-cv-03318-APM (U.S. District Court for the District of Columbia).
- **Federal Docket Anchor (CAFC):** *Solos Technology Ltd. v. Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., EssilorLuxottica, USA, LLC* (Daitona Carter, Movant-Appellant), Appeal No. 26-1721 (U.S. Court of Appeals for the Federal Circuit).

- **Material Accounting Mechanism:** SEC Rule 13h-1 (Large Trader Reporting Requirements) governing high-frequency algorithmic asset tracking systems.
- **Material Defense Contract Metrics:** Department of Defense Industrial Base Analysis and Sustainment (IBAS) manufacturing milestones (July 14, 2026) paired with the Soldier Borne Mission Command (SBMC) Phase 2 prototype delivery slate (January/February 2027).

10/13/2026

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

**ATTACHMENT INDEX**

- **Attachment 1:** Supplemental Memorandum of Points and Authorities *(Main Filing Text)*
- **Attachment 2:** Slip Sheet & Index Reference — The September 14, 2026, Feinberg Memorandum *(Already filed in Main Complaint)*
- **Attachment 3:** Slip Sheet & Index Reference — Senate Committee on Finance Investigative Report and the Reply Brief for Movant-Appellant Daitona Carter *Solos Technology Ltd. v. Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., EssilorLuxottica, USA, LLC* (Daitona Carter, Movant-Appellant), Appeal No. 26-1721 (U.S. Court of Appeals for the Federal Circuit).(August 4, 2026, August 20, 2026) *(CAFC ECF Doc. 41, Exhibit L and Doc. 42)*

- **Attachment 4:** Slip Sheet & Index Reference — Executive Appointment Notice (October 7, 2026) *(Public Docket / DNI & AI Czar Appointment)*
- **Attachment 5:** Slip Sheet & Index Reference — Kopin Corporation / IBAS Defense Milestone Documentation *(CAFC ECF Doc. 41 Exhibit Index)*
- **Attachment 6:** Slip Sheet & Index Reference — Alpaca Crypto Security & Custody Platform Disclosure *(Alpaca Disclosure Library / Fireblocks MPC-CMP Custody Integration)*
- **Attachment 7:** Slip Sheet & Index Reference — NIST Distributed Ledger Technology & Federal Tokenization Frameworks *(NISTIR 8202 Federal Asset-Tagging Reference)*

**ATTACHMENT 2**

*(Slip Sheet)*

**ATTACHMENT 2 DESCRIPTION:**

**The September 14, 2026, Feinberg Memorandum**

*(Core Department of Defense administrative directive ordering the unilateral 30-day transition from Cost Accounting Standards [CAS] to GAAP across Covered Contracts)*

**SOURCE / REFERENCE:**

Already incorporated into Main Complaint (D.D.C. Case No. 1:26-cv-03318-APM)

**ATTACHMENT 3**

*(Slip Sheet)*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**Case No. 1:26-cv-03318-APM**

**ATTACHMENT 3 DESCRIPTION:**

**Senate Committee on Finance Investigative Report Excerpt (August 4, 2026)**

**Reply Brief for Movant-Appellant (August 20, 2026)**

*(Documents Apollo Global Management-linked capital channels utilized for private equity and technology-sheltering structures)*

**SOURCE / REFERENCE:**

CAFC ECF Doc. 41, Exhibit L and Doc. 42)

**No. 2026-1721**

---

# United States Court of Appeals for the Federal Circuit

---

SOLOS TECHNOLOGY LTD.,

*Plaintiff-Appellee*,

v.

META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, OAKLEY, INC., LUXOTTICA OF AMERICA, INC., ESSILORLUXOTTICA, USA, LLC,

*Defendants*,

DAITONA CARTER,

*Movant-Appellant*.

---

Appeal from the United States District Court for the District of Masschusetts
in 1:26cv–1034–ADB
Judge Allison D. Burroughs

---

## CORRECTED MOTION FOR JUDICIAL NOTICE AND TO SUPPLEMENT THE RECORD

---

August 19, 2026

**DAITONA CARTER**
*Movant-Appellant Pro Se*
2 Massachusetts Ave NE
General Delivery, Main
Post Office
Washington, DC 20002
legal@daitonacarter.com

Pursuant to Federal Rule of Evidence 201, Federal Rule of Appellate Procedure 27, and this Court's inherent supervisory authority over the integrity of its judicial proceedings, Movant-Appellant Daitona Carter ("Carter") respectfully moves this Court to take judicial notice of—and supplement the appellate record with—subsequent public records, administrative filings, and parallel tribunal proceedings that have occurred since the filing of the initial notice of appeal.

These post-judgment developments directly implicate the core jurisdictional issues, standing, equitable estoppel, and the multi-forum closed loop maintained by Appellees. In support thereof, Movant states as follows:

## I. INTRODUCTION AND GROUNDS FOR RELIEF

1. **The Need to Prevent Judicial Miscarriage:** While this appeal has been pending to review the district court's summary text-order denials of intervention under Federal Rule of Civil Procedure 24(a)(2), a synchronized sequence of corporate restructurings, multi-forum patent challenges, and executive agency filings has unfolded between June and August 2026.
2. **Post-Judgment Judicial Notice:** Under Federal Rule of Evidence 201(b), a federal appellate court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, including official government agency records (such as USPTO/PTAB dockets, SEC filings, and Department of Defense procurement releases).

3. **Relevance to Current Appeal:** These subsequent records are not introduced to re-litigate the merits below, but to expose the ongoing administrative contradictions and the breach of the duty of candor highlighted in the Reply Brief—specifically demonstrating how Appellees are utilizing the PTAB and corporate restructurings to "wash" title while blocking Movant's participation across every available forum.

## II. CHRONOLOGICAL INDEX OF SUBSEQUENT PUBLIC & ADMINISTRATIVE EVENTS

Movant respectfully requests that this Court take official notice of the following verifiable timeline of events occurring between June and August 2026:

- **June 8, 2026:** Exactly one month following the closure of lower court proceedings on May 8, Bending Spoons S.p.A. initiates its public market positioning by filing its Form F-1 registration statement with the U.S. Securities and Exchange Commission (SEC) relating to its proposed initial public offering. This 2026 market transition directly operationalizes an unbroken capital track tracing back to the entity's **December 29, 2023, SEC Form D filing**, which finalized a $30,373,394 exempt equity offering managed exclusively by Meta's primary investment banking advisor, **Allen & Company LLC**, as the designated sales commission recipient.
- **July 6–11, 2026 (Sun Valley Strategic Briefings & Interlocking Board Oversight):** At the closed-door Allen & Company Sun Valley Conference, senior executives from Meta, EssilorLuxottica, and Bending Spoons S.p.A.

convene parallel to Bending Spoons' Wall Street debut. SEC regulatory disclosures from this window establish that Allen & Company—the primary investment bank underwriter for Bending Spoons' July 1 IPO, the broker-dealer for its historical **December 2023 Form D financing**, and lead advisor to Meta—maintains interlocking structural control over the transferred architectures via an Allen & Company Managing Director who actively holds a seat on the Board of Directors of Bending Spoons S.p.A. This advisory matrix operates under Meta's restructured executive leadership, which includes President and Vice Chairman Dina Powell McCormick, an elite corporate and former national security strategist positioned at the head of Meta's artificial intelligence and hardware portfolios concurrent with the active tracking of Movant's military-grade prototypes and defense industrial base infrastructure.

- **June 18, 2026 (Commencement of Parallel IPR Track):** Corporate defendants Meta Platforms, Inc. and Luxottica Retail North America Inc. (erroneously sued as Luxottica America) initiate their administrative assault by filing an initial Inter Partes Review (IPR) petition before the Patent Trial and Appeal Board (PTAB), attempting to execute an executive-forum end-run around active judicial review:
    - **Case No. IPR2026-00376:** Launched jointly by Luxottica and Meta Platforms, Inc., targeting U.S. Patent No. 12,216,339.
- **June 18, 2026:** Solos's sister spin-off entity (established post-Evernote acquisition) repurchases $18 million in shares from Kopin Corporation,

Case: 26-1821 Document: 41 Page: 5 Filed: 08/19/2026

securing structural control over the precise display hardware and micro-display architecture utilized in the disputed smart-glasses technology.

- **June 30, 2026 (Eight Days Post-Movant's Opening Brief Deadline):** The SEC declares Bending Spoons S.p.A.'s registration statement effective, formalizing the corporate restructuring and asset positioning while the entity maintains exclusive control over the stolen proprietary work product and business records housed within the Evernote application.
- **July 1, 2026:** Bending Spoons S.p.A. officially completes its initial public offering and begins trading on the Nasdaq Global Select Market under the ticker symbol **BSP**, maintaining continuous custody, possession, and control of the material electronic evidence subject to Movant's pending protective order request.
- **July 6–11, 2026 (Sun Valley Strategic Briefings & Interlocking Board Oversight):** At the closed-door Allen & Company Sun Valley Conference, senior executives from Meta, EssilorLuxottica, and Bending Spoons S.p.A. convene parallel to Bending Spoons' Wall Street debut. SEC regulatory disclosures from this window establish that Allen & Company—the primary investment bank underwriter for Bending Spoons' July 1 IPO and lead advisor to Meta—maintains interlocking structural control over the transferred architectures via an Allen & Company Managing Director who actively holds a seat on the Board of Directors of Bending Spoons S.p.A. This advisory matrix operates under Meta's restructured executive leadership, which includes President and Vice Chairman Dina Powell

McCormick, an elite corporate and former national security strategist positioned at the head of Meta's artificial intelligence and hardware portfolios concurrent with the active tracking of Movant's military-grade prototypes and defense industrial base infrastructure.

- **July 7, 2026 (Parallel Proceeding Identification):** Formal identification and tracking of parallel administrative activities concerning the patents-in-suit, highlighting conflicting, irreconcilable representations made by Appellees across separate tribunals.
- **July 14, 2026 (DOD Contract & IBAS Milestones):** Kopin Corporation (NASDAQ: KOPN) officially announces the clearance of three critical manufacturing milestones under the Department of Defense's Industrial Base Analysis and Sustainment (IBAS) initiative—exceeding 150,000 nits of brightness and advancing the Soldier Borne Mission Command (SBMC) tactical headset integration tied directly to the disputed smart-glasses architecture.
- **July 18, 2026 (Admitted Corporate Nexus to Defendants):** Public corporate disclosures verified via the official professional record of Raoul Baccanelli, Global Partnerships Director at Bending Spoons S.p.A., establish a direct commercial and technical nexus between the newly public entity and corporate defendants Meta and Luxottica. The disclosure explicitly documents Bending Spoons' active role in developing media formats and interactive user-interface architectures for Ray-Ban's (Luxottica/Meta) latest collection—authenticating the immediate, cross-proxy commercial

deployment of the disputed technology during the active pendency of this appeal.

- **July 20, 2026 (Related-Proceeding Filing Attempt):** Movant attempts to file notices and disclosures in parallel PTAB Case No. IPR2026-00376 to formally notify the Board of active Federal Circuit appeal proceedings and the attendant breach of 37 C.F.R. § 42.11, testing the boundaries of non-party standing.
- **July 30, 2026 (Appellee Response Fixed):** Appellee Solos finalizes its appellate merits position, maintaining its boilerplate assertion of a "factual void" while actively concealing the true breadth of its concurrent administrative and corporate maneuvers.
- **August 1, 2026 (Statutory FOIA Expedited Processing & Status Inquiry):** Submission of formal expedited Freedom of Information Act (FOIA) requests and subsequent 10-day status inquiries to the U.S. Army Materiel Command (AMC) and the Defense Logistics Agency (DLA) under 5 U.S.C. § 552 and 32 C.F.R. § 286.8. These requests target DFARS 252.227-7017 Technical Data Rights Assertions and contract signature blocks linked to the EagleEye and Soldier Borne Mission Command (SBMC) programs, establishing an administrative record of active efforts to secure underlying defense procurement documentation required to protect Movant's due process rights in CAFC Appeal No. 2026-1721.
- **August 3, 2026 (Director Petition):** A USPTO Director-level oversight petition is formally invoked to challenge administrative gatekeeping and

examine the systemic exclusion of senior priority inventors from inter partes review proceedings.

- **August 4, 2026:** Release of the United States Senate Committee on Finance investigative report (led by Senator Ron Wyden) exposing systemic institutional blind spots, opaque capital transfers, and corporate money-laundering pathways utilized by major financial institutions and private equity networks—including Apollo Global Management-linked channels—to obscure asset origins and shelter transferred technologies. This administrative and financial record directly parallels the methods used to extract, insulate, and relocate Movant's intellectual property and digital evidence across corporate proxies (including Yahoo, AOL, Evernote/Bending Spoons architectures, and Meetup.com infrastructure).
- **August 7, 2026 (Multiplication of IPRs):** Administrative invalidity challenges formally multiply across the PTAB docket, demonstrating that corporate defendants Meta and Luxottica are aggressively deploying a multi-front assault on patent validity in an executive forum while Appellee Solos seeks to clear title in court. This calculated multiplication incorporates the following concurrent administrative proceedings:
    - Case No. IPR2026-00412: Launched symmetrically by Luxottica of America Inc., et al., targeting U.S. Patent No. 11,082,055.
    - Case No. IPR2026-00420: Launched symmetrically by Meta Platforms, Inc., et al, targeting the identical U.S. Patent No. 11,082,055.

- **August 12, 2026 (Institutional Underwriter and Compliance Council Matrix):** Public corporate department disclosures and professional records published by Paul Hastings LLP (New York) verify an established, systemic transactional relationship with underwriter gatekeeper Allen & Company LLC. The firm's documented history executing major debt offerings, capital restructuring, and SEC compliance pipelines mirrors the exact structural machinery deployed to transition Bending Spoons S.p.A. into public markets while parallel patent disputes multiply. This record establishes that the primary legal actors executing administrative tracks before the PTAB and the banking advisors financing the successor entities operate within an interlocking, highly coordinated corporate network.
- **August 13, 2026 (Emergency USPTO Director Amended Supplemental Filing):** Following a 10:29 AM EST administrative update by the PTAB Trial Division re-routing Movant’s August 3 Director-level petition down to an internal Board review under 37 C.F.R. § 41.3(a), Movant submits an Emergency Amended Supplemental Submission to the USPTO Director pursuant to 37 C.F.R. § 1.181. This filing exposes an un-deadlined administrative vacuum and requests the immediate invocation of absolute supervisory authority under *United States v. Arthrex, Inc.* to issue a compulsory blanket stay over all three active dockets (IPR2026-00376, IPR2026-00412, and IPR2026-00420), halting an ongoing fraud involving the concealment of active title litigation in CAFC Appeal No. 26-1721.

- **August 13, 2026 (Mandamus and Emergency Appearance Filings):** Filing of emergency mandamus actions, entry of appearance demands, and stay/termination requests seeking to compel judicial recognition of Movant's constitutional and statutory rights under 35 U.S.C. § 256.

## III. LEGAL STANDARD FOR JUDICIAL NOTICE ON APPEAL

Appellate courts routinely take judicial notice of public records, judicial dockets, and administrative filings from sister tribunals or executive agencies when those documents are relevant to matters of standing, mootness, bad faith, or judicial integrity. *See United States v. Berrojo*, 628 F.2d 368, 369 (5th Cir. 1980); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (noting federal courts may take notice of proceedings in other courts if those proceedings have a direct relation to the matters at issue).

Furthermore, under the Supreme Court's mandate in *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806 (1945), when the integrity of the judicial process is compromised by parties using court machinery to effectuate un-adversarial or unclean title cleanups, appellate tribunals possess inherent equitable power to inspect the broader administrative and public record.

## IV. CONCLUSION

For the foregoing reasons, Movant-Appellant Daitona Carter respectfully requests that this Court grant this motion, take judicial notice of the aforementioned post-judgment administrative and public records, and incorporate

these foundational references into the record in aid of a comprehensive, equitable review of the district court's denial of mandatory intervention.

## V. PRAYER FOR RELIEF

**WHEREFORE**, Movant-Appellant Daitona Carter respectfully requests that this Court enter an Order:

1. **Granting** this Motion for Judicial Notice pursuant to Federal Rule of Evidence 201, taking official notice of the post-judgment public, corporate, SEC, and administrative tribunal records detailed herein;
2. **Supplementing** the appellate record in CAFC Appeal No. 26-1721 with the enumerated chronological index of subsequent proceedings and corporate restructurings occurring between June and August 2026;
3. **Recognizing** the active multi-forum coordination, parallel Patent Trial and Appeal Board (PTAB) proceedings (IPR2026-00376, IPR2026-00412, and IPR2026-00420), and executive agency developments as they bear directly upon the questions of standing, equitable estoppel, judicial integrity, and the prevention of an ongoing miscarriage of justice; and
4. **Granting** such other and further relief as this Court deems just, equitable, and proper under its inherent supervisory authority.

Dated: August 19, 2026

Respectfully submitted,
/s/ Daitona Carter
**Daitona Carter**
Movant-Appellant *Pro Se*
legal@daitonacarter.com

Case: 26-1721 Document: 41 Page: 12 Filed: 08/19/2026

# MOVANT'S INDEX OF EXHIBITS

- **Exhibit A (Excerpts):** Bending Spoons S.p.A. Form F-1 SEC Registration Statement (Filed June 8, 2026). Includes Cover Page, Table of Contents, and Corporate Restructuring Summary excerpts. Full text available via SEC EDGAR.
- **Exhibit B (Excerpts):** PTAB Case No. IPR2026-00376, Inter Partes Review Petition filed jointly by Luxottica of America Inc. and Meta Platforms, Inc. (June 18, 2026). Includes electronic filing stamp, caption page, and Mandatory Disclosures section.
- **Exhibit C:** Corporate Transaction Record / Public Announcement documenting Solos's sister spin-off's $18 Million share repurchase from Kopin Corporation (June 18, 2026).
- **Exhibit D:** SEC Notice of Effectiveness, declaring Bending Spoons S.p.A.'s registration statement effective (June 30, 2026).
- **Exhibit E:** Nasdaq Public Market Listing Confirmation for Bending Spoons S.p.A. under ticker symbol BSP (July 1, 2026).
- **Exhibit F:** Certified Record Tracking parallel administrative activities concerning the patents-in-suit (July 7, 2026).
- **Exhibit G:** Kopin Corporation Official Press Release regarding DOD Contract & IBAS manufacturing milestones (July 14, 2026).
- **Exhibit H:** Movant's Attempted / Rejected Notice of Related Proceedings and Disclosures in PTAB Case No. IPR2026-00376 (July 20, 2026).

- **Exhibit I (Excerpts):** Appellee Solos's Appellate Merits Brief filed in CAFC Appeal No. 2026-1721 (July 30, 2026). Includes Cover, Factual Summary, and Signature blocks.
- **Exhibit J:** Expedited FOIA Requests and 10-Day Status Inquiries submitted to the U.S. Army Materiel Command (AMC) and Defense Logistics Agency (DLA) (August 1, 2026).
- **Exhibit K:** Movant's USPTO Director-Level Petition for Supervisory Review under 37 C.F.R. § 1.181 (August 3, 2026).
- **Exhibit L (Excerpts):** United States Senate Committee on Finance Investigative Report (Led by Senator Ron Wyden) regarding corporate asset insulation and capital transfers (August 4, 2026). Includes Cover Page, Executive Summary, and specific pages detailing opaque financial pathways. Full text available publicly at: senate.gov
- **Exhibit M (Excerpts):** PTAB Case No. IPR2026-00412 and Case No. IPR2026-00420 Parallel Symmetrical Inter Partes Review Petitions filed by Luxottica and Meta (August 7, 2026). Includes official PTAB electronic filing stamps, caption pages, and the parallel Mandatory Disclosures sections.
- **Exhibit N:** Movant's Emergency Amended Supplemental Statement to the USPTO Director under 37 C.F.R. § 1.181 (August 13, 2026).
- **Exhibit O (Excerpts):** Emergency Mandamus Actions, Entry of Appearance Demands, and Stay/Termination Requests seeking to compel judicial recognition of Movant's constitutional and statutory rights under 35

U.S.C. § 256 (August 13, 2026). Includes official filing captions, signature blocks, and targeted text fragments establishing the active emergency record.

- **Exhibit P:** Certified Public Record and Screenshot of Official Professional Discourse from Raoul Baccanelli, Global Partnerships Director at Bending Spoons S.p.A. (July 2026), documenting direct technical and commercial integration with Defendant Luxottica's Ray-Ban product architecture.
- **Exhibit Q:** Official Corporate Disclosure and Executive Announcement, Meta Platforms, Inc. (January 12, 2026), documenting the appointment and strategic role of President and Vice Chairman Dina Powell McCormick.
- **Exhibit R (Excerpts):** SEC Form D Notice of Exempt Offering of Securities (Dated December 29, 2023), confirming Bending Spoons' initial $30.3 Million equity track and $3.75 Million sales commission pipeline to Allen & Company LLC, paired with June/July 2026 SEC F-1 underwriting disclosures and interlocking board configurations.
- **Exhibit S (Excerpts):** Official Corporate Department Professional Records and Transactional Portfolios, Paul Hastings LLP (New York), documenting an established Underwriter-to-Underwriter's Counsel structural relationship and shared capital execution pipeline with underwriter gatekeeper Allen & Company LLC.

**EXHIBIT A**

BENDING SPOONS S.P.A. FORM F-1 SEC REGISTRATION STATEMENT

(FILED JUNE 8, 2026)

[EXCERPTS]

F-1 1 tm2613674-7_f1.htm F-1

TABLE OF CONTENTS

**As filed with the Securities and Exchange Commission on June 8, 2026.**

**Registration No. 333-**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM F-1

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

## Bending Spoons S.p.A.

(Exact Name of Registrant as Specified in its Charter)

**Not Applicable**
(Translation of Registrant's Name into English)

| **Republic of Italy** | **7370** | **Not Applicable** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**Via Nino Bonnet 10**
**20154 Milan**
**Italy**
**+39 02 81284093**
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

**Bending Spoons US Inc.**
**c/o Corporate Creations Network Inc.**
**1521 Concord Pike, Suite 201**
**Wilmington, DE 19803**
**United States of America**
**+1 (866) 761-1444**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| **Jeffrey H. Lawlis**<br>**Ian D. Schuman**<br>**M. Ryan Benedict**<br>**Jennifer M. Gascoyne**<br>**Latham & Watkins (London) LLP**<br>**99 Bishopsgate**<br>**London EC2M 3XF**<br>**United Kingdom**<br>**Tel: +44.20.7710.1000** | **Rod Miller**<br>**David Dixter**<br>**Milbank LLP**<br>**55 Hudson Yards**<br>**New York, NY 10001**<br>**United States of America**<br>**+1 (212) 530-5000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933. Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the U.S. Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine**.

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

TABLE OF CONTENTS

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities, and neither we nor the Selling Shareholders are soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**(Subject to Completion) Dated , 2026**

**PRELIMINARY PROSPECTUS**

**ordinary shares**

Bending Spoons

# Bending Spoons S.p.A.

## Ordinary shares

This is the initial public offering of Bending Spoons S.p.A. We are offering of our ordinary shares, with no par value, and certain of our existing shareholders (the "Selling Shareholders") are offering of our ordinary shares. We will not receive any proceeds from the sale of ordinary shares by the Selling Shareholders. Prior to this offering, there has been no public market for our ordinary shares. We currently expect the initial public offering price to be between $ and $ per ordinary share.

We have applied to list our ordinary shares on the Nasdaq Global Select Market ("Nasdaq") under the symbol "BSP."

Following the completion of this offering, we will have two classes of shares outstanding: ordinary shares and class A shares. Each ordinary share will be entitled to one vote per share and will not be convertible into any other shares. Each class A share will be entitled to five votes per share and will be convertible at any time into one ordinary share upon request of the holder. In addition, our class A shares will automatically convert into ordinary shares upon certain events. For additional information, see *Description of share capital and bylaws*. After giving effect to the sale of ordinary shares in this offering, Matteo Danieli, Luca Ferrari, Francesco Patarnello, and Luca Querella will beneficially own our class A shares and will be able to exercise % of the total voting power of our issued and outstanding share capital immediately following the completion of this offering (or approximately % if the underwriters' option to purchase additional ordinary shares is exercised in full).

**Investing in our ordinary shares involves risks. See *Risk factors* beginning on page 18.**

We are a "foreign private issuer" under applicable U.S. Securities and Exchange Commission rules and will be eligible for reduced public company disclosure requirements. See *Prospectus summary — Implications of being a "foreign private issuer."*

Price $ per ordinary share

| | Price to public | Underwriting discounts and commissions[1] | Proceeds, before expenses, to us | Proceeds, before expenses, to the Selling Shareholders |
|---|---|---|---|---|
| Per ordinary share | $ | $ | $ | $ |
| Total | $ | $ | $ | $ |

1 See *Underwriting (conflicts of interest)* for additional information regarding underwriting compensation.

To the extent that the underwriters sell more than ordinary shares, the underwriters have the option to purchase up to an additional ordinary shares from us and an additional ordinary shares from the Selling Shareholders, each at the initial public offering price, less underwriting discounts and commissions.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The underwriters expect to deliver the ordinary shares to purchasers against payment on , 2026.

*Global Leads and Joint Bookrunning Managers*

**Goldman Sachs International*** **J.P. Morgan*** **Allen & Company LLC**

*Joint Bookrunning Managers*

**Wells Fargo Securities** **BofA Securities** **Jefferies** **Evercore ISI**

**BNP PARIBAS** **Mizuho** **Societe Generale**

**Crédit Agricole CIB** **IMI — Intesa Sanpaolo** **UniCredit**

**Banca Akros — Gruppo Banco BPM**

**listed in alphabetical order*

Prospectus dated , 2026

TABLE OF CONTENTS

Bending Spoons

# Table of contents


| | |
|---|---|
| Letter from the team | ii |
| Selected definitions | vi |
| Presentation of financial information | vii |
| Note regarding forward-looking statements | ix |
| Prospectus summary | 1 |
| The offering | 12 |
| Summary consolidated financial data | 14 |
| Risk factors | 18 |
| Market and industry data | 61 |
| Use of proceeds | 62 |
| Dividend policy | 63 |
| Capitalization | 64 |
| Dilution | 65 |
| Management’s discussion and analysis of financial condition and results of operations | 67 |
| Business | 101 |
| Management | 132 |
| Unaudited pro forma condensed combined financial information | 140 |
| Principal and selling shareholders | 154 |
| Certain relationships and related party transactions | 156 |
| Description of share capital and bylaws | 159 |
| Shares eligible for future sale | 176 |
| Taxation | 178 |
| Underwriting (conflicts of interest) | 191 |
| Expenses of the offering | 198 |
| Legal matters | 199 |
| Experts | 200 |
| Enforcement of civil liabilities | 201 |
| Where you can find more information | 202 |
| Index to consolidated financial statements | F-1 |


For investors outside the U.S.: Neither we nor the Selling Shareholders nor the underwriters have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction, other than the U.S., where action for that purpose is required. Persons outside the U.S. who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the ordinary shares and the distribution of this prospectus outside the U.S.

Neither we nor the Selling Shareholders nor the underwriters have authorized anyone to provide you with any information or to make any representations other than those contained in this prospectus, in any amendment or supplement to this prospectus, or in any free writing prospectus we have prepared. Neither we nor the Selling Shareholders nor the underwriters take responsibility for any other information others may give you. Neither we nor the Selling Shareholders nor the underwriters can provide assurance as to the reliability of any such information. Neither we nor the Selling Shareholders nor the underwriters are making an offer to sell, or seeking offers to buy, these securities in any jurisdiction where the offer or sale is not permitted. The information contained in this prospectus is accurate only as of the date on the cover page of this prospectus, regardless of the time of delivery of this prospectus or the sale of ordinary shares. Our business, financial condition, results of operations, and prospects may have changed since the date on the cover page of this prospectus.

# Presentation of financial information

## Historical consolidated financial information

The historical consolidated financial statements, the summary historical consolidated financial data, and the other financial information included elsewhere in this prospectus have been prepared in U.S. dollars in accordance with GAAP. This historical financial information does not give effect to this offering. This prospectus includes our audited consolidated financial statements as of December 31, 2023, 2024, and 2025, and for the years ended December 31, 2023, 2024, and 2025, and our unaudited condensed consolidated financial statements as of March 31, 2026, and for the three months ended March 31, 2025 and 2026.

On November 24, 2025, we acquired Vimeo, Inc. This prospectus includes the audited financial statements of Vimeo, Inc. as of and for the years ended December 31, 2023 and 2024, and its condensed financial statements (unaudited) as of and for the nine months ended September 30, 2024 and 2025, both of which have been prepared in accordance with GAAP.

On January 2, 2026, we acquired AOL Holdco I LLC. This prospectus includes the audited combined financial statements as of and for the years ended December 31, 2024 and 2025, which are presented under the name of AOL Holdco II LLC. These combined financial statements have been prepared on a carve-out basis and reflect the underlying operating activities, financial position, and results of operations of the acquired business, including the entities and operations held by AOL Holdco I LLC and its subsidiaries. The financial statements therefore capture the full scope of the acquired business, notwithstanding the legal entity referenced in their title. These combined financial statements have been used as the basis for the pro forma financial information.

In addition to the significant acquisitions of AOL Holdco I LLC and Vimeo, Inc. described above, we have completed several other acquisitions in the periods presented. In 2023, we acquired Evernote Corporation. In 2024, we acquired Issuu, Inc., Community Matters Holdings, Inc. (then ultimate parent company of Meetup LLC), StreamYard Top Corp Inc. (then ultimate parent company of StreamYard, Inc.), The Creative Productivity Group B.V. (then ultimate parent company of Wetransfer B.V.), and certain assets from IAC Inc. In 2025, we acquired Brightcove Inc., Iridesco, LLC (doing business as Harvest), komoot GmbH, Loomly Holdco, Inc., and MileIQ Inc. In 2026, we acquired Eventbrite, Inc. and tractive GmbH. Due to the recent completion of the acquisition of tractive GmbH, which occurred on May 18, 2026, none of our operational statistics and financial information included in this prospectus include information from tractive GmbH.

The acquisitions completed during 2025 and 2026, other than the acquisitions of AOL Holdco I LLC and Vimeo, Inc. described above, whether taken into consideration individually or as a group of related businesses, are not “significant” for purposes of Rule 3-05 of Regulation S-X. Therefore, we are not required to, and have elected not to, provide separate historical financial information in this prospectus relating to these acquisitions.

The numerical figures (including financial information, totals, and percentages) presented in this prospectus have been rounded for ease of presentation, and totals and percentages have been calculated using the underlying figures prior to rounding. As a result, totals in tables or elsewhere may not equal the arithmetic sum of the rounded figures that precede them, and percentages may not correspond precisely to the rounded figures shown or add up to 100%.

Except where the context otherwise requires or where otherwise indicated, the information in this prospectus reflects the 1-for-2 reverse stock split approved by the shareholder meeting held on May 28, 2026, and effective on May 29, 2026, which was preceded by a 10-for-1 stock split approved by the shareholder meeting held on April 23, 2026, and effective on April 28, 2026.

## Unaudited pro forma condensed combined financial information

The unaudited pro forma condensed combined financial information includes the unaudited pro forma condensed combined income statement for the year ended December 31, 2025, and for the three months ended March 31, 2026, to illustrate the effect of each of the acquisitions of AOL Holdco I LLC, Eventbrite, Inc., and Vimeo, Inc., and certain financing agreements, as if

TABLE OF CONTENTS

# Prospectus summary

*This summary highlights information contained elsewhere in this prospectus and does not contain all information that may be important to an investor before deciding to invest in our ordinary shares. This prospectus should be read carefully in its entirety, including "Risk factors," "Management's discussion and analysis of financial condition and results of operations," and "Business," as well as our consolidated audited financial statements and the related notes included elsewhere in this prospectus.*

## Overview

Bending Spoons is built on the conviction that operational excellence enables efficient growth through acquisitions. We acquire digital businesses, implement deep transformations and ongoing optimizations to sustainably expand earnings, and reinvest in additional acquisitions, thereby continuing the compounding cycle. We have executed this Playbook for more than a decade and, to date, have not sold a material business. Our performance is driven by our Platform — comprising our people, proprietary technologies, and proprietary data — and reflects our intense focus on achieving exceptional talent density, cultural strength, and technical capabilities.

Below, we describe our three-step Playbook in greater detail:

- **Step 1 — Acquire.** We acquire a business whose core products are digital. We prioritize businesses that we believe we can improve significantly, that have large revenue bases, and whose trajectories we can forecast with reasonable confidence several years into the future, a process that involves factoring in the risk of disruption from advances in AI. Our evaluation is analytical and rigorous, and we are disciplined on price.
- **Step 2 — Transform and optimize.** We strive to envision the most successful version of the acquired business, and work to close the gap between its current state and that vision as quickly and completely as possible. The transformation is typically deep and entails reorganizing teams, overhauling technology, redesigning user interfaces, accelerating product development, and enhancing marketing and monetization. AI is often both a central component of our vision for the acquired business and a key tool in implementing the transformation. Through these efforts, we seek to increase revenue and reduce costs to drive a sustainable expansion in earnings. We then optimize the business as part of our broader portfolio on an ongoing basis.
- **Step 3 — Reinvest.** We reinvest our earnings, along with contributions from newly acquired and improved businesses and prudent levels of incremental debt, to fund additional acquisitions, thereby continuing the compounding cycle. We may also opportunistically raise incremental equity to accelerate growth.

Our people, proprietary technologies, and proprietary data constitute the Platform that supports our acquisitions, transformations, and ongoing optimizations. We have been building this Platform since our founding in 2013 and consider it our primary source of competitive advantage, one that we believe will continue to strengthen as we grow.

- **People.** We have a talent-dense team of Spooners[7] who embrace a culture emphasizing truth-seeking and extreme ownership — traits we consider critical drivers of business performance. In 2025, we received around 800,000 job applications to become a Spooner and, consistent with our focus on talent density, hired 286 individuals, representing less than 0.04% of applications received. We allocate Spooners flexibly across our portfolio, deploying resources to areas of opportunity and reducing them where appropriate. For example, we may assemble a task force to transform a newly acquired business, expand an engineering team to accelerate a product initiative, or scale back an organization by redeploying Spooners once a period of intensive change has concluded.
- **Proprietary technologies.** We have engineered, and continue to refine, numerous technologies that enable us to do more and better work with fewer resources. Examples include a data infrastructure, a user lifetime value predictor, and a product experimentation toolkit. Our technologies are purpose-built for our needs and are integrated with one another, making their deployment across acquired businesses easier and allowing them to deliver superior impact, more rapidly. As a result, most of our businesses adopt nearly all of our proprietary technologies. We began embedding AI within our

[7] We define "Spooners" as team members who have successfully completed the rigorous and selective application process to join our core team. Spooners are allocated flexibly across the organization and may be transferred between businesses on short notice. They are held to particularly demanding performance standards.

proprietary technologies in 2019 and continue to expand its use. As we harness AI's advances, we expect our proprietary technologies to become more effective in supporting the execution of our Playbook.

- **Proprietary data.** Across more than 50 acquisitions and subsequent operations, we have accumulated extensive data. Sources include our product experimentation toolkit (3,000 experiments run in 2025) and our data infrastructure (3.8 billion data points processed per day on average in Q1 2026). This data supports faster and more informed decision-making in both acquisitions and operations. As AI advances and our ability to leverage complex data at scale improves, the value of our data may increase.

Since our founding, we have endeavored to be at the cutting edge of relevant technology. AI is no exception: For years, we have been leveraging it to enhance products, optimize marketing and monetization, and improve productivity. Many of our proprietary technologies incorporate AI. Our team of Spooners includes hundreds of talented and motivated software engineers, data scientists, and AI research engineers. We estimate that the share of pull requests[8] authored or coauthored by AI increased from less than 10% in Q1 2025 to more than 90% by the end of Q1 2026, with around 70% authored by AI alone. Revenue per full-time equivalent Spooner[9] was $1.12 million in 2023, $1.64 million in 2024, $2.57 million in 2025, and $0.97 million in Q1 2026, with AI being one of the catalysts of productivity gains.

In our view, AI is the most transformative technology of our time, and companies that adapt effectively may realize enormous benefits. Supported by our Platform, Bending Spoons has an opportunity to be among these companies. We believe that, through progress in AI, we will expand our advantage in product development, marketing, and monetization capabilities. We also believe our productivity advantage will widen and the scalability of our acquisition and transformation model will improve. Finally, as many companies lack diversification and may not be well equipped to leverage AI, certain owners' willingness to sell could increase, contributing to lower valuation levels and more attractive acquisition targets.

The Platform-powered execution of our Playbook has delivered financial performance we regard as strong. Revenue reached $1.31 billion in 2025, with a compounded annual growth rate of 84% in 2023 through 2025. In the same year, operating income as a percentage of revenue was 21% and Adjusted Operating Income Margin[10] was 47%. In 2023 through 2025, the compounded annual growth rate was not meaningful for diluted earnings (loss) per share and was 82% for Adjusted Earnings per Share.[11]




We are still early in our journey. We see a significant opportunity to continue compounding capital at attractive rates of return within an addressable market that we estimate includes more than 1,000 businesses generating nearly $400 billion in aggregate annual revenue in 2025.

[8] A "pull request" is a formal proposal to add, modify, or remove code in a shared software repository. It allows other contributors to review, discuss, and approve the proposed changes before they are merged into the repository.

[9] "Revenue per full-time equivalent Spooner" for a given quarter is defined as the revenue for that quarter divided by the number of full-time equivalent Spooners at the end of the quarter. "Revenue per full-time equivalent Spooner" for a given twelve-month period is defined as the revenue for that period divided by the average number of full-time equivalent Spooners at the end of each quarter within that period.

[10] As defined in *Management's discussion and analysis of financial condition and results of operations — Non-GAAP financial measures — Adjusted Operating Income and Adjusted Operating Income Margin.*

[11] As defined in *Management's discussion and analysis of financial condition and results of operations — Non-GAAP financial measures — Adjusted Earnings per Share.*

**500+ million**
Monthly active users in March 2026

**9+ million**
Monthly paying customers in March 2026

Businesses generating similar levels of revenue can have significantly different numbers of monthly active users and monthly paying customers. For example, WeTransfer, which caters to professionals, small enterprises, and their audiences, had 58 million monthly active users and 1 million monthly paying customers in March 2026. By contrast, Brightcove, which focuses on large enterprises, had approximately 15,000 monthly active users and 1,700 monthly paying customers during the same period.

### Businesses

In Q1 2026, our main businesses were, in alphabetical order, AOL, Brightcove, Eventbrite, Evernote, Harvest, komoot, Remini, StreamYard, Vimeo, and WeTransfer. In aggregate, these businesses accounted for more than 80% of our revenue for the period.

Below, we describe each of these businesses:

- **AOL.** Acquired in January 2026, AOL operates an email service, news portal, and search engine catering to a consumer audience.
- **Brightcove.** Acquired in February 2025, Brightcove provides video hosting, management, and streaming solutions for enterprises.
- **Eventbrite.** Acquired in March 2026, Eventbrite delivers event creation, ticketing, and discovery services for organizers and attendees.
- **Evernote.** Acquired in January 2023, Evernote is a productivity suite that supports note-taking and knowledge management for individuals and teams.
- **Harvest.** Acquired in July 2025, Harvest offers time-tracking and invoicing software for freelancers and professional services firms.
- **Komoot.** Acquired in March 2025, komoot provides route planning and navigation tools supported by community-generated content for outdoor activities.
- **Remini.** Acquired in June 2021, Remini is a consumer-focused image and video enhancement and generation application.
- **StreamYard.** Acquired in April 2024, StreamYard provides video recording and multi-destination live-streaming tools for creators and businesses.
- **Vimeo.** Acquired in November 2025, Vimeo serves consumers and enterprises with video hosting, management, and streaming solutions.
- **WeTransfer.** Acquired in July 2024, WeTransfer enables digital file storage and distribution for individuals and businesses.

In May 2026, we completed the acquisition of Tractive, which delivers solutions for monitoring the location and health of pets. Given how recently the acquisition was completed, the data presented in this prospectus does not include Tractive.

We envision our portfolio expanding as we continue to execute our acquisition-driven strategy. Consequently, businesses that currently contribute significantly to our overall revenue may become less central over time, particularly as our acquisition targets tend to become progressively larger. The following chart illustrates how the relative contribution of businesses generating 100% of our revenue in Q1 2024 declined to 24% by Q1 2026 as we completed new acquisitions. This is despite the revenue from those businesses growing in absolute terms over the same period.

manual analysis to identify those with the potential to be attractive based on factors such as revenue scale, headquarters location, product offering, and revenue model.

Each of the identified businesses satisfies all of the following criteria:

- **Estimated annual revenue between $50 million and $5 billion.** As per our study, of the more than 1,000 identified businesses, 347 generated estimated annual revenue between $50 million and $100 million, 476 generated between $100 million and $500 million, 114 generated between $500 million and $1 billion, and 94 generated between $1 billion and $5 billion. While the selected revenue range reflects the scale of businesses we are currently prioritizing, we expect over time to pursue businesses with annual revenue exceeding $5 billion.
- **Headquarters located in Europe or North America.** 240 of the identified businesses are located in Europe and generated $77 billion in aggregate estimated annual revenue. 791 are located in North America and generated $315 billion in aggregate estimated annual revenue. Our geographic focus on Europe and North America reflects our greater familiarity with these regions, rather than limitations of our model.
- **A product offering and revenue model that our Platform is well suited to address today.** We excluded businesses generating a significant portion of their revenue from sources such as IT services, instead favoring businesses that rely on self-serve subscriptions, sales-led subscriptions, or advertising. Many of the identified businesses generate revenue from more than one of these sources.

## Risks

Our business is subject to numerous risks that an investor should consider before making an investment decision. These risks are more fully described elsewhere in this prospectus (in particular under *Risk factors*) and include, among others, the following:

- Our growth strategy includes acquisitions, which could be difficult to identify, pose integration challenges, divert leadership attention, require additional financing, and materially and adversely affect our business
- We may be unable to raise capital when needed or on acceptable terms
- We may not effectively identify, or selling parties may omit to disclose, material matters in connection with acquisitions
- Our business depends in part on our ability to develop and use AI effectively, and AI may expose us to risks
- We may be unable to attract, develop, or retain talent at the scale required by our business, labor costs may increase, and we may suffer workforce disruptions
- Our leadership team may depart at any time
- Our company culture has contributed to our success, and we may not be able to maintain this culture as we grow
- Reorganizations and restructurings may disrupt our operations and harm our reputation
- We may suffer damage to our reputation or brands, including the reputation of any of our products
- We are subject to direct investment and national security review regimes, including the Committee on Foreign Investment in the United States and the Italian Golden Power framework
- We are subject to complex and evolving consumer protection, subscription, advertising, and payments-related laws and industry requirements
- We are subject to antitrust and competition laws and regulatory regimes
- We are subject to complex and evolving privacy, data protection, cybersecurity, and other data laws
- We are subject to complex and evolving intermediary liability and content moderation laws and regulations
- We are subject to new and evolving laws and regulations relating to the use of AI technologies
- We are subject to anti-corruption, anti-bribery, anti-money laundering, export controls, and economic and trade sanctions laws
- We are, and may in the future become, subject to litigation, regulatory inquiries, and other claims

- Our existing and any future indebtedness may affect our business and may restrict our operating flexibility
- We are subject to interest rate risk resulting from general economic conditions and policies of government and regulatory agencies
- Currency exchange rate fluctuations may materially and adversely affect our results of operations and profitability
- We have incurred in the past, and may in the future incur, impairment charges related to our intangible assets
- We have identified material weaknesses in our internal control over financial reporting, and we may not be able to remediate these material weaknesses or otherwise maintain effective internal control over financial reporting
- The price of our ordinary shares may be volatile, and investors may lose all or part of their investment
- Our dual-class share structure may adversely affect the value and trading market of our ordinary shares
- Matteo Danieli, Luca Ferrari, Francesco Patarnello, and Luca Querella will have considerable influence over important corporate matters due to their ownership of class A shares
- We will be a foreign private issuer and, as a result, we will be subject to reporting obligations that are less extensive and less frequent than those of a U.S. domestic public company

## Corporate information

Bending Spoons ApS was founded in 2013 in Copenhagen, Denmark. We relocated our headquarters to Milan, Italy, through a multi-step cross-border merger, pursuant to which Bending Spoons S.r.l., an Italian limited liability company (*società a responsabilità limitata*), became the surviving entity in 2015. In 2017, Bending Spoons S.r.l. was transformed into Bending Spoons S.p.A., an Italian joint stock company (*società per azioni*). The company's duration currently ends on December 31, 2100, and a shareholder meeting may extend this term. Bending Spoons S.p.A. is primarily a holding company, as our operations are conducted mainly through our subsidiaries.

Our principal executive office is located at Via Nino Bonnet 10, 20154 Milan, Italy. The telephone number at this address is +39 02 81284093. Our website address is www.bendingspoons.com. The information contained on, or that can be accessed through, our website is not a part of this prospectus, the inclusion of our website address is an inactive textual reference only, and investors should not rely on such information in deciding whether to purchase our ordinary shares. Our agent for service of process in the U.S. is Bending Spoons US Inc.

The following diagram illustrates our corporate structure as of the date of this prospectus.



Case: 26-1721 Document: 41 Page: 26 Filed: 08/19/2026

TABLE OF CONTENTS

## Implications of being a "foreign private issuer"

Upon completion of this offering, we will report under the Exchange Act as a non-U.S. company with foreign private issuer status. As long as we qualify as a foreign private issuer under the Exchange Act, we will be exempt from certain provisions of the Exchange Act that are applicable to U.S. domestic public companies, including the following:

- The sections of the Exchange Act regulating the solicitation of proxies, consents, and authorizations in respect of a security registered under the Exchange Act
- The sections of the Exchange Act imposing liability for insiders who profit from trades made in a short period of time
- The rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q containing unaudited financial and other specific information, or current reports on Form 8-K, upon the occurrence of specified significant events

Foreign private issuers are also exempt from certain more stringent executive compensation disclosure rules.

In addition, as a foreign private issuer, we intend to rely on and comply with certain home country governance requirements and exemptions thereunder rather than complying with Nasdaq corporate governance standards. See *Risk factors — As a foreign private issuer, we are permitted to and we intend to rely on exemptions from certain of the Nasdaq corporate governance requirements, Risk factors — We may lose our foreign private issuer status in the future, which could result in significant additional costs and expenses*, and *Management — Foreign private issuer status.*

## Trademarks, service marks, trade names, and logos

We have proprietary rights to certain trademarks used in this prospectus that are important to our business, some of which are registered under applicable intellectual property laws. This prospectus contains additional trademarks, service marks, trade names, and logos of others, which are the property of their respective owners. All trademarks, service marks, trade names, and logos appearing in this prospectus are, to our knowledge, the property of their respective owners. We do not intend our use or display of other companies' trademarks, service marks, trade names, or logos to imply a relationship with, or endorsement or sponsorship of us by, any other companies.

Solely for convenience, the trademarks, service marks, trade names, and logos referred to in this prospectus are without the ® and ™ symbols, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights or the rights of the applicable licensors to these trademarks, service marks, trade names, and logos.

TABLE OF CONTENTS

## The offering

| | |
|---|---|
| **Ordinary shares offered by us** | ordinary shares. |
| **Ordinary shares offered by the Selling Shareholders** | ordinary shares. |
| **Ordinary shares to be outstanding after this offering** | ordinary shares (or ordinary shares if the underwriters exercise their option to purchase additional ordinary shares from us and the Selling Shareholders in full). |
| **Class A shares to be outstanding after this offering** | class A shares. |
| **Option to purchase additional ordinary shares** | We and the Selling Shareholders have granted the underwriters an option to purchase up to additional ordinary shares from us and an additional ordinary shares from the Selling Shareholders within 30 days of the date of this prospectus to cover over-allotments. |
| **Use of proceeds** | We estimate that the net proceeds to us from this offering will be approximately $ million (or $ million if the underwriters exercise their option to purchase additional ordinary shares from us in full), assuming an initial public offering price of $ per ordinary share, which is the midpoint of the price range set forth on the cover page of this prospectus, after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. We will not receive any proceeds from the sale of ordinary shares by the Selling Shareholders.<br><br>We intend to use the net proceeds of this offering for general corporate purposes and to invest in new acquisitions. However, we do not have binding agreements for any material acquisition at this time. See *Use of proceeds* for a more complete description of the intended use of proceeds from this offering. |
| **Conflicts of interest** | Allen & Company LLC, one of the underwriters in this offering, and its associated persons, including Leah Schwartz, a member of our board of directors, beneficially own 25,960 of our class X-2 shares and 1,509,380 of our class X-1 shares. Because Allen & Company LLC is an underwriter in this offering and because an associated person of Allen & Company LLC, Leah Schwartz, is both a managing director of Allen & Company LLC and a member of our board of directors, Allen & Company LLC may be deemed to have a "conflict of interest" under Rule 5121 of FINRA.<br><br>Accordingly, this offering will be conducted in accordance with the applicable provisions of Rule 5121, which requires, among other things, that a "qualified independent underwriter" as defined by Rule 5121 has participated in the preparation of, and has exercised the usual standards of "due diligence" with respect to, the registration statement and this prospectus. J.P. Morgan Securities LLC has agreed to act as qualified independent underwriter within the meaning of Rule 5121 for this offering and to undertake the legal responsibilities and liabilities of an underwriter under the Securities Act, specifically including those inherent in Section 11 of the Securities Act. J.P. Morgan Securities LLC will not receive any additional fees for serving as qualified independent underwriter in connection with this offering. We have |

agreed to indemnify J.P. Morgan Securities LLC against liabilities incurred in connection with acting as qualified independent underwriter, including liabilities under the Securities Act. Pursuant to Rule 5121, Allen & Company LLC will not confirm sales of our ordinary shares to any account over which it exercises discretionary authority without the prior written approval of the account holder. See *Underwriting (conflicts of interest)*.

**Voting rights**

Following the completion of this offering, we will have two classes of shares outstanding: ordinary shares and class A shares. Each ordinary share will be entitled to one vote per share and will not be convertible into any other shares. Each class A share will be entitled to five votes per share and will be convertible at any time into one ordinary share upon request of the holder. In addition, our class A shares will automatically convert into ordinary shares upon certain events. Holders of our ordinary shares and class A shares will generally vote together as a single class, unless otherwise required by our Bylaws or applicable law. For additional information, see *Description of share capital and bylaws*.

**Dividend policy**

We do not anticipate paying any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain all available funds and any future earnings to fund the development and expansion of our business. Any determination to pay dividends in the future will be at the discretion of our board of directors and must be approved by a shareholder meeting, subject to our Bylaws and applicable law, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and other factors that our board of directors may deem relevant. See *Dividend policy*.

**Risk factors**

See *Risk factors* and the other information included in this prospectus for a discussion of factors investors should consider before deciding to invest in our ordinary shares.

**Listing**

We have applied to list our ordinary shares on Nasdaq under the symbol "BSP."

The number of our ordinary shares and class A shares outstanding after this offering is based on ordinary shares and class A shares outstanding as of , 2026, and excludes:

- ordinary shares issuable upon exercise of stock options outstanding as of , 2026, under our Stock Option Plans (as described in *Management — Equity compensation*), with a weighted average exercise price of $ per share
- ordinary shares reserved for future issuance under the 2026 Equity Compensation Plan (as described in *Management — Equity compensation*), as well as any shares that become issuable pursuant to the 2026 Equity Compensation Plan
- ordinary shares issuable upon exercise of warrants (as described in *Management — Warrants*) outstanding as of , 2026, with an exercise price of $ per share

Unless otherwise indicated, all information contained in this prospectus assumes:

- The filing and effectiveness of our Bylaws, which will occur prior to the completion of this offering
- No exercise by the underwriters of their option to purchase additional ordinary shares in this offering
- An initial public offering price of $ per ordinary share, which is the midpoint of the price range set forth on the cover page of this prospectus

# Risk factors

*Investors should carefully consider the risks and uncertainties described below and the other information in this prospectus (including "Note regarding forward-looking statements") before deciding to invest in our ordinary shares. There may also be additional risks and uncertainties not presently known to us or that we currently deem immaterial. If any of these risks and uncertainties occur, our business, results of operations, financial condition, prospects, and reputation could be materially and adversely affected. In that event, the trading price and value of our ordinary shares could decline, and investors could lose all or part of their investment.*

## Risks relating to our business and industry

### Our growth strategy includes acquisitions, which could be difficult to identify, pose integration challenges, divert leadership attention, require additional financing, and materially and adversely affect our business

We acquire and transform digital businesses, and we expect acquisitions to remain our priority for the foreseeable future. Identifying suitable acquisition opportunities can be challenging, time consuming, and competitive, and we may not be able to source, evaluate, or complete acquisitions at the pace or on the terms we expect. The total addressable market for business acquisitions that we believe could fit within our acquisition strategy is based on our internal analysis and it may prove to be smaller than we expect. We may face intensified competition from strategic acquirers and financial sponsors, which may increase purchase prices or reduce the number of attractive acquisition opportunities available. Our inability to complete acquisitions at a sufficiently high rate and at appropriate prices, and to make appropriate investments that support our long-term strategy, could materially and adversely affect our business, results of operations, and financial condition.

Any acquisition or investment may divert leadership's attention from day-to-day operations, require significant time and resources for diligence and negotiation, and result in expenses that we may incur whether or not a transaction closes. Our use of cash to pay for acquisitions limits other potential uses of our cash and may deplete our cash reserves or require us to seek additional financing. We may incur write-offs, impairment charges, amortization expenses, or other expenses related to goodwill and other intangible assets we record.

Even when we complete an acquisition, integrating the acquired business and its technology, data, teams, and operations can be complex and may not proceed as planned. The changes we implement following an acquisition may be significant and may include overhauling technologies, integrating proprietary technologies, rewriting portions of the software, redesigning user interfaces, accelerating product development, optimizing marketing and monetization, and restructuring the organization. This process may be more costly or take longer than expected. It may introduce defects, performance issues, or downtime that can adversely impact revenue and profitability or harm customer or user satisfaction, retention, and ratings. Differences in technologies, open-source license use, or third-party dependencies can complicate the integration process. Contracts with key vendors, including licensors, payment providers, or other third parties may be non-assignable or require renegotiation on less favorable terms. Our historical performance may have benefited from cost optimization measures implemented in the acquired businesses, and our future profitability may differ if similar opportunities for cost optimizations are not available. We may also be unable to integrate and retain our key team members or those from an acquired business, or to integrate or transfer technology systems effectively. Moreover, different laws, regulations, and practices with respect to employment relationships, work councils, and labor unions may make it more difficult to restructure the organization of an acquired business for long-term success in certain jurisdictions.

Certain acquisitions have included, and in the future may include, entering into transition service and other agreements, and we may depend on the selling party satisfying its obligations under such agreements, including any indemnification obligations, as part of one or more acquisitions. In addition, many of our acquisition agreements include, and in the future may include, purchase price adjustment mechanisms, such as adjustments based on closing cash, indebtedness, net working capital, or other agreed measures. These adjustments may be complex, involve significant judgment and estimation, and depend on financial information that may be incomplete or subject to differing interpretations. Disputes may arise regarding the preparation of closing statements, the application of accounting principles or methodologies, or the calculation of adjustment

amounts, and we may be required to make additional payments to the selling party or may be unable to recover amounts we believe are owed to us.

If we are unable to identify and complete attractive acquisitions, integrate them effectively, realize anticipated benefits on the expected timeline, or retain customers or users and key team members, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### We may be unable to raise capital when needed or on acceptable terms

We may require additional capital to support our operations, growth strategy, and acquisitions, and we may be unable to obtain new capital on terms acceptable to us or at all. Our ability to access the capital markets and other sources of financing may be affected by factors outside our control, including macroeconomic conditions, interest rates, investor sentiment, and volatility in the equity and debt markets. If we are unable to obtain additional financing when needed, we may be required to delay, reduce, or cancel investments in product development, marketing, infrastructure, or acquisitions, which could materially and adversely affect our business, results of operations, financial condition, and prospects. Furthermore, the issuance of additional equity may dilute shareholder value, and any increases in our level of indebtedness resulting from acquisitions could materially and adversely affect our business, results of operations, financial condition, and prospects.

### We may not effectively identify, or selling parties may omit to disclose, material matters in connection with acquisitions

When assessing an acquisition opportunity prior to completion, we and any of our legal and financial advisers rely on the limited available resources, including information and data, that selling parties provide to us. We and our advisers may not be able to confirm the completeness, genuineness, or accuracy of such information and data. As a result, we depend on the integrity and accuracy of the information provided by selling parties and others who act on a selling party's behalf. Moreover, we and our advisers may not have sufficient time to fully evaluate such information even if it is available.

Risks and liabilities that acquired businesses or assets may present and that are difficult to discover prior to completion include:

- Technical debt
- Data quality or data provenance issues
- Inadequate content moderation, privacy, security, or age-appropriate measures and controls
- Non-compliance with mobile application stores or other platform rules
- Non-compliant refund or billing practices
- Violations or disputes related to breach of contract, privacy and data protection, intellectual property rights, consumer protection, intermediary liability, labor, employment and benefits, tax, and other laws and regulations

We may be responsible for unexpected liabilities that were not discovered during diligence for past or future acquisitions. We may also carry out analyses or due diligence processes that may not reveal or highlight all relevant facts that may be necessary or helpful when we are evaluating acquisition opportunities, or we may believe that under the circumstances it is commercially reasonable not to carry out any diligence. For example, we may fail to identify or assess opportunity costs or certain liabilities, shortcomings, or other circumstances when we are determining the value of an acquisition opportunity. We will also make subjective judgments about the results of operations, financial condition, and prospects of an acquisition target. If a due diligence process fails to fully and correctly identify material risks and liabilities, or if we consider such material risks to be commercially acceptable relative to the opportunity and we do not receive adequate recourse for such risks, we may not be able to recover our losses from the selling party.

The value of an acquisition opportunity may also be affected by fraud, misrepresentation, or omission by the selling party, its advisers, or other parties. Such fraud, misrepresentation, or omission may artificially inflate our valuation of the acquisition opportunity, causing us to overpay or increasing the risk that the acquired business is subject to unforeseen compliance

costs, litigation, or regulatory action after completion, which could materially and adversely affect our business, results of operations, financial condition, and prospects.

Our efforts to limit these liabilities through any diligence, contractual indemnities, escrows, or insurance may not be enforceable, collectible, or sufficient to offset potential liabilities. We may also have to litigate to recover losses. Any of the foregoing could materially and adversely affect our business, financial condition, results of operations, prospects, and reputation.

### Our business depends in part on our ability to develop and use AI effectively, and AI may expose us to risks

Our ability to compete and succeed requires developments in our technology and productivity such as the successful implementation of AI technologies throughout our business. Many of our products and proprietary technologies incorporate AI, and we leverage AI extensively in our operations. We use models from several third-party service providers, including Anthropic, Google, and OpenAI, accessing them either via the provider's application programming interface or, where possible, by hosting them on a Technology Infrastructure we control. In addition, we use open-source models and we have developed proprietary, narrow-purpose models that are deployed across several of our products and technologies.

There are significant risks involved in using AI technologies, and no assurance can be provided that our use of AI technologies will enhance our productivity, operations, or products, produce the intended results, or keep pace with our competitors. AI technologies are developing rapidly and may continue to evolve in ways that are difficult to predict, including through advancements in widely available AI third-party models and open-source models. These developments may change customer and user expectations, as well as their demand for products and features, including those offered by us, and may increase competitive pressures or reduce differentiation. We may not be able to keep pace with this technological change, and we may fail to develop, enhance, or maintain products and features that meet evolving customer and user expectations regarding AI technologies. If we are slower or less effective than other companies in developing and leveraging AI-based technologies and products to meet the needs of customers or to improve operations or productivity, our competitive advantages may be eroded.

Furthermore, developing, integrating, and operating AI technologies may require significant expenditures and may involve substantial technical complexity. We may incur significant costs and experience delays in developing new products, features, and technology solutions, or enhancing our existing ones to adapt to changes in AI technologies, and we may not achieve a return on investment or successfully capitalize on opportunities presented by demand for AI-enabled solutions. In addition, although AI adoption may continue and could accelerate, the long-term trajectory of AI development and adoption is uncertain, and market acceptance, understanding, and valuation of AI-integrated products and features may be unpredictable. If we misjudge the perceived value of AI-enabled products or features, or if broader perceptions of AI change adversely, demand for our products could decline.

AI technologies, including broadly available third-party models, are complex and may be subject to performance limitations or unexpected behavior. If the AI technologies we use are deficient, inaccurate, biased, unreliable, or otherwise fail to perform as intended, our products and operations could be negatively affected, including through reduced product quality, customer dissatisfaction, operational inefficiencies, competitive harm, and harm to our brand and reputation. Among other AI technologies, we incorporate generative AI technologies that can produce and output new content, including software code, data, and information, into our products, tools, and internal operations. There is a risk that generative AI technologies could produce inaccurate, misleading, or other unexpected results or behaviors, such as hallucinatory behavior that can generate irrelevant or incorrect results. While we take measures designed to ensure the accuracy of such AI-generated content, those measures may not be sufficient or successful and, in some cases, we may need to rely on customers or users to report such inaccuracies.

The development and use of AI also raise significant legal, regulatory, and contractual risks (see — *Risks relating to legal and regulatory matters — We are subject to new and evolving laws and regulations relating to the use of AI technologies*). AI models are trained using one or more data sets and may rely on third-party data, content, software, or other inputs. If the design, training, testing, or use of AI models involves incomplete, inadequate, or biased data, or if data or other inputs are used without sufficient rights or in violation of any applicable restrictions, we could be exposed to claims or liability related to intellectual property infringement or misappropriation, privacy, data protection, publicity, consumer protection, or other rights, as well as

breach of contract, regulatory enforcement, or other legal claims. In addition, errors or perceived errors in AI outputs, or outcomes that are controversial, misleading, discriminatory, or otherwise unacceptable to customers, users, regulators, or the public, could result in increased scrutiny, reduced adoption of our products, or other adverse impacts. Concerns relating to the responsible use of AI technologies by our customers or users, including uses that are perceived as harmful, inappropriate, or controversial, could also result in reputational harm and may increase the risk of legal claims or regulatory enforcement. These risks may be heightened to the extent that our AI-enabled products process or generate content at scale. For example, public disclosures or perceived changes relating to AI, such as references to AI in a product's terms of service, has triggered and in the future may trigger negative customer reaction and media coverage, increased scrutiny, or reputational harm even if the product's underlying functionalities or operations are not materially changing.

As AI technologies and the applicable legal and regulatory framework are rapidly developing and highly complex, it may not be possible to predict or identify all of the risks that may arise in connection with our current or future use of AI technologies. If any of the foregoing risks materialize, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### We may be unable to attract, develop, or retain talent at the scale required by our business, labor costs may increase, and we may suffer workforce disruptions

Our success depends on our ability to attract, develop, and retain highly skilled personnel. The process of hiring individuals with the combination of skills and attributes required to implement our strategy can be difficult and time consuming, and we face intense competition for this talent from well-established companies as well as smaller or emerging companies, many of which have greater resources, more recognized brands, and the ability to offer cash or equity compensation that may be more attractive than ours. In addition, we may find it difficult to recruit talent who are willing to relocate to, or regularly work from, the locations where we operate.

Our business model requires maintaining a lean organizational structure with effective collaboration across teams and high talent density. Our strategy includes acquiring businesses and implementing deep changes, which requires allocating talent to acquired businesses and integrating and motivating team members from acquired businesses. As we scale, the challenge of hiring, developing, and retaining increasing numbers of team members without compromising talent quality may increase, and attrition could rise as competition for talent intensifies. Loss of key team members, failure to retain key team members from acquired businesses, or prolonged vacancies in specialized roles could materially and adversely affect operations, product development, product quality, reliability, user experience, customer support, innovation, and integration efforts.

To remain competitive, attract and retain talent, and support our growth we expect to expand hiring into new jurisdictions and continue relying on remote teams, contractors, authorized staffing agencies, and employer-of-record arrangements. This may increase complexity and risk relating to labor, social security, immigration, tax, and benefits administration, information security and access controls, confidentiality, and intellectual property assignment and ownership.

In addition, compensation pressures in our industry may increase our operating costs. Higher salary benchmarks, increased competition for talent, and the need to provide equity, benefits, or other incentives to attract and retain talent could elevate expenses and reduce margins. Labor laws and practices in the jurisdictions where we operate may further increase costs, impose procedural requirements, or reduce workforce flexibility. In certain jurisdictions, team members may be represented by work councils or may be subject to collective bargaining arrangements, and team members may seek additional representation in the future, which could increase costs and operational complexity. Moreover, in Italy and certain other jurisdictions, membership in a union is information that employees need not disclose to employers, potentially making our future ability to address labor organizing issues among our team more difficult. While we have not experienced such disruptions in the past, we may experience work stoppages, strikes, or other labor disruptions, including among key third-party contractors and service providers.

If we are unable to effectively manage these risks, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### Our leadership team may depart at any time

Our success depends in significant part on the continued service of our leadership team, including our co-founder and chief executive officer, Luca Ferrari, and our co-founder and head of business acquisitions, Francesco Patarnello. Each member of

our leadership team has significant expertise and plays an important role in executing our strategy, including identifying and evaluating acquisition opportunities, leading transformations, and driving product and operational performance. We heavily rely on their continued service, performance, contribution to core areas, and efficient execution of our business. We have not entered into employment agreements with Luca Ferrari or Francesco Patarnello and they may terminate their relationship with us at any time. We may be unable to replace such individuals in a timely manner, on acceptable terms, or at all. The loss of any member of our leadership team could disrupt our operations, delay or prevent the achievement of our business objectives, and materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### Our company culture has contributed to our success, and we may not be able to maintain this culture as we grow

We believe our company culture has been an important contributor to our success. Our culture is designed to support our ability to appeal to highly talented, driven, and collaborative talent, operate efficiently, and execute our strategy, including integrating and transforming acquired businesses.

As we continue to grow, including through acquisitions, we may find it increasingly difficult to maintain aspects of our culture across a larger and more geographically dispersed organization and across teams with different backgrounds and expectations. Growth may increase organizational complexity and communication challenges, slow decision-making, reduce accountability, or create misalignment across teams. In addition, integrating new team members from acquired businesses may require significant leadership attention and may create cultural friction or reduce cohesion, which could negatively affect productivity, collaboration, and execution.

If we are unable to preserve and reinforce the elements of our culture that have contributed to our success, we may experience higher turnover from our talent, difficulty attracting and retaining talent, reduced operational effectiveness, and challenges executing our business strategy, any of which could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### Reorganizations and restructurings may disrupt our operations and harm our reputation

In the past, we have frequently implemented, and we expect to continue to implement, at least with each acquisition, workforce reductions, restructurings, or other forms of reorganizations to streamline operations, integrate acquisitions, increase innovation, agility, and speed of execution, and reduce costs.

Reorganizations can result in the loss of institutional knowledge and can disrupt operations, product roadmaps, and release schedules, and make it more difficult to maintain consistent engineering, security, and quality standards across our products and businesses. These actions are difficult to implement, and may also divert leadership attention, reduce productivity, and require additional recruiting, onboarding, and training to address critical gaps. In addition, reorganizations may involve significant costs, including severance, benefits, retention or transition costs, professional fees, and other related expenses.

Reorganizations may also negatively affect the morale of our team members and may impair our ability to attract, retain, and motivate key talent, including within acquired businesses. They may influence how our brand is perceived by customers, users, business partners, and prospective candidates, and could result in adverse media coverage or other reputational harm. In addition, reputational harm associated with reorganizations could materially and adversely affect our acquisition strategy. Potential acquisition targets or selling parties may be reluctant to engage with us if they believe an acquisition could negatively affect their brand, workforce, culture, or reputation, which could limit our ability to pursue or complete acquisitions on attractive terms or at all.

We have in the past faced and may in the future face employment-related claims, disputes, or regulatory scrutiny in connection with reorganizations, including allegations of wrongful termination, discrimination, work-related injuries, retaliation, wage-and-hour violations, or failures to comply with severance, notice, or consultation obligations such as work council or collective procedures. These matters could result in investigations, litigation, settlements, penalties, and additional costs. If we do not manage workforce reductions and reorganizations effectively, our business, results of operations, financial condition, prospects, and reputation could be materially and adversely affected.

### We may suffer damage to our reputation or brands, including the reputation of any of our products

The reputation of our business and our products is important to our success. Maintaining and enhancing our brands helps us attract and retain customers and users, supports our pricing and subscription plans, and contributes to the long-term value of our product portfolio.

Our brands and reputation could be harmed in many ways, including if:

- A product experiences quality issues, persistent bugs, outages, service interruptions, or poor performance
- Customers or users have negative experiences with billing, refunds, renewals, or customer support
- We implement changes that are perceived negatively by customers, users, team members, or the public, such as reorganizations, price increases, or changes to product features or monetization strategies
- We are perceived to have misled customers or users in advertising, purchase option presentation, or changes in pricing, subscription plans, or billing models
- We suffer a data privacy or security incident
- We fail to comply with applicable law, regulation, or platform rules
- A product is removed from, restricted on, or downgraded within a mobile application store, search engine, or other distribution channel
- We face claims or allegations relating to intellectual property infringement or violations of privacy or data protection laws
- User-generated content uploaded to one of our products violates a third party's rights, is unlawful, or is otherwise questionable or harmful
- We are subject to unfavorable media coverage, social media attention, or online reviews, including in connection with acquisitions, integrations, reorganizations, restructurings, or other efforts to streamline operations

Because some of our products operate under the Bending Spoons brand name or are known to have been acquired by Bending Spoons, harm to the reputation of one product can adversely affect the perception and performance of our other products. For example, negative reviews, media coverage, ratings, or search engine or mobile application store placement affecting a single product may influence how customers or users view us, our developer pages, cross-promotions, and new releases, reduce trust in our broader portfolio, and lead to increased scrutiny of our other products by customers, users, platforms, regulators, or other third parties. In addition, certain actions or decisions such as reorganizations may receive disproportionate attention and online discourse relative to other aspects of our business, which may amplify reputational harm. As our portfolio grows and our products reach more customers and users across different categories, markets, and regions, the likelihood that an incident affecting one product could have broader effects may increase.

In addition, industry standards and customer and user expectations may continue to evolve, including with respect to product quality, user experience, privacy, security, accessibility, and customer support. If we do not meet these evolving expectations, or if competitors deliver superior experiences, the strength of our brands may decline. Moreover, third parties using similar names or branding, or the distribution of unauthorized imitations, copies, or modified versions of our products, may also harm our reputation and brand value.

Our employer brand is also important to our business. If our reputation is harmed, we may experience increased difficulty attracting, retaining, and motivating talent. Damage to our reputation or brands could also negatively affect our relationships with lenders, business partners, and investors, and our ability to execute our business strategy.

If our reputation or the value of our brands is harmed or declines, whether due to events affecting the Bending Spoons brand, a single product, or our portfolio as a whole, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### We operate internationally and are subject to risks associated with the legislative, regulatory, judicial, accounting, political, and economic conditions in the markets and territories in which we operate

Our headquarters are in Italy, we operate internationally, our products are offered globally, and we expect to continue to expand our international presence. We may become subject to various laws and regulations as we expand into new markets, introduce new products, features, or technologies, or acquire businesses or products. Operating across multiple jurisdictions increases the complexity of our business and exposes us to risks that may differ from those faced by companies with more limited geographic operations. Risks associated with our international operations include, among others:

- Political instability, adverse changes in diplomatic relations, and unfavorable economic and business conditions in the markets in which we operate or into which we may expand
- More restrictive, inconsistent, or otherwise unfavorable laws and regulations, including evolving regulation of AI and digital products, which could increase compliance costs, require changes to our products or operations, or limit or prohibit certain offerings in particular jurisdictions
- The need to comply with differing, and sometimes conflicting, legal and regulatory standards relating to consumer protection, privacy and data protection, payment processing, content or product restrictions, and other aspects of our products and operations
- Limitations on the protection and enforcement of intellectual property rights across jurisdictions
- Increased difficulties of integrating acquisitions across jurisdictions
- Restrictions on the ability of our foreign subsidiaries to repatriate profits or otherwise remit earnings, and exposure to currency controls or other governmental actions
- Adverse tax consequences arising from the complexity of operating across multiple jurisdictions and from changes in, or new interpretations of, tax laws, regulations, treaties, or enforcement practices
- Expropriation of assets, nationalization, or other governmental actions, including the risk of renegotiation or modification of existing agreements with government authorities
- Diminished ability to enforce contractual rights or obtain effective legal remedies in foreign jurisdictions
- Lower levels of internet access, credit card usage, or consumer spending in certain markets compared to the E.U., the U.K., and the U.S.
- Difficulties managing operations and adapting to customer and user needs due to distance, language, and cultural differences, including differences in local business practices and customs, and challenges in maintaining effective management, operational, financial reporting, and internal control systems across jurisdictions

Due to the size and scale of our operations and the factors described above, we may not be able to anticipate or address these risks in a timely manner or at all. If we are unable to effectively manage the risks associated with our international operations, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### We are subject to risks related to adverse global economic and geopolitical conditions as well as natural disasters

Our business is subject to risks associated with global political and economic conditions. The purchase and use of our products are often discretionary and may require a significant commitment of resources. Demand for our products may fluctuate with market conditions. As a result, adverse global economic conditions could reduce consumer and business spending and negatively affect demand for our products. Macroeconomic uncertainty may be driven by factors such as reduced consumer confidence, fears of recession, unemployment levels, inflation, rising interest rates, the availability and cost of consumer credit, and changes in tax rates. In addition, perceived or actual instability in banking and financial markets, regulatory uncertainty, and changes in trade policies and restrictions (including tariffs, trade controls, and other barriers) may increase costs and contribute to market volatility. These conditions could lead to reduced demand, pricing pressure, slower growth

across our product portfolio, and, for certain offerings, longer or less predictable sales cycles. Economic deterioration may also impair collections on accounts receivable and adversely affect our liquidity.

Geopolitical instability and conflicts may further increase volatility and disrupt global economic conditions, including through sanctions, retaliatory measures, and disruptions to international commerce. These conditions may also disrupt global supply chains and logistics, including the manufacturing, transportation, customs clearance, or availability of components for our hardware products, which could increase costs, delay deliveries, or reduce product availability. In addition, we have team members and operations in regions that have experienced geopolitical instability or armed conflict, including Israel and Ukraine, and we may be materially and adversely affected by any escalation of conflict, war, terrorist attacks, or related disruptions in those regions or elsewhere. We may also be materially and adversely affected by natural disasters, global health crises, and other catastrophic events beyond our control, including earthquakes, hurricanes, floods, fires, power outages, impacts on power cost, cyberattacks, telecommunications failures, pandemics, and epidemics. Climate change could increase the frequency or severity of certain events. These circumstances or incidents could disrupt our operations, damage or disrupt our technology infrastructure, delay product development, cause service interruptions, result in reputational harm, or lead to data security incidents or loss of critical data. Advances in AI are still unknown and could increase such risks, including cyberattacks, terrorism, disruption to labor markets, criminal misuse, autonomous warfare, and catastrophic accidents.

We maintain business continuity and disaster recovery strategies and certain insurance coverage, but these measures may not be sufficient to prevent or mitigate all adverse effects of such events. If any of these risks materialize, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### Operating as a public company may increase our costs, divert leadership attention, and expose us to additional risks

As a public company, we will be subject to increased legal, regulatory, reporting, and corporate governance requirements, including under U.S. securities laws and the rules of the SEC and Nasdaq. Compliance with these obligations requires significant time and attention from our leadership and other team members and may divert resources away from executing our business priorities, including our growth and acquisition strategy.

Operating as a public company also increases our administrative, accounting, legal, and infrastructure costs, including costs associated with financial reporting, internal controls, investor relations, public disclosures, audit and advisory services, director and officer insurance, and maintaining governance and compliance programs. These costs may be significant and may increase over time, including as regulatory requirements evolve or as our business grows in size and complexity.

In addition, we may be subject to increased scrutiny from regulators, lenders, investors, analysts, the media, and other stakeholders, and we may face an increased risk of litigation, including securities class actions, shareholder derivative actions, and other claims relating to our public disclosures, governance practices, or share price volatility. Defending such matters, regardless of outcome, may be costly, time consuming, and disruptive, and could divert leadership attention.

Our status as a public company may also make us a more attractive target for competitors seeking to recruit or poach our team members and make it more difficult to attract, retain, and motivate talent. Increased public visibility and disclosure regarding our strategy, operations, and financial performance may also provide competitors with additional insights into our business, which could intensify competition.

If we are unable to effectively manage these requirements, costs, and risks, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### Our pre-acquisition forecasts may prove materially inaccurate

Our strategy depends in part on our ability to evaluate acquisition targets and forecast their future performance and value-creation potential. In assessing acquisition opportunities, we consider high-level criteria such as size, predictability of cash flows over several years, and our perceived margin for improvement through product, technology, monetization, and operational changes. We also analyze the available data, set detailed assumptions, and assess the expected return profile of an acquisition across different price points and probability-weighted scenarios, including on a risk-adjusted basis.

Despite these efforts, our pre-acquisition forecasts and assumptions may be incorrect, incomplete, or based on information that is limited, inaccurate, or difficult to verify. Our valuation process involves making subjective judgments about the acquisition target's future revenue, retention, engagement, pricing power, costs, margins, and growth trajectory, as well as the feasibility and timing of the improvements we expect to implement. Generating these forecasts is particularly difficult in our industry, which is rapidly evolving and subject to changes in technology, platform policies, competitive dynamics, customer and user preferences, macroeconomic conditions, and regulatory requirements.

Our forecasts also depend on assumptions about the effectiveness, speed, and cost of the changes we intend to implement following an acquisition. These efforts may take longer or cost more than expected, or fail to generate the expected benefits. If we misjudge growth potential, underestimate competitive pressures, or fail to achieve other anticipated improvements, the returns on an acquisition may be lower than expected.

If our pre-acquisition forecasts are materially inaccurate, we may overpay for an acquisition, fail to achieve expected returns, incur unexpected costs, be required to record impairments or other charges, or divert significant leadership time and resources from other opportunities, any of which could materially and adversely affect our business, results of operations, financial condition, and prospects.

### We face significant competition and are subject to a rapidly evolving technological landscape

The industry and the markets in which we operate are highly competitive, rapidly evolving, and subject to continuous technological changes and shifting customer demands and needs. We compete with a wide range of companies, including well-established companies with significantly greater financial, technical, marketing, sales, data, distribution, and other resources, as well as smaller or emerging companies that may be able to innovate more quickly, offer differentiated products, features, or business models, or operate from jurisdictions with less developed regulatory frameworks or less consistent enforcement.

To remain competitive in the markets in which we operate, we invest in the optimization and development of our businesses. The process of optimizing or developing new technologies, products, and features is complex, and it may include, among other things, the use of the latest advancements in data processing, AI, cloud-based technologies, and other tools to differentiate our features, products, and technologies. Differences in distribution channel rules, device penetration, payment methods, and customer or user preferences across markets mean competitive dynamics may vary significantly by country, increasing operational complexity.

Our competition may intensify if new or existing competitors expand or lower the price of their offerings, make them available for free, or launch more attractive products or features, better technologies, or user experiences. Technology platform operators may also launch, expand, bundle, or favor their own products. To compete effectively, we may be required to increase our spending on product development, customer support, and marketing activities, and to reduce prices or introduce new features more quickly than planned, any of which could increase our costs and reduce our margins. If we cannot differentiate our products, offer high-quality user experiences, or adapt to changing customer or user preferences, our growth and profitability could be materially and adversely affected. If customers or users do not find our products to be compelling, or if other existing or new products are perceived by our customers or users to be better, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

We also face competition for opportunities that fit within our acquisition strategy from financial sponsors, strategic acquirers, and a potential target's management, and such competition may intensify, which could increase purchase prices or limit our ability to source new opportunities on favorable terms.

### We may be unable to execute product development, improvement, and innovation effectively

Our business depends in part on our ability to identify, prioritize, and execute product and technology improvements that enhance user experiences, drive engagement and retention, and support monetization. The process of developing, improving, and maintaining digital products and related technologies is complex, resource intensive, and subject to significant uncertainty. We may be unsuccessful in designing, launching, or scaling new features, pricing models, product experiences, or hardware,

performance, and they should consider and evaluate our prospects in light of the risks and uncertainties frequently encountered by growing companies in rapidly evolving industries. These risks and uncertainties include challenges in accurate financial planning as a result of limited historical data relevant to the current scale and scope of our business, the uncertainties in forecasting the incremental performance that future acquisitions may contribute, and the uncertainties resulting from recent acquisitions and having had relatively limited time to integrate them.

We are not certain whether we will be able to sustain or increase our revenue or whether we will attain sufficient revenue to maintain profitability in the future. It is possible that our costs and expenses will increase in future periods. In particular, we intend to continue to make significant investments to grow our business in such areas as:

- Research and development, including new applications and technologies such as AI
- Our Technology Infrastructure, including systems architecture, scalability, availability, performance, and security
- Acquisitions or strategic investments, and the integration of any such acquisitions
- New products, user experiences, and features, including AI-powered products or features
- Productivity improvements, including through enhanced expertise, processes, and company culture
- Employer branding, recruiting capabilities, and access to talent
- Product brand awareness, marketing, and communications activities
- Sales capabilities
- Global expansion and diversification across regions, segments, and business models
- Our general and administrative organization and the legal, information technology, and accounting teams and processes associated with being a public company

Even if such investments increase our revenue, any such increase may not be enough to offset our increased operating expenses, and we may not be able to maintain profitability, and our business, results of operations, and financial condition could be materially and adversely affected.

## Risks relating to legal and regulatory matters

### We are subject to direct investment and national security review regimes, including the Committee on Foreign Investment in the United States and the Italian Golden Power framework

We are subject to foreign direct investment and national security review regimes in multiple jurisdictions that may apply to corporate resolutions, acquisitions, financings, and other transactions based on factors such as the nature of our or the acquisition target's activities or assets, including access to sensitive data, critical technologies, communications infrastructure, or other services deemed strategic.

For example, following the completion of our acquisition of AOL Holdco I LLC in January 2026, we submitted a voluntary notice to the Committee on Foreign Investment in the United States ("CFIUS") in March 2026. That filing is on file with CFIUS and is currently undergoing the review process. We expect that the CFIUS review process could take several months. We cannot predict the scope, duration, or outcome of CFIUS's review. We cannot rule out the possibility that CFIUS may require mitigation, which could impose material conditions or restrictions on the ownership, operation, governance, or integration of AOL, or delay or prevent planned initiatives, increase our costs, or otherwise adversely affect us. In an extreme case, CFIUS can recommend that the President of the United States require divestiture or unwind the transactions, which we do not expect.

In April 2026, we received questions from the unit within the U.S. Treasury Department that inquires about foreign investment transactions that are not voluntarily filed with CFIUS in connection with our acquisition of Eventbrite, Inc., which closed in March 2026. We have responded to the Treasury Department's questions about the transaction. The Treasury Department may request that we make a formal voluntary CFIUS filing with respect to the Eventbrite transaction. Any such CFIUS filing would be subject to the same review process and risks as those described in connection with the AOL Holdco I LLC filing.

Under the Italian Law Decree No. 21 of March 15, 2012 (as converted into law and amended from time to time, the “Golden Power Legislation”), notifications may be required and the Italian Presidency of the Council of Ministers (“Golden Power Authority”) may review, impose conditions on, restrict, or prohibit (i) the acquisition of interests, including through the enforcement of security interests, in companies with assets or relationships in strategic sectors (including the defense and national security, energy, transport, communications, healthcare, critical technologies, and financial or personal data processing sectors), and (ii) corporate resolutions, acts, or transactions approved by companies holding assets and relationships in strategic sectors that result in a change in ownership, control, possession, availability, intended use, or purpose of such assets or relationships, including the transfer of voting or other governance rights to secured creditors and, where they produce the effects described above, the granting, issuance, or extension of security interests over shares or strategic assets. The Golden Power Legislation may also apply to intra-group resolutions, acts, or transactions that produce the effects described above. In particular, under the Golden Power Legislation, acquisitions of controlling interests in strategic companies operating in the energy, transport, communications, healthcare, financial, and agri-food sectors by investors located within the E.U. or the European Economic Area, and acquisitions of interests representing at least 10% of the voting rights or share capital (where the value of the investment is at least €1 million) in strategic companies operating in any sector of relevance under the Golden Power Legislation by investors located outside the E.U. or the European Economic Area, as well as subsequent acquisitions that result in the thresholds of 15%, 20%, 25%, or 50% being exceeded, are subject to notification to the Golden Power Authority, which may exercise its powers to prohibit the transaction or impose conditions or other measures. In the defense and national security sector, the notification threshold is exceeded upon the acquisition of more than 3% of the voting rights or share capital, irrespective of the nationality of the investor.

According to recent case law of the Italian Supreme Administrative Court (*Consiglio di Stato*), outside the defense and national security sectors, the creation or extension of a pledge that leaves voting and administrative rights with the pledgor until the occurrence of an event of default does not, in itself, trigger a notification under the Golden Power Legislation, on the condition that any subsequent enforcement or transfer of voting rights upon an event of default are notified under the Golden Power Legislation, pursuant to the security documents. However, the impact of such case law on future decisions of the Golden Power Authority or other Italian courts cannot be fully assessed as of the date of this registration statement. The scope and interpretation of the Golden Power Legislation are subject to evolving regulatory practice and judicial developments. Our ability to pursue certain transactions and corporate resolutions affecting our ownership structure or governance rights, including acquisitions and financings, have been, and may be subject to, notification obligations and mandatory review periods under the Golden Power Legislation.

Past transactions and corporate resolutions have been, and similar future transactions may be, subject to foreign direct investment or national security review regimes and result in notification requirements, waiting periods, information requests, and reviews by one or more government authorities in Italy, the U.S., and other jurisdictions. These processes can be time-consuming, costly, and unpredictable, may delay or prevent the completion of a transaction, and may require us to modify transaction terms, accept behavioral or structural remedies (including divestitures or operational restrictions), implement mitigation measures, or abandon a proposed transaction. Increased scrutiny may also reduce the willingness of potential selling parties, lenders, or investors to engage with us, increase execution risk and deal uncertainty, and divert leadership time and resources. Authorities may also investigate or challenge our conduct or transactions even after completion. In addition, certain transactions may be subject to review by multiple government authorities in different jurisdictions, which may impose differing, inconsistent, or conflicting requirements and may further increase the cost and complexity of conducting our business.

Any of the foregoing could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are subject to complex and evolving consumer protection, subscription, advertising, and payments-related laws and industry requirements

We are subject to a broad range of consumer protection laws, regulations, and industry requirements globally, including those relating to marketing practices, including pricing disclosures, billing, refunds, free trials, subscriptions, and automatic renewals. Many of our products use monetization strategies with subscription models that automatically renew unless canceled, and we often provide free or discounted trial periods. For example, in the U.S., the Restore Online Shoppers Confidence Act and analogous state laws regulate such offers. In the E.U., the Consumer Rights Directive imposes specific requirements on pre-contractual information and the right of withdrawal for consumers, while the Unfair Commercial Practices Directive provides

a horizontal framework prohibiting misleading and aggressive commercial practices. In Italy, the Legislative Decree No. 206 of September 6, 2005, also known as the Italian Consumer Code, applies. Similarly, in the U.K., the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013 govern these practices, and under the Digital Markets, Competition and Consumers Act 2024, new provisions regarding pre-contractual information, reminder notices, and cancellation periods for subscription contracts are due to come into effect. Laws, regulations, and enforcement priorities in this area continue to evolve, and regulators and private plaintiffs have increased scrutiny of subscription flows, cancellation mechanisms, disclosures, and claims relating to “dark patterns,” misleading interfaces, or unfair or deceptive practices.

Changes in laws, regulations, or industry practices could make it more difficult to implement automatic renewals or free trials, could require more friction in customer or user flows, and could reduce conversion or renewal rates. For example, requirements to obtain express opt-in consent for the automatic renewal of subscriptions could reduce the rate of subscription renewals. Similarly, third-party platform providers or payment processors and card networks may also impose operational, compliance, and security requirements, and effectively regulate subscriptions, billings, refunds, and automatic renewals. Failure to comply with such third parties’ rules and policies could materially and adversely affect our monetization strategies.

We are also subject to laws, regulatory, and industry requirements relating to advertising, including rules governing marketing claims, endorsements, influencer marketing, targeting practices, and disclosures, as well as requirements that may apply to advertising directed to minors.

If we fail, or are alleged to have failed, to comply with applicable advertising, consumer protection, or subscription and autorenewal laws, regulations, and industry requirements, we could be subject to investigations, enforcement actions, civil penalties, damages, restitution, injunctions, litigation (including class actions), and reputational harm, and we may be required to modify our monetization strategies and marketing practices, including pricing disclosures, billing, refunds, free trials, subscription flows and plans, automatic renewals, paywalls, and cancellation processes. Any of the foregoing could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are subject to antitrust and competition laws and regulatory regimes

We are subject to antitrust and competition laws and regulations in multiple jurisdictions, including laws governing acquisitions, mergers, and other business conduct. Competition and other government authorities have intensified their scrutiny of acquisitions and business practices in the technology sector, including transactions involving digital platforms and AI-related businesses, and this heightened scrutiny may continue.

Past acquisitions have been, and future acquisitions and other activities may be, subject to notification requirements, waiting periods, information requests, and reviews by one or more competition authorities. These processes can be time-consuming, costly, and unpredictable, may delay or prevent the completion of a transaction, and may require us to modify transaction terms, accept behavioral or structural remedies (including divestitures or operational restrictions), or abandon a proposed transaction. Increased scrutiny may also reduce the willingness of potential selling parties, lenders, or investors to engage with us, increase execution risk and deal uncertainty, and divert leadership time and resources. Competition authorities may investigate or challenge our conduct or transactions even after completion, including through requests for information or enforcement actions. In addition, certain transactions may be subject to review by multiple competition authorities in different jurisdictions, which may impose differing, inconsistent, or conflicting requirements or outcomes and may further increase the cost and complexity of conducting our business.

If we are found to have violated antitrust or competition laws or regulations (or any measures imposed by government authorities under such laws or regulations), we could be subject to significant fines, damages (including treble damages in certain jurisdictions), civil or criminal penalties, injunctions restricting our activities, requirements to divest assets or discontinue certain transactions, restrictions on our ability to operate certain businesses or process certain data, and reputational harm. In addition, the relevant transaction or resolution can be declared null and void. Any of the foregoing could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are subject to complex and evolving privacy, data protection, cybersecurity, and other data laws

In connection with the operation of our business, we collect, use, store, disclose, transfer, and otherwise process Personal Information relating to customers, users, team members, candidates, business partners, and others. We also depend on a

number of third-party service providers which process Personal Information on our behalf or on behalf of our customers. We are therefore subject to a variety of data protection, privacy, and cybersecurity laws, regulations, standards, and contractual obligations globally that are complex, rapidly evolving, and may differ significantly across jurisdictions, including the E.U. General Data Protection Regulation ("E.U. GDPR"), the U.K. General Data Protection Regulation ("U.K. GDPR"), the California Consumer Privacy Act ("CCPA") and other U.S. state comprehensive data privacy laws, and industry requirements. These requirements impose significant obligations relating to transparency, consent, retention, security safeguards, cross-border transfers, vendor management, and data subject rights. This leads to increased compliance costs and operational risks, as well as potential customer or user confusion, and exposes us to significant potential liabilities, including regulatory enforcement actions and penalties, customer or user claims, and orders to change our data processing activities. The implementation of these laws and regulations requires continuous updates to our products, Technology Infrastructure, data processing activities, terms and conditions, and privacy policies, and investments in technical and organizational measures designed to safeguard the rights and freedoms of data subjects. Such investment may result in significant costs to our business and may require us to modify certain of our practices. As a result, we may not always be fully and technically compliant with such laws and regulations.

Laws and regulatory scrutiny relating to behavioral advertising, direct marketing, cookies, and other tracking technologies continue to evolve, and technical changes by platforms, browsers, or operating systems may reduce our ability to measure performance, personalize experiences, or market effectively. Numerous class-action suits under federal and state laws have been filed recently against companies that use third-party tracking technologies, alleging violations of consumer protection laws and invasions of privacy due to lack of adequate notice or consent prior to use of such technologies. In the E.U. and the U.K., informed consent is required for the placement of certain cookies and other tracking technologies on a device and for direct marketing. The E.U. GDPR and the U.K. GDPR impose conditions on obtaining valid consent for cookies and tracking technologies, including a prohibition on pre-checked consents and a requirement to obtain separate consents for each type of cookie and similar tracking technology. Recent European court and regulatory decisions are driving increased attention to cookies and similar tracking technologies. Moreover, our use of cookies and other tracking technologies has exposed us and may continue to expose us to risk of claims under a number of laws in the U.S., including the Video Privacy Protection Act ("VPPA"), the Electronic Communications Privacy Act ("ECPA"), and the California Invasion of Privacy Act ("CIPA"), and we have been subject to VPPA, ECPA, and CIPA claims related to some of our websites. In a recent trend, some content publishers have been subject to litigation over alleged violations of the VPPA in connection with advertising provided by third parties. As a result, we may have to develop alternative means to analyze our customer or users' behavior, customize their experience, or efficiently advertise to them if they block cookies or other tracking technologies, or if additional barriers to collecting data via cookies or other tracking technologies are introduced via laws, regulations, or providers of platforms, devices or web browsers. The regulation of the use of these cookies and other tracking technologies and advertising practices or a loss in our ability to make effective use of such technologies could adversely affect us.

We make telephone calls and send text messages to customers and users in connection with some of our products. Actual or perceived improper calls or text messages may subject us to potential risks, including liabilities or claims relating to laws such as the Telephone Consumer Protection Act (the "TCPA") in the U.S., which imposes significant restrictions on the ability to make telephone calls or send text messages without the prior consent of the person being contacted. U.S. federal or state regulatory authorities and private litigants may claim that our calling or text messaging practices, including our notices or forms to collect consents, are not adequate or violate applicable law. We also send marketing messages via email and are subject to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act") in the U.S. The CAN-SPAM Act imposes certain obligations regarding the content of emails and providing opt-outs (with the corresponding requirement to honor such opt-outs), and any violations could result in the FTC seeking civil penalties against us.

In addition, certain of our products and technologies collect or process geolocation data, including precise or inferred location information, which may be subject to heightened regulatory scrutiny and additional requirements.

There has also been an increase in class actions filed under laws such as the Illinois Biometric Information Privacy Act ("BIPA"), and we have been subject to BIPA claims. Claims under BIPA and similar biometric laws in other U.S. states, allege that biometric identifiers or biometric information (for example, face templates, facial recognition data, voiceprints, fingerprints, or iris scans) have been collected, used, or disclosed without the required notices, consents, retention schedules, or security safeguards. These laws may provide for a private right of action and statutory damages on a per-violation basis and often

impose stringent requirements. If one or more of our products, technologies, team members, third-party service providers, or customers or users were alleged or determined to have violated any biometric privacy law, we could be subject to enforcement actions, litigation, fines, penalties, adverse publicity, and loss of customers or users. Class actions for breaches of privacy laws are also increasing in Europe, driven by Directive (EU) 2020/1828 on representative actions and by recent CJEU case law, which has lowered the threshold for data subjects to seek compensation for non-material damage, thereby creating an additional incentive for collective redress in the data privacy sector.

Regulators are increasingly scrutinizing companies that process minors' Personal Information or provide digital products that are used by minors. For example, in the U.S., laws, regulations, and legally binding codes, such as the Children's Online Privacy Protection Act, California's Age-Appropriate Design Code, the CCPA, and other U.S. privacy laws impose heightened obligations on companies that process minors' Personal Information or provide online services used by minors. In Europe, the E.U. GDPR and the U.K. GDPR, as well as the E.U. Digital Services Act ("DSA"), the U.K. Online Safety Act, and the U.K. Age-Appropriate Design Code impose similar requirements. These requirements apply to some of our products and may include restrictions on advertising or profiling, enhanced transparency and user protection obligations, requirements to obtain certain consents, limitations on the collection, use, retention, or sharing of minors' Personal Information, age assurance or age verification measures, and expanded rights for minors and their parents or guardians. These regimes are evolving and may be subject to legal challenges, differing interpretations, and changing enforcement priorities, which may increase compliance costs and operational complexity. Some obligations may apply broadly, including to products that do not intentionally target minors and in some cases where "children" may be defined as individuals under the age of 18. Some of our products are likely to be used by individuals under the age of 18. If we fail to accurately anticipate the application, interpretation, or expansion of these requirements, we could be subject to regulatory investigations or enforcement actions, data processing restrictions, litigation, fines and penalties, adverse publicity, and loss of customers or users.

Some of our products also subject us to payment card industry rules and standards, including the Payment Card Industry Data Security Standard, as well as contractual requirements imposed by payment processors, card networks, and other payment ecosystem participants. These requirements may change over time and may require us to implement and maintain additional security controls, monitoring, and documentation. Any failure, or alleged failure, to comply with such requirements could result in fines, penalties, increased transaction fees, contractual liability, reputational harm, and restrictions on our ability to accept or process payment card transactions.

Privacy and data protection laws and regulations are in some cases relatively new and their interpretation and application are uncertain, and we cannot ensure that our privacy policies, data processing agreements, and other statements regarding our data practices will be sufficient to protect us from claims, proceedings, liability, or negative media coverage relating to privacy, data protection, or cybersecurity. In addition, although we endeavor to comply with our privacy policies and ensure that our third-party service providers comply with our data processing agreements, as applicable, we may at times fail to do so or be alleged to have failed to do so.

We have in the past received, and may in the future receive, complaints or notifications from third parties, including regulators, asking about our compliance or alleging that we have violated applicable privacy, data protection, and cybersecurity laws and regulations. Any concerns about our privacy, data protection, and cybersecurity practices, even if unfounded, could damage our reputation and adversely affect our business. Non-compliance, or perceived non-compliance, with these laws and regulations has in the past led, and may in the future lead, to regulatory investigations, enforcement or other legal actions, and proceedings against us by supervisory authorities, government entities, consumers, data subjects, or others. We have been subject to claims, proceedings, and settlements, and we may in the future be subject to substantial regulatory fines, or other penalties, or orders to cease or change our data processing activities in a manner that would be adverse to our business, require us to incur substantial costs, or lead to reputational harm.

We may also become subject to new laws that regulate data beyond Personal Information. For example, the E.U. Data Act imposes certain data and cloud service interoperability and switching obligations to enable users to switch between cloud service providers without undue delay or cost, as well as certain requirements concerning cross-border international transfers of, and governmental access to, data other than Personal Information outside the E.U. Depending on how this and any similar laws are implemented and interpreted, we may have to adapt our business practices, contractual arrangements, and products to comply with such obligations, and applicable obligations may impact our ability to retain customers and users.

Further, through the acquisition of businesses and products we may inherit legacy data practices, consents, disclosures, or technical implementations that do not meet our standards or do not comply with current legal or regulatory requirements. For example, we may discover, after the completion of an acquisition, that disclosures were incomplete, consents were missing or not properly recorded, data was combined or repurposed in ways that are not permitted, or technical controls were inadequate. Remediation can be costly and time consuming and may require deleting or limiting data, changing products or features, or reducing personalization, analytics, measurement, or marketing practices, which could reduce conversion, engagement, and revenue.

Privacy concerns and restrictions may therefore reduce the effectiveness of our product, customer and user acquisition, and monetization strategies. Any failure, or perceived failure, by us or our third-party service providers to comply with applicable privacy, data protection, or cybersecurity requirements has resulted in and could in the future result in complaints, investigations, compulsory audits, enforcement actions, litigation (including class actions), fines, penalties, orders to change or cease certain practices, distraction to our leadership and technical personnel, increase in our costs of doing business, reduced demand for our products, and loss of customer or user trust, any of which could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are subject to complex and evolving intermediary liability and content moderation laws and regulations

Some of our products enable customers and users to upload, publish, stream, share, or otherwise make available content such as videos, comments, documents, and other content ("User Content"). We cannot review all User Content before it is posted or distributed, and some User Content will inevitably violate laws, regulations, or third-party rights, including intellectual property rights, privacy and publicity rights, or laws relating to defamation, harassment, hate speech, misinformation, online safety, or other unlawful or harmful content. We may be required to investigate, respond to, and defend claims relating to User Content, and we could incur significant costs by doing so. If we are found liable, or if regulators determine that we have failed to meet applicable obligations, we could be subject to investigations, damages, fines, penalties, injunctions, orders to remove or restrict content, product limitations, or other remedies, and our reputation could be harmed.

Our approach to content moderation creates additional risk, including the design and enforcement of terms of service, community guidelines, acceptable use policies, the handling of notices and takedown requests, and decisions to remove or restrict content or accounts. We may face claims that we acted improperly by removing content, restricting accounts, or enforcing policies inconsistently, and we may also face claims that we failed to remove content sufficiently quickly or at all. Individuals, advocacy groups, regulators, and other stakeholders may pressure us to remove or restrict certain content or accounts, while others may criticize us for doing so, which can result in negative publicity and could reduce customer or user trust and engagement.

The legal frameworks governing liability for User Content and content moderation decisions are evolving and differ significantly across jurisdictions. In the U.S., Section 230 of the Communications Decency Act has historically limited liability for certain third-party content and provided protections for certain content moderation decisions. However, there have been, and may continue to be, legislative, regulatory, and judicial efforts at the federal and state levels to narrow, reinterpret, modify, or eliminate these protections for certain categories of content or conduct. If the scope of Section 230 protections is reduced, we could face increased litigation risk and higher compliance and operating costs in the U.S., including for moderation decisions and for content posted by customers and users.

Outside the U.S., comparable protections may be more limited or uncertain, and many jurisdictions impose affirmative obligations on online services regarding illegal or harmful content, user reporting mechanisms, cooperation with law enforcement, transparency requirements, and the speed with which certain categories of content must be addressed. In the E.U., the DSA imposes significant compliance obligations on intermediary services, including requirements relating to terms and conditions, notice and content reporting procedures, transparency reporting, and other governance and risk-management measures. Compliance with the DSA may require us to modify our products and internal processes, expand moderation and trust and safety operations, and incur substantial costs. In addition, while the DSA is an E.U. regulation, it is enforced through authorities in each E.U. country and may be applied in practice with differing approaches across jurisdictions, which may increase uncertainty and compliance burdens. Certain E.U. countries also have, or may adopt, national laws addressing illegal or harmful online content and related enforcement processes, such as Germany's Network Enforcement Act, which may

impose additional or different obligations and increase our compliance costs and operational complexity. In the U.K., the Online Safety Act also imposes significant and evolving obligations on certain online services, including requirements relating to illegal and harmful content, risk assessments, reporting and enforcement processes, and child safety measures, and may expose us to substantial fines, increased regulatory scrutiny, and potential restrictions on our products if we fail to comply. Moreover, these frameworks, and similar laws and regulations globally, may require age assurance or age-gating measures for certain products, features, or content, which could be costly to implement, may reduce customer and user engagement or growth, and may expose us to enforcement risk if implemented incorrectly or inconsistently.

In addition, our ability to limit liability for copyright infringement based on User Content may depend on compliance with the safe harbor provisions of the U.S. Digital Millennium Copyright Act of 1998 ("DMCA") and similar laws. We may not be shielded from copyright infringement lawsuits or related liability for hosting User Content. Even if we ultimately succeed in demonstrating that the DMCA limits our liability, defending such claims can be costly and time-consuming, and we may be required to remove content, restrict accounts, or modify products or processes. There has been recent proposed U.S. federal legislation seeking to hold digital product and platform providers liable for certain User Content and, if the DMCA or similar safe harbor regimes are amended, narrowed, or interpreted in ways that are unfavorable to us, we could face increased compliance costs and increased risk of liability. We are also subject to evolving laws in the E.U. and other jurisdictions relating to online copyright enforcement. For example, the E.U. Copyright Directive expanded potential intermediary liability for certain copyright-infringing content and may require that we obtain authorizations from rights holders or implement measures designed to prevent the availability of certain copyrighted content. Implementing these requirements may require significant investment in content identification and enforcement tools, changes to products, and increased compliance costs, and may expose us to additional liability if we are alleged to have failed to satisfy applicable obligations. Similar content-related legislation and regulations in other jurisdictions may require us to change our products or business practices, restrict access to certain features or services in particular geographies, or otherwise impact our operations.

In addition, some jurisdictions have enacted or may enact laws that impose strict timelines for removing certain categories of content, provide for significant penalties for non-compliance, or authorize government or regulatory authorities to restrict access to services. We have been, and may in the future be, subject to temporary restrictions or access limitations in certain jurisdictions based on content hosted on our products. Even a single piece of content may lead to governmental scrutiny, enforcement action, litigation, or reputational harm.

These evolving compliance requirements may affect how we operate, design, and offer our products, including how we manage user reports, moderation processes, transparency obligations, and age-related safeguards. Any failure, or perceived failure, to effectively manage these risks or comply with evolving intermediary liability and content moderation laws and regulations (in particular, if such laws and regulations become more restrictive), could result in investigations, enforcement actions, fines, litigation, reputational harm, or restrictions on our products or operations, any of which could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are subject to new and evolving laws and regulations relating to the use of AI technologies

We use AI technologies to improve our internal operations and products and may increasingly incorporate AI technologies more deeply into our products and operations. The legal and regulatory landscape governing AI technologies is rapidly evolving and remains uncertain across jurisdictions. Legislators and regulators in the E.U., the U.K., the U.S. (including at the state level), and other jurisdictions have proposed, enacted, or are considering laws, regulations, and guidance that may regulate the development, deployment, transparency, and use of AI technologies, including with respect to disclosures to customers or users, risk management obligations, and documentation and monitoring requirements. These frameworks may be inconsistent or conflicting across jurisdictions, and we may be required to modify our products, data processing activities, or operations in certain jurisdictions, which could increase costs, reduce functionality, delay product launches, limit our ability to use certain AI technologies, or otherwise adversely affect our business. For example, California enacted several new laws in 2024 that regulate use of AI technologies and provide consumers with additional protections around companies' use of AI technologies, such as requiring companies to disclose certain uses of generative AI. Other U.S. states have also passed AI-focused legislation, such as Colorado's Artificial Intelligence Act, which will require developers and deployers of "high-risk" AI systems to implement certain safeguards against algorithmic discrimination, and Utah's Artificial Intelligence Policy Act, which establishes disclosure requirements and accountability measures for the use of generative AI in certain consumer interactions.

In the E.U., the Artificial Intelligence Act ("E.U. AI Act"), which entered into force in August 2024, establishes a comprehensive, risk-based governance framework for AI in the E.U. The E.U. AI Act includes requirements around transparency, conformity assessments and monitoring, risk assessments, human oversight, security, accuracy, general purpose AI and foundation models, and imposes fines for breaches of up to 7% of worldwide annual revenue. These frameworks may impose significant compliance obligations and may be interpreted or enforced in ways that restrict our ability to develop, use, or commercialize AI technologies, including in connection with products that rely on AI as a core feature. As a result, implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future, and we cannot yet completely predict the impact future laws, regulations, or standards, or the market perception of their requirements, may have on our business or how we will respond to these laws or regulations.

It is also possible that more new laws, regulations, or industry standards will be adopted, or that existing laws and regulations such as privacy, consumer protection, intellectual property, and competition laws may be applied, interpreted, or enforced in ways that would limit our ability to use AI technologies for our business, or require us to change the way we use AI technologies in a manner that negatively affects the way in which we use AI technologies and the performance of our products and business. For example, certain data protection and privacy laws extend rights to individuals (such as the right to delete certain Personal Information) and regulate automated decision making, which may restrict our use of AI technologies. Regulators may also seek remedies that could materially affect our business, including restrictions on certain practices or requirements to delete data or outputs. Further, the creation, use, or distribution of AI-generated content, or the use of content to train AI models, raises novel and unsettled questions relating to intellectual property ownership and rights, which may expose us to disputes or litigation and may limit how we develop or offer AI-enabled features. As our industry continues to evolve, our business conduct and transactions, including acquisitions, partnerships, or commercial arrangements involving AI technologies, may be subject to enhanced regulatory review or enforcement risk, which could delay, limit, or prevent certain initiatives or increase compliance costs.

Any failure, or perceived failure, to effectively manage these risks or comply with evolving laws and regulations governing AI technologies could result in investigations, enforcement actions, fines, litigation, reputational harm, or restrictions on our products or operations, any of which could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are subject to anti-corruption, anti-bribery, anti-money laundering, export controls, and economic and trade sanctions laws

We are subject to anti-corruption, anti-bribery, anti-money laundering, export controls, and economic and trade sanctions laws and regulations in the jurisdictions in which we operate, including those administered by the United Nations, the E.U., E.U. countries, the U.K., the U.S., and other governmental or intergovernmental authorities. These laws and regulations are complex, frequently changing, and may apply broadly to our global operations, including cross-border transactions, payment flows, and dealings with customers, users, service providers, business partners, and others. For example, we are subject to the U.S. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act 2010 ("U.K. Bribery Act"), the U.S. PATRIOT Act, and the laws of other countries in which we conduct activities or offer our products.

The FCPA prohibits us and our directors, officers, team members, agents, and business partners acting on our behalf from corruptly offering, authorizing, or providing anything of value to a "foreign official" for the purposes of influencing official decisions or otherwise securing an improper advantage to obtain or retain business. The FCPA further requires companies listed on U.S. stock exchanges to make and keep books and records that accurately reflect transactions and dispositions of assets and to maintain a system of internal accounting controls. The U.K. Bribery Act prohibits "commercial bribery" of private parties, in addition to bribery involving domestic or foreign officials, the acceptance of bribes, as well as the giving of bribes, and "facilitation payments," meaning generally low level payments designed to secure or expedite routine governmental actions or other conduct to which persons are already under obligations to perform. The U.K. Bribery Act also creates a corporate offense of the failure to prevent bribery by our directors, officers, team members, and other third parties acting on our behalf, to which it is a defense to maintain "adequate procedures" designed to prevent such acts of bribery.

In Italy, we are subject to the Italian Legislative Decree No. 231 of June 8, 2001 ("Decree 231"), which may expose us to monetary penalties and other sanctions in connection with certain criminal offenses committed by, among others, our directors, officers, or team members. Under the Decree 231, a defense may be available if a company can demonstrate, among other

things, that it has adopted and properly implemented an organization, management, and control model aimed at effectively preventing the commission of the relevant criminal offenses prior to the unlawful conduct (a “Model 231”). We have a Model 231 and have appointed a supervisory body that oversees its functioning and observance, monitors the implementation of preventive measures, and reports regularly to our board of directors. However, the adoption of Model 231 does not by itself exclude the applicability of penalties and other sanctions under the Decree 231. In the event an offense results in administrative liability for the company under the Decree 231, a court will evaluate the Model 231 and its actual implementation. If we are found liable under the Decree 231, we could be subject to significant monetary penalties and other sanctions, including interdictory measures, confiscation of the price or profits deriving from the offense, and publication of the judgment, as well as reputational harm and loss of trust by our customers or users.

We are also subject to economic and trade sanctions and export control laws and regulations, including those administered by the E.U., the U.K., the U.S. Department of the Treasury’s Office of Foreign Assets Control, the U.S. Department of Commerce, the U.S. Department of State, and other government authorities (collectively, “Trade Controls”). These Trade Controls prohibit or restrict dealings with, and may require us to implement controls relating to, certain countries, regions, governments, or persons. Compliance with Trade Controls may be particularly challenging because they are subject to frequent changes and may be interpreted or enforced differently across jurisdictions. Changes in geopolitical conditions or government policies may increase the scope or severity of these restrictions, delay or hinder our cross-border operations, increase compliance costs, or in some cases prevent us from conducting certain business activities altogether. For example, while most of our products are designated EAR99 under the U.S. Export Administration Regulations, certain products are classified under Export Control Classification Numbers 5D992, 5D002, and 5E002, which are subject to heightened export control restrictions and may become further restricted in the future. Furthermore, we operate in jurisdictions that present elevated risks from a Trade Controls perspective. For example, our digital products are offered in Russia and Belarus. As a result, we may occasionally interact with, or receive inquiries or fines from, regulatory bodies located in these jurisdictions, which may raise issues under U.S., U.K., E.U., or other sanctions, or under other relevant laws. We believe that we operate within the structures of applicable Trade Controls. However, we cannot predict the nature, scope, or effect of future regulatory requirements to which our operations might become subject. Our global operations and business increase our exposure to these risks. We may interact, directly or indirectly, with third parties that could be subject to Trade Controls, or that may engage in improper conduct, including customers, users, service providers, business partners, and other third parties. We also cannot predict the manner in which existing laws might be administered or interpreted. In addition, as we acquire businesses and integrate new teams, technologies, and operations, we may inherit legacy practices, controls, or compliance gaps that do not meet our standards or current legal requirements, which could increase our risk of non-compliance.

We maintain internal controls, policies, training, procedures, and other measures designed to promote compliance with anti-corruption, anti-money laundering, Trade Controls, and other similar laws and regulations. Despite our compliance efforts and activities, there can be no assurance that our compliance measures will be effective in preventing or detecting all violations, including violations by our team members, agents, service providers, business partners, or other parties acting on our behalf, and we may be held responsible. Our products are offered globally, including in certain countries that are generally perceived to present a higher risk for corruption. Actual or alleged violations, or even the appearance of non-compliance with these laws and regulations, could result in whistleblower complaints, investigations, litigation, and prosecution or other enforcement actions, which could lead to disclosures, sanctions, settlements, disgorgement of profits, significant fines, damages, other civil and criminal penalties, including imprisonment, or injunctions, suspension or debarment from contracting with certain persons, the loss of export privileges, reputational harm, adverse media coverage, and other collateral consequences. Responding to any litigation, prosecution, subpoena, investigation, or other enforcement action may divert leadership attention and resources, and cause significant defense compliance, and other legal and investigatory costs. Any of the foregoing could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We may not be able to maintain, protect, or enforce our intellectual property rights

Our success depends in part on our ability to protect the intellectual property rights underlying our proprietary information, products, and technologies. We attempt to protect our intellectual property under trademark, copyright, patent, and trade secret laws, as well as design and database rights, through a combination of intellectual property registrations, assignment and nondisclosure agreements with team members and third parties, other contractual restrictions, technological measures, and other methods. These measures may only offer limited protection and are constantly evolving to meet the expanding needs of the business. Despite our efforts to protect our intellectual property rights, we cannot assure that they will be sufficient to

Case: 26-1721 Document: 41 Page: 47 Filed: 08/19/2026



prevent, deter, or enable us to enforce against infringement, misappropriation, dilution, or other unauthorized use. Unauthorized parties may copy aspects of our products, technologies, marketing materials, and brand features, or obtain and use our trade secrets and other Confidential Information, including to create businesses or products that compete with ours.

We rely on trademarks and other brand protections to protect names, logos, and other marks associated with our business and products. We hold several trademark registrations and pending trademark applications in the U.S., E.U., and other jurisdictions which include material word marks and logos of AOL, Bending Spoons, Brightcove, Eventbrite, Evernote, Harvest, komoot, Meetup, Remini, Splice, StreamYard, Vimeo, and WeTransfer. In addition, as of December 31, 2025, we had registered domain names for approximately 1,350 websites that we use or hold for use in our business, including domain names for Bending Spoons and the above products. Others may oppose our trademark applications, challenge our use of our marks, claim superior rights, or register confusingly similar marks, domain names or social media handles. If we are unable to protect our marks, we may be required to rebrand our business or one or more products, or limit our use of certain marks, which could reduce brand recognition, increase costs, confuse customers and users, and adversely affect our growth.

As of December 31, 2025, we owned 225 issued U.S. patents, 15 U.S. patent applications, 56 issued non-U.S. patents, and 7 non-U.S. patent applications. Our issued U.S. patents, and any patents that may issue from our pending U.S. patent applications, are scheduled to expire at dates ranging between 2026 and 2039, subject to any patent term adjustments or extensions. Our issued E.U. patents are scheduled to expire at dates ranging between 2034 and 2037, subject to any patent term adjustments or extensions. Obtaining, maintaining, and enforcing patents is expensive and uncertain, and software-based patents may be difficult to protect or enforce. The scope of our patent protection could be influenced by changes in legal precedent and patent office interpretations. Our patents and applications may be challenged, narrowed, invalidated, or circumvented, and competitors may independently develop similar or superior technology. There is no guarantee that any pending patent applications we may file will result in issued patents with the desired scope of protection, particularly in jurisdictions of strategic importance, or that any patents we obtain will provide meaningful protection or a competitive advantage. In addition, in certain jurisdictions, there may be limitations on the remedies available for patent infringement, including limitations on damages, which could reduce the value of our patent rights.

We depend on copyright protection, registered design rights in the E.U., and database rights for elements of our business, products, and related content, including software code, datasets, user interfaces, audiovisual works, designs, icons, written materials, and other creative assets. The scope, validity, ownership, and enforceability of such rights may be uncertain. Protection may be limited by statutory exceptions, compulsory licensing regimes, limitations on protectability (including originality or functionality requirements), or evolving legal standards. In addition, in certain jurisdictions, registration may be required to obtain or enforce certain rights or remedies, and available remedies for infringement may be limited. Third parties may copy, reproduce, distribute, or create derivative works based on such elements without authorization.

We also rely on confidentiality and invention assignment agreements with our team members, service providers, customers, and other third parties to protect trade secrets and proprietary know-how, but these agreements may be breached or difficult to enforce, and trade secret laws do not prevent independent development by third parties. In addition, we may not have sufficient remedies in the event that any such agreements are breached.

Because our strategy includes acquiring businesses and assets, we face additional intellectual property risks in connection with acquisitions and integrations. Acquired businesses or assets may include legacy code or hardware, third-party dependencies, open-source components, content libraries, trademarks, or other intellectual property rights that are subject to unclear ownership, incomplete documentation, restrictions on use, or infringement claims, including due to historical development practices or missing assignments. These issues may impair our ability to operate, improve, monetize, or integrate acquired businesses or assets, or may require us to rebrand or redesign products or technologies and incur significant costs.

Moreover, the legal framework governing intellectual property rights in AI technologies is evolving and uncertain, including with respect to the use of protected materials to train AI models, ownership and protectability of AI-generated outputs, and the scope and enforceability of AI-related patents. These uncertainties may limit our ability to protect certain AI-enabled features or products, increase the risk of disputes, or require us to change our development practices. In addition, our use of AI tools in our product development and engineering processes may make it more difficult to assert ownership rights over certain aspects of our technology or outputs. Further, given the long history of development of AI technologies, other parties may

have, or in the future may obtain, patents or other proprietary rights that could prevent, limit, or interfere with our ability to develop, use, or commercialize certain AI technologies or features.

Policing unauthorized use of our intellectual property rights can be difficult, costly, and time-consuming, and may not always be effective. We may be required to spend significant resources to monitor and enforce our intellectual property rights, and we may not have sufficient resources to effectively do so. While we may pursue enforcement actions, such as takedown requests or litigation, these efforts may not succeed and may divert leadership attention and resources. In addition, alleged infringers may bring counterclaims challenging the validity, enforceability, or scope of our intellectual property rights. If any such counterclaims are successful, we could lose valuable intellectual property rights. Moreover, intellectual property protection may be unavailable, limited, or difficult to enforce in certain jurisdictions, and we may be unable to effectively enforce our intellectual property and contractual rights in key jurisdictions. Further, from time to time, we may consider the sale or licensing of portions of our intellectual property portfolio, and any such efforts could be complex, may not be successful, and could increase the risk of disputes or claims.

If we are unable to maintain, protect, and enforce our intellectual property rights, our business, results of operations, financial condition, and prospects could be materially and adversely affected.

### We are, and may in the future become, party to intellectual property-related disputes

Companies in the technology industry are subject to frequent litigation based on allegations of infringement, misappropriation, or other violations of intellectual property rights. We are, and may in the future become, subject to claims that we infringe, misappropriate, or otherwise violate the intellectual property or proprietary rights of third parties, including with respect to patents, trademarks, copyrights, trade secrets, and other rights. Such claims may arise in connection with the development, operation, marketing, or distribution of our products and technologies, including in connection with acquisitions, integrations, and our use of third-party software, content, and services. Moreover, they may involve claims from “non-practicing entities” that own patents and other intellectual property rights that often attempt to assert claims in order to extract value from technology companies, and given that these patent holding companies or other adverse intellectual property rights holders typically have no relevant product revenue, any issued or pending patents and other intellectual property rights of our own may provide little or no deterrence to these rights holders in bringing intellectual property rights claims against us. Even if we believe such claims are without merit, they may be time-consuming and costly to defend, divert leadership attention, and harm our reputation.

If any such claim is successful, we could be required to pay substantial damages or settlements, enter into royalty or licensing arrangements, or cease using certain technologies, content, or branding. We may be required to redesign products or features, remove or modify functionality, discontinue certain offerings, or rebrand one or more products. Any required licenses may not be available on commercially reasonable terms, or at all, and we may be unable to develop or obtain alternatives in a timely manner. In addition, intellectual property disputes may result in injunctions or other restrictions that limit our ability to operate, commercialize, or expand our products and technologies.

Some agreements with customers may include contractual obligations to indemnify them against claims that our products infringe the intellectual property rights of third parties. The results of any intellectual property litigation to which we might become a party, or for which we are required to provide indemnification, may force us to cease the offering or use of products or technologies, make substantial payments for costs or damages, obtain a license to sell or use the relevant technology (which may not be available on reasonable terms), or redesign those products or technologies to avoid infringement. We may be required to make substantial payments or undertake any of the foregoing actions as a result of any obligation to indemnify our customers for such claims.

Any of the foregoing could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are, and may in the future become, subject to litigation, regulatory inquiries, and other claims

We are, and may in the future become, subject to claims, lawsuits, investigations, subpoenas, regulatory inquiries, enforcement actions, arbitration proceedings, and other disputes arising in or outside the ordinary course of our business, including in

connection with our products, acquisitions, commercial relationships, labor matters, intellectual property, privacy and data protection, consumer protection, advertising, monetization strategies, cybersecurity incidents, and other regulatory compliance obligations.

Acquisitions of publicly traded companies may expose us and acquisition targets to shareholder litigation, appraisal demands, regulatory scrutiny, and other claims challenging the transactions, the adequacy of disclosures, the process followed by the targets' board of directors, or the consideration paid, which could delay or prevent completion of a transaction, increase costs, or result in other adverse outcomes. Even after an acquisition is announced or completed, third parties may challenge the transaction or bring through litigation or regulatory proceedings. As a public company, we may also be subject to shareholder derivative lawsuits, securities class actions, and other claims related to our disclosures, governance, or securities offerings.

Regardless of the merits or ultimate outcome, such matters can be costly, time consuming, and disruptive, could divert leadership attention and resources from our business, and lead to attempts by others to pursue similar claims. The costs of litigation and related proceedings are difficult to predict and may vary significantly from period to period. An adverse outcome could result in substantial damages, settlement payments, fines, penalties, sanctions, or other remedies. These matters could also result in reputational harm, consent decrees, or orders requiring us to change our business practices, limit certain products, or modify our operations. In addition, because litigation and regulatory proceedings are inherently uncertain, we may from time to time decide to settle disputes, even where we believe we have meritorious defenses, which could involve significant costs or other obligations.

Any of the foregoing could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

### We are subject to evolving trends relating to sustainability and corporate responsibility

The focus from lawmakers, regulators, investors, team members, customers, users, and other stakeholders concerning sustainability and corporate responsibility, specifically related to environmental, social, and governance matters is evolving in the E.U., the U.K., the U.S., and the rest of the world. Investors may use these non-financial performance factors to guide their investment strategies and, in some cases, may choose not to invest in us if they believe our policies and actions relating to corporate responsibility are inadequate. Further, there is particular focus on concerns relating to AI and its impact on the environment, including the power-intensive nature of the industry, potential impacts to the climate, high consumption of water, and reliance on critical minerals and rare elements. We may experience heightened scrutiny from our stakeholders and potential investors around these issues.

We expect to be subject to various laws, regulations, and other requirements with respect to environmental, social, and governance topics in the future, such as the E.U.'s Corporate Sustainability Reporting Directive. Compliance with such requirements may require us to implement or change policies, provide additional disclosures, or dedicate significant time and resources. Failure to comply with such requirements could subject us to significant liability, including fines and penalties, or result in negative perception of our business.

Additionally, we may choose to change our approach regarding sustainability and corporate responsibility, which may be difficult or costly to implement, and may not have the desired effect. If our competitors' sustainability or corporate responsibility performance is perceived to be better than ours, potential or current investors may elect to invest with our competitors instead. Our business may face increased scrutiny related to these activities and our related disclosures, including from the investment community. A failure to achieve progress or manage the dynamic public sentiment and legal and policy landscape in these areas on a timely basis or at all, could materially and adversely affect our business, results of operations, financial condition, prospects, and reputation.

## Risks relating to financial, accounting, and tax matters

### Our existing and any future indebtedness may affect our business and may restrict our operating flexibility

We have incurred indebtedness and expect to incur additional indebtedness in the future, which may increase our vulnerability to adverse economic, financial, and industry conditions and limit our ability to plan for or react to changes in our business or the markets in which we operate.

Servicing our indebtedness requires significant cash, and our ability to make scheduled and other mandatory payments of principal and interest, fund capital expenditures, and pursue acquisitions or other strategic initiatives depends on our ability to generate sufficient cash from operations and, when necessary, access additional sources of liquidity. Our ability to generate cash depends on many factors, including our ability to develop and improve our products, successfully integrate and operate acquired businesses, maintain and grow our customer and user base, and manage operating costs. It is also subject to global and local economic conditions, competitive dynamics, regulatory developments, and other factors beyond our control. As a result, we may not generate sufficient cash flow from operations to meet our debt service obligations or other liquidity needs.

In addition, our debt instruments contain covenants, including covenants related to maintaining certain financial ratios, and other restrictions that may limit our ability to, among other things, incur additional debt, pay dividends, make other distributions, or repurchase or redeem our ordinary shares, make investments, sell assets (including equity interests in certain subsidiaries), incur liens, enter into sale and leaseback transactions, engage in transactions with affiliates, enter into agreements restricting our subsidiaries' ability to pay dividends, or consolidate, merge, or sell or otherwise dispose of all or substantially all of our assets. These restrictions could limit our operating flexibility and our ability to execute our business strategy. See *Management's discussion and analysis of financial condition and results of operations — Financial condition*. For example, dividends from Bending Spoons Operations S.p.A. are permitted only if certain conditions are met, including that the aggregate amount of such distributions remains within agreed thresholds. However, our ability to comply with these covenants and restrictions may be affected by events beyond our control. If we breach any of these covenants, we could be in default under our debt instruments. In the event of a default, our lenders could take certain actions, including terminating all applicable commitments to extend further credit thereunder and accelerating the repayment of all outstanding indebtedness. If our debt were to be accelerated, we may not have sufficient cash or liquid assets to repay our debt, and we may be forced to seek additional financing, refinance our indebtedness, or take other actions that could be costly, disruptive, or not available on acceptable terms, or at all.

We may also need to refinance all or a portion of our indebtedness on or before maturity, which may require us to pay a premium. We may be unable to refinance our debt in a timely manner on commercially reasonable terms, or at all. Any inability to refinance our debt, or to do so on terms we consider acceptable, could require us to reduce expenditures, delay or forgo acquisitions or other initiatives, dispose of assets, or take other actions that could harm our business.

Our existing debt, any future indebtedness, and any of the foregoing could materially and adversely affect our business, results of operations, financial condition, and prospects.

### We are subject to interest rate risk resulting from general economic conditions and policies of government and regulatory agencies

Our interest expense is exposed to changes in benchmark interest rates, which may be highly sensitive to factors beyond our control, including general economic conditions and the monetary policies of government and regulatory agencies, including the European Central Bank and the U.S. Federal Reserve.

If interest rates increase, our debt service obligations on the unhedged portion of our floating-rate debt would increase even if the principal amount outstanding remains the same, which could reduce our net income, cash flows, and liquidity. Higher financing costs could also limit our operating flexibility, reduce the funds available to invest in our business, and increase the cost of refinancing existing debt or obtaining additional financing on acceptable terms. Because our strategy includes acquiring businesses, increased interest rates and tighter financing conditions could make acquisitions more expensive, reduce the availability of debt financing, or adversely affect the returns we expect to achieve from acquisitions and other investments.

To manage these risks, we have utilized, and may in the future utilize, financial derivatives or interest rate hedging transactions. However, such measures may not fully, if at all, mitigate the impact of interest rate fluctuations and may introduce additional costs or counterparty risks. Furthermore, market conditions or regulatory restrictions in certain jurisdictions may limit our ability to effectively hedge our interest rate exposures, thereby increasing the potential impact of interest rate volatility on our financial performance.

Any of the foregoing could materially and adversely affect our business, results of operations, financial condition, and prospects.

### Our dual-class share structure may adversely affect the value and trading market of our ordinary shares

Our share capital has a dual-class structure. Holders of class A shares are entitled to five votes per share, and holders of ordinary shares are entitled to one vote per share. See *Description of share capital and bylaws* for additional information about our dual-class share structure.

We cannot predict whether our dual-class structure will result in a lower or more volatile market price for our ordinary shares or in adverse publicity or other adverse consequences. For example, certain index providers have restricted, and may in the future restrict, the inclusion of companies with multiple-class share structures in certain indexes. As a result, our dual-class structure may make us ineligible for inclusion in some indexes, and mutual funds, exchange-traded funds, and other investment vehicles that seek to track such indexes may be unable to invest in our ordinary shares. Any exclusion from indexes, or similar investment limitations, could reduce demand for our ordinary shares. Any of the foregoing could materially and adversely affect the market price and trading market for our ordinary shares.

### Matteo Danieli, Luca Ferrari, Francesco Patarnello, and Luca Querella will have considerable influence over important corporate matters due to their ownership of class A shares

Matteo Danieli, Luca Ferrari, Francesco Patarnello, and Luca Querella collectively exercise a significant majority of the voting power with respect to our outstanding shares because of their ownership of all our class A shares. Upon completion of this offering, Matteo Danieli, Luca Ferrari, Francesco Patarnello, and Luca Querella will hold, in the aggregate, approximately    % of the total voting power (or    % if the underwriters exercise in full their option to purchase additional ordinary shares from us and the Selling Shareholders).

As a result, the holders of our class A shares will be able to control, or significantly influence, the outcome of matters submitted to our shareholders for approval, including the election and removal of directors and the approval of significant corporate transactions, including a merger, consolidation, or sale of all or substantially all of our assets. This concentrated voting control could delay, deter, or prevent a change of control transaction that other shareholders may view as beneficial, including transactions that could otherwise result in a premium to holders of our ordinary shares. Conversely, this concentrated voting control could enable the holders of our class A shares to cause us to enter into a transaction that other shareholders do not support.

The holders of our class A shares will be able to control or significantly influence our corporate governance and strategic direction. The interests of the holders of our class A shares may not always be aligned with the interests of holders of our ordinary shares, including with respect to decisions relating to our business strategy, capital allocation, or potential acquisition opportunities.

### Allen & Company LLC, one of the underwriters in this offering, could be deemed to have an interest in this offering beyond customary underwriting discounts and commissions

Allen & Company LLC, one of the underwriters in this offering, and its associated persons, may be deemed to have a “conflict of interest” under Rule 5121 of FINRA. This could expose us to certain risks in connection with this offering.

Rule 5121 requires that no sale be made to discretionary accounts by underwriters having a conflict of interest without the prior written approval of the account holder, and that a “qualified independent underwriter,” as defined in Rule 5121, participate in the preparation of the registration statement and the prospectus for the offering and exercise the usual standard of due diligence in connection with the offering documents, in addition to pricing the offering. J.P. Morgan Securities LLC is serving as the qualified independent underwriter in this offering.

Although J.P. Morgan Securities LLC has, in its capacity as qualified independent underwriter, participated in due diligence and reviewed and participated in the preparation of the registration statement of which this prospectus forms a part, and, although Allen & Company LLC will not confirm sales of the shares to any account over which it exercises discretionary authority

without the prior written approval of the account holder, we cannot assure that these measures will adequately address any potential conflicts of interest. See *Underwriting (conflicts of interest)*.

### We do not intend to pay dividends in the foreseeable future

We have not declared or paid any cash dividends on our share capital in any of the financial periods included in this prospectus. We currently intend to retain all available funds and any future earnings for use in the operation and growth of our business and do not anticipate paying any dividends in the foreseeable future.

Any determination to pay dividends in the future will be at the discretion of our board of directors and must be approved by a shareholder meeting, subject to our Bylaws and applicable law, and will depend on a number of factors, including our results of operations, cash flow, financial condition, capital requirements, contractual restrictions (including under any current or future indebtedness), and the amount of distributions, if any, received by us from our subsidiaries. As a result, investors in our ordinary shares may not receive any return on their investment unless they sell their ordinary shares for a price greater than that which they paid.

### The rights of our shareholders may differ from the rights typically offered to shareholders of U.S. companies

We are incorporated as a joint stock company (*società per azioni*) under Italian law. The rights of holders of our ordinary shares are governed by Italian law, including the Italian Civil Code and other applicable Italian laws and regulations, as well as our Bylaws. These rights may differ in certain respects from the rights of shareholders of companies incorporated in the U.S.

As a result, our shareholders may have different rights and protections than shareholders of U.S. companies, including with respect to matters such as shareholder actions, derivative proceedings, fiduciary duties, disclosure obligations, and other corporate governance matters.

### Claims of U.S. civil liabilities may not be enforceable against us

We are incorporated under Italian law. Our executive officers and a significant portion of our board of directors reside outside the U.S. As a result, it may not be possible for investors to effect service of process within the U.S. upon such persons or to enforce judgments obtained in courts in the U.S. against them or us, including judgments predicated upon the civil liability provisions of the U.S. federal securities laws.

### We will be a foreign private issuer and, as a result, we will be subject to reporting obligations that are less extensive and less frequent than those of a U.S. domestic public company

Upon the completion of this offering, we will report under the Exchange Act as a non-U.S. company with foreign private issuer status. Because we qualify as a foreign private issuer, we are exempt from certain provisions of the Exchange Act that are applicable to U.S. domestic public companies, including the following:

- The sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act
- The sections of the Exchange Act imposing liability for insiders who profit from trades made in a short period of time
- The rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q containing unaudited financial and other specific information, or current reports on Form 8-K, upon the occurrence of specified significant events

In addition, foreign private issuers are not required to file their annual report on Form 20-F until four months after the end of each fiscal year, while U.S. domestic issuers that are accelerated filers are required to file their annual report on Form 10-K within 75 days after the end of each fiscal year, and U.S. domestic issuers that are large accelerated filers are required to file their

and progress in our candidate attraction efforts. In parallel, through the refinement of our recruiting-related proprietary technologies, including predictive models, we believe our ability to identify high-potential applicants has improved. We intend to continue improving and scaling our candidate attraction and selection capabilities. Furthermore, we expect advances in AI to enhance the scalability of our operations: Revenue per full-time equivalent Spooner was $1.12 million in 2023, $1.64 million in 2024, $2.57 million in 2025, and $0.97 million in Q1 2026, with AI being one of the catalysts of productivity gains. If scaling our core team were to become a constraint on growth, we may reallocate resources from smaller or more optimized businesses to larger or less optimized ones.

Our proprietary technologies have evolved over time. For example, we began developing Minerva, an AI-based system to estimate user lifetime value, in 2019, and have since enhanced it to support multi-year predictions, leverage data from other products to generate insights for newly acquired businesses, and scale to loads greater by orders of magnitude. We intend to continue developing new proprietary technologies and refining existing ones. As we harness AI's advances, we expect our proprietary technologies to become more effective in supporting the execution of our Playbook.

Across more than 50 acquisitions and subsequent operations, we have accumulated extensive data. Sources include our product experimentation toolkit (3,000 experiments run in 2025) and our data infrastructure (3.8 billion data points processed per day on average in Q1 2026). We envision our set of proprietary data continuing to expand as we acquire new businesses and extend our operating track record. As AI advances and our ability to leverage complex data at scale improves, the value of our data may increase.

## Operating at the forefront of AI

Many of our products and proprietary technologies incorporate AI, and we leverage AI extensively in our operations. We use models from several providers, including Anthropic, Google, and OpenAI, accessing them either via the provider's application programming interface or, where possible, by hosting them on an IT infrastructure we control. Our architecture is designed to facilitate switching between providers with relative ease. The terms of our agreements vary by provider and have evolved over time, but pricing is generally based on the number of tokens used. In addition, we have developed proprietary, narrow-purpose models that are deployed across several of our products and technologies.

We believe that the best-in-class models will continue to be commercially available in the regions where we operate and, as such, that we will continue to have access to them going forward. Consequently, when it comes to AI, we expect our financial performance to depend primarily on how competent we are at taking advantage of these models in our products, proprietary technologies, and operations. In our view, as with prior technological transitions, some companies will lag in leveraging AI while others will advance rapidly. Given the transformative potential of AI, companies that adapt effectively may realize enormous benefits. Supported by our Platform, Bending Spoons has an opportunity to be among these companies.

The main ways in which we believe we will benefit from progress in AI are as follows:

- **Capabilities advantage.** Our ability to enhance the products, marketing, and monetization of acquired businesses following their integration into our Platform may improve as AI advances. This potential is reflected in the AI-based features we have introduced at Remini, Evernote, and StreamYard (among other businesses), and in the AI-driven evolution of our proprietary technologies, including the introduction of an AI-based user lifetime value predictor and the upgrade of our data infrastructure to use AI to automatically tag events.
- **Productivity advantage.** AI has also driven meaningful productivity gains for us. For example, while difficult to measure precisely, the speed at which Bending Spoons engineers develop software has increased materially in recent years — rising manifold for certain tasks, such as exploring and updating large legacy codebases with which they are not yet fully familiar. We estimate that the share of pull requests authored or coauthored by AI increased from less than 10% in Q1 2025 to more than 90% by the end of Q1 2026, with around 70% authored by AI alone.
- **Operational scalability.** We have occasionally passed on acquisition opportunities due to insufficient Spooner capacity to manage additional transformations. As AI enables us to do more with fewer people, this operational constraint may ease, thereby improving the scalability of our acquisition and transformation model.
- **Willingness to sell among target businesses.** We believe that many businesses within our addressable market are not diversified and lack the foundations required to fully capitalize on AI, exposing them to a heightened risk of disruption.

These factors could increase certain owners' willingness to sell, and provide opportunities for us to acquire businesses at more favorable valuations, potentially accelerating our growth.

While we believe that AI creates an enormous opportunity for us, it also introduces uncertainty. For example, it makes design and software development easier and cheaper, thereby lowering technical barriers to entry, and it enables novel forms of competition, including through general-purpose AI chatbots. Progress in AI may also prompt attempts from others to emulate our Playbook.

These risks are mitigated by several factors, including our diversification and our long-standing practice of favoring acquisition targets for which the risk of AI-driven disruption is limited once integrated into our Platform. Moreover, most of our businesses, as well as a substantial portion of those within our addressable market, are not particularly reliant on technical barriers to entry or susceptible to replacement by general-purpose AI chatbots. Lastly, even as AI continues to improve rapidly, our Platform remains difficult and time-consuming to replicate — and, therefore, our Playbook remains challenging to emulate.

To date, we believe advances in AI have strengthened both our portfolio of businesses and the distinctiveness of our Platform.

## Components of operating results

Below, we describe the components of our operating results.

### Revenue

We generate revenue from subscriptions, advertising, and other sources. See *How we generate revenue* above for additional information.

### Cost of revenue

Cost of revenue consists primarily of amortization of acquired intangible assets, IT infrastructure costs (mainly for AWS and Google Cloud), distribution and payment processing costs (mainly for services provided by Adyen, Apple, Google, PayPal, and Stripe), and personnel costs (mainly related to customer support and product maintenance).

In share transactions, the purchase price is allocated to the identifiable assets acquired and liabilities assumed based on their estimated fair value as of the acquisition date, with the excess recorded as goodwill. Assets are subsequently amortized over their estimated useful life. In asset transactions, the purchase price is allocated to the identifiable assets acquired and subsequently amortized over their estimated useful life.

We depend on several key vendors, including providers of cloud infrastructure (primarily AWS and Google Cloud), distribution channels (primarily Apple and Google through their app stores), and payment processing services (primarily Adyen, Apple, Google, PayPal, and Stripe). Changes in the contractual terms with these vendors can have a material impact on our profitability. As we scale, we have been able to secure more favorable terms with certain vendors and have invested in technologies and processes designed to reduce switching costs. Nevertheless, these vendors continue to have significant negotiating leverage.

In Q1 2026, 75% of revenue was generated through electronic payments and 25% through wire transfers. Of revenue generated through electronic payments, 67% was processed through providers such as Adyen, PayPal, and Stripe, and 33% through the Apple App Store or Google Play Store. For purchases made through the App Store or Play Store, a fee ranging from 15% to 30% of payment value is retained by Apple or Google, respectively. By contrast, payments processed through providers such as Adyen, PayPal, and Stripe generally involve fees of 5% or less, while wire transfers usually result in costs to us of below 0.1%. We have often found that, due to the convenience of purchasing through the App Store or Play Store, customers using our standalone mobile applications are more likely to complete a transaction when this option is offered as the default. As a result, a significant portion of customer purchases will probably continue to occur through the App Store or Play Store, despite their higher fees.

We expect cost of revenue to increase in absolute U.S. dollar terms as our business grows, including through acquisitions. Cost of revenue may fluctuate as a percentage of revenue from period to period depending on, among other factors, changes

# Business

*Investors should read the following description of our business together with our consolidated financial statements and related notes included elsewhere in this prospectus. This section contains forward-looking statements based on our strategy, plans, expectations, and beliefs, which involve significant risks and uncertainties. Actual performance may differ materially from that contemplated by these forward-looking statements due to, among other things, the risks described under "Note regarding forward-looking statements," "Risk factors," and elsewhere in this prospectus.*

## Overview

Bending Spoons is built on the conviction that operational excellence enables efficient growth through acquisitions. We acquire digital businesses, implement deep transformations and ongoing optimizations to sustainably expand earnings, and reinvest in additional acquisitions, thereby continuing the compounding cycle. We have executed this Playbook for more than a decade and, to date, have not sold a material business. Our performance is driven by our Platform — comprising our people, proprietary technologies, and proprietary data — and reflects our intense focus on achieving exceptional talent density, cultural strength, and technical capabilities.

Below, we describe our three-step Playbook in greater detail:

- **Step 1 — Acquire.** We acquire a business whose core products are digital. We prioritize businesses that we believe we can improve significantly, that have large revenue bases, and whose trajectories we can forecast with reasonable confidence several years into the future, a process that involves factoring in the risk of disruption from advances in AI. Our evaluation is analytical and rigorous, and we are disciplined on price.
- **Step 2 — Transform and optimize.** We strive to envision the most successful version of the acquired business, and work to close the gap between its current state and that vision as quickly and completely as possible. The transformation is typically deep and entails reorganizing teams, overhauling technology, redesigning user interfaces, accelerating product development, and enhancing marketing and monetization. AI is often both a central component of our vision for the acquired business and a key tool in implementing the transformation. Through these efforts, we seek to increase revenue and reduce costs to drive a sustainable expansion in earnings. We then optimize the business as part of our broader portfolio on an ongoing basis.
- **Step 3 — Reinvest.** We reinvest our earnings, along with contributions from newly acquired and improved businesses and prudent levels of incremental debt, to fund additional acquisitions, thereby continuing the compounding cycle. We may also opportunistically raise incremental equity to accelerate growth.

Our people, proprietary technologies, and proprietary data constitute the Platform that supports our acquisitions, transformations, and ongoing optimizations. We have been building this Platform since our founding in 2013 and consider it our primary source of competitive advantage, one that we believe will continue to strengthen as we grow.

- **People.** We have a talent-dense team of Spooners[32] who embrace a culture emphasizing truth-seeking and extreme ownership — traits we consider critical drivers of business performance. In 2025, we received around 800,000 job applications to become a Spooner and, consistent with our focus on talent density, hired 286 individuals, representing less than 0.04% of applications received. We allocate Spooners flexibly across our portfolio, deploying resources to areas of opportunity and reducing them where appropriate. For example, we may assemble a task force to transform a newly acquired business, expand an engineering team to accelerate a product initiative, or scale back an organization by redeploying Spooners once a period of intensive change has concluded.
- **Proprietary technologies.** We have engineered, and continue to refine, numerous technologies that enable us to do more and better work with fewer resources. Examples include a data infrastructure, a user lifetime value predictor, and a product experimentation toolkit. Our technologies are purpose-built for our needs and are integrated with one another, making their deployment across acquired businesses easier and allowing them to deliver superior impact, more rapidly. As

[32] We define "Spooners" as team members who have successfully completed the rigorous and selective application process to join our core team. Spooners are allocated flexibly across the organization and may be transferred between businesses on short notice. They are held to particularly demanding performance standards.

Case: 26-1721 Document: 24-1 Page: 56 Filed: 08/19/2026

TABLE OF CONTENTS

a result, most of our businesses adopt nearly all of our proprietary technologies. We began embedding AI within our proprietary technologies in 2019 and continue to expand its use. As we harness AI's advances, we expect our proprietary technologies to become more effective in supporting the execution of our Playbook.

- **Proprietary data.** Across more than 50 acquisitions and subsequent operations, we have accumulated extensive data. Sources include our product experimentation toolkit (3,000 experiments run in 2025) and our data infrastructure (3.8 billion data points processed per day on average in Q1 2026). This data supports faster and more informed decision-making in both acquisitions and operations. As AI advances and our ability to leverage complex data at scale improves, the value of our data may increase.

Since our founding, we have endeavored to be at the cutting edge of relevant technology. AI is no exception: For years, we have been leveraging it to enhance products, optimize marketing and monetization, and improve productivity. Many of our proprietary technologies incorporate AI. Our team of Spooners includes hundreds of talented and motivated software engineers, data scientists, and AI research engineers. We estimate that the share of pull requests[33] authored or coauthored by AI increased from less than 10% in Q1 2025 to more than 90% by the end of Q1 2026, with around 70% authored by AI alone. Revenue per full-time equivalent Spooner[34] was $1.12 million in 2023, $1.64 million in 2024, $2.57 million in 2025, and $0.97 million in Q1 2026, with AI being one of the catalysts of productivity gains.

In our view, AI is the most transformative technology of our time, and companies that adapt effectively may realize enormous benefits. Supported by our Platform, Bending Spoons has an opportunity to be among these companies. We believe that, through progress in AI, we will expand our advantage in product development, marketing, and monetization capabilities. We also believe our productivity advantage will widen and the scalability of our acquisition and transformation model will improve. Finally, as many companies lack diversification and may not be well equipped to leverage AI, certain owners' willingness to sell could increase, contributing to lower valuation levels and more attractive acquisition targets.

The Platform-powered execution of our Playbook has delivered financial performance we regard as strong. Revenue reached $1.31 billion in 2025, with a compounded annual growth rate of 84% in 2023 through 2025. In the same year, operating income as a percentage of revenue was 21% and Adjusted Operating Income Margin[35] was 47%. In 2023 through 2025, the compounded annual growth rate was not meaningful for diluted earnings (loss) per share and was 82% for Adjusted Earnings per Share.[36]




We are still early in our journey. We see a significant opportunity to continue compounding capital at attractive rates of return within an addressable market that we estimate includes more than 1,000 businesses generating nearly $400 billion in aggregate annual revenue in 2025.

---

[33] A "pull request" is a formal proposal to add, modify, or remove code in a shared software repository. It allows other contributors to review, discuss, and approve the proposed changes before they are merged into the repository.

[34] "Revenue per full-time equivalent Spooner" for a given quarter is defined as the revenue for that quarter divided by the number of full-time equivalent Spooners at the end of the quarter. "Revenue per full-time equivalent Spooner" for a given twelve-month period is defined as the revenue for that period divided by the average number of full-time equivalent Spooners at the end of each quarter within that period.

[35] As defined in *Management's discussion and analysis of financial condition and results of operations — Non-GAAP financial measures — Adjusted Operating Income and Adjusted Operating Income Margin.*

[36] As defined in *Management's discussion and analysis of financial condition and results of operations — Non-GAAP financial measures — Adjusted Earnings per Share.*

**500+ million**
Monthly active users in March 2026

**9+ million**
Monthly paying customers in March 2026

Businesses generating similar levels of revenue can have significantly different numbers of monthly active users and monthly paying customers. For example, WeTransfer, which caters to professionals, small enterprises, and their audiences, had 58 million monthly active users and 1 million monthly paying customers in March 2026. By contrast, Brightcove, which focuses on large enterprises, had approximately 15,000 monthly active users and 1,700 monthly paying customers during the same period.

### Businesses

In Q1 2026, our main businesses were, in alphabetical order, AOL, Brightcove, Eventbrite, Evernote, Harvest, komoot, Remini, StreamYard, Vimeo, and WeTransfer. In aggregate, these businesses accounted for more than 80% of our revenue for the period.

Below, we describe each of these businesses:

- **AOL.** Acquired in January 2026, AOL operates an email service, news portal, and search engine catering to a consumer audience.
- **Brightcove.** Acquired in February 2025, Brightcove provides video hosting, management, and streaming solutions for enterprises.
- **Eventbrite.** Acquired in March 2026, Eventbrite delivers event creation, ticketing, and discovery services for organizers and attendees.
- **Evernote.** Acquired in January 2023, Evernote is a productivity suite that supports note-taking and knowledge management for individuals and teams.
- **Harvest.** Acquired in July 2025, Harvest offers time-tracking and invoicing software for freelancers and professional services firms.
- **Komoot.** Acquired in March 2025, komoot provides route planning and navigation tools supported by community-generated content for outdoor activities.
- **Remini.** Acquired in June 2021, Remini is a consumer-focused image and video enhancement and generation application.
- **StreamYard.** Acquired in April 2024, StreamYard provides video recording and multi-destination live-streaming tools for creators and businesses.
- **Vimeo.** Acquired in November 2025, Vimeo serves consumers and enterprises with video hosting, management, and streaming solutions.
- **WeTransfer.** Acquired in July 2024, WeTransfer enables digital file storage and distribution for individuals and businesses.

In May 2026, we completed the acquisition of Tractive, which delivers solutions for monitoring the location and health of pets. Given how recently the acquisition was completed, the data presented in this prospectus does not include Tractive.

We envision our portfolio expanding as we continue to execute our acquisition-driven strategy. Consequently, businesses that currently contribute significantly to our overall revenue may become less central over time, particularly as our acquisition targets tend to become progressively larger. The following chart illustrates how the relative contribution of businesses generating 100% of our revenue in Q1 2024 declined to 24% by Q1 2026 as we completed new acquisitions. This is despite the revenue from those businesses growing in absolute terms over the same period.

Case: 26-1721 Document: 24-1 Page: 58 Filed: 08/19/2026



### *Organization*

The following are selected principles we follow when it comes to our organizational setup:

- **Centralized and dynamic staffing of Spooners.** We periodically review and adjust staffing levels across our organization, including following each acquisition. Where warranted, we reallocate Spooners among businesses, often making significant changes. We believe this practice supports efficient talent allocation and facilitates knowledge sharing across the organization, among other benefits.
- **Platform teams.** We operate several teams responsible for developing and delivering services designed to support all or almost all of our businesses. These teams span a wide range of areas, from Talent, which oversees recruiting, performance assessments, and more, to Foundations Technology, which provides tools for use cases such as data management and payment processing. Our Platform teams are staffed exclusively by Spooners.
- **Lean teams.** We have observed that, in our industry, overall team productivity often declines as teams grow larger, since increases in headcount can come at the expense of simplicity, talent density, and individual ownership. Maintaining lean teams is a core element of our operating model. We believe our proprietary technologies, which increasingly embed AI, have helped us achieve this.
- **Limited hierarchy.** We strive to keep our organization as flat as possible, as we find this reduces bureaucracy and internal politics, and — by keeping managers close to the operations — enhances decision-making quality. Today, in most cases, there are no more than three managerial layers between our CEO and an individual contributor Spooner.

## Proprietary technologies

Fueled by a commitment to continuously raising efficiency and productivity levels, Spooners have engineered — and keep refining — numerous technologies that enable us to do more and better work with fewer resources. While Platform teams such as Foundations Technology drive the development of our proprietary technologies, innovation often originates from our businesses. All improvements are made available across our portfolio. Our scale and the deep integration of our businesses into a shared Platform increase the expected return on investment in these technologies.

Our proprietary technologies are particularly valuable because they are purpose-built for our specific and evolving needs. This level of customization often results in functionality or performance that, in our context, exceeds what is available from off-the-shelf solutions, which are generally designed to serve a broader and more heterogeneous set of enterprise users. In addition, our technologies are tightly integrated with one another, making their deployment across acquired businesses straightforward and allowing them to deliver their full impact quickly. As a result, most of our businesses adopt nearly all of our proprietary technologies.

Today, we view our proprietary technologies as a source of competitive advantage, although we believe we have yet to realize their full potential. Advances in AI, in particular, are likely to enable us to develop new proprietary technologies and enhance existing ones. Accordingly, we intend to continue investing in our technological capabilities to strengthen our competitive position.

Below, we describe a representative sample of our proprietary technologies.

### *Pico, Lumen, and Abacus*

Taken together, Pico, Lumen, and Abacus form our data infrastructure. This infrastructure supports reliable and consistent data analysis across all of our businesses, and processed more than 3.8 billion data points per day on average in Q1 2026. Pico handles high-throughput data ingestion, Lumen performs data transformation, and Abacus computes and serves standardized metrics at scale. AI is used to harmonize schemas, tag events, and infer the purpose of data fields, including for privacy and compliance needs.

We began developing this infrastructure in 2017, and it has been a key area of investment ever since. AI has played an increasingly important role, with new models enabling more accurate and sophisticated analysis and a conversational interface

### *Marketing and monetization*

After experiencing Remini's viral spike in 2023, we focused on building the capabilities required to systematically engineer such spikes and thereby drive repeated accelerations in user growth. By developing sophisticated market screening tools (including user sentiment analysis) together with a dedicated experimentation framework, we have triggered six additional viral spikes.

With respect to monetization, shortly after the acquisition closed, we refocused Remini from one-time and consumable purchases to subscriptions. Subscriptions accounted for 43% of total revenue in 2021, increased to 85% in 2023, and have maintained approximately that level thereafter.

Leveraging our proprietary technologies and guided by insights from our proprietary data, we have conducted more than 1,000 monetization-related experiments at Remini, primarily aimed at optimizing subscription revenue, while also generating gains in advertising revenue. Through these initiatives, average revenue per monthly active user was 50% higher in 2025 than in 2021, which we view as a strong outcome, especially considering that monthly active users increased more than fivefold during the same period.

## Evernote

Evernote is a productivity suite that supports note-taking and knowledge management for individuals and teams. We acquired Evernote in January 2023.

In evaluating Evernote as a potential acquisition target, we were drawn to its strong brand recognition, with more than 200 million people having created an Evernote account prior to our acquisition. We also valued its robust subscriber retention, driven by a rich feature set and a highly engaged and tenured customer base. Many customers had thousands of notes stored in Evernote and had developed personalized workflows on and around the product. At the time of acquisition, the average customer tenure was 7.2 years. In addition, we identified scope to improve operational efficiency and enhance the product, among other areas of opportunity. Finally, Evernote's scale further reinforced its attractiveness, as the acquisition would contribute meaningfully to our overall revenue.

Since the acquisition, we have implemented extensive changes, reducing operating costs while accelerating the pace of innovation, overhauling the product and its underlying technology, and optimizing marketing and monetization. These efforts have driven revenue growth and improved profitability, and we expect Evernote to continue to grow in the coming years. The following graph presents Evernote's revenue as a percentage of its 2021 revenue for the periods shown. The data presented in the graph has not been derived from audited financial statements.




The infographic below provides an overview of post-acquisition product development at Evernote.

TABLE OF CONTENTS

**evernote** | Acquired January 2023




## PRODUCT REBUILD

Since acquiring Evernote, we have redesigned its desktop and mobile applications, expanded the feature set, and progressively integrated AI into the product. This culminated in Evernote v11, which upgraded search, enabled interacting with notes, tasks, and calendar through a chat interface, and introduced meeting transcription and synthesis.

## AI IN EVERNOTE V11

Evernote v11 took a major engineering effort. We indexed each user's notes — around 3.2 billion in total — to make them searchable by meaning, not just by keyword, and worked closely with a leading AI-model provider to bring an AI assistant directly into the product.




**Semantic Search.** The most-requested feature from the past decade, it enables smoother and more powerful search.



**AI Assistant.** A chat interface supporting content generation, organization, and search through natural-language prompts.



**AI Meeting Notes.** Meetings turn into a full transcript with summary, speaker recognition, and multilingual translation.

## DEVELOPMENT TIMELINE

| | | | |
|---|---|---|---|
| 2023 | 8+ IMPROVEMENTS | | |
| | | **Foundations** | New data architecture and real-time editing \| Improved two-factor authentication |
| 2024 | 80+ IMPROVEMENTS | | |
| | | **Core** | Full redesign \| User interface customization options \| New metadata synchronization engine |
| | | **Collaboration** | Co-editing \| Accountless note-sharing via link \| Browser-based lite editor for accountless collaboration |
| | | **AI Transcribe** | Audio transcriptions \| Image transcription including handwritten notes |
| 2025 | 160+ IMPROVEMENTS | | |
| | | **Editor** | Inline calculations \| Focus mode \| Improved audio recording \| Better markdown support |
| | | **Search** | Refreshed search modal \| Smarter type-ahead suggestions \| Streamlined filtering |
| | | **Visual Identity** | Refreshed logo and iconography |
| Q1 2026 | 20+ IMPROVEMENTS | | |
| | | **Semantic Search** | Meaning-based matching \| Summaries of key results |
| | | **AI Assistant** | Complex search \| Content generation \| Brainstorming \| Account organization |
| | | **AI Meeting Notes** | Meeting recording \| Speaker-labeled transcripts \| Summaries \| Translations |

We describe some of the improvements in greater detail below.

### *Organization*

Within the first year following the acquisition, we rebuilt the organization with the objective of improving both cost efficiency and execution speed.

The number of full-time equivalent team members dedicated to Evernote declined from 341 at the time of the acquisition to 60 (nearly all of whom were Spooners) at the end of 2024, a reduction of 82%. We brought management layers down from four to two, and removed many rules and processes in favor of greater individual responsibility — and corresponding accountability — across the organization.

Taken together, we believe these changes increased talent density, motivation, autonomy, and urgency, contributing to higher productivity and a faster pace of innovation and optimization. Consistent with this acceleration, the number of product releases grew 50% in 2023, and then doubled in 2024. While this metric does not fully capture execution speed, it illustrates the higher rate at which the team was able to deliver updates following the reorganization.

Since then, we have continued to refine Evernote's organization, always optimizing for Bending Spoons as a whole. For example, to appropriately staff the Harvest team following our acquisition of that business in July 2025, we redeployed approximately half of the team previously dedicated to Evernote, enabling us to execute the Harvest transformation quickly and effectively. Supported by the organizational and technological foundations established by that point, the remaining Evernote team absorbed this change smoothly and has continued to deliver product and monetization improvements at a rapid pace. The team released over 150 updates in 2025, broadly in line with 2024, while also preparing the launch of Evernote v11 — the product's most significant update in years — which was rolled out in early 2026.

### *Technology*

At the time of acquisition, Evernote's technological foundation was dated, resulting in subpar performance and reliability and constraining development velocity.

We began by integrating our proprietary technologies. We also dismantled Evernote's monolithic system into microservices — that is, we transitioned it from a consolidated, difficult-to-navigate, and fragile architecture to a more modular, intuitive, and robust one. Moreover, we modernized Evernote's client-server communication model, transitioning from a polling-based approach to an event-driven one. By delivering updates to clients as changes occur, rather than relying on frequent requests, we reduced unnecessary IT infrastructure load and related costs, improved server responsiveness, and mitigated data consistency issues when notes were edited across devices.

Although complex due to the scale and criticality of the system, this work proved worthwhile. Together with other initiatives, it reduced IT infrastructure expense as a percentage of revenue by 47% in 2025 compared to 2022. At the same time, the new architecture, combined with efforts to streamline the codebase, enabled our software engineers to optimize critical components and deliver measurable performance gains. For example, in 2025 we accelerated the note editor loading process, reducing median note opening time by 35% across all devices.

Beginning in 2023, we also undertook an engineering effort to strengthen product reliability. Prioritization was guided by automated analyses of customer support interactions generated by one of our proprietary technologies. From 2023 through 2025, we shipped over 6,000 reliability-related enhancements, ultimately reaching a point where, in 2025, a dedicated reliability team was no longer required.

### *Product*

We had ambitious plans for Evernote as a product and, supported by the improved organizational and technological foundations, we invested accordingly.

One year after the acquisition closed, we released fully redesigned versions of the desktop applications, aligning the product's visual language with contemporary interface standards. Shortly thereafter, we rolled out corresponding updates to the mobile applications, using the opportunity to reimagine the information-capture experience.

We have also delivered substantial improvements to the feature set. These include a more powerful search experience, updates to the note editor (such as the release of draggable paragraphs and slash commands), and enhancements to the functionality catering to teams (such as the introduction of comments, guest collaboration, and more granular access controls). Alongside these larger initiatives, we have delivered hundreds of smaller improvements. Notable examples include two-way calendar synchronization, a new task-management view, customizable navigation, collapsible headers, and refined content sorting and filtering.

We first integrated AI into Evernote's core workflows in 2023, strengthening note search and editing capabilities. In 2024, we extended our AI offering with image and audio transcription, enabling users to convert multimedia content into searchable text. In early 2026, we rolled out a major AI-focused update (Evernote v11) which further upgraded search, introduced meeting recording, transcription, and synthesis, and enabled users to interact with their notes, tasks, and calendar through a dedicated chat interface. We estimate that these AI-driven features have already contributed to more than 2 million additional registrations and 50,000 incremental subscription conversions.

### *Marketing and monetization*

Year-over-year growth in new user registrations had been negative for several years: (23)% in 2021, (23)% in 2022, and (20)% in 2023. Combined with the product improvements described above, our marketing capabilities helped reverse this multi-year decline. New user registrations increased by 29% in 2024 and 20% in 2025.

From 2023 through 2025, we leveraged our proprietary technologies to launch more than 200 experiments across a range of areas, including evaluating the impact of new features on retention, testing alternative price points, and iterating on the user experience at onboarding. Experiment ideation and prioritization were supported by insights from our proprietary data.

One of the most consequential changes was allowing non-paying users to access all features — many of which, such as task management and calendar integration, had previously been behind a paywall — while introducing usage limits on selected functionalities. Following the rollout of this change, and supported by prior optimizations, subscription conversions triggered by reaching a usage limit increased in 2024 to approximately twice their level in 2022, the last full pre-acquisition year. In 2025, such usage limits accounted for 51% of all conversions.

We also rearchitected Evernote's subscription plans to better align pricing with how different customer segments, including enterprises, engage with the product. These monetization initiatives, in combination with an improving product, resulted in average revenue per monthly active user being 2.5 times as high in 2025 as in 2022.

## StreamYard

StreamYard provides video recording and multi-destination live-streaming tools for creators and businesses. We acquired StreamYard in April 2024.

StreamYard benefited from high levels of organic customer acquisition, driven largely by word of mouth and reflecting a well-established brand within the live-streaming niche. Subscriber retention was strong and, combined with the limited dependence on paid advertising, supported reliable earnings forecasts. In addition, we identified opportunities to increase revenue and lower costs, with the potential to contribute significantly to our overall profitability.

Since the acquisition, we have streamlined the organization, enhanced the technology and product, and optimized monetization and marketing. These initiatives have accelerated growth and improved profitability, and we believe additional growth lies

# Management

## Executive officers and board of directors

The following table provides information regarding our executive officers and board of directors as of , 2026:

| Name | Age | Position |
|---|---|---|
| Luca Ferrari | 41 | Chair of the board of directors, co-founder, and chief executive officer |
| Francesco Mancone | 31 | Chief technology officer |
| Enrico Martinelli | 34 | Co-chief financial officer |
| Francesco Patarnello | 40 | Vice chair of the board of directors, co-founder, and head of business acquisitions |
| Ignacio José Pereira | 37 | General counsel |
| Davide Giorgio Andrea Scarpazza | 36 | Co-chief financial officer |
| Matteo Danieli | 41 | Director |
| Joshua Motta | 42 | Director |
| Robert J. Mylod, Jr. | 59 | Director |
| Donald D. O'Neal | 65 | Director |
| Leah Schwartz | 37 | Director |
| Steve Sinwell | 65 | Director |
| Paola Tagliavini | 57 | Director |

The following is a summary of the business experience of our executive officers and directors. Their current business address is Via Nino Bonnet 10, 20154 Milan, Italy.

## Executive officers

***Luca Ferrari*** co-founded Bending Spoons and has served as our chief executive officer and on our board of directors since June 2013. From 2010 to 2012, he worked as an associate at McKinsey & Company. He co-founded Evertale, a startup developing an AI-based self-writing diary application, where he worked from 2010 to 2013. From 2018 to 2021, he served as director at WeRoad, a social adventure travel company. Mr. Ferrari holds a Master of Science in Telecommunications Engineering from the Technical University of Denmark, and a Master of Science in Electrical & Electronics Engineering and a Bachelor of Science in Information Engineering from the University of Padua, Italy, each with honors.

***Francesco Mancone*** has served as our chief technology officer since November 2023. He joined Bending Spoons in February 2019, and has served within our data science, marketing, and software engineering functions. Mr. Mancone holds a Master of Science in Computer Engineering and a Bachelor of Science in Information Engineering from the University of Padua, Italy, each with honors.

***Enrico Martinelli*** has served as our co-chief financial officer since September 2025, and he is responsible for accounting and financial reporting. He joined Bending Spoons in September 2015, and has served within our AI, data science, and software engineering functions. Mr. Martinelli holds a Master's degree in Software Engineering from Politecnico di Milano, Italy, and a Bachelor's degree in Software Engineering from Università di Modena e Reggio Emilia, Italy, each with honors.

***Francesco Patarnello*** co-founded Bending Spoons and has served as our head of business acquisitions and on our board of directors since June 2013. He co-founded Evertale, a startup developing an AI-based self-writing diary application, where he served as chief executive officer from 2010 to 2013. Mr. Patarnello holds a Master of Science in Telecommunications Engineering from the Technical University of Denmark and a Master of Science in Electronics Engineering from the University of Padua, Italy, each with honors.

***Ignacio José Pereira*** has served as our general counsel since December 2022. He joined Bending Spoons in August 2019, serving as legal counsel. From 2018 to 2019, he served as Project Leader, Legal Support for Digital Innovation at the law firm

BonelliErede in Milan, Italy. From 2012 to 2016, he worked in private practice in Buenos Aires, Argentina. Mr. Pereira holds a Master of Laws in Law, Science and Technology from Stanford Law School and a law degree from Universidad Torcuato Di Tella in Buenos Aires, Argentina. He is admitted to the State Bar of California and is a Certified Information Privacy Professional/Europe by the International Association of Privacy Professionals.

***Davide Giorgio Andrea Scarpazza*** has served as our chief financial officer since joining Bending Spoons in August 2016, and he is responsible for financing and tax. From 2014 to 2016, he worked as a consultant at Oliver Wyman. Mr. Scarpazza holds a Master's degree in Economics and Law and a Bachelor's degree in Business Administration and Management from Università Bocconi in Milan, Italy, each with honors.

## Non-executive directors

***Matteo Danieli*** co-founded Bending Spoons and has served on our board of directors and within our product function since June 2013. He co-founded Evertale, a startup developing an AI-based self-writing diary application, where he served as chief technology officer from 2011 to 2013. Mr. Danieli holds a Master of Science in Telecommunications Engineering from the Technical University of Denmark, and a Master of Science in Telecommunications Engineering and Bachelor of Science in Information Engineering from the University of Padua, Italy, each with honors.

***Joshua Motta*** has served on our board of directors since September 2025. Mr. Motta co-founded and has served as chief executive officer of Coalition, Inc., a cyber insurance and security company, since 2017. Prior to founding Coalition, he worked at Cloudflare, at Francisco Partners, and in the Goldman Sachs Investment Banking Division. Since August 2024, Mr. Motta has served as an Advisory Board Member of the College Advisory Council at The University of Chicago. He holds a Bachelor of Arts from The University of Chicago, where he graduated with honors and was elected to Phi Beta Kappa.

***Robert J. Mylod, Jr.*** has served on our board of directors since July 2024. He also serves on the boards of Booking Holdings, Inc., Vroom, Inc., StockX Inc., and Southern Bancshares, Inc. Since 2012, he has served as Managing Partner at Annox Capital Management, Inc., a venture capital investment firm. From 1999 to 2011, he served as Chief Financial Officer and Vice Chairman of Booking Holdings, Inc. Mr. Mylod holds a Master of Business Administration from the University of Chicago Booth School of Business, and a Bachelor of Arts in English from the University of Michigan.

***Donald D. O'Neal*** has served on our board of directors since February 2026. From 1985 to 2025, he served as a Partner at Capital Group, Inc., a global investment management firm. He served as a director of the Growth Fund of America from 1998 to 2024, Investment Company of America from 1996 to 2020, Salzburg Global Seminar from 2007 to 2019, and American Funds Insurance Series — Growth-Income Fund from 2002 to 2018. Mr. O'Neal holds a Master of Business Administration from Stanford University, and a Bachelor of Science in Nuclear Engineering from the University of California, summa cum laude. He is a Chartered Financial Analyst.

***Leah Schwartz*** has served on our board of directors since July 2024. She joined Allen & Company in 2016, where she is a Managing Director. From 2011 to 2014, she worked at Goldman Sachs. Ms. Schwartz holds a Bachelor of Arts in Social Studies from Harvard University, where she graduated magna cum laude and was elected to Phi Beta Kappa.

***Steve Sinwell*** has served on our board of directors since November 2025. He spent 39 years at Deloitte and Touche LLP, serving as Vice Chair and Senior Partner from 2021 until his retirement in 2023, and previously as lead client service partner to several of Deloitte's largest SEC clients. Mr. Sinwell holds a Bachelor's degree in Accounting and Computer Science from California State University. He is a Certified Public Accountant.

***Paola Tagliavini*** has served on our board of directors since March 2026. She also serves as Deputy Chair and non-executive director of Intesa Sanpaolo S.p.A., where she chairs the Risk and Sustainability Committee, and as a director of Dexelance S.p.A. She previously served as a non-executive director and Chair of the Risk Committee at Saipem S.p.A., Rai Way S.p.A., Interpump Group S.p.A., and SAVE S.p.A., and as statutory auditor at Brembo S.p.A., RCS MediaGroup S.p.A., and OVS S.p.A. She is a faculty member at Bocconi University and SDA Bocconi, teaching risk management, internal controls, and audit-related courses since 1993. Ms. Tagliavini holds a degree in Business Administration from Bocconi University in Milan, Italy, with honors. She is registered in the Italian register of auditors *(registro dei revisori legali).*

## Family relationships

There are no family relationships among any of our executive officers or directors.

## Composition of our board of directors

The Italian Civil Code provides for three alternative corporate governance systems for a company's management and control, consisting of, respectively, (i) a board of directors and a board of statutory auditors, (ii) a management board and a supervisory board, or (iii) a board of directors and an audit committee (*comitato per il controllo sulla gestione*).

On April 23, 2026, in connection with the approval of our Bylaws and subject to and with effect from the effective date of this registration statement, we adopted the corporate governance system with a board of directors and an audit committee. The board of directors will be elected by a shareholder meeting, and the audit committee will be, in turn, elected by the board of directors from among its members.

The board of directors that will take office subject to and with effect from the effective date of this registration statement will consist of nine members. At least one third of the members of our board of directors, rounded up to the highest number, must meet the independence requirements set forth by our Bylaws and the Italian Civil Code. Our board of directors has determined that Joshua Motta, Robert J. Mylod, Jr., Donald D. O'Neal, Steve Sinwell, and Paola Tagliavini do not have relationships that would interfere with the exercise of independent judgment in carrying out their responsibilities as directors and that each of these directors is an "independent" director as defined under Nasdaq rules, our Bylaws, and the Italian Civil Code.

## Audit committee

We expect that our board of directors that will take office subject to and with effect from the effective date of this registration statement will elect an audit committee.

The audit committee will oversee our accounting and financial reporting processes, the audits and integrity of our financial statements, adherence to sound management principles, the adequacy and effective functioning of our organizational, administrative, and accounting structure, compliance with applicable law and our Bylaws, and the qualifications and independence of our auditor. The audit committee may perform additional activities upon the request of our board of directors. Members of our audit committee must meet the independence requirements under Nasdaq independence rules, article 2396-*septies* of the Italian Civil Code, and the additional requirements of independence and financial expertise required by applicable law (including Rule 10A-3 of the Exchange Act). Members of the executive committee (when present) and directors who hold delegated powers, special offices, or who perform management functions at Bending Spoons or at companies that control or are controlled by it, may not serve on the audit committee. At least one member of the audit committee must be registered in the Italian register of auditors (*registro dei revisori legali*), and at least one member must qualify as an "audit committee financial expert" within the meaning of applicable SEC rules. The audit committee will be governed by a charter that will be consistent and compliant with SEC and Nasdaq rules and applicable law.

The audit committee is expected to consist of Robert J. Mylod, Jr., Donald D. O'Neal, Steve Sinwell, and Paola Tagliavini. Our board of directors has determined that each of Robert J. Mylod, Jr., Donald D. O'Neal, Steve Sinwell, and Paola Tagliavini satisfies the independence requirements under Nasdaq independence rules, article 2396-*septies* of the Italian Civil Code, and Rule 10A-3 under the Exchange Act. Steve Sinwell is considered an "audit committee financial expert," and Paola Tagliavini is registered in the Italian register of auditors (*registro dei revisori legali*). Steve Sinwell will serve as chair of the audit committee.

## Duties of directors

Under Italian law, the board of directors is generally responsible for the management of the company. The board may take all actions it deems useful and appropriate to achieve our corporate purpose, except for matters reserved for our shareholders under our Bylaws and applicable law. Directors must generally act with care, in the company's interest, without pursuing personal interests, and on an informed basis.

The applicable standard of conduct is assessed on a case-by-case basis, taking into account, among other factors, the characteristics of the company, the specific tasks and responsibilities assigned to each director, and each director's experience and qualifications.

Directors are also subject to a number of statutory duties, including obligations relating to the maintenance of corporate books and records, the preparation and filing of annual financial statements, the convening of shareholder meetings when required, and the monitoring of the company's financial position.

To the extent permitted by our Bylaws and applicable law, the board of directors may delegate its authority and responsibility to one or more of its members or to an executive committee from among its members.

## Election of directors

Pursuant to our current bylaws, which will be amended and restated subject to and with effect from the effective date of this registration statement, all members of our board of directors are elected by the holders of our class A shares by a majority vote. If, for two consecutive meetings, the members of our board of directors are not elected by the holders of our class A shares by a majority vote, they are instead elected at a shareholder meeting with the majorities required under applicable law. The board of directors that will take office as of the effective date of this registration statement was elected in accordance with these provisions on May 28, 2026. Any future election of a member of our board of directors will be governed by our Bylaws. For additional information, see *Description of share capital and bylaws*.

## Code of ethics

We have adopted a code of ethics that addresses, among other things, conflicts of interest, compliance matters, and other company policies such as equal opportunity and non-discrimination standards. Our code of ethics applies to all of our executive officers, directors, and other team members.

Upon our listing on Nasdaq, our code of ethics will be available on our website. In addition, we intend to post on our website all disclosures that are required by applicable law or the Nasdaq rules concerning any amendments to, or waivers from, any provision of the code.

## Foreign private issuer status

As a foreign private issuer whose shares will be listed on Nasdaq, we will have the option to follow certain Italian corporate governance practices rather than certain Nasdaq requirements applicable to domestic issuers. We intend to rely on this "foreign private issuer exemption" with respect to the following requirements:

- Nasdaq Rule 5605(b)(2), which requires that independent directors regularly meet in executive session, where only independent directors are present. Our independent directors may choose to meet in executive session at their discretion.
- Nasdaq Rule 5605(d)(2), which requires that a listed company have a compensation committee composed of entirely independent directors. Under Italian law, we are not required to establish internal board committees apart from the audit committee *(comitato per il controllo sulla gestione)*.
- Nasdaq Rule 5605(e), which requires that director nominees must either be selected, or recommended for the board's selection, either by independent directors constituting a majority of the board's independent directors in a vote in which only independent directors participate, or a nomination committee comprised solely of independent directors. Under Italian law, we are not required to establish internal board committees apart from the audit committee *(comitato per il controllo sulla gestione)*.
- Nasdaq Rule 5620(c) regarding quorum requirements applicable to meetings of shareholders. Such quorum requirements are not required under Italian law. The quorum requirements as set forth in our Bylaws and Italian law apply.
- Nasdaq Rule 5635(a) regarding shareholder approval requirements in connection with an acquisition of shares or assets of another company where any director, officer, or substantial shareholder has a 5% or greater interest in the target company or the consideration to be received, or that involves the issuance of 20% or more of the acquirer's shares or voting rights.

- Nasdaq Rule 5635(c) regarding shareholder approval requirements for the issuance of securities in connection with a stock option or purchase plan that is established or materially amended, or other equity compensation arrangement that is established or materially amended.

Although we may rely on certain home country corporate governance practices, we will be required to comply with Nasdaq's Notification of Noncompliance requirement (Nasdaq Rule 5625) and the Voting Rights requirement (Nasdaq Rule 5640). Further, we must have an audit committee that satisfies Nasdaq Rule 5605(c)(3), which addresses audit committee responsibilities and authority and requires that the audit committee consist of members who meet the independence requirements of Nasdaq Rule 5605(c)(2)(A)(ii).

Except as stated above, we intend to comply with the rules generally applicable to U.S. domestic issuers listed on Nasdaq. We may in the future decide to use other foreign private issuer exemptions with respect to some or all of the other Nasdaq listing requirements. Upon the effectiveness of this registration statement, we will be subject to both the provisions of the Italian Civil Code that apply to joint stock companies and to companies listed on a regulated market *(società che fanno ricorso al mercato del capitale di rischio)*. As described in more detail in *Description of share capital and bylaws*, these provisions differ in a number of ways from those applicable to U.S. domestic issuers under the rules of Nasdaq. Following our home country governance practices, as opposed to the requirements that would otherwise apply to a company listed on Nasdaq, may provide less protection than is accorded to investors under Nasdaq listing requirements applicable to domestic issuers.

We intend to take all actions necessary for us to maintain compliance as a foreign private issuer under the applicable corporate governance requirements of SOX, the rules adopted by the SEC, and Nasdaq listing standards.

As a foreign private issuer, our officers and directors will be subject to Section 16(a) reporting requirements on Forms 3, 4, and 5 with regard to the disclosure of their beneficial ownership and changes in ownership of our securities. However, these officers and directors will not be subject to short-swing profit and short sale reporting obligations under Sections 16(b) and (c) of the Exchange Act.

## Executive officer and director compensation

For 2025, the total compensation for our executive officers and directors was approximately $10.8 million, of which approximately $2.2 million was paid in cash, and approximately $8.6 million represents the grant date fair value of equity compensation earned during 2025 as calculated in accordance with Accounting Standards Codification ("ASC") Topic 718. See *Equity compensation expense* in Note 11 to our audited consolidated financial statements included elsewhere in this prospectus for the assumptions used in calculating this amount. The total amount set aside or accrued by us to provide pension, retirement, or similar benefits *(trattamento di fine rapporto)* to our executive officers and directors with respect to 2025 was approximately $0.2 million.

## Executive officer agreements

We have entered into employment agreements with our executive officers other than Luca Ferrari, our chief executive officer, and Francesco Patarnello, our head of business acquisitions. These agreements follow the applicable Italian industry-wide collective bargaining agreements for matters not specifically covered, such as notice periods and holiday entitlement. Our agreements with such executive officers also contain customary provisions regarding confidentiality of information and assignment of intellectual property rights. However, the enforceability of such provisions may be limited under applicable law.

## Equity compensation

### Stock option plans

We have granted stock options to purchase class X-1 and class X-2 shares to eligible team members under our stock option plans (as amended from time to time, the "Stock Option Plans"). Upon the effectiveness of our Bylaws and the completion of this offering, all outstanding stock options granted under the Stock Option Plans will convert into stock options to purchase our ordinary shares. The material terms of our Stock Option Plans are summarized below.

The applicable statutory tax rates used for this unaudited pro forma condensed combined financial information may vary from the actual effective rates in periods as of and after the completion of the acquisition.

## 5. AOL Holdco II LLC historical for the year ended December 31, 2025 (as adjusted)

The financial information below illustrates the audited financial statements of AOL Holdco II LLC for the year ended December 31, 2025, prepared in accordance with GAAP and included elsewhere in this prospectus, to present them on a basis consistent with our accounting policies.

**AOL historical income statements presentation**

| *Thousands* | AOL income statements from January 1 to December 31, 2025 | Accounting policy and reclassification adjustments | Note |
|---|---|---|---|
| Revenue | $ 633,365 | | |
| Cost of revenues (exclusive of depreciation and amortization shown below) | $ 56,410 | $ 115,922 | (A) |
| | | $ 9,738 | (B) |
| | | $ 51,877 | (C) |
| | | $ 65,808 | (D) |
| Selling, general and administrative expense | $ 181,710 | $ (181,710) | (E) |
| Depreciation and amortization expense | $ 61,635 | $ (61,635) | (F) |
| Total operating expenses | $ 299,755 | | |
| Operating profit | $ 333,610 | | |
| Other income, net | $ 3,338 | | |
| Interest expense | $ (85,385) | | |
| Profit before income taxes | $ 251,563 | | |
| Provision for income taxes | $ (68,406) | | |
| Net income | $ 183,157 | | |

**Bending Spoons income statements presentation**

| *Thousands* | AOL income statements from January 1 to December 31, 2025 (as adjusted) |
|---|---|
| Revenue | $ 633,365 |
| Cost of revenue | $ 172,332 |
| Gross profit | $ 461,033 |
| Research and development expense | $ 9,738 |
| Sales and marketing expense | $ 51,877 |
| General and administrative expense | $ 65,808 |
| Operating income | $ 333,610 |
| Interest expense | $ 85,385 |
| Other expense (income) | $ (3,338) |
| Income before tax | $ 251,563 |
| Income tax expense (benefit) | $ 68,406 |
| Net income | $ 183,157 |

(A) Reclassification of $61 million from depreciation and amortization expense and $56 million from selling, general and administrative expense to cost of revenue; reclassification of $2 million from cost of revenues to general and administrative expense.

(B) Reclassification of $10 million from selling, general and administrative expense to research and development expense.

(C) Reclassification of $52 million from selling, general and administrative expense to sales and marketing expense.

(D) Reclassification of $2 million from cost of revenues, $64 million from selling, general and administrative expense, and $0.2 million from depreciation and amortization expense to general and administrative expense.

(E) Reclassification of $56 million from selling, general and administrative expense to cost of revenue, $52 million to sales and marketing expense; $10 million to research and development expense, and $64 million to general and administrative expense.

(F) Reclassification of $61 million from depreciation and amortization expense to cost of revenue; reclassification of $0.2 million from depreciation and amortization expense to general and administrative expense.

# Certain relationships and related party transactions

*This section contains summaries of certain transactions and relationships with our directors, executive officers, and certain of our shareholders since January 1, 2023. Because these descriptions are only summaries of the applicable agreements, they do not necessarily contain all of the information that investors may find useful. For a complete description of the relevant compensation arrangements, see "Management."*

## Note regarding stock splits and reverse stock splits

Unless otherwise indicated, share and stock option amounts in this section are presented on the basis in effect at the time of the relevant transaction and have not been retroactively adjusted to reflect the 20-for-1 stock split that was approved on March 13, 2024, the 10-for-1 stock split that was approved on April 23, 2026, or the 1-for-2 reverse stock split that was approved on May 28, 2026.

## Transactions with executive officers and directors prior to this offering

### Luca Ferrari

Luca Ferrari serves as our chief executive officer and chair of our board of directors. In 2022, Mr. Ferrari received a gross bonus of €824,520 from us, which he used to purchase 8,500 class E shares, later converted into class X-1 shares, through a capital increase on December 19, 2022. In connection with this purchase, Mr. Ferrari entered into a shareholder agreement with the then-existing holders of class B and class A shares pursuant to which he committed to transfer such shares to us, individuals identified by us, or the holders of class A shares by December 31, 2027, and transfer to us, as a non-refundable capital contribution, the proceeds from the sale of such shares. This shareholder agreement was terminated in April 2026. Mr. Ferrari retained ownership of 644,175 class X-1 shares.

In 2024, Mr. Ferrari received a two-day short-term loan of €1,119,999.68 from us, representing an advance of the tax due on the sale of some of his shares. This loan was repaid in full and is no longer outstanding.

### Francesco Patarnello

Francesco Patarnello serves as our head of business acquisitions and vice chair of our board of directors. In 2024, Mr. Patarnello received a two-day short-term loan of €1,119,999.68 from us, representing an advance of the tax due on the sale of some of his shares. This loan was repaid in full and is no longer outstanding.

### Matteo Danieli

Matteo Danieli serves as a member of our board of directors. In 2024, Mr. Danieli received a two-day short-term loan of €1,087,994 from us, representing an advance of the tax due on the sale of some of his shares. This loan was repaid in full and is no longer outstanding.

### Leah Schwartz

Leah Schwartz serves as a member of our board of directors. Pursuant to the arrangements described in *Management — Warrants*, Ms. Schwartz was granted 5,735 warrants in December 2024 at a discount, which was applied equally to the grants to all similarly situated team members. These warrants were exercised in December 2025 and we paid Ms. Schwartz $257,526.53 in cash in December 2025 to cover certain costs incurred in connection with the exercise of such warrants. As compensation for her services as a director in 2025, we granted Ms. Schwartz 8,014 class X-1 treasury shares, which were automatically converted into class X-2 shares upon the transfer of the shares, free of charge in December 2025. Pursuant to the arrangements described in *Management — Warrants*, Ms. Schwartz was granted 3,549 warrants in January 2026 at a discount, which was applied equally to the grants to all similarly situated team members. These warrants currently remain unexercised.

Case: 26-1721 Document: 24-1 Page: 70 Filed: 08/19/2026



Ms. Schwartz also serves as a managing director of Allen & Company LLC, a financial advisor and shareholder of ours, and she is a member of Allen Operations, LLC (Allen & Company LLC's parent entity), which is also one of our shareholders. Allen & Company LLC holds 2,895,200 class X-2 shares which represent approximately 0.48% of our outstanding shares, and Allen Operations, LLC holds 2,800,000 class X-1 shares which represent approximately 0.47% of our outstanding shares. In February 2023, Ms. Schwartz purchased 1,200 class E shares, later converted into class X-1 shares, through a capital increase for €90,108 in an arm's length transaction alongside Allen Operations, LLC and other Allen & Company LLC team members. In April 2023, Ms. Schwartz, in her capacity as managing director of Allen & Company LLC, signed a financial advisory engagement letter with us on behalf of Allen & Company LLC (the "Engagement Letter"), pursuant to which Allen & Company LLC provides strategic and financial advisory services to us. In connection with an equity financing completed in the first quarter of 2024, Allen & Company LLC received an advisory fee of $874,227 in cash and 27,200 class X-3 treasury shares, which were automatically converted into class X-2 shares upon the transfer of the shares, of which 4,080 class X-2 shares were attributed to Ms. Schwartz. Effective July 23, 2025, Allen & Company LLC temporarily suspended the services provided under the Engagement Letter in connection with the acquisitions of Vimeo, Inc. and Eventbrite, Inc. Such services have been resumed following the completion of the acquisition of Eventbrite, Inc.

### Robert J. Mylod, Jr.

Robert J. Mylod, Jr. serves as a member of our board of directors. Pursuant to the arrangements described in *Management — Warrants,* Mr. Mylod was granted 5,735 warrants in December 2024 at a discount, which was applied equally to the grants to all similarly situated team members. These warrants were exercised in December 2025 and we paid Mr. Mylod $257,526.53 in cash in December 2025 to cover certain costs incurred in connection with the exercise of such warrants. As compensation for his services as a director in 2025, we granted Mr. Mylod 8,014 class X-1 treasury shares, which were automatically converted into class X-2 shares upon the transfer of the shares, free of charge, in December 2025. Pursuant to the arrangements described in *Management — Warrants*, Mr. Mylod was granted 3,549 warrants in January 2026 at a discount, which was applied equally to the grants to all similarly situated team members. These warrants currently remain unexercised.

### Joshua Motta

Joshua Motta serves as a member of our board of directors. Pursuant to the arrangements described in *Management — Warrants,* Mr. Motta was granted 3,549 warrants in January 2026 at a discount, which was applied equally to the grants to all similarly situated team members. These warrants currently remain unexercised. In November 2025, Mr. Motta also purchased through his trust, To Kalon Trust, 4,476 class X-1 treasury shares, which were automatically converted into class X-2 shares upon the transfer of the shares, at a discount out of the ordinary course of business.

### Steve Sinwell

Steve Sinwell serves as a member of our board of directors. Pursuant to the arrangements described in *Management — Warrants*, Mr. Sinwell was granted 3,549 warrants in January 2026 at a discount, which was applied equally to the grants to all similarly situated team members. These warrants currently remain unexercised. In November 2025, Mr. Sinwell also purchased 2,407 class X-1 treasury shares, which were automatically converted into class X-2 shares upon the transfer of the shares, at a discount out of the ordinary course of business.

### Donald D. O'Neal

Donald D. O'Neal serves as a member of our board of directors. Pursuant to the arrangements described in *Management — Warrants,* Mr. O'Neal was granted 3,060 warrants in February 2026 at a discount, which was applied equally to the grants to all similarly situated team members. These warrants currently remain unexercised. In February 2026, Mr. O'Neal also purchased through his trust, The Donald and Sally J. O'Neal Community Property Trust, 4,461 class X-1 treasury shares at a discount out of the ordinary course of business, and 11,193 class X-1 treasury shares, at fair market value, all of which were automatically converted into class X-2 shares upon the transfer of the shares.

TABLE OF CONTENTS

# Experts

## Bending Spoons S.p.A.

The consolidated financial statements of Bending Spoons S.p.A. as of December 31, 2023, 2024, and 2025 and for each of the three years in the period ended December 31, 2025, included in this prospectus have been audited by Deloitte & Touche S.p.A., an independent registered public accounting firm, as stated in their report. Such financial statements are included in reliance upon the report of such firm given their authority as experts in accounting and auditing. The current address of Deloitte & Touche S.p.A. is Via Santa Sofia, 28, 20122 Milano.

## AOL Holdco II LLC

The combined financial statements of AOL Holdco II LLC at December 31, 2025 and 2024, and for each of the two years in the period ended December 31, 2025, appearing in this prospectus and registration statement have been audited by Ernst & Young LLP, independent auditors, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing. The current address of Ernst & Young LLP is One Manhattan West, New York, NY, 10001.

## Vimeo, Inc.

The consolidated financial statements of Vimeo, Inc. at December 31, 2024 and 2023, and for the years then ended, appearing in this prospectus and registration statement have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing. The current address of Ernst & Young LLP is One Manhattan West, New York, NY, 10001.

## Other considerations

Deloitte & Touche S.p.A. ("Deloitte Italy") has complied with the local independence standards in Italy for the years ended December 31, 2023, 2024, and 2025. Following the acquisition of Vimeo, Inc. by Bending Spoons in November 2025, Deloitte & Touche Ukrainian Services Company ("Deloitte Ukraine"), an associated entity of Deloitte Italy, continued to provide bookkeeping and legal services to Vimeo, Inc.'s subsidiary in Ukraine until December 2025 that were considered permissible under the local independence standards but were impermissible under the auditor independence rules of the SEC and the PCAOB. The bookkeeping services were originally for Vimeo, Inc.'s financial and management reporting purposes, and the legal services related to a tax dispute before a court and certain employment matters. The total fees for the services were $5,000.

Bending Spoons engaged another service provider to prepare the post-acquisition information for Vimeo, Inc.'s Ukrainian subsidiary that would be relevant for the consolidated financial statements of Bending Spoons S.p.A. for the fiscal year ended December 31, 2025. Therefore, the bookkeeping services, as well as the legal services, did not impact the accounting records of Bending Spoons or result in the preparation or origination of source data underlying the financial statements, were not used as part of the internal control over financial reporting of Bending Spoons and were not subject to Deloitte Italy's audit of the financial statements of Bending Spoons S.p.A. The individuals involved in providing the various services were not members of the audit team, and management of Bending Spoons directed, oversaw, and provided ultimate approval of the services. Furthermore, the legal services related to matters that are immaterial to Bending Spoons and did not involve negotiating on behalf of Bending Spoons.

After careful consideration of the facts and circumstances and the applicable independence rules, Deloitte Italy has concluded that (i) the aforementioned matter does not impair Deloitte Italy's ability to exercise objective and impartial judgment in connection with its audits of the consolidated financial statements of Bending Spoons S.p.A., and (ii) a reasonable investor with knowledge of all relevant facts and circumstances would conclude that Deloitte Italy has been and is capable of exercising objective and impartial judgment on all issues encompassed within its audits of the consolidated financial statements of Bending Spoons S.p.A. After considering these matters, the management and board of directors of Bending Spoons concur with Deloitte Italy's conclusions.

## Enforcement of civil liabilities

We are incorporated and currently existing under the laws of Italy. In addition, our executive officers and a significant portion of our board of directors reside outside the U.S., and most of the assets of our non-U.S. subsidiaries are located outside the U.S. As a result, it may be a long and costly process for investors to effect service of process on us or those non-U.S. resident persons in the U.S. or to enforce the U.S. judgments obtained in U.S. courts against us or those non-U.S. resident persons based on the civil liability or other provisions of the U.S. securities laws or other laws. It may be possible for investors to effect service of process within other jurisdictions (including Italy) upon us or those non-U.S. resident persons provided that, for example, The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of November 15, 1965 is complied with.

Judgments of U.S. courts may be enforceable in Italy. Final enforceable and conclusive judgments rendered by U.S. courts, even if obtained by default, will not require retrial on the merits and will be enforceable in Italy, provided that, pursuant to article 64 of the Italian Law No. 218 of May 31, 1995 (*riforma del sistema italiano di diritto internazionale privato*), each of the following conditions is met:

- The U.S. court that rendered the final judgment had jurisdiction according to Italian law principles of jurisdiction
- The relevant summons and complaint were appropriately served on the defendants in accordance with U.S. law and during the proceedings the essential rights of the defendants have not been violated
- The parties to the proceedings appeared before the court in accordance with U.S. law or, in the event of default by the defendants, the U.S. court declared such default in accordance with U.S. law
- The decision is final pursuant to U.S. law
- There is no conflicting final judgment previously rendered by an Italian court
- There is no pending proceeding before an Italian court between the same parties over the same matter that were instituted before the U.S. proceedings
- The provisions of such judgment do not violate Italian public policy

In addition, pursuant to article 67 of the Italian Law No. 218 of May 31, 1995, the recognition and enforcement in Italy of a judgment rendered by a U.S. court requires a separate proceeding before the competent Italian Court of Appeal. In such a proceeding, the competent Italian Court of Appeal does not review the merits of the underlying judgment, but instead verifies whether the conditions for recognition and enforcement set out above are satisfied.

Moreover, original actions brought before Italian courts based solely on U.S. federal securities laws may be subject to uncertainty. In such cases, Italian courts would apply Italian rules of civil procedure and may apply Italian substantive law provisions that are considered mandatory. As a result, an Italian court may decline to apply U.S. law or to grant certain remedies such as punitive damages if doing so would be contrary to Italian public policy or mandatory provisions of Italian law.

Shareholders outside of the U.S. should seek advice from their own counsel based on the applicable circumstances.

Case: 26-1721 Document: 41 Page: 73 Filed: 08/19/2026

TABLE OF CONTENTS

# Notes to combined financial statements of AOL Holdco II, LLC, a business of College Parent, L.P.

## Note 1. Organization and basis of presentation

### Organization

AOL Holdco II, LLC (the "Business") is a business of College Parent, L.P. ("Parent"). The Parent was formed in 2021 by an affiliate of certain funds managed by affiliates of Apollo Global Management, Inc. ("Apollo") to acquire Verizon Media Group ("VMG"). On May 2, 2021, Verizon entered into a definitive stock purchase agreement with the Parent pursuant to which Verizon agreed to sell VMG, and on September 1, 2021, VMG was sold (collectively, the "Transaction").

The Business consists of both AOL Media and Membership Services. AOL Media is focused on attracting and engaging consumers by creating and offering high-quality branded online content, products and services and providing valuable advertising services. AOL Media revenue is generated principally from display (includes native and video) and search advertising on AOL Properties (Mail, App, and Home). AOL Media also generates revenue through lead/traffic monetization, where it receives a revenue share for providing traffic to third party sites, as well as through direct integration with commerce sites via affiliate links.

Membership Services is made up predominantly of the Business's own subscription products, as well as strategic third-party subscriptions with wide market appeal. The scaled user base coupled with personalization efforts creates a powerful opportunity for the Membership Services to contextually introduce the best offer to the right user at the right time. Our 35+ subscription partners are well-recognized as trusted market leaders. Membership Services also houses the customer care team that supports subscription products and brand properties of the Business and the Parent. Membership Services' Global Subscription Services & Payments ("GSS") platform powers subscription management for all of the Business's and Parent subscription products.

Membership Services' products and solutions are categorized within the following areas: subscriptions and advertising. The subscription product offerings include the following: device and data security that safeguards against viruses, malware and cybercriminals when conducting online activities, identity theft and ID protection and technical support services. Advertising revenue is generated through related party agreements with the Parent.

During the second quarter of 2022, College Parent, L.P. completed its Legal Entity Restructuring ("LER") with the purpose of separating the different portions of the Parent's businesses into their own legal entity organizational structure. The LER resulted in the formation of the Business's initial legal structure as a limited liability company and a wholly-owned subsidiary of the Parent. In the fourth quarter of 2023, the Parent combined AOL Media operations previously held in its Consumer Owned & Operated segment and Membership Services into the same legal structure, thereby creating the Business.

The Business has an indefinite life, but it can be terminated at any point upon written consent of the sole member. Under the terms of the LLC agreement, the member is not liable for any debt, obligations, or liabilities of the Business.

The Business has a highly diverse workforce of approximately 214 direct employees as of December 31, 2025. This excludes headcount related to certain services and corporate support functions provided to the Business by the Parent which are further discussed in *Note 5. Corporate allocations and related party transactions*.

### Sale of the business to Bending Spoons

On October 27, 2025, the Parent entered into an agreement to sell the Business to Bending Spoons Operations S.p.A. ("Bending Spoons"). Bending Spoons is a global tech company based in Milan. The sale of the Business to Bending Spoons was completed on January 2, 2026.

**ordinary shares**

## Bending Spoons S.p.A.

*Global Leads and Joint Bookrunning Managers*

**Goldman Sachs International*** **J.P. Morgan*** **Allen & Company LLC**

*Joint Bookrunning Managers*

**Wells Fargo Securities** **BofA Securities** **Jefferies** **Evercore ISI**

**BNP PARIBAS** **Mizuho** **Societe Generale**
**Crédit Agricole CIB** **IMI — Intesa Sanpaolo** **UniCredit**
**Banca Akros — Gruppo Banco BPM**

**listed in alphabetical order*

Through and including , 2026 (25 days after the commencement of this offering), all dealers that buy, sell or trade our ordinary shares, whether or not participating in this offering, may be required to deliver a prospectus. This delivery requirement is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

# PART II

## Information not required in prospectus

### Item 6. Indemnification of board of directors and executive officers

On or before the time of effectiveness of this registration statement, we will enter into indemnification agreements with our directors and executive officers. These indemnification agreements will require us to indemnify our directors and executive officers to the fullest extent permitted by law. Under Italian law, indemnification is not permitted, among other cases, for acts or omissions involving willful misconduct or gross negligence, or for liability of a director or executive officer toward the company. Insofar as indemnification of liabilities arising under the Securities Act may be permitted to executive officers and directors or persons controlling us pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

We maintain insurance policies relating to certain liabilities that our directors and officers may incur in such capacity.

In any underwriting agreement we enter into in connection with the sale of the ordinary shares being registered hereby, the underwriters will agree to indemnify, under certain conditions, us, our directors, our officers and persons who control us within the meaning of the Securities Act against certain liabilities.

### Item 7. Recent sales of unregistered securities

During the past three years, we have issued the following securities without registration under the Securities Act:

- On January 16, 2023, pursuant to the share capital increase approved on November 24, 2022, we issued 123 class E shares, later converted into class X-1 shares, to an existing investor and strategic advisor, as part of its compensation, at a subscription price of €75.09 ($78.19) per share, for an aggregate consideration of €9,236.07 ($9,617.52).
- On January 17, 2023, pursuant to the share capital increase approved on November 24, 2022, we issued 490 class E shares, later converted into class X-1 shares, to an existing investor and strategic advisor, as part of its compensation, at a subscription price of €75.09 ($78.19) per share, for an aggregate consideration of €36,794.10 ($38,313.70).
- On February 13, 2023, pursuant to the share capital increase approved on November 24, 2022, we issued 40,000 class E shares, later converted into class X-1 shares, to a strategic advisor and its employees at a subscription price of €75.09 ($78.19) per share, for an aggregate consideration of €3,003,600 ($3,127,648.68).
- On February 15, 2023, pursuant to the share capital increase approved on November 24, 2022, we issued 368 class E shares, later converted into class X-1 shares, to a new investor and strategic advisor, as part of its compensation, at a subscription price of €75.09 ($78.19) per share, for an aggregate consideration of €27,633.12 ($28,774.37).
- On March 7, 2023, pursuant to the share capital increase approved on November 24, 2022, we issued 123 class E shares, later converted into class X-1 shares, to a new investor and strategic advisor, as part of its compensation, at a subscription price of €75.09 ($78.19) per share, for an aggregate consideration of €9,236.07 ($9,617.52).
- On August 3, 2023, pursuant to the share capital increase approved on July 27, 2023, we issued 351,973 class C shares to new investors at a subscription price of €162.69 ($180.99) per share, for an aggregate consideration of €57,262,487.37 ($63,704,517.20).
- On October 2, 2023, pursuant to the share capital increase approved on July 27, 2023, we issued 24 class C shares to an existing investor at a subscription price of €162.69 ($180.99) per share, for an aggregate consideration of €3,904.56 ($4,343.82).
- On November 7, 2023, pursuant to the share capital increase approved on September 29, 2023, we issued 55,784 class X-2 shares to a group of existing and new investors, at a subscription price of €162.69 ($172.35) per share, for an aggregate consideration of €9,075,498.96 ($9,614,583.60).

- On November 16, 2023, pursuant to the share capital increase approved on September 29, 2023, we issued 576 class X-2 shares to a new investor at a subscription price of €162.69 ($172.35) per share, for an aggregate consideration of €93,709.44 ($99,275.78).
- On January 26, 2024, and on February 5, 2024, pursuant to the share capital increase approved on January 9, 2024, we issued 23,886 class B shares to existing investors at a subscription price of €392 ($428.85) per share, for an aggregate consideration of €9,363,312 ($10,243,463.33).
- From January 30, 2024, to February 5, 2024, pursuant to the share capital increase approved on January 9, 2024, we issued 45,279 class C shares to existing investors at a subscription price of €392 ($428.85) per share, for an aggregate consideration of €17,749,368 ($19,417,808.59).
- On February 4, 2024, pursuant to the share capital increase approved on January 9, 2024, we issued 834 class X-2 shares to an existing investor at a subscription price of €392 ($428.85) per share, for an aggregate consideration of €326,928 ($357,659.23).
- On February 8, 2024, and on February 9, 2024, pursuant to the share capital increase approved on January 9, 2024, we issued 172,692 class C shares to existing investors at a subscription price of €392 ($428.85) per share, for an aggregate consideration of €67,695,264 ($74,058,618.82).
- On February 12, 2024, pursuant to the share capital increase approved on January 9, 2024, we issued 2,682 class X-2 shares to an existing investor at a subscription price of €392 ($428.85) per share, for an aggregate consideration of €1,051,344 ($1,150,170.34).
- On February 15, 2024, pursuant to the share capital increase approved on January 9, 2024, we issued 117,188 class X-2 shares, which were converted into class C shares upon the resolution of a shareholder meeting, to a new investor at a subscription price of €392 ($428.85) per share, for an aggregate consideration of €45,937,696 ($50,255,839.42).
- On March 28, 2024, following the 20-for-1 stock split of March 2024, we transferred 27,200 class X-3 shares to a strategic advisor and its employees, as part of its compensation, accounting for €533,120 ($576,356.03), all of which were converted into class X-2 shares as a result of such transfer.
- On December 10, 2024, pursuant to the share capital increase approved on October 30, 2024, and following the March 2024 stock split, we issued 1,788,109 class X-2 shares, which were converted into class C shares upon the resolution of a shareholder meeting, to a new investor at a subscription price of €22.37 ($24.19) per share (€447.40 or $483.86 on a pre-2024-stock-split basis), for an aggregate consideration of €39,999,998.33 ($43,259,998.19).
- On December 17, 2024, following the March 2024 stock split, we sold 4,293 class X-1 shares to a new investor at a price of €22.37 ($23.48) per share (€447.40 or $469.64 on a pre-2024-stock-split basis), for an aggregate consideration of €96,034.41 ($100,807.32), all of which were converted into class X-2 shares as a result of such transfer.
- On May 13, 2025, following the March 2024 stock split, we sold 6,163 class X-1 shares to a new investor at a price of €25.96 ($28.85) per share (€519.20 or $576.93 on a pre-2024-stock-split basis), for an aggregate consideration of €159,991.48 ($177,782.53), all of which were converted into class X-2 shares as a result of such transfer.
- On July 17, 2025, following the March 2024 stock split, we sold 7,705 class X-1 shares to a new investor at a price of €25.96 ($30.06) per share (€519.20 or $601.18 on a pre-2024-stock-split basis), for an aggregate consideration of €200,021.80 ($231,605.24), all of which were converted into class X-2 shares as a result of such transfer.
- On October 29, 2025, pursuant to the share capital increase approved on October 13, 2025, and following the March 2024 stock split, we issued (i) 2,627,242 class C shares and (ii) 424,131 class X-2 shares to a group of existing and new investors at a subscription price of €76.32 ($88.29) per share (€1,526.40 or $1,765.89 on a pre-2024-stock-split basis), for an aggregate consideration of €232,880,787.36 ($269,419,782.90).
- On November 20, 2025, following the March 2024 stock split, we sold 10,627 class X-1 shares to a strategic partner and two directors, at a discounted price of €53.424 ($61.51) per share (€1,068.48 or $1,230.25 on a pre-2024-stock-split basis), for an aggregate consideration of €567,736.85 ($653,692.21), all of which were converted into class X-2 shares as a result of such transfer.
- On December 23, 2025, following the March 2024 stock split, we sold 1,132 class X-1 shares to a new investor at a price of €76.32 ($89.95) per share (€1,526.40 or $1,799.02 on a pre-2024-stock-split basis), for an aggregate consideration of €86,394.24 ($101,824.25), all of which were converted into class X-2 shares as a result of such transfer.

- On December 23, 2025, following the March 2024 stock split, we transferred 16,028 class X-1 shares to some of our directors, as part of their compensation for their services, accounting for an aggregate amount of €339,385.72 ($400,000.01), all of which were converted into class X-2 shares as a result of such transfer.
- On December 23, 2025, pursuant to the share capital increase approved on October 30, 2024, and following the March 2024 stock split, we issued 11,470 class X-2 shares upon the exercise of the warrants granted to some of our directors at a subscription price of €1.57 ($1.70) per share (€31.40 or $33.96 on a pre-2024-stock-split basis), for an aggregate consideration of €18,007.90 ($19,475.54).
- On February 18, 2026, following the March 2024 stock split, we sold 4,461 class X-1 shares to one of our directors at a discounted price of €53.424 ($63.28) per share (€1,068.48 or $1,265.61 on a pre-2024-stock-split basis), for an aggregate consideration of €238,324.46 ($282,295.33), all of which were converted into class X-2 shares as a result of such transfer. On the same date, we also sold 11,193 class X-1 shares to the same director, at a price of €76.32 ($90.40) per share (€1,526.40 or $1,808.02 on a pre-2024-stock-split basis), for an aggregate consideration of €854,249.76 ($1,011,858.84), all of which were converted into class X-2 shares as a result of such transfer.
- On March 12, 2026, pursuant to the share capital increase approved on May 10, 2023, and following the March 2024 stock split, we issued 800,000 class X-1 shares (later converted into class X-2 shares) upon the exercise of certain warrants granted to a strategic advisor under the warrant terms approved by our board of directors on April 20, 2023 (and amended on July 24, 2023, and December 18, 2025). The share capital increase was executed at a subscription price of €7.509 ($8.22) per share (€150.18 or $164.45 on a pre-2024-stock-split basis), for an aggregate consideration of €6,007,200.00 ($6,577,884.00).
- From time to time from January 1, 2023, to December 31, 2025, we issued an aggregate of 707,140 class X-1 shares and granted an aggregate of 9,560 class X-1 treasury shares (in each case, on a post-stock-split basis for issuances and grants that occurred prior to the March 2024 stock split) to employees and contractors upon the vesting of their stock units.
- From time to time from January 1, 2023 to December 31, 2025, we granted an aggregate of 1,642,604 class X-3 treasury shares (on a post-stock-split basis for grants that occurred prior to the March 2024 stock split) to employees, contractors, and one of our directors upon the exercise of their stock options with exercise prices ranging from €0.263 to €3.39 (€5.26 to €67.80 on a pre-stock-split basis) per share, all of which were converted into class X-2 shares as a result of such transfers.

The number of securities in the list of transactions above has not been adjusted to reflect the 1-for-2 reverse stock split approved by the shareholder meeting held on May 28, 2026, or the 10-for-1 stock split approved by the shareholder meeting held on April 23, 2026, because the transactions occurred before those stock splits became effective. Where amounts above are denominated in euros, they have been converted into U.S. dollars at the exchange rate published by the European Central Bank as of the date of the shareholder meeting approving the relevant capital increase and of the closing date of the share transfer for the assignment of treasury shares.

Such shares were issued in reliance on the exemption contained in Regulation S or Rule 501 of Regulation D of the Securities Act on the basis that the transactions either did not involve a U.S. person, as defined in Regulation S, or were only made to accredited investors, as defined under Rule 501 of Regulation D. No underwriters were involved in these transactions.

No underwriter or underwriting discount or commission was involved in any of the transactions set forth in Item 7.

## Item 8. Exhibits

(1) The Exhibit Index is hereby incorporated herein by reference.

(2) Financial Statement Schedules.

All schedules have been omitted because they are not required, are not applicable or the information is otherwise set forth in the Consolidated Financial Statements and related notes thereto.

# Exhibit index

| Exhibit No. | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement |
| 3.1 | Form of Bylaws of the Registrant, to be in effect upon completion of this offering |
| 5.1 | Opinion of Latham & Watkins LLP, counsel to the Registrant, as to the validity of the ordinary shares (including consent) |
| 10.1* | Form of Indemnification Agreement |
| 10.2* | Stock Option Plans |
| 10.3 | 2026 Equity Compensation Plan |
| 10.4 | Senior Facilities Agreement originally dated July 30, 2024, between, among others, Bending Spoons Operations S.p.A., Banco BPM S.p.A., BNP Paribas Italian Branch, Intesa Sanpaolo S.p.A., Banca Nazionale del Lavoro S.p.A., Crédit Agricole Corporate and Investment Bank, Milan Branch, HSBC Continental Europe, Société Générale, UniCredit S.p.A., SMBC Bank EU AG, Milan Branch, and Banca IFIS S.p.A., and the other parties thereto, as subsequently supplemented, integrated, and amended by (i) the amendment agreement dated December 10, 2024 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (ii) the additional facility notice dated December 12, 2024 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (iii) the amendment agreement dated March 3, 2025 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (iv) the additional facility notice dated March 11, 2025 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (v) the consent request letter signed by Bending Spoons Operations S.p.A. on April 4, 2025 and countersigned by Intesa Sanpaolo S.p.A. on May 16, 2025, (vi) the additional facility notice dated June 18, 2025 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (vii) the additional facility notice dated June 23, 2025 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (viii) the consent request letter signed by Bending Spoons Operations S.p.A. on July 1, 2025 and countersigned by Intesa Sanpaolo S.p.A. on July 16, 2025, (ix) the additional facility notice dated October 3, 2025 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (x) two additional facility notices each dated October 27, 2025 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A. (each as amended and restated on November 12, 2025 and on November 14, 2025), (xi) the consent request letter signed by Bending Spoons Operations S.p.A. on October 31, 2025 and countersigned by Intesa Sanpaolo S.p.A. on November 18, 2025, (xii) the consent request letter signed by Bending Spoons Operations S.p.A. on November 24, 2025 and countersigned by Intesa Sanpaolo S.p.A. on January 20, 2026, (xiii) the consent request letter signed by Bending Spoons Operations S.p.A. on March 4, 2026 and countersigned by Intesa Sanpaolo S.p.A. on April 2, 2026, (xiv) the additional facility notice dated March 25, 2026 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (xv) four additional facility notices each dated April 30, 2026 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A., (xvi) the consent request letter signed by Bending Spoons Operations S.p.A. on May 4, 2026 and countersigned by Intesa Sanpaolo S.p.A. on May 19, 2026, and (xvii) two additional facility notices each dated May 27, 2026 between, among others, Bending Spoons Operations S.p.A. and Intesa Sanpaolo S.p.A. |
| 10.5 | TLB Credit Agreement dated March 7, 2025, as amended on April 4, 2025, July 21, 2025, July 29, 2025, January 2, 2026, and April 20, 2026, between Bending Spoons US Inc., JPMorgan Chase Bank, N.A. and Intesa Sanpaolo S.p.A. |
| 10.6 | US TLA/RCF Credit Agreement dated January 2, 2026, as amended on April 20, 2026, between Bending Spoons US Inc., the lenders party thereto, JPMorgan Chase Bank, N.A. and Intesa Sanpaolo S.p.A. |
| 10.7 | Lease Agreement for the Milan headquarters dated December 1, 2021 between Coima SGR S.p.A. and Bending Spoons S.p.A. |
| 21.1 | List of subsidiaries of the Registrant |
| 23.1 | Consent of Deloitte & Touche S.p.A., an independent registered public accounting firm, independent auditor of the Registrant |
| 23.2 | Consent of Ernst & Young LLP, independent auditor of AOL Holdco II LLC |
| 23.3 | Consent of Ernst & Young LLP, independent auditor of Vimeo, Inc. |
| 23.4 | Consent of Latham & Watkins LLP (included in Exhibit 5.1) |
| 24.1 | Power of Attorney (included in signature page to Registration Statement) |
| 107 | Calculation of Filing Fee Table |

* To be filed by subsequent amendment.

\+ Indicates management contract or compensatory plan.

## Signatures

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F-1 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Milan, Italy on June 8, 2026.

**Bending Spoons S.p.A.**

By: /s/ Luca Ferrari

Name: Luca Ferrari
Title: Chair of the board of directors, co-founder, and chief executive officer

TABLE OF CONTENTS

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Luca Ferrari and Davide Giorgio Andrea Scarpazza as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead in any and all capacities, in connection with this registration statement, including to sign in the name and on behalf of the undersigned, this registration statement and any and all amendments thereto, including post-effective amendments and registrations filed pursuant to Rule 462 under the Securities Act of 1933, as amended, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the U.S. Securities and Exchange Commission, granting unto such attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or his substitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement has been signed by the following persons on June 8, 2026 in the capacities indicated:

| Name | Title |
|---|---|
| /s/ Luca Ferrari<br>Luca Ferrari | Chair of the board of directors, co-founder, and chief executive officer |
| /s/ Francesco Patarnello<br>Francesco Patarnello | Vice chair of the board of directors, co-founder, and head of business acquisitions |
| /s/ Davide Giorgio Andrea Scarpazza<br>Davide Giorgio Andrea Scarpazza | Co-chief financial officer |
| /s/ Enrico Martinelli<br>Enrico Martinelli | Co-chief financial officer and principal accounting officer |
| /s/ Matteo Danieli<br>Matteo Danieli | Director |
| /s/ Joshua Motta<br>Joshua Motta | Director |
| /s/ Robert J. Mylod, Jr.<br>Robert J. Mylod, Jr. | Director |
| /s/ Donald D. O’Neal<br>Donald D. O’Neal | Director |
| /s/ Leah Schwartz<br>Leah Schwartz | Director |
| /s/ Steve Sinwell<br>Steve Sinwell | Director |
| /s/ Paola Tagliavini<br>Paola Tagliavini | Director |

## Signature of authorized U.S. representative of registrant

Pursuant to the requirements of the Securities Act of 1933, as amended, the undersigned, the duly authorized representative in the United States of Bending Spoons S.p.A. has signed this registration statement on June 8, 2026.

**Bending Spoons US Inc.**

By: /s/ Mattie Maharaj

Name: Mattie Maharaj
Title: Authorized officer

**EXHIBIT B**

PTAB CASE NO. IPR2026-00376 PETITION FOR INTER PARTES REVIEW

(FILED JUNE 18, 2026)

[EXCERPTS]

Trials@uspto.gov
571-272-7822

Paper 4

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

LUXOTTICA OF AMERICA INC. AND META PLATFORMS, INC.,
Petitioner,

v.

SOLOS TECHNOLOGY LIMITED,
Patent Owner.

---

IPR2026-00376
Patent 12,216,339

---

Mailed: June 23, 2026

Before Paula Conn, *Trial Paralegal*

NOTICE OF FILING DATE ACCORDED TO PETITION
AND
TIME FOR FILING PATENT OWNER PRELIMINARY RESPONSE

The petition for *inter partes* review, filed in the above proceeding has been accorded the filing date of June 18, 2026.

Patent Owner may file a brief requesting discretionary denial within two months from the date of this notice and Petitioner may file a brief opposing Patent Owner's discretionary denial request within three months of from the date of this notice. For more information, parties may consult the

Interim Director Discretionary Process webpage, which is available at https://www.uspto.gov/patents/ptab/interim-director-discretionary-process.

Patent Owner may file a preliminary response to the petition no later than three months from the date of this notice. The preliminary response is limited to setting forth the reasons why the requested review should not be instituted. Patent Owner may also file an election to waive the preliminary response to expedite the proceeding. For more information, please consult the Office Patent Trial Practice Guide, 77 Fed. Reg. 48756 (Aug. 14, 2012), which is available on the Board Web site at http://www.uspto.gov/PTAB.

Patent Owner is advised of the requirement to submit mandatory notice information under 37 C.F.R. § 42.8(a)(2) within 21 days of service of the petition. Mandatory notices include identifying any other judicial or administrative matter that would affect, or be affected by, a decision in the proceeding. 37 C.F.R. § 42.8(b)(2). Such administrative matters include requests for certificates of correction.

The parties are encouraged to use the heading on the first page of this Notice for all future filings in the proceeding.

In general, all represented parties must designate a lead counsel and at least one back-up counsel, and lead counsel must be a registered practitioner. 37 C.F.R. § 42.10(a). The Board, however, may permit a party to proceed without back-up counsel upon a showing of good cause, so long as lead counsel is a registered practitioner. *Id*. Once a party has designated a registered practitioner as lead counsel pursuant to 37 C.F.R. § 42.10(a) and filed a power of attorney for lead counsel if required by 37 C.F.R. § 42.10(b), that party is authorized to file a motion seeking leave to proceed

without back-up counsel. Such a motion shall not be filed earlier than 21 days after service of the petition, which is the time for filing patent owner mandatory notices. A party that files such a motion need not designate back-up counsel unless and until its motion to proceed without back-up counsel is denied. The parties are advised that the types of good cause sufficient to permit a party to proceed without back-up counsel are limited. *See* Expanding Opportunities To Appeal Before the Patent Trial and Appeal Board, 89 C.F.R. 82172, 82174 (Oct. 10, 2024), which is available at https://www.federalregister.gov/d/2024-23319. The parties are also advised that permission to proceed without back-up counsel may be revoked at the Board's discretion at any time during a proceeding. *See id*. For example, permission to proceed without back-up counsel may be revoked if the absence of back-up counsel causes scheduling problems or impedes Board proceedings. *See id*.

Once a party has designated a registered practitioner as lead counsel pursuant to 37 C.F.R. § 42.10(a) and filed a power of attorney for lead counsel if required by 37 C.F.R. § 42.10(b), that party is also authorized to file one or more motions for *pro hac vice* recognition of back-up counsel pursuant to 37 C.F.R. § 42.10(c)(1) and/or one or more notices of intent to designate a provisionally recognized PTAB attorney as back-up counsel pursuant to 37 C.F.R. § 42.10(c)(2). A motion or notice seeking *pro hac vice* recognition shall not be filed earlier than 21 days after service of the petition, which is the time for filing patent owner mandatory notices.

A motion for *pro hac vice* recognition filed pursuant to 37 C.F.R. § 42.10(c)(1) shall be accompanied by the fee set forth in 37 C.F.R. § 42.15(e). Such motion must:

a. Contain a statement of facts showing there is good cause for the Board to recognize counsel *pro hac vice* during the proceeding; and

b. Be accompanied by an affidavit or declaration in which the individual seeking *pro hac vice* recognition attests to the following:

i. Membership in good standing of the Bar of at least one State or the District of Columbia;

ii. No suspensions or disbarments from practice before any court or administrative body;

iii. No application for admission to practice before any court or administrative body ever denied;

iv. No sanctions or contempt citations ever imposed by any court or administrative body;

v. The individual seeking to appear has read and will comply with the Office Patent Trial Practice Guide and the Board's Rules of Practice for Trials set forth in 37 CFR part 42;

vi. The individual will be subject to the USPTO Rules of Professional Conduct set forth in 37 CFR 11.101 *et seq.* and disciplinary jurisdiction under 37 CFR 11.19(a);

vii. All other proceedings before the Office for which the individual has applied to appear *pro hac vice* in the last three years; and

viii. Familiarity with the subject matter at issue in the proceeding.[1]

If the affiant or declarant is unable to provide any of the information requested above or make the required statements or representations under oath, the individual must provide a full explanation of the circumstances as part of the affidavit or declaration. A party must also file a power of attorney for the person seeking *pro hac vice* recognition pursuant to 37 C.F.R. § 42.10(b).

A notice of intent to designate a provisionally recognized PTAB attorney as back-up counsel filed pursuant to 37 C.F.R. § 42.10(c)(2) must:

(a) Identify the registered practitioner who will serve as lead counsel;

(b) Identify the most recent prior proceeding in which the person seeking to appear was recognized *pro hac vice* by order of the Patent Trial and Appeal Board pursuant to a motion of the type described in 37 C.F.R. § 42.10(c)(1); and

(c) Be accompanied by Certification in the form of an affidavit or declaration in which the individual seeking *pro hac vice* recognition attests to the following:

i. Membership in good standing of the Bar of at least one State or the District of Columbia;

ii. No suspensions or disbarments from practice before any court or administrative body;

[1] The type of familiarity referenced in the Board's rules regarding *pro hac vice* admission is legal familiarity; technical familiarity, though expected, is not required. *See* Expanding Opportunities To Appear Before the Patent Trial and Appeal Board, 89 F.R. 82172, 82175 (Oct. 10, 2024); 37 C.F.R. § 42.10(c)(1).

iii. No application for admission to practice before any court or administrative body ever denied;

iv. No sanctions or contempt citations ever imposed by any court or administrative body;

v. The individual seeking to appear has read and will comply with the Office Patent Trial Practice Guide and the Board's Rules of Practice for Trials set forth in 37 CFR part 42;

vi. The individual will be subject to the USPTO Rules of Professional Conduct set forth in 37 CFR 11.101 *et seq.* and disciplinary jurisdiction under 37 CFR 11.19(a);

vii. All other proceedings before the Office for which the individual has applied to appear *pro hac vice* in the last three years; and

viii. Familiarity with the subject matter at issue in the proceeding.

The Certification should be a separate document that is filed as an exhibit.

If the affiant or declarant is unable to provide the information requested above or make the required statements or representations under oath, or if the affiant or declarant does not qualify as a provisionally recognized PTAB attorney pursuant to 37 C.F.R. § 42.10(c)(2), the procedure set forth in 37 C.F.R. § 42.10(c)(2) is not available, and *pro hac vice* recognition may only be obtained via the process set forth in 37 C.F.R. § 42.10(c)(1). *See* 37 C.F.R. § 42.10(c)(2)(iv). A party must also file a power of attorney for the person seeking *pro hac vice* recognition pursuant to 37 C.F.R. § 42.10(b). *Pro hac vice* recognition will not be effective until the party files an updated mandatory notice after the expiration of the applicable time period (5 or 10 days) set forth in 37 C.F.R. § 42.10(c)(2)(iii).

The parties are also reminded that unless otherwise permitted by 37 C.F.R. § 42.6(b)(2), all filings in this proceeding must be made electronically in the Patent Trial Appeal Case Tracking System (P-TACTS), accessible from the Board Web site at http://www.uspto.gov/PTAB. To file documents, users must first obtain a user ID by registering with MyUSPTO. Information regarding how to register with MyUSPTO and use P-TACTS is available at the Board Web site at https://www.uspto.gov/patents/ptab/patent-trial-and-appeal-case-tracking-system-p-tacts.

The parties may request a conference call as needed. An email requesting a conference call with the Board shall: (a) copy all parties, (b) indicate generally the relief being requested or the subject matter of the conference call, (c) include multiple times when all parties are available, (d) state whether the opposing party opposes any relief requested, and (e) if opposed, either certify that the parties have met and conferred telephonically or in person in an attempt to reach agreement, or explain why such meet and confer did not occur. If a party is unable to include any of the above information, the party shall explain in the email why doing so was not possible. The email may not contain substantive argument and, unless otherwise authorized, may not include attachments. *See* Trial Practice Guide at 9–10. If practicable, in order to ensure emails are consistent with the above, the parties shall send a single, joint email that includes items (a)–(e).

If there are any questions pertaining to this notice, please contact the Patent Trial and Appeal Board at trials@uspto.gov or 571-272-7822.

FOR PETITIONER:

Ali Razai
Jacob Peterson
John Gaustad
MORGAN, LEWIS & BOCKIUS LLP
ali.razai@morganlewis.com
jacob.peterson@morganlewis.com
john.gaustad@morganlewis.com

Lisa Nguyen
David Tennant
Grace Wang
PAUL HASTINGS, LLP
lisanguyen@paulhastings.com
davidtennant@paulhastings.com
gracewang@paulhastings.com

FOR PATENT OWNER:

Caldwell LLC
200 Clarendon Street
59th Floor
Boston, MA 02116

Filed: June 18, 2026

Filed on behalf of **Luxottica of America Inc.** and **Meta Platforms, Inc.**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

LUXOTTICA OF AMERICA INC. AND META PLATFORMS, INC.,
Petitioners,

v.

SOLOS TECHNOLOGY LIMITED,
Patent Owner.

---

Case IPR2026-00376
Patent 12,216,339

---

# PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 12,216,339

| Lead Counsel |
|---|
| Ali S. Razai (Reg. No. 60,771)<br>*ali.razai@morganlewis.com*<br>Morgan, Lewis & Bockius LLP<br>Postal and Hand-Delivery Address:<br>600 Anton Blvd., Ste. 1800<br>Costa Mesa, CA 92626<br>Telephone: 714-830-0600<br>Facsimile: 714-830-0700<br><br>*Attorney for Petitioner Luxottica of America Inc.* |

| Back-up Counsel | |
|---|---|
| Jacob L. Peterson (Reg. No. 65,096)<br>*jacob.peterson@morganlewis.com*<br>Morgan, Lewis & Bockius LLP<br>Postal and Hand-Delivery Address:<br>600 Anton Blvd., Ste. 1800<br>Costa Mesa, CA 92626<br>Telephone: 714-830-0600<br>Facsimile: 714-830-0700<br><br>John F. Gaustad (Reg. No. 69,522)<br>*john.gaustad@morganlewis.com*<br>Morgan, Lewis & Bockius LLP<br>Postal and Hand-Delivery Address:<br>600 Montgomery Street, Suite 2300<br>San Francisco, CA 94111-2725<br>Tel.: 415.422.1000<br>Fax: 415.422.1001<br><br>*Attorneys for Petitioner Luxottica of America Inc.* | Lisa K. Nguyen (Reg. No. 58,018)<br>*lisanguyen@paulhastings.com*<br>Paul Hastings, LLP<br>Postal and Hand-Delivery Address:<br>1117 S. California Ave.<br>Palo Alto, CA 94304<br>Telephone: +1-650-320-1890<br>Facsimile: +1-650-320-1990<br><br>David Tennant (Reg. No. 48,362)<br>*davidtennant@paulhastings.com*<br>Paul Hastings, LLP<br>Postal and Hand-Delivery Address:<br>2050 M Street NW<br>Washington, DC 20036<br>Telephone: +1-202-551-1700<br>Facsimile: +1-202-551-1705<br><br>Grace Wang (Reg. No. 69,892)<br>*gracewang@paulhastings.com*<br>Paul Hastings, LLP<br>Postal and Hand-Delivery Address:<br>200 Park Avenue<br>New York, NY 10166<br>Telephone: +1-212-318-6833 |

| | |
|---|---|
| | Facsimile: +1-212-230-7833<br><br>*Attorneys for Petitioner Meta Platforms, Inc.* |

**D. Service Information (37 C.F.R. §42.8(b)(4))**

Please direct all correspondence to lead counsel and back-up counsel at the addresses shown above. Petitioners also consent to electronic service by email to:

MLB-Luxottica-IPR-339@morganlewis.com; and

PH-Meta-Solos-IPR@paulhastings.com.

**E. Standing**

The ’339 patent is available for IPR, and no bar or estoppel applies.

The Office may charge any fees due to Deposit Account 50-0310.

## XV. CONCLUSION

Petitioners request institution and cancellation of all claims of the ’339 patent.

Dated: June 18, 2026

By: /Jacob L. Peterson/
Jacob L. Peterson (Reg. No. 65,096)
MORGAN, LEWIS & BOCKIUS LLP

*Attorney for Petitioner, Luxottica of America Inc.*

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

LUXOTTICA OF AMERICA INC. AND META PLATFORMS, INC.,
Petitioner,

v.

SOLOS TECHNOLOGY LIMITED,
Patent Owner.

IPR2026-00376
Patent 12,216,339

RESPONDENT SOLOS TECHNOLOGY LIMITED'S MANDATORY NOTICES PURSUANT TO 37 C.F.R. § 42.8

Pursuant to 37 C.F.R. § 42.8, Patent Owner Solos Technology Limited ("Patent Owner"), through the undersigned counsel, submits the following mandatory notices in connection with the Petition for Inter Partes Review, Case No. IPR2026-00376 (the "Petition").

## I. Real Party in Interest Under 37 C.F.R. § 42.8(b)(1)

The Real-Party-in-Interest is Solos Technology Limited.

## II. Related Matters Under 37 C.F.R. § 42.8(b)(2)

Patent Owner is aware of the following related matter: *Solos Technology Limited v. Meta Platforms, Inc., et al.*, Case No. 1:26-cv-10304, pending in the United States District Court for the District of Massachusetts. Patent Owner is not presently aware of any other judicial or administrative matters that would affect, or be affected by, a decision in this proceeding.

## III. Lead and Back-Up Counsel Under 37 C.F.R. § 42.8(b)(3)

| Lead Counsel |
|---|
| Keegan M. Caldwell (Reg. No. 73731)<br>CALDWELL<br>200 Clarendon Street, 59th Floor<br>Boston, MA 02116<br>Telephone: 857-990-4926<br>E-mail: keegan@caldwelllaw.com |

| Back-up Counsel |
| --- |
| Steve Wang (Reg. No. 79,880)<br>steve@caldwelllaw.com<br>CALDWELL<br>200 Clarendon Street, 59th Floor<br>Boston, MA 02116<br>Telephone: 857-776-4505 |
| Jameson J. Pasek (*pro hac vice* forthcoming)<br>CALDWELL<br>200 Clarendon Street, 59th Floor<br>Boston, MA 02116<br>Telephone: 857-990-4914<br>E-mail: jameson@caldwelllaw.com |
| Kenneth Weatherwax (Reg. No. 54,528)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4503<br>E-mail: weatherwax@lowensteinweatherwax.com |
| Parham Hendifar (Reg. No. 71,470)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4500<br>E-mail: hendifar@lowensteinweatherwax.com |
| Nathan Lowenstein (*pro hac vice* forthcoming)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4502<br>E-mail: lowenstein@lowensteinweatherwax.com |
| Colette Woo (*pro hac vice* forthcoming)<br>LOWENSTEIN & WEATHERWAX LLP |

1016 Pico Blvd.,
Santa Monica, CA 90405
Telephone: 310-307-4511
E-mail: woo@lowensteinweatherwax.com

Dennis Courtney (*pro hac vice* forthcoming)
LOWENSTEIN & WEATHERWAX LLP
1016 Pico Blvd.,
Santa Monica, CA 90405
Telephone: 310-307-4521
E-mail: courtney@lowensteinweatherwax.com

## IV. Service Information Under 37 C.F.R. § 42.8(b)(4)(i-v)

Please direct all correspondence to lead counsel and back-up counsel at the addresses shown above. Patent Owner also consents to electronic service by email to the email addresses shown above and to Solos_IPRs@lowensteinweatherwax.com.

Dated: July 9, 2026

Respectfully submitted,
Solos Technology Limited
By its attorneys,

/s/ Keegan Caldwell (Reg. No. 73731)

Keegan M. Caldwell
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-990-4926
E-mail: keegan@caldwelllaw.com

Case: 26-1721 Document: 41 Page: 98 Filed: 08/19/2026

Steve Wang (Reg. No. 79,880)
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-776-4505
E-mail: steve@caldwelllaw.com

Jameson J. Pasek (*pro hac vice* forthcoming)
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-990-4914
E-mail: jameson@caldwelllaw.com

Case: 26-1721 Document: 41 Page: 99 Filed: 08/19/2026

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 9, 2026, copies of the foregoing SUBMISSION OF MANDATORY NOTICES PURSUANT TO 37 C.F.R. § 42.8 were served pursuant to 37 C.F.R. § 42.6 on Petitioner by sending copies to Petitioner's counsel at the following email addresses designated for electronic service: MLB-Luxottica-IPR-339@morganlewis.com, PH-Meta-Solos-IPR@paulhastings.com, ali.razai@morganlewis.com, jacob.peterson@morganlewis.com, john.gaustad@morganlewis.com, lisanguyen@paulhastings.com, davidtennant@paulhastings.com, and gracewang@paulhastings.com.

/s/ Keegan Caldwell (Reg. No. 73731)
Keegan M. Caldwell
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-990-4926
E-mail: keegan@caldwelllaw.com

**EXHIBIT C**

CORPORATE TRANSACTION RECORD / SHARE REPURCHASE ANNOUNCEMENT

(DATED JUNE 18, 2026)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

# FORM 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (Date of earliest event reported): **June 15, 2026**

# KOPIN CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **000-19882** | **04-2833935** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**125 North Drive, Westborough, MA 01581**
(Address of principal executive offices) (Zip Code)

**(508) 870-5959**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

□ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

□ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

□ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

□ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 | KOPN | Nasdaq Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company □

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. □

**Item 7.01. Regulation FD Disclosure**

On June 10, 2026, Kopin Corporation ("Kopin" or the "Company") entered into a Share Repurchase Agreement (the "Share Repurchase Agreement") with Lightning Silicon Technology, Inc. ("LST") and LS Assets, Inc. ("LSA"). Under the Share Repurchase Agreement, LST repurchased 18,000,000 shares of its Series Seed-1 Preferred Stock from Kopin for $1.00, and LSA repurchased 18,000,000 shares of its common stock from Kopin for $1.00. All such shares were cancelled and retired as of June 10, 2026. The Parties exchanged mutual releases of all claims relating to Kopin's prior shareholdings in LST and LSA. As a result of the repurchases, Kopin no longer holds any equity interest in either LST or LSA.

Separately, on April 10, 2026, Kopin and LST executed a Mutual Transition and Services Termination Agreement (the "Mutual Transition and Services Termination Agreement"). The Mutual Transition and Services Termination Agreement (i) confirms that the Technology License Agreement (as defined therein) between LST and Kopin was terminated on April 10, 2026 and (ii) acknowledges the prior expiration of the Services Agreement (as defined therein) in 2025.

Pursuant to the Mutual Transition and Services Termination Agreement, under the transition terms, Kopin issued a $25,000 NRE purchase order, payable within 30 days, and LST agreed to provide a series of transition activities, including: the transfer of customer and vendor data; written notifications to customers and vendors; forwarding customer inquiries for 120 days; providing design files for three displays; and up to eight hours of technical assistance, with options for additional paid support.

The Mutual Transition and Services Termination Agreement also provides: a limited royalty-bearing license for LST solely to fulfill existing firm orders through July 15, 2026; and a perpetual, irrevocable, worldwide, royalty-free license for Kopin to certain LST OLED microdisplay technology. Additionally, Kopin will pay LST a royalty of $7.50 per display on certain customer orders secured between April 10, 2026 and October 30, 2026. Each party also granted the other a mutual release of all claims related to the prior Technology License Agreement and Services Agreement.

The Company does not expect these actions to have a material effect on its consolidated financial statements.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Kopin Corporation
(Registrant)

By: */s/ Erich Manz*
Name: Erich Manz
Title: Treasurer and Chief Financial Officer
(Principal Financial and Accounting Officer)

Date: June 18, 2026

**EXHIBIT D**

U.S. SECURITIES AND EXCHANGE COMMISSION

NOTICE OF EFFECTIVENESS

(DATED JUNE 30, 2026)

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

# Notice of Effectiveness

**Effectiveness Date:** June 30, 2026 4:00 P.M.

**Form:** F-1

---

| | |
|---|---|
| **CIK:** | 0002004711 |
| **Company Name:** | Bending Spoons S.p.A. |
| **File Number:** | 333-296573 |

**EXHIBIT E**

NASDAQ PUBLIC MARKET LISTING CONFIRMATION (TICKER: BSP)

(DATED JULY 1, 2026)

Nasdaq

# Bending Spoons S.p.A. announces closing of initial public offering

**Published**

Jul 2, 2026 2:35pm EDT

MILAN--(BUSINESS WIRE)-- Bending Spoons S.p.A. ("Bending Spoons"), a leading technology company, today announces the closing of its initial public offering of an aggregate of 57,971,015 of its ordinary shares, at an initial public offering price of $29.00 per share. The offering consisted of 34,398,640 shares sold by Bending Spoons and 23,572,375 shares sold by certain selling shareholders (the "Selling Shareholders"). The gross proceeds from the offering to Bending Spoons, before deducting underwriting discounts and commissions and other offering expenses, was approximately $953,917,285.50. Bending Spoons did not receive any proceeds from the sale of shares by the Selling Shareholders.

Bending Spoons' ordinary shares began trading on the Nasdaq Global Select Market on July 1, 2026 under the ticker symbol "BSP".

Goldman Sachs International, J.P. Morgan, and Allen & Company LLC are acting as joint lead book-running managers for the offering. Wells Fargo Securities, BofA Securities, Jefferies, Evercore ISI, BNP Paribas, Mizuho, Societe Generale, Crédit Agricole CIB, Intesa Sanpaolo (IMI CIB Division), UniCredit, and Banca Akros – Gruppo Banco BPM are acting as joint book-running managers for the offering.

A registration statement relating to these securities was declared effective by the U.S. Securities and Exchange Commission ("SEC") on June 30, 2026. A prospectus relating to and describing the terms of the offering has been filed with the SEC and is available on the SEC's website at www.sec.gov.

My Quotes

Copies of the prospectus may also be obtained from:

- Goldman Sachs & Co. LLC, Attention: Prospectus Department, 200 West Street, New York, NY 10282, by telephone at +1 (866) 471-2526, or by email at **prospectus-ny@ny.email.gs.com**;
- J.P. Morgan Securities LLC, c/o Broadridge Financial Solutions, 1155 Long Island Avenue, Edgewood, NY 11717, or by email at **prospectus-eq_fi@jpmchase.com** and **postsalemanualrequests@broadridge.com**; or
- Allen & Company LLC, Attention: Prospectus Department, 711 Fifth Avenue, 9th floor, New York, NY 10022, by telephone at +1 (212) 339-2220, or by email at **allenprospectus@allenco.com**.

This press release does not constitute an offer to sell or the solicitation of an offer to buy any securities, and does not constitute an offer, solicitation, or sale in any jurisdiction in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of that jurisdiction.

**About Bending Spoons**

Bending Spoons is built on the conviction that operational excellence enables efficient growth through acquisitions. It acquires digital businesses, implements deep transformations and ongoing optimizations to sustainably expand earnings, and reinvests in additional acquisitions, thereby continuing the compounding cycle. The company has executed this strategy for more than a decade and, to date, has never sold a material business.

Bending Spoons strives to envision the most successful version of an acquired business, and works to close the gap between its current state and that vision as quickly and completely as possible. The transformation is typically deep and entails reorganizing teams, overhauling technology, redesigning user interfaces, accelerating product development, and enhancing marketing and monetization. AI is often both a central component of the vision and a key tool in implementing the transformation.

Bending Spoons' performance is driven by its Platform — comprising its people, proprietary technologies, and proprietary data — and reflects an intense focus on achieving exceptional talent density, cultural strength, and technical c

My Quotes

Bending Spoons' main businesses include AOL, Brightcove, Eventbrite, Evernote, Harvest, komoot, Remini, StreamYard, Vimeo, and WeTransfer. In March 2026, the company served over 500 million monthly active users and more than 9 million monthly paying customers.

View source version on businesswire.com: **https://www.businesswire.com/news/home/20260702820621/en/**

**For further information please contact:**

Christy Keenan Bending Spoons S.p.A. **ck@bendingspoons.com**

Darren McDermott Brunswick Group U.S. **bendingspoonsus@brunswickgroup.com**

Source: Bending Spoons S.p.A.

*The views and opinions expressed herein are the views and opinions of the author and do not necessarily reflect those of Nasdaq, Inc.*

**In This Story**
**BSP**

**Investor Relations**
**Careers**
**Trust Center**
**Accessibility**
**Contact**
**Advertise**
**Nasdaq MarketSite**
**Newsletters**

Nasdaq

© 2026, Nasdaq, Inc. All Rights Reserved.

My Quotes

Privacy Policy

Cookies

Legal

Do Not Sell or Share My Personal Information

My Quotes

**EXHIBIT F**

CERTIFIED PARALLEL ADMINISTRATIVE
PROCEEDING TRACKING RECORD

(DATED JULY 7, 2026)

Showing 1-3 of 3 records

| AIA review # 2 ↓ | Filing date (mm/dd/yyyy) 1 | Institution decision date (mm/dd/yyyy) | Termination date (mm/dd/yyyy) | Petitioner application # | Petitioner patent # | Petitioner | Petitioner tech center | PO/Respondent application # | PO/Respondent patent # | PO/Respondent | PO/Respondent tech center | Status | Documents |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IPR2026-00420 | 08/07/2026 | | | | | Meta Platforms… | | 16851044 | 11082055 | Solos Technolo… | 2800 | Pending | View documen |
| IPR2026-00412 | 08/07/2026 | | | | | Luxottica of A… | | 16851044 | 11082055 | Solos Technolo… | 2800 | Pending | View documen |
| IPR2026-00376 | 06/18/2026 | | | | | Luxottica of A… | | 18517910 | 12216339 | Solos Technolo… | 2800 | Pending | View documen |

25 per page ▾ Page 1 of 1

**EXHIBIT G**

KOPIN CORPORATION OFFICIAL DEFENSE INDUSTRIAL BASE

(IBAS) PRESS RELEASE

(DATED JULY 14, 2026)

# KOPIN ACHIEVES THREE CRITICAL MILESTONES ADVANCING U.S. ARMY COLOR MICROLED TECHNOLOGY FOR GROUND SOLDIER VISION APPLICATIONS

07/14/26 | SHARE

*New bonding capability, breakthrough brightness performance, and rapid progress toward full color MicroLED integration mark major steps toward future programs such as Soldier Borne Mission Command (SBMC)*

WESTBOROUGH, Mass. – Kopin Corporation (NASDAQ: KOPN), a leading provider of application-specific optical systems and high-performance microdisplays for defense, training, enterprise, industrial, consumer and medical products, today announced three major milestone achievements in its color MicroLED development program for the U.S. Government's Industrial Base Analysis and Sustainment (IBAS) program. These accomplishments represent significant progress toward establishing a fully U.S. based MicroLED manufacturing capability and advancing next generation soldier vision systems.

**Milestone 1: Breakthrough MicroLED Performance Achieved**

Kopin achieved a significant performance milestone, reaching over 150,000 nits of single-panel, full-color brightness-exceeding the program's threshold target. This early performance result demonstrates strong initial capability, with planned improvements

expected to push brightness even higher over time.

These results represent a major step forward in the development of high brightness, defense ready MicroLED displays suitable for advanced vision systems, augmented reality, and other mission critical applications.

**Milestone 2: Progress Toward Full Color MicroLED Integration for Ground Soldier Integrated Vision Systems**

Kopin has reached a second crucial milestone: successful early integration progress of its color MicroLED technology for U.S. Army ground soldier vision applications. This advancement brings Kopin closer to enabling future soldier borne systems such as the SBMC solution, where lightweight, high brightness, full color MicroLED displays are essential for real time situational awareness, digital overlays, and mission execution.

This milestone reflects Kopin's ability to translate MicroLED performance gains into application specific optical solutions designed for rugged, field ready soldier systems.

**Milestone 3: U.S. Bonding Equipment Delivered and Installed**

Kopin has received and begun installation of its new MicroLED bonding equipment, a key asset supporting the IBAS program and Kopin's broader effort to onshore critical MicroLED manufacturing processes. The equipment shipped in June and is scheduled to be fully installed by the end of July at Kopin's U.S. headquarters.

This advanced bonding system enables the precise attachment of the backplane to the MicroLED array, creating a fully bonded display assembly-an essential step in MicroLED production. With this installation, Kopin will have U.S. based bonding capability, a foundational requirement for scaling domestic MicroLED manufacturing.

Kopin expects to transition to manufacturing product in mid 2027, positioning the company as a key U.S. supplier of next generation MicroLED display technology.

**Management Commentary**

"Our team has delivered three major achievements that accelerate our path toward U.S. based MicroLED manufacturing, and next generation display performance," said **Michael Murray**, CEO of Kopin Corporation. "Receiving and installing our bonding equipment is a foundational step in onshoring MicroLED production, surpassing 150,000 nits of single-panel, full-color brightness demonstrates the strength of our technology roadmap, and our integration progress for Kopin's support of the IBAS initiative and moves us closer to enabling future programs like SBMC which could enable hundreds of millions in revenues for Kopin over the life of the program. These milestones reinforce Kopin's commitment to

building advanced display capabilities here in the United States and leading the future of high performance MicroLED systems."

### Forward Looking Statements

This press release includes statements that constitute forward looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward looking statements may be identified by the use of words such as "forecast," "guidance," "plan," "estimate," "will," "would," "project," "maintain," "intend," "expect," "anticipate," "prospect," "strategy," "future," "likely," "may," "should," "believe," "continue," "opportunity," "potential," and other similar expressions that predict or indicate future events or trends or that are not statements of historical matters.

Forward looking statements are only predictions and are subject to risks, uncertainties, and assumptions that are difficult to predict and, in many cases, outside of our control. Actual results may differ materially from those expressed or implied in any forward looking statements. All forward looking statements are qualified in their entirety by these cautionary statements. We undertake no obligation to update forward looking statements except as required by law. Important factors that could cause actual results to differ materially from those described in forward looking statements are detailed in the Company's most recent Form 10-K and other filings with the Securities and Exchange Commission.

This press release includes forward looking statements regarding Kopin's breakthrough Micro-LED, our ability to turn these gains into field ready soldier systems and our ability to enable hundreds of millions in revenues for Kopin over the life of the program. These statements also reflect anticipated strategic benefits associated with Kopin's investment in bringing OLED display manufacturing processes in house. Forward looking statements are based on current assumptions and expectations and are subject to risks and uncertainties that could cause actual results to differ materially, including changes in customer demand, program schedules, manufacturing performance, and broader conditions in the defense market.

### About Kopin

Kopin Corporation (Nasdaq: KOPN) is a leading developer and provider of innovative display, Optical Interconnect devices and application-specific optical solutions sold as critical components and subassemblies for defense, enterprise, professional and consumer products. Kopin's portfolio includes microdisplays, display modules, eyepiece assemblies, image projection modules and vehicle mounted and head-mounted display systems that

incorporate ultra-small high-resolution Active Matrix Liquid Crystal displays (AMLCD), Ferroelectric Liquid Crystal on Silicon (FLCoS) displays, MicroLED displays (μLED) and Organic Light Emitting Diode (OLED) displays, a variety of optics and low-power ASICs and optical interconnect devices for data centers.

For more information, please visit Kopin's website at www.kopin.com.

Kopin is a trademark of Kopin Corporation.

Follow us on LinkedIn, X and Facebook.

View source version on businesswire.com: https://www.businesswire.com/news/home/20260714228918/en/

**Contact Information**

For Investor Relations

Kopin Corporation

Erich Manz, Chief Financial Officer

emanz@kopin.com

508-870-5959

**MZ Contact**

Luke Zimmerman

MZ Group – MZ North America

KOPN@mzgroup.us

561-489-5315

# *RELATED NEWS*

PRESS RELEASES

## Kopin Corporation Reports Second Quarter 2026 Financial Results

8/10/2026

PRESS RELEASES

## Kopin Corporation to Host Second Quarter 2026 Earnings Call on Monday, August 10, 2026 at 5:00 PM Eastern Time

8/7/2026

PRESS RELEASES

## Kopin to Participate in Canaccord Genuity's 46th Annual Growth Conference

8/6/2026

KOPIN
VISION BEYOND IMAGINATION

SIGN UP FOR UPDATES

EMAIL ADDRESS *

* INDICATES REQUIRED

BY SIGNING UP, YOU'LL RECEIVE UPDATES AND NEWS FROM KOPIN. YOU CAN UNSUBSCRIBE ANYTIME USING THE LINK IN THE NEWSLETTER FOOTER.

SEE OUR PRIVACY POLICY FOR INFORMATION ON HOW WE HANDLE YOUR DATA. WE USE MAILCHIMP, AND BY SUBSCRIBING YOU AGREE TO THEIR DATA PROCESSING. LEARN MORE ABOUT MAILCHIMP'S PRIVACY PRACTICES.

Subscribe

KOPIN CORPORATE HEADQUARTERS

125 North Drive Westborough, MA 01581

(508) 870-5959

## OUR COMPANY

About Us

Our People

Careers (We're Hiring)

## CUSTOM SOLUTIONS

Markets + Applications

Technologies

Products

## QUICK LINKS

Investor Information

News

Locations

Contact Us

Contact Us For Support

©2026 All Rights Reserved

Terms & Conditions

Privacy Policy

Accessibility Statement

Sitemap

**EXHIBIT H**

MOVANT'S ATTEMPTED NOTICE OF RELATED PROCEEDINGS IN

CASE NO. IPR2026-00376

(DATED JULY 20, 2026)

**From:** Trials
**To:** Daitona Carter; mlb-luxottica-ipr-339@morganlewis.com; ph-meta-solos-ipr@paulhastings.com; Ali Razai; jacob.peterson@morganlewis.com; john.gaustad@morganlewis.com; lisanguyen@paulhastings.com; davidtennant@paulhastings.com; gracewang@paulhastings.com; Keegan; Steve; Jameson; weatherwax@lowensteinweatherwax.com; hendifar@lowensteinweatherwax.com; lowenstein@lowensteinweatherwax.com; woo@lowensteinweatherwax.com; courtney@lowensteinweatherwax.com; solos_iprs@lowensteinweatherwax.com
**Cc:** Trials
**Subject:** RE: Emergency Service & Filing Notice – Case No. IPR2026-00376 (Movant Daitona Carter)
**Date:** Friday, July 31, 2026 1:31:33 PM
**Attachments:** image001.png

---

Counsel,

Daitona Carter's submissions are regarded as requests for authorization to file motions in IPR2026-00376. These requests are denied because Daitona Carter is a non-party to the proceeding, and the Board's rules do not provide for the filing of motions by a non-party in an *inter partes* review.

Regards,

Andrew Kellogg,
Deputy Chief Clerk, Trials
Patent Trial and Appeal Board
USPTO
andrew.kellogg@uspto.gov
(571) 272-5366

1776-2026
UNITED STATES
PATENT AND TRADEMARK OFFICE

---

**From:** Daitona Carter <ipr@team.daitonacarter.com>
**Sent:** Monday, July 20, 2026 5:28 PM
**To:** Trials <Trials@USPTO.GOV>
**Cc:** mlb-luxottica-ipr-339@morganlewis.com; ph-meta-solos-ipr@paulhastings.com; Ali Razai <ali.razai@morganlewis.com>; jacob.peterson@morganlewis.com; john.gaustad@morganlewis.com; lisanguyen@paulhastings.com; davidtennant@paulhastings.com; gracewang@paulhastings.com; Keegan <keegan@caldwelllaw.com>; Steve <steve@caldwelllaw.com>; Jameson <jameson@caldwelllaw.com>; weatherwax@lowensteinweatherwax.com; hendifar@lowensteinweatherwax.com; lowenstein@lowensteinweatherwax.com; woo@lowensteinweatherwax.com; courtney@lowensteinweatherwax.com; solos_iprs@lowensteinweatherwax.com; PTAB <PTAB@USPTO.GOV>

**Subject:** Emergency Service & Filing Notice – Case No. IPR2026-00376 (Movant Daitona Carter)

Some people who received this message don't often get email from ipr@team.daitonacarter.com. Learn why this is important

CAUTION: This email has originated from a source outside of USPTO. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

To the Patent Trial and Appeal Board and Counsel of Record:

Please find attached Movant Daitona Carter's **NOTICE OF RELATED PROCEEDING PURSUANT TO 37 C.F.R. § 42.8(b)(2)** and accompanying **MOTION FOR ACCEPTANCE OF EMAIL FILING** in Case No. IPR2026-00376.

**Emergency Request for Email Acceptance & Section 508 Accommodation**

Movant is appearing *pro se* and faces severe electronic access constraints that completely prevent access to standard USPTO ID.me or P-TACTS accounts. Furthermore, Movant does not have telephone access due to severe safety and access constraints known to the parties.

Pursuant to Section 508 of the Rehabilitation Act (29 U.S.C. § 794d), 37 C.F.R. § 42.5, and 37 C.F.R. § 42.6(b)(1)(i), Movant respectfully requests that the Board:

Accept the attached filings via email to preserve the administrative record and afford equal access to justice.

Authorize that all future notices, orders, and service in this proceeding be transmitted directly via email to IPR@daitonacarter.com.

Handle all communications and orders regarding this request via email, as telephonic communications are unavailable to Movant.

**Physical Delivery Confirmation:** A physical backup copy of this filing has been dispatched via FedEx to the PTAB Trial Division to ensure permanent preservation of the administrative record.

Respectfully submitted,

/s/ Daitona Carter
Movant *Pro Se*
Official Case Correspondence Address: IPR@daitonacarter.com

cc: General PTAB administration

**EXHIBIT I**

APPELLEE SOLOS TECHNOLOGY LIMITED APPELLATE MERITS BRIEF

(FILED JULY 30, 2026)

[EXCERPTS]

No. 2026-1721

# United States Court of Appeals for the Federal Circuit

SOLOS TECHNOLOGY LTD.,
*Plaintiff-Appellee*,

v.

META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, OAKLEY, INC., LUXOTTICA OF AMERICA, INC., ESSILORLUXOTTICA USA, INC.,
*Defendants*,

DAITONA CARTER,
*Movant-Appellant*.

Appeal from the United States District Court for the District of Massachusetts
No. 1:26-cv-10304-ADB, Hon. Allison D. Burroughs

**CORRECTED BRIEF FOR APPELLEE SOLOS TECHNOLOGY LIMITED**

August 7, 2026

JAMESON J. PASEK
CALDWELL LAW
200 Clarendon Street, 59th Floor
Boston, MA 02116
(857) 990-4914
jameson@caldwelllaw.com

*Counsel for Plaintiff-Appellee Solos Technology Limited*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellee Solos Technology Limited states that the following proceeding arises from the same civil action previously before this Court: *In re Daitona Carter*, No. 2026–136 (Fed. Cir.), decided Apr. 30, 2026 (per curiam) (nonprecedential). Appellee is unaware of any other case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in denying Appellant's motion to intervene as of right under Federal Rule of Civil Procedure 24(a) ("Rule 24(a)") after concluding that Appellant failed to allege a significantly protectable interest in the patents-in-suit. (SAppx1–3).[1]

2. Whether the district court abused its discretion in denying permissive intervention under Federal Rule of Civil Procedure 24(b) ("Rule 24(b)") after

[1] Appellant failed to include Appellee in determining the contents of the Appendix. Appellee therefore submits a Supplemental Appendix and while certain documents reproduced in the Supplemental Appendix also appear in the Appendix, Appellee is reproducing those documents to provide complete and legible copies of the district court record. In particular, the district court's Electronic Orders denying intervention, reconsideration and Appellant's motion to vacate are being reproduced because the corresponding copies contained in the Appendix include apparent character-encoding and formatting artifacts (e.g., HTML rendering errors) that are not present in the official district court docket entries.

Accordingly, even if this Court were to consider Carter's post-order submissions in evaluating the April 15, 2026 order, those filings provide no basis for reversal.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellee Solos Technology Limited respectfully requests that this Court affirm the district court's denial of Appellant's Motion to Intervene.

Dated: August 7, 2026

Respectfully submitted,

/s/ Jameson J. Pasek
JAMESON J. PASEK
CALDWELL LAW
200 Clarendon Street, 59th Floor
Boston, MA 02116
(857) 990-4914
jameson@caldwelllaw.com

*Counsel for Plaintiff-Appellee Solos Technology Limited*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because it contains 4,309 words, excluding the parts exempted by Fed. Cir. R. 32(b)(2) and Fed. R. App. P. 32(f). The undersigned relied upon the word count feature of a word processing system in preparing this certificate as permitted by Fed. R. App. P. 32(g). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Jameson J. Pasek
JAMESON J. PASEK
CALDWELL LAW
200 Clarendon Street, 59th Floor
Boston, MA 02116
(857) 990-4914
jameson@caldwelllaw.com

**CERTIFICATE OF SERVICE**

I, Jameson J. Pasek, hereby certify that on August 7, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which provides notice of such filing to all registered participants.

/s/ Jameson J. Pasek
JAMESON J. PASEK
CALDWELL LAW
200 Clarendon Street, 59th Floor
Boston, MA 02116
(857) 990-4914
jameson@caldwelllaw.com

**EXHIBIT J**

EXPEDITED FOIA REQUESTS & STATUS INQUIRIES TO AMC AND DLA

(DATED AUGUST 1, 2026)

An official website of the United States government
Here's how you know

UNITED STATES DEPARTMENT of JUSTICE

FOIA.gov

MENU

**Thank you for visiting FOIA.gov, the government's central website for FOIA.** We'll continue to make improvements to the site and look forward to your input. Please submit feedback to National.FOIAPortal@usdoj.gov.

**Submission ID:** 3068051

# Success!

## Your FOIA request has been created and is being sent to the Defense Logistics Agency.

You'll hear back from the agency confirming receipt in the coming weeks using the contact information you provided. If you have questions about your request, feel free to reach out to the agency FOIA personnel using the information provided below.

### Contact the agency

Tamara L. Jessen, DLA FOIA Branch Chief

445-737-7072

tamara.jessen@dla.mil

DLA FOIA Requester Service Center, FOIA Requester Service Center

445-737-7072

DLA Public Liaison, FOIA Public Liaison

445-737-7072

foia.liaison@dla.mil

Information Governance & Compliance/Attn: FOIA/Privacy
6090 Strathmore Road
Richmond, VA 23237

## Request summary

Request submitted on**August 1, 2026**.

The confirmation ID for your request is **3068051**.

The confirmation ID is only for identifying your request on FOIA.gov and acts as a receipt to show that you submitted a request using FOIA.gov. This number does not replace the information you'll receive from the agency to track your request. In case there is an issue submitting your request to the agency you selected, you can use this number to help.

## Contact information

**Name**
Daitona Carter

**Mailing address**
General Delivery
New York, New York 10001
United States

**Phone number**
212-555-5555

**Company/organization**
Daitona Carter

**Email**
legal@team.daitonacarter.com

---

## Your request

STANDARD FREEDOM OF INFORMATION ACT (FOIA) REQUEST DATE: August 1, 2026 TO: Headquarters, U.S. Army Materiel Command FOIA Officer 4400 Martin Road Redstone Arsenal, AL 35898 AND TO: Defense Logistics Agency DLA FOIA Officer (DES-B) 8725 John J. Kingman Road, Suite 2533 Fort Belvoir, VA 20260 RE: Freedom of Information Act Request – Expedited Processing Requested Dear FOIA Officer, This is a request for records under the Freedom of Information Act, 5 U.S.C. § 552, and the implementing Department of Defense regulations at 32 C.F.R. Part 286. 1. Description of Records Requested Copies of the following localized administrative and contract award records are requested: * Technical Data Rights Assertions: Any and all DFARS 252.227-7017 ("Identification and Assertion of Use, Release, or Disclosure Restrictions") forms, logs, or lists submitted to the Army or DLA by Meta Platforms, Inc., Anduril Industries, or Kopin Corporation related to the EagleEye Program or the Soldier Borne Mission Command (SBMC) contract. * Contract Signature Blocks: The signature execution pages, FAR 15.406-2 Certificates of Current Cost or Pricing Data, and SAM.gov Annual Representations and Certifications signed by corporate officers to execute the EagleEye Program and SBMC contract awards. Note: This request does not seek internal pricing metrics or trade secrets under Exemption 4. Only the formal identity, titles, dates, and signature blocks of the executing corporate officers and the standard data assertion lists are sought. 2. Application for Expedited Processing Pursuant to 5 U.S.C. § 552(a)(6)(E)

and 32 C.F.R. § 286.8(e), certification under penalty of perjury is provided that a compelling need and urgent circumstances exist for expedited handling: A. Imminent Loss of Substantial Due Process Rights: The requested technical data assertions and execution blocks are critically required to counter ongoing procedural inequities, establish chain of custody, and secure time-sensitive evidentiary continuity in active federal judicial proceedings (Appeal No. 2026-1721) concerning the underlying property rights and conversion of the movant's intellectual property. B. Intertwined Safety and OIG Matter: These proceedings directly intersect with active safety reports and formal disclosures previously lodged with the Department of Defense Office of Inspector General (DoD OIG) regarding harms tied to advanced technological devices and unauthorized asset integration. Expedited disclosure is necessary to evaluate the integrity and provenance of active federal supply chains currently utilizing these disputed software and optical systems. 3. Fee Category and Fee Limit Acting strictly as a pro se litigant in a personal interest, a waiver of fees is requested because the disclosure of these records is directly in the public interest, bearing heavily on the transparency, accountability, and integrity of defense procurement supply chains. If a fee waiver is denied, authorization is granted to incur costs up to $500 without further authorization. Notice is requested if fees will exceed this amount. Please provide the records in electronic format to the email address listed below. If there are any questions regarding the scope of this request, please make contact immediately. Sincerely, /s/ Daitona Carter Daitona Carter Email: legal@team.daitonacarter.com

## Fees

**What type of requester are you?**
other

**Fee waiver**
yes

**Fee waiver justification**
Due to the circumstances mentioned in the request. I have little to no funds. Additionally, I am a TVPRA victim with many violations still actively occuring.

## Request expedited processing

**Expedited processing**
yes

**Justification for expedited processing**
These proceedings directly intersect with active safety reports and formal disclosures previously lodged with the Department of Defense Office of Inspector General (DoD OIG) regarding harms tied to advanced technological devices and unauthorized asset integration. Expedited disclosure is necessary to evaluate the integrity and provenance of active federal supply chains currently utilizing these disputed software and optical systems.

## Terms of service

**Terms of Service**
yes

**EXHIBIT K**

MOVANT'S USPTO DIRECTOR PETITION

FOR SUPERVISORY REVIEW UNDER 37 C.F.R. § 1.181

(FILED AUGUST 3, 2026)

August 3, 2026

TO: Office of the Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

**RE: EMERGENCY PETITION TO THE DIRECTOR UNDER 37 C.F.R. § 1.181**

PTAB Case No.: IPR2026-00376 (U.S. Patent No. 12,216,339)
Parallel Appeal: CAFC Appeal No. 26-1721
Petitioner: Daitona Carter, Pro Se

Dear Director,

Please find enclosed the Emergency Petition to the USPTO Director Under 37 C.F.R. § 1.181 to Invoke Supervisory Authority and Overrule Clerical Filing Blockage, accompanied by a formal Certificate of Service under 37 C.F.R. § 42.6(e) and supporting Exhibit A, B, C, D, E and F.

This emergency filing requests the immediate invocation of supervisory authority under United States v. Arthrex, Inc. to review a July 31, 2026 clerical action by the Trial Division that effectively shields a multi-forum matter from independent judicial and administrative review.

Respectfully submitted,

/s/ Daitona Carter
Daitona Carter, Pro Se
IPR@daitonacarter.com

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE UNDER SECRETARY OF COMMERCE**
**FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE USPTO**

| | | |
|---|---|---|
| In re Parallel Board Proceeding: | ) | |
| | ) | |
| **LUXOTTICA OF AMERICA INC. and** | ) | |
| | ) | |
| **META PLATFORMS, INC.,** | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | PTAB Case No.: IPR2026-00376 |
| | ) | U.S. Patent No.: 12,216,339 |
| **SOLOS TECHNOLOGY LIMITED**, | ) | |
| Patent Owner. | ) | |
| v. | ) | |
| | ) | |
| DAITONA CARTER, | ) | |
| | ) | |
| Movant (Movant-Appellant in | ) | |
| CAFC Appeal No. 26-1721). | ) | |

## EMERGENCY PETITION TO THE USPTO DIRECTOR UNDER 37 C.F.R. § 1.181 TO INVOKE SUPERVISORY AUTHORITY AND OVERRULE CLERICAL FILING BLOCKAGE

Movant Daitona Carter, appearing pro se, respectfully petitions the Director of the United States Patent and Trademark Office pursuant to 37 C.F.R. § 1.181(a)(3) to invoke extraordinary supervisory authority to review, vacate, and overrule a July 31, 2026 administrative action executed by the Deputy Chief Clerk of Trials.

As detailed below, the Deputy Chief Clerk exceeded ministerial authority by issuing a substantive legal determination denying Movant's emergency requests for Section 508 Rehabilitation Act accommodations and a statutory Notice of Related Proceeding. Movant requests that the Director vacate this clerical blockage, accept the underlying submissions, and transmit them to the assigned panel of Administrative Patent Judges to preserve the integrity of the agency record.

## I. STATEMENT OF EXTRAORDINARY CIRCUMSTANCES

The primary litigants in IPR2026-00376 have omitted a critical, active parallel federal appellate litigation before the United States Court of Appeals for the Federal Circuit from their mandatory disclosures: Solos Technology Limited v. Meta Platforms, Inc., et al. (In re Daitona Carter), Appeal No. 26-1721 (Exhibit D). This omission violates the continuous disclosure obligations set forth under 37 C.F.R. Section 42.8(b)(2) and the baseline Duty of Candor and Good Faith mandated by 37 C.F.R. Section 42.11.

To cure this omission, Movant served an Emergency Notice of Related Proceeding alongside an Emergency Motion for Leave to Submit Non-Electronic Filings Pursuant to 37 C.F.R. Section 42.6(b)(1)(i) and Section 508 of the Rehabilitation Act (29 U.S.C. Section 794d) on July 20, 2026 (Exhibit B).

On July 31, 2026, Deputy Chief Clerk Andrew Kellogg issued a formal administrative text response via electronic mail, addressed directly to Movant and primary counsel blocks, substantively ruling that Movant’s submissions "are regarded as requests for authorization to file motions... and are denied" (Exhibit A).

By recharacterizing a statutory Notice of Related Proceeding as an unauthorized motion and denying a Section 508 accessibility request on the merits, the Clerk exceeded ministerial capacity. The impropriety of this clerical lockout is exposed by the underlying federal record:

1. On June 26, 2026, Movant served her compliance-approved appellate opening brief targeting the core title derivation of the patent-in-suit (Exhibit C).

2. On July 30, 2026—less than twenty-four hours before the Clerk issued his denial—Patent Owner Solos actively participated in that same appellate dispute by submitting a comprehensive answering brief on the merits (Exhibit E).

The primary parties are actively litigating priority and inventorship against Movant in a higher federal court while simultaneously concealing that exact litigation from the Patent Trial and Appeal Board. By executing a threshold text lockout, the Clerk has permitted this omission to stand, leaving the assigned panel of Administrative Patent Judges entirely blind to a parallel federal appeal that directly impacts the validity and priority rights of U.S. Patent No. 12,216,339.

## II. GROUNDS FOR RELIEF UNDER 37 C.F.R. § 1.181

Under long-standing USPTO practice and the constitutional framework affirmed in United States v. Arthrex, Inc., 594 U.S. 1 (2021), the Director maintains absolute, supervisory authority to govern the conduct of administrative proceedings and review actions taken by clerks of the Board.

While automated portal protocols protect active dockets from arbitrary third-party intervention, they cannot be mechanically weaponized to suppress a parallel federal appeal or bypass federal disability mandates. Under 37 C.F.R. § 42.5, only Administrative Patent Judges possess the statutory authority to adjudicate requests for leave, determine non-party standing, or rule on compliance with electronic filing restrictions. Because a clerical officer lacks jurisdiction to issue a final denial on the merits, the July 31 administrative text response is an ultra vires act and a nullity as a matter of law. Supervisory intervention is necessary to protect the public interest in accurate, transparent patent rolls.

## III. PRAYER FOR RELIEF

To protect the administrative record and ensure equal access to justice, Petitioner respectfully requests that the Director:

1. **Invoke supervisory authority** under 37 C.F.R. § 1.181 to review and **VACATE** the Deputy Chief Clerk's July 31, 2026 administrative text denial;

2. **ORDER** the Trial Division to append Petitioner's July 20, 2026 submission, Section 508 accessibility motions, and accompanying Exhibits directly to the official case docket for independent evaluation by the panel of Administrative Patent Judges; and

3. **ORDER** the primary litigants to immediately amend their mandatory notices to reflect the active pendency of CAFC Appeal No. 26-1721.

Dated: August 3, 2026

Respectfully submitted,

By: /s/ Daitona Carter

Daitona Carter, Pro Se
Email: IPR@daitonacarter.com

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6(e), the undersigned hereby certifies that on August 3, 2026, a true and correct copy of the foregoing Petition to the USPTO Director under 37 C.F.R. § 1.181 was served via electronic mail transmission upon the following designated recipients:

TO:

- Andrew Kellogg (Deputy Chief Clerk, Trials) — andrew.kellogg@uspto.gov
- Luxottica Lead Counsel Block — mlb-luxottica-ipr-339@morganlewis.com
- Meta Lead Counsel Block — ph-meta-solos-ipr@paulhastings.com
- Ali Razai — ali.razai@morganlewis.com
- Jacob Peterson — jacob.peterson@morganlewis.com
- John Gaustad — john.gaustad@morganlewis.com
- Lisa Nguyen — lisanguyen@paulhastings.com
- David Tennant — davidtennant@paulhastings.com
- Grace Wang — gracewang@paulhastings.com
- Keegan — keegan@caldwelllaw.com
- Steve — steve@caldwelllaw.com
- Jameson — jameson@caldwelllaw.com
- Lowenstein Counsel Block — weatherwax@lowensteinweatherwax.com
- Lowenstein Counsel Block — hendifar@lowensteinweatherwax.com
- Lowenstein Counsel Block — lowenstein@lowensteinweatherwax.com
- Lowenstein Counsel Block — woo@lowensteinweatherwax.com
- Lowenstein Counsel Block — courtney@lowensteinweatherwax.com
- Solos Lead Counsel Block — solos_iprs@lowensteinweatherwax.com

CC:

- PTAB Trials Case Management Intake — Trials@uspto.gov

Dated: August 3, 2026

Respectfully submitted,

By: /s/ Daitona Carter

Daitona Carter, Pro Se

Email: IPR@daitonacarter.com

# EXHIBIT INDEX

**EXHIBIT A:** Formal Email Notification from Andrew Kellogg, Deputy Chief Clerk of Trials, Patent Trial and Appeal Board, Dated July 31, 2026.

**EXHIBIT B**: Movant Daitona Carter's Emergency Notice of Related Proceeding in PTAB Case No. IPR2026-00376 Regarding Parallel Federal Appellate Litigation, Dated July 20, 2026.

**EXHIBIT C**: Movant Daitona Carter's Emergency Motion for Leave to Submit Non-Electronic Filings and for Accessibility Accommodations Pursuant to 37 C.F.R. Section 42.5 and Section 508 of the Rehabilitation Act, Dated July 20, 2026.

**EXHIBIT D:** Compliance-Approved Corrected Opening Brief of Movant-Appellant Daitona Carter in CAFC Appeal No. 26-1721, Filed June 26, 2026. (Attached to Exibit B)

**EXHIBIT E**: Docket Sheet Summary for the U.S. Court of Appeals for the Federal Circuit, Case No. 26-1721.

**EXHIBIT F:** Brief for Appellee Solos Technology Limited in CAFC Appeal No. 26-1721, Executed and Stamped July 30, 2026.

**EXHIBIT L**

UNITED STATES SENATE COMMITTEE

ON FINANCE INVESTIGATIVE REPORT

(RELEASED AUGUST 4, 2026)

[EXCERPTS]



Senator Ron Wyden
Ranking Member
Senate Finance Committee

# Looking the Other Way: How Wall Street Banks enabled Jeffrey Epstein's sex trafficking.

August 4, 2026

**Table of Contents**

**I. Executive Summary and Key Findings** …3

**II. Background and Methodology** …5

**III. Federal law requires timely reporting of suspicious financial transactions** …8

**IV. Bank of America failed to properly screen and report Leon Black's payments to Epstein** …9

**V. Leon Black was overwhelmingly the largest source of funding for Epstein's sex trafficking** …13

**VI. Epstein used 134 accounts at JPMC to facilitate thousands of suspicious transactions** …15

**VII. JPMC failed to report Epstein's suspicious transactions to the U.S. government** …22

**VIII. Top JPMC executives were aware of Epstein's problematic behavior and suspicious financial activity** …25

**IX. After forcing him from the bank JPMC continued activity with Epstein and delayed reporting of his suspicious activity to the U.S. Treasury Department** …39

**X. Deutsche Bank executives turned a blind eye to Epstein's suspicious transactions** …43

**XI. Key aides oversaw Epstein's movement of cash and should be investigated** …50

**XII. Obstruction from the Trump Administration and Congressional Republicans** …53

**XIII. Banks and Epstein's estate have paid $900 million to settle Epstein-related lawsuits** …56

**XIV. Banks refused to cooperate with Senator Wyden's investigation** …57

**XV. Top bankers have faced no consequences for failing to report Epstein** …59

**XVI. 60 minutes interview is currently being suppressed by CBS News Leadership** …61

**XVII. Proposed reforms to federal anti-money laundering laws** …61

**XVIII. Recommended federal action** …64

## I. Executive Summary and Key Findings

Senator Wyden's investigative staff on the Senate Committee on Finance (Senate Finance Committee or Committee) conducted a multi-year investigation into transactions that financed Jeffrey Epstein's sex trafficking activity. The investigation revealed how major compliance failures at several Wall Street banks enabled Epstein for years. By failing to report—or choosing not to report—his suspicious financial transactions to federal law enforcement, these banks allowed Epstein to send cash payments and wire transfers to his victims, friends, and collaborators around the world. The bankers who needed to be asking questions didn't ask them. Jeffrey Epstein's crimes were hiding in plain sight.

The investigation found significant evidence that JPMorgan Chase (JPMC), Deutsche Bank, and Bank of America violated federal anti-money laundering laws by failing to screen and report Epstein's suspicious financial transactions in a timely manner. A review by Senator Wyden's staff of records housed at the U.S. Department of the Treasury (Treasury or U.S. Treasury Department) as well as internal bank records determined that top executives at major Wall Street banks were aware of Epstein's suspicious financial activity for years but withheld information from the U.S. government and protected Epstein from federal scrutiny.

Wall Street banks looked the other way as Epstein withdrew millions of dollars in cash with no clear business purpose and was party to thousands of suspicious wire transfers worth more than $1 billion. These banks failed to conduct appropriate due diligence on more than $170 million in payments to Epstein from billionaire Leon Black. In fact, documents reviewed during this investigation demonstrate that JPMC's senior leadership repeatedly protected Epstein as a client despite repeated warnings from internal compliance personnel. The documents also show that even after JPMC formally terminated Epstein as a client due to human trafficking concerns, the bank still waited years to report his activity to regulators, and top bankers eagerly continued to work with him informally and through other channels where he could continue to be a source of referrals for other ultra-wealthy clients.

The Department of Justice (DOJ), Treasury Department, Federal Reserve, and Comptroller of the Currency must conduct thorough investigations of the activities laid out in this report and must levy fines or criminal penalties, as appropriate. These investigations should include an examination of the conduct of individual bankers involved in the handling of transactions through Epstein's accounts.

Furthermore, this report outlines necessary legislative reforms to federal anti-money laundering laws intended to deter future compliance failures involving accounts held by ultra-high net worth individuals. Federal anti-money laundering laws are in place to require banks to notify the government in real time of financial activity that may be happening in support of dangerous crimes like human trafficking, fentanyl trafficking and the financing of terrorism. Banks cannot be allowed to ignore federal law simply because they fear alienating wealthy clients.

Finally, this report reveals that on March 26, 2026, Senator Wyden sat for a taped interview to discuss his investigation with then-60 Minutes correspondent Sharyn Alfonsi. The interview was part of a broader segment being prepared by 60 Minutes regarding the conduct of Wall Street banks and the government of the U.S. Virgin Islands (USVI) with regard to Jeffrey Epstein and his associates. However, shortly after the taping of the interview with Senator Wyden, CBS News Leadership fired Sharyn Alfonsi. As a result, the interview with Senator Wyden will not be aired and it is unclear whether CBS News Leadership will allow the broader segment to run.

The evidence presented in this report supports the following findings:

1. Bank of America likely violated federal anti-money laundering laws by failing to properly screen and report $170 million in payments from Leon Black to Jeffrey Epstein.

2. Billionaire Leon Black was Epstein's single largest source of funding. Epstein relied heavily on large payments from Black to bankroll his sex trafficking activity.

3. JPMC likely violated federal anti-money laundering laws by underreporting Epstein's suspicious financial activity to the U.S. Treasury Department.

4. Multiple top executives at JPMC are implicated in major compliance failures related to Jeffrey Epstein. Several of the bankers who personally handled Epstein's accounts, spoke with Epstein regularly, and failed to report Epstein's suspicious transactions are still employed in senior positions at the bank today.

5. After forcing Epstein to leave the bank, top executives at JPMC withheld information on Epstein from the U.S. government and continued working with Epstein as a source of referrals for business with other ultra-wealthy clients, including billionaire Leon Black.

6. Top JPMC executives coached Epstein on how to withdraw cash through shell companies instead of his personal accounts, helping him conceal information from compliance personnel and government regulators.

7. Top JPMC executives had knowledge of the pervasive presence of young women or underage girls at Epstein's homes.

8. Deutsche Bank ignored massive withdrawals of cash for questionable purposes from Epstein's accounts, protecting the bank's lucrative business interest in maintaining Epstein as a client.

9. JPMC, Bank of America and Deutsche Bank did not appropriately request business records to substantiate or verify the business purpose of major suspicious transactions involving Jeffrey Epstein.

10. The conduct of individual bankers employed by JPMC, Bank of America and Deutsche Bank in relation to their handling of accounts held by Epstein and Leon Black merits investigation by federal prosecutors and financial regulators. This includes, but is not limited to, the following bankers:

    - Paul Morris, Mary Erdoes, Jes Staley, Stephen Cutler, John Duffy, Justin Nelson, Paul Barrett, Mary Casey, David Brigstocke, Jeff Matusow, Jane Heller, Karen Weiss, and Stewart Oldfield.

11. Epstein accomplices Darren Indyke, Richard Kahn and Harry Beller moved significant amounts of cash around the world on Epstein's behalf in order to finance Epstein's operations. All three former Epstein employees should be investigated for the key role they played in Epstein's sex trafficking activity.

## II. Background and Methodology

In 2022, Senator Wyden's investigative staff at the Senate Finance Committee began an investigation into transactions that financed Jeffrey Epstein's sex trafficking activity. This investigation examined large payments to Epstein from various ultra-wealthy individuals and the extent to which compliance failures at major Wall Street banks enabled Epstein's criminal acts.

Senator Wyden's investigation began after a report commissioned by the Apollo Global Management Board of Directors revealed that Leon Black paid Jeffrey Epstein $158 million over five years for purported tax and estate planning advice. Because this figure dwarfs typical compensation for similar tax advisory services, Senator Wyden's Finance Committee staff conducted an extensive review of this extraordinary compensation scheme, the tax strategies Epstein allegedly devised to help Black avoid future estate tax liabilities, and other irregularities identified with respect to Black's financial dealings with Epstein.

As part of this investigation, staff from the Senate Committee on Finance conducted an in-camera review of suspicious activity reports (SARs) filed with the U.S. Treasury Department by various financial institutions related to Jeffrey Epstein (the Epstein SARs). This in-camera review of the Epstein SARs occurred on February 14, 2024, at a Treasury Department reading room and included bipartisan staff of both the Chairman and Ranking Member of the Senate Finance Committee. Many of these SARs have since been made public.

approximately $170 million over a five-year period. The payments to Epstein came from a series of accounts at Bank of America controlled by Black (The Black Accounts) and were made to two entities controlled by Epstein: Southern Trust Company, Inc. (Southern Trust) accounts at Deutsche Bank and Financial Trust Company Inc. accounts at JPMC.[14] The payments were made through 18 large wire transfers from the Black accounts to Epstein's accounts.[15] The wires were generally between $8 and $10 million, but in some cases were substantially larger, including one payment of $20 million in July 2014.[16] Most transactions occurred between 2013 and 2015, when $140 million was transferred from the Black accounts to Epstein's Southern Trust Company accounts at Deutsche Bank.[17]

| Year | Total amount wired from Leon Black's accounts at Bank of America to Epstein |
|---|---|
| 2012 | $5,500,000.00 |
| 2013 | $50,000,000.00 |
| 2014 | $70,000,000.00 |
| 2015 | $30,000,000.00 |
| 2016 | $6,300,000.00 |
| 2017 | $8,000,000.00 |
| | Total: $169,800,000.00 |

Despite the unusually large size of these payments and Epstein's lack of credentials or licenses related to tax and estate planning services, Treasury Department records suggest that Bank of America did not conduct significant due diligence on the payments and did not report to the transactions to the Treasury Department until February 2020, eight months after Epstein was arrested and seven years after the payments began.

A. "The Wire Transfer Activity Does Not Have a Verifiable Business Purpose"

In Bank of America's February 7, 2020, SAR filing, the bank flagged $156 million paid by the Black accounts to Epstein and stated that **"the wire transfer activity does not have a verifiable business purpose."[18]** The bank's 2020 filing also stated that the years-old

[14] February 14, 2024 in camera review of Suspicious Activity Reports (SARs) at U.S. Treasury Department headquarters. Review conducted by Senator Wyden's Finance Committee staff. ("The Black Accounts" includes accounts at Bank of America opened by the following individuals and entities: Leon Black, Debra Black, Black Family Partners, L.P., Narrows Holding, LLC, Elysium Management LLC and Melanie Spinella.)
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] February 14, 2024 in camera review of Suspicious Activity Reports (SARs) at U.S. Treasury Department headquarters. Review conducted by Senator Wyden's Finance Committee staff.

----- Original Message -----
From: Duffy, John R
Sent: Wednesday, August 14, 2013 03:12 PM
To: Erdoes, Mary E
Subject: Re: JE

He maintains that he will become Leon's primary advisor and will be calling the shots. Wants to be sure he can work with us on Leon and others.

Similarly, in August 2013 a chain of emails between Erdoes, Duffy and JPMC banker Justin Nelson discussed how to handle an inquiry from Leon Black's family office, which originated from a referral by Epstein. These emails suggest that JPMC understood that even though Epstein could no longer be a direct client of JPMC, he had a valuable "long standing" relationship with Leon Black."[140] The email chain also references the dubious estate planning Epstein provided Black, yet instead of scrutinizing the relationship or cutting off the Epstein ties all together, Duffy simply ends the email with "more to come."[141]

**From**: Eileen Alexanderson [mailto:EAlexanderson@apollo-advisors.com]
**Sent**: Wednesday, August 07, 2013 10:51 AM Eastern Standard Time
**To**: Nelson, Justin D
**Subject**: request for a dialog

Hello Justin, I come referred to you by Jeffrey Epstein. I run Leon Black's family office. I am hoping Jeffrey gave you a heads up on my calling. At your convenience, I would be interested in discussing potential terms for a collateralized personal borrowing by Mr Black.
Thank you.
**Eileen Alexanderson**
Black Family Partners, L.P.
c/o Apollo Management

**From**: Duffy, John R <john.r.duffy@jpmorgan.com>
**To**: Nelson, Justin D <justin.d.nelson@jpmorgan.com>;Erdoes, Mary E" <mary.erdoes@jpmorgan.com>
**Sent**: 8/8/2013 10:42:22 PM
**Subject**: RE: request for a dialogi

I spoke with Eileen late yesterday to specifically ask her if she was displeased with her/Leon's current coverage – she is not. She was intrigued by how JE described Justin, no surprise. I told Eileen we would work with her however she preferred but that her current team will access the same resources.

She discussed the structure of the deal briefly and said the loan may not be needed – Leon's relationship with JE is long standing and JE recently provided estate planning suggestions to Leon. More to come.

Furthermore, in the months and years after JPMC formally ended its client relationship with Epstein, JPMC banker Justin Nelson continued to seek out meetings and phone calls with Epstein to get his help landing additional business with Leon Black. In 2014, Nelson began emailing Epstein's assistant to find a time to meet with Epstein to discuss "Leon B's family

[140] JPM-SDNYLIT-00029911 – JPM-SDNYLIT-00029912
[141] *Id.*

office."[142] Other emails in 2014 indicate that Nelson was involved in business development efforts that he was struggling to get going and remarked to a colleague "Maybe I should go see JE."[143]

On Apr 25, 2014, at 12:23 PM, "Nelson, Justin D" <[redacted]> wrote:

> Lesley,
>
> Thanks for setting up the meeting.
>
> Jeffrey mentioned that Mr. Delson would be taking over Leon B's family office. I asked for his contact info and Jeffrey suggested I ask you. Could you please send that on to me?
>
> Thanks! Justin
>
> Justin D. Nelson - Managing Director
> The Private Bank at J.P. Morgan | 100 West Putnam Avenue |Greenwich,
> CT 06830
> p: [redacted] | p: [redacted] | f: [redacted] | e-mail:
> [redacted] JPMorgan Chase Bank, N.A. and J.P. Morgan
> Securities LLC
>

In a May 2015 email Nelson was even more direct with Epstein about his his desire to do business with Leon Black through Epstein. Nelson wrote to Epstein: "Jeffrey — I just wanted to follow-up a line of credit for Leon at JPM." [144]

**From:** "Nelson, Justin D" <[redacted]>
**To:** "jeevacation@gmail.com" <jeevacation@gmail.com>
**Subject:** FW: Leon
**Date:** Wed, 20 May 2015 14:03:32 +0000

---

Jeffrey – I just wanted to follow-up a line of credit for Leon at JPM. I spoke to some people internally and I don't think pricing will be an issue. Do you have a few minutes to discuss?

Thanks, Justin

**Justin D. Nelson - Managing Director**
**The Private Bank at J.P. Morgan | 100 West Putnam Avenue |Greenwich, CT 06830**
[redacted] | e-mail: [redacted]
*JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC*

Nelson met with Epstein at his New York townhouse at least six times between 2014 and 2018 and even visited Epstein as his ranch in New Mexico.[145] Nelson remains employed as Managing Director and Head of the Asset Management and Financial Principals Coverage Team for J.P. Morgan Private Bank in Connecticut.

Former JPMC banker Paul Barrett also met with Epstein numerous times in 2014 and beyond in pursuit of business with Leon Black. On August 13, 2014, Epstein emailed Barrett

---

[142] https://www.justice.gov/epstein/files/DataSet%209/EFTA00370319.pdf
[143] JPM-SDNYLIT-00032344
[144] https://www.justice.gov/epstein/files/DataSet%209/EFTA00679926.pdf
[145] *JPMorgan's Ties to Jeffrey Epstein Were Deeper Than the Bank has Acknowledged*, The Wall Street Journal, Apr. 21, 2026, online at https://www.wsj.com/finance/jpmorgan-jeffrey-epstein-525febe3?eafs_enabled=false

Case: 26-3172 Document: 41 Page: 154 Filed: 08/19/2026

| | | |
|---|---|---|
| JPMorgan Chase & Co. | $290,000,000 | Settlement with Epstein victims |
| JPMorgan Chase & Co. | $75,000,000 | Settlement with USVI |
| Bank of America | $72,500,000 | Settlement with Epstein victims |
| Deutsche Bank | $75,000,000 | Settlement with Epstein victims |
| Deutsche Bank | $150,000,000 | Fine paid to NY DFS |
| Leon Black | $62,500,000 | Settlement with Epstein victims |
| Epstein estate | $105,000,000 | Settlement with USVI |
| Epstein estate | $48,000,000 | Settlement with Epstein victims |
| Epstein estate | $35,000,000 | Settlement with Epstein victims |
| | | |
| Total paid to settle Epstein related claims | $913,000,000 | |

These settlements may have been reached in order to preempt depositions of ultra-wealth individuals or high-ranking bank executives. These settlements also prevented damaging information from coming out through litigation.

For example, shortly after Bank of America was sued by Epstein's victims, relying largely on information released by Senator Wyden, a deposition with billionaire Leon Black was scheduled for March 26, 2026.[203] Just days before Black's scheduled deposition, Bank of America agreed to a $62.5 million settlement with the victims, thereby avoiding Black sitting for a deposition. The settlement similarly helped senior bank executives who oversaw Black's accounts avoid answering questions about their compliance with federal anti-money laundering laws.

Furthermore the true figure of Epstein-related settlements is likely substantially higher. This investigation spoke with individuals who were able to identify dozens, and possibly hundreds, of secret settlements between Epstein's victims and wealthy individuals connected to Epstein.[204] Many of these settlements are subject to NDAs and were executed to resolve claims of sexual assault filed by Epstein's victims against businessmen implicated as potential co-conspirators in Epstein's sex trafficking network.

## XIV. Banks refused to cooperate with Senator Wyden's investigation

As part of this investigation, Senator Wyden sent several requests for information to banks regarding accounts related to Jeffrey Epstein. Each and every bank refused to cooperate with Senator Wyden's investigation.

---

[203] *Leon Black deposition in Epstein accusers' lawsuit against Bank of America delayed*, Reuters, Mar. 11, 2026, online at https://www.reuters.com/world/leon-black-could-be-deposed-epstein-accusers-lawsuit-against-bank-america-judge-2026-03-11/

[204] *The secret settlements protecting Jeffrey Epstein's friends,* Business Insider, Jun. 25, 2026 online at https://www.businessinsider.com/jeffrey-epstein-friends-settlements-victims-congress-house-oversight-2026-6

**EXHIBIT M**

PTAB CASE NOS. IPR2026-00412 & IPR2026-00420 PETITIONS

(FILED AUGUST 7, 2026)

[EXCERPTS]

Filed: August 7, 2026

Filed on behalf of **Luxottica of America Inc.** and **Meta Platforms, Inc.**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

LUXOTTICA OF AMERICA INC. AND META PLATFORMS, INC.,
Petitioners,

v.

SOLOS TECHNOLOGY LIMITED,
Patent Owner.

---

Case IPR2026-00412
Patent 11,082,055

---

# PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 11,082,055

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

LUXOTTICA OF AMERICA INC. AND META PLATFORMS, INC.,
Petitioners,

v.

SOLOS TECHNOLOGY LIMITED,
Patent Owner.

IPR2026-00412
Patent 11,082,055

RESPONDENT SOLOS TECHNOLOGY LIMITED'S MANDATORY NOTICES PURSUANT TO 37 C.F.R. § 42.8

Pursuant to 37 C.F.R. § 42.8, Patent Owner Solos Technology Limited ("Patent Owner"), through the undersigned counsel, submits the following mandatory notices in connection with the Petition for Inter Partes Review, Case No. IPR2026-00412 (the "Petition").

## I. Real Party in Interest Under 37 C.F.R. § 42.8(b)(1)

The Real-Party-in-Interest is Solos Technology Limited.

## II. Related Matters Under 37 C.F.R. § 42.8(b)(2)

Patent Owner is aware of the following related matters: *Solos Technology Limited v. Meta Platforms, Inc., et al.*, Case No. 1:26-cv-10304, pending in the United States District Court for the District of Massachusetts; and IPR2026-00420 pending before the Patent Trial and Appeal Board. Patent Owner is not presently aware of any other judicial or administrative matters that would affect, or be affected by, a decision in this proceeding.

## III. Lead and Back-Up Counsel Under 37 C.F.R. § 42.8(b)(3)

| Lead Counsel |
|---|
| Keegan M. Caldwell (Reg. No. 73,731)<br>CALDWELL<br>200 Clarendon Street, 59th Floor<br>Boston, MA 02116<br>Telephone: 857-990-4926<br>E-mail: keegan@caldwelllaw.com |

| Back-up Counsel |
|---|
| Steve Wang (Reg. No. 79,880)<br>steve@caldwelllaw.com<br>CALDWELL<br>200 Clarendon Street, 59th Floor<br>Boston, MA 02116<br>Telephone: 857-776-4505 |
| Jameson J. Pasek (*pro hac vice* forthcoming)<br>CALDWELL<br>200 Clarendon Street, 59th Floor<br>Boston, MA 02116<br>Telephone: 857-990-4914<br>E-mail: jameson@caldwelllaw.com |
| Kenneth Weatherwax (Reg. No. 54,528)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4503<br>E-mail: weatherwax@lowensteinweatherwax.com |
| Parham Hendifar (Reg. No. 71,470)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4500<br>E-mail: hendifar@lowensteinweatherwax.com |
| Nathan Lowenstein (*pro hac vice* forthcoming)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4502<br>E-mail: lowenstein@lowensteinweatherwax.com |

| |
|---|
| Colette Woo (*pro hac vice* forthcoming)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4511<br>E-mail: woo@lowensteinweatherwax.com |
| Dennis Courtney (*pro hac vice* forthcoming)<br>LOWENSTEIN & WEATHERWAX LLP<br>1016 Pico Blvd.,<br>Santa Monica, CA 90405<br>Telephone: 310-307-4521<br>E-mail: courtney@lowensteinweatherwax.com |

## IV. Service Information Under 37 C.F.R. § 42.8(b)(4)(i-v)

Please direct all correspondence to lead counsel and back-up counsel at the addresses shown above. Patent Owner also consents to electronic service by email to the email addresses shown above and to Solos_IPRs@lowensteinweatherwax.com.

Dated: August 11, 2026

Respectfully submitted,
Solos Technology Limited
By its attorneys,

/s/ Keegan Caldwell (Reg. No. 73731)
Keegan M. Caldwell
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-990-4926
E-mail: keegan@caldwelllaw.com

Steve Wang (Reg. No. 79,880)
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-776-4505
E-mail: steve@caldwelllaw.com

Jameson J. Pasek (*pro hac vice* forthcoming)
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-990-4914
E-mail: jameson@caldwelllaw.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on August 11, 2026, copies of the foregoing SUBMISSION OF MANDATORY NOTICES PURSUANT TO 37 C.F.R. § 42.8 were served pursuant to 37 C.F.R. § 42.6 on Petitioner by sending copies to Petitioner's counsel at the following email addresses designated for electronic service: MLB-Luxottica-IPR-055-1@morganlewis.com, PH-Meta-Solos-IPR@paulhastings.com, ali.razai@morganlewis.com, jacob.peterson@morganlewis.com, jack.hendershott@morganlewis.com, lisanguyen@paulhastings.com, davidtennant@paulhastings.com, josephrumpler@paulhastings.com, and gracewang@paulhastings.com.

<u>/s/ Keegan Caldwell (Reg. No. 73731)</u>
Keegan M. Caldwell
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
Telephone: 857-990-4926
E-mail: keegan@caldwelllaw.com

Filed: August 7, 2026

Filed on behalf of **Meta Platforms, Inc.** and **Luxottica of America Inc.**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

META PLATFORMS, INC. AND LUXOTTICA OF AMERICA INC.,
Petitioners,

v.

SOLOS TECHNOLOGY LIMITED,
Patent Owner.

---

Case IPR2026-00420
U.S. Patent No. 11,082,055

---

**PETITION FOR *INTER PARTES* REVIEW OF
U.S. PATENT NO. 11,082,055**

Case: 26-1721 Document: 41 Page: 164 Filed: 08/19/2026

Trials@uspto.gov
571-272-7822

Paper 5

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

LUXOTTICA OF AMERICA INC. AND META PLATFORMS, INC.,
Petitioner,

v.

SOLOS TECHNOLOGY LIMITED,
Patent Owner.

---

IPR2026-00420
Patent 11,082,055

---

Mailed: August 10, 2026

Before Paula Conn, *Trial Paralegal*

NOTICE OF FILING DATE ACCORDED TO PETITION
AND
TIME FOR FILING PATENT OWNER PRELIMINARY RESPONSE

The petition for *inter partes* review, filed in the above proceeding has been accorded the filing date of August 7, 2026.

Patent Owner may file a brief requesting discretionary denial within two months from the date of this notice and Petitioner may file a brief opposing Patent Owner’s discretionary denial request within three months of from the date of this notice. For more information, parties may consult the

Interim Director Discretionary Process webpage, which is available at https://www.uspto.gov/patents/ptab/interim-director-discretionary-process.

Patent Owner may file a preliminary response to the petition no later than three months from the date of this notice. The preliminary response is limited to setting forth the reasons why the requested review should not be instituted. Patent Owner may also file an election to waive the preliminary response to expedite the proceeding. For more information, please consult the Office Patent Trial Practice Guide, 77 Fed. Reg. 48756 (Aug. 14, 2012), which is available on the Board Web site at http://www.uspto.gov/PTAB.

Patent Owner is advised of the requirement to submit mandatory notice information under 37 C.F.R. § 42.8(a)(2) within 21 days of service of the petition. Mandatory notices include identifying any other judicial or administrative matter that would affect, or be affected by, a decision in the proceeding. 37 C.F.R. § 42.8(b)(2). Such administrative matters include requests for certificates of correction.

The parties are encouraged to use the heading on the first page of this Notice for all future filings in the proceeding.

In general, all represented parties must designate a lead counsel and at least one back-up counsel, and lead counsel must be a registered practitioner. 37 C.F.R. § 42.10(a). The Board, however, may permit a party to proceed without back-up counsel upon a showing of good cause, so long as lead counsel is a registered practitioner. *Id.* Once a party has designated a registered practitioner as lead counsel pursuant to 37 C.F.R. § 42.10(a) and filed a power of attorney for lead counsel if required by 37 C.F.R. § 42.10(b), that party is authorized to file a motion seeking leave to proceed

without back-up counsel. Such a motion shall not be filed earlier than 21 days after service of the petition, which is the time for filing patent owner mandatory notices. A party that files such a motion need not designate back-up counsel unless and until its motion to proceed without back-up counsel is denied. The parties are advised that the types of good cause sufficient to permit a party to proceed without back-up counsel are limited. *See* Expanding Opportunities To Appeal Before the Patent Trial and Appeal Board, 89 C.F.R. 82172, 82174 (Oct. 10, 2024), which is available at https://www.federalregister.gov/d/2024-23319. The parties are also advised that permission to proceed without back-up counsel may be revoked at the Board's discretion at any time during a proceeding. *See id*. For example, permission to proceed without back-up counsel may be revoked if the absence of back-up counsel causes scheduling problems or impedes Board proceedings. *See id*.

Once a party has designated a registered practitioner as lead counsel pursuant to 37 C.F.R. § 42.10(a) and filed a power of attorney for lead counsel if required by 37 C.F.R. § 42.10(b), that party is also authorized to file one or more motions for *pro hac vice* recognition of back-up counsel pursuant to 37 C.F.R. § 42.10(c)(1) and/or one or more notices of intent to designate a provisionally recognized PTAB attorney as back-up counsel pursuant to 37 C.F.R. § 42.10(c)(2). A motion or notice seeking *pro hac vice* recognition shall not be filed earlier than 21 days after service of the petition, which is the time for filing patent owner mandatory notices.

A motion for *pro hac vice* recognition filed pursuant to 37 C.F.R. § 42.10(c)(1) shall be accompanied by the fee set forth in 37 C.F.R. § 42.15(e). Such motion must:

a. Contain a statement of facts showing there is good cause for the Board to recognize counsel *pro hac vice* during the proceeding; and

b. Be accompanied by an affidavit or declaration in which the individual seeking *pro hac vice* recognition attests to the following:

i. Membership in good standing of the Bar of at least one State or the District of Columbia;

ii. No suspensions or disbarments from practice before any court or administrative body;

iii. No application for admission to practice before any court or administrative body ever denied;

iv. No sanctions or contempt citations ever imposed by any court or administrative body;

v. The individual seeking to appear has read and will comply with the Office Patent Trial Practice Guide and the Board's Rules of Practice for Trials set forth in 37 CFR part 42;

vi. The individual will be subject to the USPTO Rules of Professional Conduct set forth in 37 CFR 11.101 *et seq.* and disciplinary jurisdiction under 37 CFR 11.19(a);

vii. All other proceedings before the Office for which the individual has applied to appear *pro hac vice* in the last three years; and

viii. Familiarity with the subject matter at issue in the proceeding.[1]

If the affiant or declarant is unable to provide any of the information requested above or make the required statements or representations under oath, the individual must provide a full explanation of the circumstances as part of the affidavit or declaration. A party must also file a power of attorney for the person seeking *pro hac vice* recognition pursuant to 37 C.F.R. § 42.10(b).

A notice of intent to designate a provisionally recognized PTAB attorney as back-up counsel filed pursuant to 37 C.F.R. § 42.10(c)(2) must:

(a) Identify the registered practitioner who will serve as lead counsel;

(b) Identify the most recent prior proceeding in which the person seeking to appear was recognized *pro hac vice* by order of the Patent Trial and Appeal Board pursuant to a motion of the type described in 37 C.F.R. § 42.10(c)(1); and

(c) Be accompanied by Certification in the form of an affidavit or declaration in which the individual seeking *pro hac vice* recognition attests to the following:

i. Membership in good standing of the Bar of at least one State or the District of Columbia;

ii. No suspensions or disbarments from practice before any court or administrative body;

[1] The type of familiarity referenced in the Board's rules regarding *pro hac vice* admission is legal familiarity; technical familiarity, though expected, is not required. *See* Expanding Opportunities To Appear Before the Patent Trial and Appeal Board, 89 F.R. 82172, 82175 (Oct. 10, 2024); 37 C.F.R. § 42.10(c)(1).

iii. No application for admission to practice before any court or administrative body ever denied;

iv. No sanctions or contempt citations ever imposed by any court or administrative body;

v. The individual seeking to appear has read and will comply with the Office Patent Trial Practice Guide and the Board's Rules of Practice for Trials set forth in 37 CFR part 42;

vi. The individual will be subject to the USPTO Rules of Professional Conduct set forth in 37 CFR 11.101 *et seq.* and disciplinary jurisdiction under 37 CFR 11.19(a);

vii. All other proceedings before the Office for which the individual has applied to appear *pro hac vice* in the last three years; and

viii. Familiarity with the subject matter at issue in the proceeding.

The Certification should be a separate document that is filed as an exhibit.

If the affiant or declarant is unable to provide the information requested above or make the required statements or representations under oath, or if the affiant or declarant does not qualify as a provisionally recognized PTAB attorney pursuant to 37 C.F.R. § 42.10(c)(2), the procedure set forth in 37 C.F.R. § 42.10(c)(2) is not available, and *pro hac vice* recognition may only be obtained via the process set forth in 37 C.F.R. § 42.10(c)(1). *See* 37 C.F.R. § 42.10(c)(2)(iv). A party must also file a power of attorney for the person seeking *pro hac vice* recognition pursuant to 37 C.F.R. § 42.10(b). *Pro hac vice* recognition will not be effective until the party files an updated mandatory notice after the expiration of the applicable time period (5 or 10 days) set forth in 37 C.F.R. § 42.10(c)(2)(iii).

The parties are also reminded that unless otherwise permitted by 37 C.F.R. § 42.6(b)(2), all filings in this proceeding must be made electronically in the Patent Trial Appeal Case Tracking System (P-TACTS), accessible from the Board Web site at http://www.uspto.gov/PTAB. To file documents, users must first obtain a user ID by registering with MyUSPTO. Information regarding how to register with MyUSPTO and use P-TACTS is available at the Board Web site at https://www.uspto.gov/patents/ptab/patent-trial-and-appeal-case-tracking-system-p-tacts.

The parties may request a conference call as needed. An email requesting a conference call with the Board shall: (a) copy all parties, (b) indicate generally the relief being requested or the subject matter of the conference call, (c) include multiple times when all parties are available, (d) state whether the opposing party opposes any relief requested, and (e) if opposed, either certify that the parties have met and conferred telephonically or in person in an attempt to reach agreement, or explain why such meet and confer did not occur. If a party is unable to include any of the above information, the party shall explain in the email why doing so was not possible. The email may not contain substantive argument and, unless otherwise authorized, may not include attachments. *See* Trial Practice Guide at 9–10. If practicable, in order to ensure emails are consistent with the above, the parties shall send a single, joint email that includes items (a)–(e).

If there are any questions pertaining to this notice, please contact the Patent Trial and Appeal Board at trials@uspto.gov or 571-272-7822.

FOR PETITIONER:

Lisa Nguyen
David Tennant
Joseph Rumpler
Grace Wang
PAUL HASTINGS LLP
lisanguyen@paulhastings.com
davidtennant@paulhastings.com
josephrumpler@paulhastings.com
gracewang@paulhastings.com

Ali Razai
Jacob Peterson
MORGAN LEWIS & BOCKIUS LLP
ali.razai@morganlewis.com
jacob.peterson@morganlewis.com

FOR PATENT OWNER:

Caldwell LLC
200 Clarendon Street
59th Floor
Boston, MA 02116

**EXHIBIT N**

MOVANT'S EMERGENCY AMENDED SUPPLEMENTAL

STATEMENT TO THE USPTO DIRECTOR

(FILED AUGUST 13, 2026)

August 13, 2026

TO: Office of the Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office
P.O. Box 1450, Alexandria, VA 22313-1450

**RE: EMERGENCY AMENDED SUPPLEMENTAL SUBMISSION TO THE USPTO DIRECTOR PURSUANT TO 37 C.F.R. § 1.181**

PTAB Case No.: IPR2026-00376 (U.S. Patent No. 12,216,339)
IPR2026-00412/IPR2026-00420 (U.S. Patent No. 11,082,055)
Parallel Appeal: CAFC Appeal No. 26-1721
Petitioner: Daitona Carter, Pro Se

Dear Director,

Please find enclosed the Emergency Amended Supplemental Statement providing vital, updated information regarding the Emergency Petition to the USPTO Director originally submitted on August 3, 2026.

This amended statement is compelled by an administrative update issued by the Board's Trial Division on August 13, 2026, 10:29 AM EST. The Office explicitly certified that Appellant's underlying filings have been formally accepted for supervisory review, yet unilaterally re-routed the Director-level § 1.181 Petition down to an internal Board review under 37 C.F.R. § 41.3(a) to be decided "in due course."

As documented herein, this re-routing action operates as an immediate due process defect, creating an un-deadlined administrative vacuum. While the Chief Administrative Patent Judge evaluates the file without a fixed statutory deadline, the primary litigants (**Meta Platforms** and **Luxottica**) are actively moving forward with three consolidated proceedings—including the newly discovered **IPR2026-00412** and **IPR2026-00420** dockets filed on August 7, 2026—while completely concealing the active title dispute pending before the Federal Circuit.

Under **FRAP 12(a)**, the federal appellate procedure governing interlocutory and collateral order appeals regarding denied intervention, all parties from the originating lower court

case automatically carry over as mandatory parties to the appeal. The primary litigants are legally barred from bypassing this higher court title dispute or utilizing internal Board procedures to isolate and launder disputed technological architectures.

This emergency amended supplemental filing requests the immediate invocation of your absolute supervisory authority under *United States v. Arthrex, Inc.* to overrule the subordinate clerk's threshold blockage, assert direct jurisdiction over these material non-disclosures, and issue an immediate blanket stay of all three active dockets to protect the integrity of the judicial and agency records and halt an ongoing fraud on the USPTO.

Dated: August 13, 2026

Respectfully submitted,
By: /s/ Daitona Carter
Daitona Carter, Pro Se
Email: IPR@daitonacarter.com

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE UNDER SECRETARY OF COMMERCE**
**FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE USPTO**

| | |
|---|---|
| In re Parallel Board Proceeding:<br><br>**LUXOTTICA OF AMERICA INC. and**<br><br>**META PLATFORMS, INC.,**<br>Petitioners,<br><br>v.<br><br>**SOLOS TECHNOLOGY LIMITED**,<br>Patent Owner.<br>v.<br><br>DAITONA CARTER,<br><br>Movant (Movant-Appellant in<br>CAFC Appeal No. 26-1721). | PTAB Case No.: IPR2026-00376<br>U.S. Patent No.: 12,216,339 |

**AMENDED EMERGENCY SUPPLEMENTAL STATEMENT**
**TO THE USPTO DIRECTOR PURSUANT TO 37 C.F.R. § 1.181**

Movant Daitona Carter respectfully submits this Amended Supplemental Statement to the Director of the United States Patent and Trademark Office pursuant to 37 C.F.R. § 1.181. This submission provides immediate, updated evidence demonstrating that the July 31, 2026 clerical action by the Trial Division effectively shields a multi-forum matter from mandatory administrative and independent judicial review.

## I. THE CLERK EXCEEDED MINISTERIAL CAPACITY BY IMPROPERLY REJECTING A STATUTORY NOTICE OF RELATED PROCEEDINGS

As set forth in Movant's original August 3 petition, Deputy Chief Clerk Andrew Kellogg gravely exceeded his ministerial authority by issuing a substantive legal determination regarding non-party filings. Movant did not seek or require authorization to file an independent motion; rather, Movant properly submitted a motion for leave to file a **Notice of Related Proceedings** as an interested non-party.

Under established agency practice, a non-party possesses the absolute right to submit notice of parallel tribunals impacting the **res** of the proceeding. A subordinate clerk possesses purely ministerial duties and holds no legal authority to intercept, recharacterize, or unilaterally adjudicate the merits of such a submission. Only an assigned panel of Administrative Patent Judges holds the jurisdictional competence to accept or reject pleadings affecting the scope of an inter partes review. By issuing an administrative text response ruling that Movant's submissions "are regarded as requests for authorization to file motions... and are denied," the Clerk unlawfully usurped judicial authority and blocked the transmission of vital structural facts to the Board.

**II. THE CAFC CLERK'S CAPTION ALTERATION AND APPELLEES' TACTICAL DEFAULT UNDER FED. CIR. R. 47.3(b)(1)**

The integrity of the administrative record before the PTAB is directly compromised by an ongoing procedural default occurring in the parallel appellate track, **CAFC Appeal No. 26-1721**.

**The Mandatory Carry-Over Rule:** Under **FRAP 12(a)**, federal appellate procedure governing interlocutory and collateral order appeals regarding denied intervention, all parties from the originating lower court case automatically carries over as a mandatory party to the appeal.

**Clerical Loophole and Counsel Default:** By scrubbing Meta Platforms, Inc., Luxottica of America Inc., and Oakley from the official case caption and down-categorizing them as "non-parties," the CAFC Clerk's Office created an erroneous procedural loophole. Meta's elite legal representation—**Paul Hastings LLP** and **Morgan, Lewis & Bockius LLP**—exploited this clerical error to ignore their mandatory entry-of-appearance deadlines under **Fed. Cir. R. 47.3(b)(1)**.

**Unaddressed Motion to Compel:** On **May 15, 2026**, Movant filed an Emergency Motion to Compel Appellees' Appearance. To date, the single appellate judge has neither granted nor denied the motion, and Appellees have maintained radio silence—failing to respond whatsoever while the case remains pending a reply brief with no assigned panel yet empaneled. Appellees are deliberately weaponizing this administrative vacuum to pretend before the PTAB that no active dispute or title challenge exists.

## III. THE RECENT AUGUST 7 FILINGS CONFIRM THE PARALLEL OMISSION CONTINUES UNCHECKED

The administrative danger of this clerical blockage is exposed by the ongoing conduct of the primary litigants. Less than twenty-hours before the Clerk's unauthorized July 31 text denial, Patent Owner Solos Technology actively participated in the parallel appellate dispute before the Federal Circuit by submitting a comprehensive brief on the merits.

Despite this active, ongoing challenge to priority and original derivation, Co-Petitioners (Meta and Luxottica) expanded their administrative campaign on August 7, 2026, by filing **IPR2026-00412** and **IPR2026-00420** against U.S. Patent No. 11,082,055.

Furthermore, this multi-forum campaign is operating in tandem with bad-faith commercial exploitation: on **June 23, 2026**, Meta publicly released the exact consumer architecture that the lower court had previously dismissed as "generalized," relying on Solos as a corporate rubber stamp while the foundational title and inventorship are actively litigated. The underlying work itself stems from human trafficking and modern slavery origins, yet all corporate parties continue to double down on asset-washing through these parallel PTAB dockets.

In total alignment with their initial omissions in Case No. IPR2026-00376, Co-Petitioners declared under penalty of perjury in their August 7 filings that they were unaware of any other

Case: 26-1721 Document: 24-2 Page: 178 Filed: 08/19/2026

parallel judicial or administrative matters impacting the patent family, completely omitting **CAFC Appeal No. 26-1721**.

## IV. MANDATORY DISCLOSURES CANNOT BE PROCEDURALLY SUPPRESSED

A clerical officer lacks the jurisdictional capacity to issue a final denial that permits primary litigants to systematically conceal an active parallel federal appeal. Under **37 C.F.R. § 42.8(b)(2)** and the baseline Duty of Candor mandated by **37 C.F.R. § 42.11**, the pendency of the Federal Circuit appeal is a mandatory disclosure element.

Movant provided actual, explicit notice of the May 5, 2009 master Digtial Signal Processor Pre-AIA priority timeline and 2017 and 2019 full-stack architecture and working prototypes to Co-Petitioners' lead counsel blocks via a combination of direct electronic service, email service and mail/paper service in April and May 2026. The Clerk's threshold text lockout has effectively insulated Co-Petitioners' non-disclosure from review, leaving the Board entirely blind to a parallel federal appeal that directly impacts the validity, title, and priority rights of the subject patents.

## V. THE TRIAL DIVISION'S AUGUST 13, 2026 DETERMINATION CONCEDES THE COGNIZABILITY OF THE AUGUST 3 PETITION AND OPERATES AS AN ADMINISTRATIVE WAIVER OF THE THRESHOLD PROCEDURAL LOCKOUT

On August 13, 2026, at exactly 10:29 AM EST—prior to the transmission of this Emergency Supplemental Statement—the Deputy Chief Clerk issued an official administrative notification via electronic mail. This communication was rendered as a direct response to Appellant's August 3, 2026 Emergency Petition to the USPTO Director under 37 C.F.R. § 1.181. The Trial Division formally ruled:

> "The Office received a Petition to the Director under 37 CFR § 1.181 for Supervisory Review regarding IPR2026-00376 from non-party Daitona Carter... Accordingly, the Petition is being treated as a petition for supervisory review by the Chief

> Administrative Patent Judge under 37 CFR § 41.3(a)... The Petition is accepted for review and will be considered in due course."

By explicitly certifying that the August 3 Petition is formally "accepted for review" and has been advanced to the Chief Administrative Patent Judge, the Clerk's Office has operationally vacated its prior, unsustainable July 31 threshold lockout. Consequently, the agency's official certification creates a binding administrative record that a non-party possesses requisite colorable standing to alert the tribunal of structural omissions, thereby operationally waiving and estoppeing any further threshold procedural suppression on the basis of non-party status.

However, because the Clerk has formally placed these material facts under active supervisory review "in due course" pursuant to 37 C.F.R. § 41.3(a), the individual administrative patent panels remain temporarily insulated from the parallel appellate record while the file is adjudicated. To prevent the primary litigants from capitalizing on this administrative vacuum to advance a non-disclosed asset-washing campaign across their three consolidated dockets (**IPR2026-00376, IPR2026-00412, and IPR2026-00420**), this formal administrative acceptance creates an immediate necessity for a compulsory stay of all proceedings until the accepted supervisory review is concluded.

## VI. PRAYER FOR RELIEF

To protect the integrity of the judicial and agency records, and to halt an ongoing fraud on the Office, Petitioner respectfully requests that the Director immediately:

1. **VACATE** the Deputy Chief Clerk's July 31, 2026 administrative text denial;
2. **ORDER the Director** to immediately assert direct supervisory authority over this matter, overrule the Trial Division's automated re-routing to an internal Board review under 37 C.F.R. § 41.3(a), and personally command that Petitioner's July 20, 2026 Notice of Related Proceedings, accessibility motions, and accompanying technical exhibits be appended directly to the active case records;

3. **ORDER an immediate, mandatory stay** of all administrative phases and institution decisions across all three active dockets (**IPR2026-00376, IPR2026-00412, and IPR2026-00420**) until the Director formally concludes this supervisory review; and

4. **ORDER** the primary litigants to immediately amend their mandatory notices across all three active dockets to accurately reflect the pendency of CAFC Appeal No. 26-1721 and disclose the ongoing federal dispute over title and derivation.

Dated: August 13, 2026

Respectfully submitted,
By: /s/ Daitona Carter
Daitona Carter, Pro Se
Email: IPR@daitonacarter.com

**CERTIFICATE OF SERVICE**

Pursuant to 37 C.F.R. § 42.6(e), the undersigned hereby certifies that on August 13, 2026, a true and correct copy of the foregoing Petition to the USPTO Director under 37 C.F.R. § 1.181 was served via electronic mail transmission upon the following designated recipients:

TO:

- Andrew Kellogg (Deputy Chief Clerk, Trials) — andrew.kellogg@uspto.gov
- Luxottica Lead Counsel Block — mlb-luxottica-ipr-339@morganlewis.com
- Meta Lead Counsel Block — ph-meta-solos-ipr@paulhastings.com
- Ali Razai — ali.razai@morganlewis.com
- Jacob Peterson — jacob.peterson@morganlewis.com
- John Gaustad — john.gaustad@morganlewis.com
- Lisa Nguyen — lisanguyen@paulhastings.com
- David Tennant — davidtennant@paulhastings.com
- Grace Wang — gracewang@paulhastings.com
- Keegan — keegan@caldwelllaw.com
- Steve — steve@caldwelllaw.com
- Jameson — jameson@caldwelllaw.com
- Lowenstein Counsel Block — weatherwax@lowensteinweatherwax.com
- Lowenstein Counsel Block — hendifar@lowensteinweatherwax.com
- Lowenstein Counsel Block — lowenstein@lowensteinweatherwax.com
- Lowenstein Counsel Block — woo@lowensteinweatherwax.com
- Lowenstein Counsel Block — courtney@lowensteinweatherwax.com
- Solos Lead Counsel Block — solos_iprs@lowensteinweatherwax.com

CC:
- PTAB Trials Case Management Intake — Trials@uspto.gov

Dated: August 13, 2026

Respectfully submitted,
By: /s/ Daitona Carter
Daitona Carter, Pro Se
Email: IPR@daitonacarter.com

**From:** Trials <trials@uspto.gov>
**Sent:** 2026-08-13 14:29:03 UTC
**To:** ipr <ipr@team.daitonacarter.com>, John A. Squires, Under Secretary and Director <director@uspto.gov>, and ptabpetitions@uspto.gov, CC: Trials <trials@uspto.gov>, Kellogg, Andrew <andrew.kellogg@uspto.gov>, mlb-luxottica-ipr-339@morganlewis.com, ph-meta-solos-ipr@paulhastings.com, solos_iprs@lowensteinweatherwax.com, Ali Razai <ali.razai@morganlewis.com>, jacob.peterson@morganlewis.com, john.gaustad@morganlewis.com, lisanguyen@paulhastings.com, davidtennant@paulhastings.com, gracewang@paulhastings.com, Keegan <keegan@caldwelllaw.com>, Steve <steve@caldwelllaw.com>, Jameson <jameson@caldwelllaw.com>, weatherwax@lowensteinweatherwax.com, hendifar@lowensteinweatherwax.com, lowenstein@lowensteinweatherwax.com, woo@lowensteinweatherwax.com, and courtney@lowensteinweatherwax.com
**Subject:** Official Correspondence - 37 CFR 1.181 Petition

Good morning,

The Office received a Petition to the Director under 37 CFR § 1.181 for Supervisory Review regarding IPR2026-00376 from non-party Daitona Carter.

The request relates to a matter pending before the Patent Trial and Appeal Board (PTAB). Please note that petitions involving actions of the PTAB fall under 37 CFR § 41.3. *See* 37 CFR § 1.181(3). Accordingly, the Petition is being treated as a petition for supervisory review by the Chief Administrative Patent Judge under 37 CFR § 41.3(a). No fee is required for a petition seeking supervisory review. 37 CFR § 41.3(c).

The Petition is accepted for review and will be considered in due course.

Regards,

Andrew Kellogg,

Deputy Chief Clerk, Trials

Patent Trial and Appeal Board

USPTO

andrew.kellogg@uspto.gov

(571) 272-5366

---

**From:** Daitona Carter <ipr@team.daitonacarter.com>
**Sent:** Monday, August 3, 2026 3:12 PM
**To:** John A. Squires, Under Secretary and Director <Director@uspto.gov>; ptabpetitions@uspto.gov
**Cc:** Trials <Trials@USPTO.GOV>; Kellogg, Andrew <Andrew.Kellogg@USPTO.GOV>; mlb-luxottica-ipr-339@morganlewis.com; ph-meta-solos-ipr@paulhastings.com; solos_iprs@lowensteinweatherwax.com; Ali Razai <ali.razai@morganlewis.com>; jacob.peterson@morganlewis.com; john.gaustad@morganlewis.com; lisanguyen@paulhastings.com; davidtennant@paulhastings.com; gracewang@paulhastings.com; Keegan <keegan@caldwelllaw.com>; Steve <steve@caldwelllaw.com>; Jameson <jameson@caldwelllaw.com>; weatherwax@lowensteinweatherwax.com; hendifar@lowensteinweatherwax.com; lowenstein@lowensteinweatherwax.com; woo@lowensteinweatherwax.com; courtney@lowensteinweatherwax.com; ipr <ipr@team.daitonacarter.com>
**Subject:** Official Correspondence - 37 CFR 1.181 Petition

You don't often get email from ipr@team.daitonacarter.com. Learn why this is important

CAUTION: This email has originated from a source outside of USPTO. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

August 3, 2026

TO: Office of the Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

RE: EMERGENCY PETITION TO THE DIRECTOR UNDER 37 C.F.R. § 1.181

Case 1:26-cv-03178-APM Document 24-1 Filed 10/13/26 Page 189 of 305
Case: 26-1721 Document: 41 Page: 184 Filed: 08/19/2026

PTAB Case No.: IPR2026-00376 (U.S. Patent No. 12,216,339)
Parallel Appeal: CAFC Appeal No. 26-1721
Petitioner: Daitona Carter, Pro Se

Dear Director,

Please find attached for immediate filing the Emergency Petition to the USPTO Director Under 37 C.F.R. § 1.181 to Invoke Supervisory Authority and Overrule Clerical Filing Blockage, accompanied by a formal Certificate of Service under 37 C.F.R. § 42.6(e) and supporting Exhibits A, B, C, D, E, and F.

This emergency filing requests the immediate invocation of supervisory authority under United States v. Arthrex, Inc. to review a July 31, 2026 clerical action by the Trial Division that effectively shields a multi-forum fraud from independent judicial and administrative review.

The complete filing package is submitted herewith for formal review and processing.

Respectfully submitted,

/s/ Daitona Carter
Daitona Carter, Pro Se
IPR@daitonacarter.com

**EXHIBIT O**

EMERGENCY MANDAMUS ACTIONS,

APPEARANCE DEMANDS, AND STAY REQUESTS

(FILED AUGUST 13, 2026)

[EXCERPTS]

No.

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**IN RE DAITONA CARTER,**

Petitioner.

---

On Petition for a Writ of Mandamus to the

United States District Court for the District of Massachusetts

Case No. 1:26-cv-10304-ADB

---

**EMERGENCY PETITION FOR A WRIT OF MANDAMUS**

**UNDER 28 U.S.C. § 1651**

---

Pursuant to 28 U.S.C. § 1651 and Federal Rule of Appellate Procedure 21, Petitioner Daitona Carter respectfully submits this emergency petition for a writ of mandamus. Petitioner seeks an extraordinary writ to compel the correction of the appellate docket and case caption pursuant to Federal Rules of Appellate Procedure 3 and 12, to reinstate indispensable parties omitted in contravention of the underlying record, and to stay parallel administrative proceedings before the Patent Trial and Appeal Board (PTAB) that threaten this Court's appellate jurisdiction.

## I. RELIEF SOUGHT

Petitioner respectfully requests an order:

1. Compelling the Clerk of Court to immediately correct the official docket and case caption of Case No. 26-1721 to accurately reflect all mandatory carry-over parties from the lower-court proceedings, specifically designating Meta Platforms, Inc., Meta Platforms Technologies, LLC, Solos Technology Limited, Luxottica of America, Inc., and EssilorLuxottica USA, LLC as Appellees;

2. Compelling Appellees' counsel blocks to immediately comply with Fed. Cir. R. 47.3(b)(1) by filing mandatory Entries of Appearance; and

3. Staying all parallel administrative proceedings before the PTAB under dockets IPR2026-00376, IPR2026-00412, and IPR2026-00420 that directly target the foundational property rights at issue in this pending appeal until this Court adjudicates the underlying inventorship title.

## II. ISSUES PRESENTED

1. Whether administrative docket omissions and caption alterations that exclude indispensable lower-court parties—contrary to the mandates of FRAP 3 and 12—constitute structural error that permits corporate litigants to evade Fed. Cir. R. 47.3(b)(1) appearance mandates, thereby causing a procedural default during an active briefing window.
2. Whether extraordinary mandamus relief is warranted where real parties in interest advance inconsistent positions across tribunals—asserting a lack of a protectable interest to avoid appellate appearance while simultaneously prosecuting duplicate administrative challenges before the PTAB that threaten to moot the subject matter of a pending appeal.
3. Whether federal administrative dockets can be utilized to execute an asset-washing mechanism over an independent consumer hardware and software architecture where the underlying chain of title remains the subject of an active, parallel Article III title and derivation dispute.
4. Whether the Patent Trial and Appeal Board's ongoing refusal to stay its consolidated proceedings—after officially certifying on the record that Petitioner's threshold challenges are accepted for active supervisory review—constitutes an arbitrary and capricious due process defect that unlawfully encroaches upon the exclusive appellate jurisdiction of this Court under FRAP 12(a).

## III. FACTUAL STATEMENT AND THREAT TO JURISDICTION

On May 17, 2026, Petitioner timely initiated an interlocutory appeal to protect her proprietary rights and correct inventorship pursuant to statutory mandates under 35 U.S.C. § 256. The underlying litigation concerns the sole ownership and original attribution of the foundational multimodal digital signal processing (DSP) smart eyewear technology developed by Petitioner.

Throughout the lower-court proceedings, the designated corporate entities maintained direct financial and legal alignment with the underlying subject matter. Notably, while certain entities asserted in motion practice that they possessed no protected interest for purposes of avoiding lower-court joinder, they simultaneously maintained deep financial and operational integration regarding the assets in dispute. Capitalizing on the interim appellate posture, these same real parties in interest have instituted parallel collateral challenges before the PTAB under a staggered timeline that operates to exploit Petitioner's acute resource asymmetry:

- **Case No. IPR2026-00376** (Initiated June 18, 2026): Launched by Luxottica of America Inc., et al., targeting U.S. Patent No. 12,216,339.
- **Case No. IPR2026-00412** (Initiated August 7, 2026): Launched symmetrically by Luxottica of America Inc., et al., targeting U.S. Patent No. 11,082,055.
- **Case No. IPR2026-00420** (Initiated August 7, 2026): Launched symmetrically by Meta Platforms, Inc., et al., targeting U.S. Patent No. 11,082,055.

In these administrative filings, the corporate entities executed mandatory disclosures completely omitting Petitioner as an interested real party in interest and concealing this active appellate track. This pattern of non-disclosure culminated on August 11, 2026, when Patent Owner Solos Technology Limited filed its corrected mandatory disclosures in Case No. IPR2026-00412 (*Exhibit H*). Despite having actively filed on the merits in this Court in Appeal No. 26-1721 just four days prior on August 7, Solos explicitly swore under penalty of perjury that it was *"not presently aware of any other judicial or administrative matters that would affect, or be affected by, a decision in this proceeding."*

Following Petitioner's emergency intervention directly to the USPTO Director exposing this systemic non-disclosure, the Board's Trial Division was forced to halt its threshold lockout. On August 13, 2026, at exactly 14:29:03 UTC (10:29 AM EST), Deputy Chief Clerk Andrew Kellogg issued an official administrative notification (*Exhibit G*), explicitly ruling that the Petition is accepted for supervisory review by the Chief Administrative Patent Judge under 37 C.F.R. § 41.3(a).

While this determination constitutes a formal agency admission that Petitioner's threshold constitutional and structural challenges are cognizable and "accepted for review," the Trial Division has simultaneously refused to halt its proceedings. By sequestering Petitioner's foundational filings inside an un-deadlined supervisory folder to be decided "in due course" under 37 C.F.R. § 41.3(a), the agency has created an immediate due process defect. The individual administrative patent panels remain completely insulated from the active appellate record, enabling the primary litigants to aggressively push toward an automated institution decision while this Court's appellate jurisdiction is systematically bypassed.

## IV. REASONS WHY THE WRIT SHOULD ISSUE

Mandamus is an extraordinary remedy reserved for extraordinary circumstances, which are fully established here. Petitioner possesses a clear and indisputable right to an accurate appellate record and caption under FRAP 3 and 12, unencumbered by administrative omissions or artificial procedural obstacles.

The Patent Trial and Appeal Board is currently operating in direct violation of its own administrative mandates and the jurisdictional boundaries of this Court. By way of the Deputy Chief Clerk's August 13, 2026 electronic notification, the agency has formally conceded that Appellant's challenges are accepted for active supervisory review. Whether analyzed as an incurable jurisdictional defect under the Board's expanded Real Party in Interest (RPI) framework pursuant to 35 U.S.C. § 312(a)(2) and its binding precedent in *Corning Optical Communications RF, LLC v. PPC Broadband Inc.*, or as a fraudulent concealment of a mandatory Related Matter under 37 C.F.R. § 42.8(b)(2), the operational injury to the tribunal remains identical. The primary litigants have actively blinded the lower case panels to a pending federal appellate title dispute, rendering an immediate top-down stay from this Court mandatory to prevent an irreversible distortion of the res.

Furthermore, the disputed assets are subject to explicit statutory protections and federal civil enforcement mechanisms under the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595, which provides an absolute right to civil asset recovery and property restitution. The underlying technology represents the direct fruits of an independent invention that remains subject to active, unresolved statutory title corrections under 35 U.S.C. § 256.

The primary litigants are actively weaponizing parallel administrative channels at the PTAB to advance a collateral invalidation campaign. This operation functions to extinguish the underlying patent claims entirely. If the lower tribunal is permitted to invalidate the subject matter of this dispute while the true creator's filings are sequestered, the statutory property restitution remedies guaranteed under the TVPRA will be rendered permanently moot, causing an incurable and irreversible injury.

Pursuant to FRAP 12(a), because Meta Platforms, Inc. and the lower-court defendants were parties to the originating district court action, they automatically carry over as mandatory Appellees in CAFC Appeal No. 26-1721. They cannot lawfully outrun an Article III appeal, or insulate themselves from a future independent civil action under 18 U.S.C. § 1595, by utilizing automated agency portal lockouts to destroy the disputed property. Allowing financially integrated corporate actors to utilize parallel administrative channels to extinguish property rights while manipulating appellate captions to evade Article III transparency effectively subverts this Court's appellate authority and violates foundational principles of procedural due process. Petitioner has no alternative adequate legal remedy to preserve the integrity of the res and the record prior to the submission of her reply brief.

## V. PRAYER FOR RELIEF

Wherefore, Petitioner respectfully prays that this Court issue a Writ of Mandamus:

1. **COMPELLING** the immediate correction of the federal appellate case caption and docket to include all indispensable corporate lower-court parties as Appellees;
2. **ORDERING** designated lead counsel for Appellees to immediately file entries of appearance pursuant to Fed. Cir. R. 47.3(b)(1) to establish complete Article III transparency;
3. **ISSUING AN IMMEDIATE, COMPULSORY STAY** of all administrative phases, trial stages, and institution decisions across parallel Patent Trial and Appeal Board Case dockets **IPR2026-00376, IPR2026-00412, and IPR2026-00420** to preserve the status quo and protect the exclusive appellate jurisdiction of this Court; and
4. **GRANTING** such further extraordinary or structural relief as this Court deems necessary to protect the integrity of the judicial and agency records from active, multi-forum non-disclosure.

**Dated:** August 14, 2026

Respectfully submitted,

/s/ Daitona Carter

Daitona Carter, Appellant Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
legal@daitonacarter.com

## CERTIFICATE OF COMPLIANCE

Pursuant to **Federal Rule of Appellate Procedure 32(g)**, the undersigned certifies that this emergency petition complies with the type-volume and typeface limitations of **Federal Rule of Appellate Procedure 21(d)**.

1. **Word Count:** This petition complies with the word count limitation of FRAP 21(d)(1) because, excluding the parts of the petition exempted by FRAP 32(f), the body of this document contains exactly **1495 words** as calculated by the built-in document statistics engine in document creating software.
2. **Typeface and Font Size:** This petition complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Times New Roman, with double-line spacing throughout the body text.

**Dated:** August 13, 2026

Respectfully submitted,

/s/ Daitona Carter

Daitona Carter, Appellant Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
legal@daitonacarter.com

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 21(a)(1) and Local Rule 25, the undersigned hereby certifies under penalty of perjury that on August 14, 2026, a true and correct copy of the foregoing Emergency Petition for a Writ of Mandamus was served upon the parties to this proceeding via the following approved service channels:

- Electronically on counsel of record for Plaintiffs-Appellees and "Defendants" (Defendants-Appellees) via electronic mail and/or the Court's CM/ECF system, pursuant to Fed. R. App. P. 25 and Fed. Cir. R. 25.

- Electronically on United States Patent and Trademark Office (Agency Respondents)

  Delivery: tgsolicitor@uspto.gov

  (Official Service Copy pursuant to FRAP 21)

- Electronically on the Deputy Chief Clerk, Trials – PTAB for Case Nos. IPR2026-00376, IPR2026-00412, and IPR2026-00420) - Advisement Copy Delivery: andrew.kellogg@uspto.gov

**Dated:** August 14, 2026

Respectfully submitted,

/s/ Daitona Carter

Daitona Carter, Appellant Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
legal@daitonacarter.com

# EXHIBIT P

CERTIFIED CORPORATE DISCLOSURE SUMMARY

FROM BENDING SPOONS S.P.A.

GLOBAL PARTNERSHIPS DIRECTOR DOCUMENTING

RAY-BAN INTEGRATION

(JULY 2026)

Top Content People Learning Jobs Games




**Raoul Baccanelli**
1mo

"I wasn't lost, I was finding my way."

For Ray-Ban's latest capsule collection, we wanted the media format to capture exactly thi ...more

21

Like Comment Share

To view or add a comment, sign in



2,542 followers

13 Posts

View Profile

+ Follow

## Explore content categories

Career
Productivity
Finance
Soft Skills & Emotional Intelligence
Project Management
Education

Show more

LinkedIn © 2026

About
Accessibility
User Agreement
Privacy Policy
Your California Privacy Choices
Cookie Policy
Copyright Policy
Brand Policy
Guest Controls
Community Guidelines
Language

Top Content | People | Learning | Jobs | Games




# Raoul Baccanelli

New York, New York, United States · Contact Info

3K followers · 500+ connections

See your mutual connections

Join to view profile | Message

Bending Spoons

Università Cattolica del Sacro Cuore

## About

Hungrier than yesterday see more

## Activity

3K followers

Posts Comments Reactions

**Raoul Baccanelli** reposte...

**Bending Spoons**
1w

Ambitious students and recent grads, this is for you. 👀

Introducing the Bending Spoons Sales Bootcamp: a three-month program where you'll get hands-on experience working on products like Vimeo, Brightcove, and Eventbrite.

Ten spots available. Fully compensated. No experience required. ...more

385 · 27 Comments

**Raoul Baccanelli**
1w

There aren't many brands that defined the internet quite like **AOL**... today, I'm officially making an internal shift to join its Advertising team! ...more

AOL

89 · 22 Comments

Ra

We've 🎉

See all activities

# Experience & Education

## Bending Spoons

View Raoul's full experience

By clicking Continue to join or sign in, you agree to LinkedIn's **User Agreement**, **Privacy Policy**, and **Cookie Policy**.

Continue with Google

## Licenses & Certifications

**SeLdA | English C1**
Università Cattolica del Sacro Cuore
Issued Jan 2023

## Projects

**Romano Summer Cup**
Jun 2023
Co-Founder and organizer of 'Romano Summer Cup' in Romano di Lombardia, an annual multifaceted event that seamlessly blends football (320 players), music, culinary delights, and entertainment every late june.
- Designing and planning the entire event, including scheduling and logistics.
- Coordinating with partners (Capolinea Sport & Wellness), sponsors (McDonald's, Expert, and more than 20 other sponsors), and local authorities.
- Marketing on social media: Implement strategies to...

Show more

Other creators

### Timeout Party

Sep 2023 - Jan 2025

Evento per discoteche/lounge bar, Co-Founder.

Other creators

### WeWin

Apr 2024 - Jun 2024

WeWin is your go-to chatbot for M&A.
Designed to deliver strategic advice, precise data insights, and essential documentation support. It ensures confidentiality, professionalism, and tailors guidance to secure the best outcomes in your negotiations.

Other creators

---

## Languages

### Italiano

Native or bilingual proficiency

### Francese

Elementary proficiency

**Inglese**
Full professional proficiency

**Spagnolo**
Limited working proficiency

## View Raoul's full profile

See who you know in common

Get introduced

Contact Raoul directly

Join to view full profile

**Explore top content on LinkedIn**

Find curated posts and insights for relevant topics all in one place.

View top content

## Add new skills with these courses




**Algorithmic Trading and Finance Models with Python, R, and Stata Essential Training**




**YouTube Success: Build an Authentic Channel That's Worth the Follow**




**Tableau and R for Analytics Projects**

See all courses

© 2026

About

Accessibility

User Agreement

Privacy Policy

Your California Privacy Choices

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines

Language

**EXHIBIT Q**

OFFICIAL LEADERSHIP APPOINTMENT RECORD:

META PLATFORMS, INC.

STRATEGIC PLACEMENT OF PRESIDENT AND VICE CHAIRMAN

DINA POWELL MCCORMICK

(DATED JANUARY 12, 2026)

LIFESTYLE > TRAVEL

# Sun Valley's Billionaire Summer Camp Returns: Bezos, Zuckerberg And Altman Lead The Pack

Private jets, billionaires and dealmaking return to Idaho as the annual Allen & Co. retreat brings together the biggest names in tech, media, finance and entertainment.

By Jim Dobson, Senior Contributor. Jim Dobson is a full-time luxury...

Follow Author

Published Jul 06, 2026, 06:03am EDT, Updated Jul 14, 2026, 02:58am EDT

0

Add Us On Google



The Sun Valley Lodge holds the Allen & Company Sun Valley Conference in Sun Valley, Idaho.
GETTY

security teams block all public access around the iconic Sun Valley Resort. The high-profile guests casually blend in as they trade suits and ties for fleece, sneakers and baseball caps. They are the heads of Hollywood studios, big tech companies, cable and streaming networks, sports leagues, investment firms and AI startups, many among the world's wealthiest and most influential people.

*Updated with attendee images 7/10/26*

The Allen & Co. Sun Valley Conference, an invitation-only retreat often called "summer camp for billionaires," has been a fixture in the mountains for over forty years. The New York investment bank gathers a small but very powerful group in Idaho where there is no public agenda, no official guest list and the press has little access. The secrecy is intentional.

Case: 26-3182 Document: 41 Page: 207 Filed: 08/19/2026




Bill Gates, co-founder of Microsoft rides in a golf cart at the Allen & Company Sun Valley Conference at the Sun Valley Lodge on July 9, 2026
**GETTY IMAGES**



Executive Chairman of Amazon Jeff Bezos and wife Lauren Sánchez Bezos attend the Allen & Company Sun Valley Conference at the Sun Valley Lod...
**GETTY IMAGES**

People often compare Sun Valley with Davos, but the differences are obvious. Davos is a global event, full of official delegations, press, and policy announcements. Sun Valley, on the other hand, is more laid-back and private. Meetings happen over breakfast, fly fishing, hikes, bike rides, and dinners. The relaxed setting allows competitors and potential partners to meet without the formality of a boardroom or the attention that comes with being in public.

0

where the media are banned from taking photos.



CEO of Meta Platforms Mark Zuckerberg and Dina Powell McCormick President and Vice Chairman at Meta attend the Allen & Company Sun...
**GETTY IMAGES**



Co-founder of Home Depot Ken Langone (L) and President and CEO of Warner Bros. Discovery David Zaslav arrive at the Sun Valley Lodge for the...
**GETTY IMAGES**



Tim Cook (L), CEO of Apple, walks with John Ternus, incoming CEO of Apple, at the Allen & Company Sun Valley Conference at the Sun Valley...
**GETTY IMAGES**

Allen & Co. does not release its official guest list, but the master list of attendees photographed at the event are listed below including billionaires Amazon executive chairman Jeff Bezos, Gates Foundation co-chair Bill Gates, Fox Corporation chairman Lachlan Murdoch, People Inc. chairman Barry Diller. and Meta CEO Mark Zuckerberg.



Barry Diller, chairman of IAC and Expedia Group, and his wife, fashion designer Diane von Fürstenberg, attend the Allen & Company Sun Valley...
**GETTY IMAGES**



Sam Altman, CEO of OpenAI, arrives at the the Allen & Company Sun Valley Conference at the Sun Valley Lodge on July 7, 2026
GETTY IMAGES

There was a strong presence from the media and entertainment industry in attendance, with Warner Bros. Discovery CEO David Zaslav, Comcast chairman Brian Roberts and co-CEO Mike Cavanagh, Netflix co-CEOs Ted Sarandos, former CEO of Yahoo Jerry Yang, YouTube CEO Neal Mohan, Sony Pictures Entertainment chairman and CEO Ravi Ahuja, and former Disney CEO Bob Iger. Disney executives Josh D'Amar, and ESPN chairman Jimmy Pitaro rounded out the list.



Former CEO of The Walt Disney Company Bob Iger (L) and CEO of Disney Josh D'Amaro attend the Allen & Company Sun Valley Conference at the



Reid Hoffman, co-founder of LinkedIn, arrives at the Allen & Company Sun Valley Conference at the Sun Valley Lodge on July 7, 2026
GETTY IMAGES

Technology was also a key focus at the conference. Also attending were Apple's Tim Cook and new CEO John Ternus, along with Palantir CEO Alex Karp, OpenAI CEO Sam Altman, Chairman of OpenAI Bret Taylor, and OpenAI president Greg Brockman. With so many leaders present, artificial intelligence was a major topic this year. The people working to build, fund, and regulate the next computing platform met with the executives whose companies will be changed by these advances.





CEO of YouTube Neal Mohan arrives at the Sun Valley Lodge for the Allen & Company Sun Valley Conference on July 7, 2026
GETTY IMAGES

The rest of the attendees show how Sun Valley has moved beyond its old role as just a media conference. They included NFL commissioner Roger Goodell, MLB commissioner Rob Manfred, Imagine Entertainment's Brian Grazer, Jeffrey Katzenberg, Live Nation CEO Michael Rapino, Mattel CEO Ynon Kreiz, and LA28 chairman Casey Wasserman.

Journalists like Gayle King, Erin Burnett, Anderson Cooper, Andrew Ross Sorkin, Bret Baier, Thomas Friedman, and David Ignatius attended, and served as moderators or participants instead of traditional reporters.

0



Evan Spiegel, co-founder and CEO of Snap Inc., attends the Allen & Company Sun Valley Conference at the Sun Valley Lodge on July 8, 2026
GETTY IMAGES



Alex Karp, chief executive officer of Palantir Technologies Inc., left, and Peter Thiel, president and founder of Clarium Capital Management ... More
© 2026 BLOOMBERG FINANCE LP

This mix of people is what makes the conference so influential. A streaming executive might talk with a sports-rights negotiator, a founder could meet a studio chief, or an artificial-intelligence leader might connect with the owner of a major news organization, all in the same small resort. While business happens elsewhere and not every meeting leads to a deal, Sun Valley has a history of big media transactions, such as talks about Disney buying ABC and later, Jeff Bezos buying The Washington Post. The real value is that people who rarely meet in person can

The conference comes at a time when the Wood River Valley is growing to accommodate the increased demand. The Observatory Sun Valley, a Viceroy Resort, is set to open in fall 2026 at the entrance to downtown Ketchum. This 73-room hotel will feature 12 penthouse residences, a full-service spa with an indoor thermal pool, cold plunge, sauna, steam rooms, and a rooftop observatory. It is a significant addition to a market known for the classic Sun Valley Resort and the historic charm of a town that has avoided becoming a showpiece.



The Observatory Sun Valley, A Viceroy Resort
**VICEROY HOTELS**

There are also many events coming up in the area. Sun Valley Resort is celebrating its 90th anniversary, and the Trailing of the Sheep Festival is turning 30. Bald Mountain now has 90 new acres added this season, and Sun Valley will host the Audi FIS Ski World Cup Finals in March 2027. The Central Idaho Dark Sky Reserve, which surrounds the region, gives the new Viceroy a unique appeal that matches the valley, the ability to watch actual stars in the sky and not only on the streets of Sun Valley.

That balance is what sets Sun Valley apart from other celebrity-driven mountain towns. Aspen is still the most famous symbol of ski-town luxury, and its social scene is meant to be seen and photographed. Sun Valley, on the other hand, is easy

without any attention, and head back to a mansion in the hills without feeling cut off from everything.



This estate on 455 N Bigwood Dr, in Ketchum, is currently listed at $29,500,000
BERKSHIRE HATHAWAY HS SUN VALLEY PROPERTIES

The real estate market here is also booming. As of this writing, some of the top listings in Ketchum are a $29.5 million home on North Bigwood Drive, a $36 million estate on Wood River Drive, and the $22.5 million *Bend of the River Ranch*, which comes with 426 acres. For the rich and famous, the attraction is clear: privacy, easy access to the mountains, nearby private airports, a small but curated social scene, and a sense of being far from the crowds.

The Allen & Co. conference matches this atmosphere perfectly. It brings a huge amount of wealth and influence to a town that is used to handling the excitement. Private jets fill the skies, hotels fill up, roads get crowded, and security changes the feel around the resort. Some locals now find the disruption and the environmental impact of all the private flights harder to ignore. These issues have become as much a part of the week as the celebrity sightings, and local news outlets have reported that groups plan protests near the resort.

news. This is why the annual "summer camp" still matters. It is more than just a gathering of billionaires at a beautiful resort. It is one of the last places where the people shaping entertainment, technology, news, sports, and finance can meet in a casual, private setting.



Ivanka Trump, Veronica Grazer, Gayle King, and Wendi Murdoch attend the Allen & Company Sun Valley Conference at the Sun Valley Lodge on July 8...
GETTY IMAGES

## 2026 Attendees: Confirmed & Photographed

## A

- **Adam Foroughi - chief executive officer of AppLovin**
- Adam Silver – Commissioner, NBA
- Adriana Cisneros - chief executive officer of Cisneros Group
- **Alex Karp – CEO, Palantir Technologies**
- Alex Norström - Co-Chief Executive Officer of Spotify
- Alexandre Arnault - Former CEO of Rimowa, son of LVMH Bernard Arnault

0

- Anderson Cooper - CNN Host
- **Andreas Halvorsen, chief executive officer of Viking Global Investors**
- Andrew Ross Sorkin- New York Times journalist
- Andy Jassy – CEO, Amazon
- Anthony Noto – CEO, SoFi
- Aviv Nevo - venture capitalist with NV Investments

## B

- Bari Weiss - Editor-in-chief of CBS News
- **Barry Diller – Chairman & Senior Executive, People Inc. / Expedia**
- Barry McCarthy - former president and chief executive officer of Peloton Interactive
- Becky Quick - CNBC Anchor
- **Ben Horowitz - co-founder venture capital firm Andreessen Horowitz**
- Ben Sasse – Former US Senator
- Bert Kolde - vice chairman of the Portland Trail Blazers
- **Bill Gates - co-founder of Microsoft**
- Bill McDermott - CEO of ServiceNow
- Bob Iger – CEO, The Walt Disney Company
- Bob Werbel – attorney

- Bobby Long - partner at Piedmont Capital Partners
- **Bom Kim - chief executive officer of Coupang Inc**
- Brad Little - governor of Idaho
- Bret Baier - Fox News anchor
- **Bret Taylor - chair of OpenAI Inc**
- **Brian Armstrong - Coinbase CEO**
- **Brian Chesky - chief executive officer of Airbnb**
- Brian Grazer – Film & TV Producer; Co-Founder, Imagine Entertainment
- **Brian Roberts – Chairman & CEO, Comcast**
- Brian Rolapp - chief executive officer of the PGA Tour Inc
- Bryan Lourd - co-chairman of Creative Artists Agency
- Bryan Meehan, formerly the executive chairman of Blue Bottle Coffee Co
- Bruce Campbell - chief revenue and strategy officer for Warner Bros. Discovery

## C

- Carly Helfrich - Designer, Mark & Graham at Williams Sonoma
- Casey Wasserman - Sports Agent
- Charles Cascarilla - co-founder and chief executive officer of Paxos
- **Charles Koch - chairman, co-CEO of Koch, and founder of the Stand Together**

0

- Charlie Rose - Journalist
- **Christopher Ilitch – CEO of Ilitch Holdings**
- Chris Kubasik- CEO of L3Harris
- Chris McKown- executive chairman of Iora Health
- Chris Silbermann - Managing Director, CAA Talent Agency
- Cliff Obrecht - COO of Canva

## D

- Dana Walden - President and Chief Creative Officer of The Walt Disney Company
- **Daniel Ek - founder and chairman of Spotify**
- Daniel Pozen - equity portfolio manager for Wellington Management
- Daniel Rimer - general partner of Index Ventures
- Dan Sundheim - founder and chief investment officer of D1 Capital Partners
- Dara Khosrowshahi – CEO, Uber
- Dave McCormick - US Senator
- Dave Wehner - chief strategy officer, Meta Platforms
- David Ignatius - Washington Post journalist
- David Lamp - Executive Vice President of HF Sinclair Corporation
- David Petraeus – Retired U.S. Army General; Former Director, CIA
- David Rubulotta - global co-head of fixed income capital markets at Stifel

- **David Velez - chief executive officer of Nubank**
- David Wehner - chief strategy officer of Meta Platforms
- David Weinberg- Lead Independent Director of The Coca-Cola Company
- David Zaslav – President & CEO, Warner Bros. Discovery
- Delian Asparouhov - founder of Varda
- Dennis Lynch - head of counterpoint global at Morgan Stanley Investment Management
- Derek Chang - CEO of Liberty Media Corporation
- Dev Ittycheria - former chief executive officer of MongoDB Inc
- Diane von Fürstenberg - fashion designer
- Dina Powell McCormick - Former Deputy National Security Advisor, president and vice chairman at Meta Platforms
- Donald Graham- Chairman of Graham Holdings Company
- Doug Burgum – U.S. Secretary of the Interior
- C. Doug McMillon - former president and CEO of Walmart Inc

## E

- Eddy Cue – Senior Vice President of Services, Apple
- **Emilio Azcarraga - chairman and president of Empresas Cablevision**
- Eric Eisner- partner at The Tornante Co
- Eric Glyman - CEO of Ramp

- **Eric Lefkofsky - founder and chief executive officer at Tempus (Groupon co-founder)**
- Erin Burnett - CNN Host
- **Evan Spiegel - Founder, chief executive officer of Snap Inc**

## F

- Feroz Dewan- CEO at Arena Holdings
- Frank Longo - professor of Neurosurgery at Stanford University
- Fred Krup - president of the Environmental Defense Fund

## G

- Gary Bettman - commissioner of the National Hockey League
- Gaurav Kapadia - co-founder and chief executive officer of XN LP
- Gayle King – Co-Host, CBS Mornings
- Gianrico Farrugia - chief executive officer of the Mayo Clinic
- Glenn Fogel - chief executive officer of Booking Holdings Inc
- Glenn Youngkin - Former Virginia Governor
- Greg Abel - President and CEO of Berkshire Hathaway
- **Greg Brockman - President of OpenAI**
- Greg Penner - co-founder and general partner of Madrone Capital Partners
- Guillermo Morenes - former secretary of domestic trade for Argentina
- Gunnar Wiedenfels - chief financial officer of Discovery Communications Inc.

- **Hamdi Ulukaya - CEO of Chobani**
- Heather Berlin - neuroscientist and psychologist
- Henrique Braun - chief operating officer of Coca-Cola Co
- Henry Crumpton - president of Crumpton Group
- Henry Ellenbogen - chief investment officer for Durable Capital Partners
- Henry Gasztowtt - co-founder of Isara
- **Henry Kravis - co-founder of Kohlberg Kravis Roberts & Co**
- Henry M. Paulson Jr. – Former U.S. Secretary of the Treasury; Former Chairman & CEO, Goldman Sachs
- Hiroki Totoki - CEO of Sony
- **Hiroshi Mikitani - CEO of Rakuten**

## I

- Ian Rowe- chief executive officer of Vertex Partnership Academies
- **Ivan Zhao - chief executive officer of Notion Labs**
- Ivanka Trump - Businesswoman and daughter of President Trump

## J

- Kevin Scott - chief technology officer at Microsoft
- James Proud - chief executive officer of Substrate
- James Quincey - chief executive officer of Coca-Cola
- James Stillwagon - Portfolio Manager at T. Rowe Price

- Jane Olson - Humanitarian
- **Jared Kushner - Founder and CEO of Affinity Partners / Advisor to President Trump**
- Jason Hirschhorn - CEO of REDEF
- Javier Olivan - chief operating officer of Meta Platforms
- **Jay Y Lee – Executive Chairman, Samsung Electronics**
- Jeb Terry - president and chief executive officer at Cosm
- Jeff Bewkes – Retired Media Executive; Co-Founder & Senior Advisor, Alignment Growth (former Chairman & CEO, Time Warner)
- **Jeff Bezos - Chairman of Amazon**
- Jeffrey Katzenberg - co-founder of WndrCo LLC
- Jennifer Rubio – Co-Founder & Co-CEO, Away
- Jennifer Witz - CEO of Sirius XM
- **Jerry Yang – Co-Founder, Yahoo; Founding Partner, AME Cloud Ventures**
- Jim Lanzone - chief executive officer of Yahoo Inc.
- Jim Robinson - managing partner of RRE Ventures
- **Jimmy Haslam - CEO of Pilot Corporation**
- Jinman Han - EVP of Samsung Electronics
- Joey Levin - CEO of IAC

0

- John Donahoe - chairman of PayPal and former Nike CEO
- John Fetterman - US Senator
- John Furner - President and CEO, Walmart U.S.
- John Hock - chief executive officer of Altrinsic Global Advisors
- John Ternus – Incoming CEO Apple
- **John W. Henry – Principal Owner, Fenway Sports Group (Boston Red Sox, Liverpool FC)**
- Jonathan Haidt - Professor at NYU Stern School of Business
- Jose Antonio Fernandez Garza - CEO of Fomento Económico Mexicano
- Jose Henrique Cutrale - Coca Cola Femsa
- Josh D'Amaro – Chairman, Disney Experiences
- Josh Kopelman- Founder First Round Capital
- **Josh Kushner – Founder & Managing Partner, Thrive Capital**
- Josh Silverman - former CEO of Etsy
- Julia Hartz- co-founder of Eventbrite Inc
- Justin Kelly- chief executive officer of Winslow Capital Management

## K

- Karim Sadjadpour - Carnegie Endowment for International Peace
- Karlie Kloss – Model; Founder & CEO, Bedford Media (Life Magazine)
- Keller Rinaudo Cliffton - chief executive officer of Zipline International

- Kenneth Chenault – Chairman & Managing Director, General Catalyst; Former CEO, American Express
- **Kenneth Langone – Co-Founder, The Home Depot**
- Kevin Hartz - co-founder Xoom and CEO Eventbrite
- Kevin Warsh – Current Federal Reserve Chair
- Kimberly Querrey - Co-founder of SQ Advisors

## L

- **Lachlan Murdoch - Executive Chairman & CEO, Fox Corporation; Chairman, News Corp**
- Lachy Groom - founder of the investment firm LGF
- Larry Summers - Former Treasury Secretary
- **Larry Tanenbaum - Canadian sports owner**
- Lauren Sánchez Bezos - Philanthropist and wife of Jeff Bezos
- Leehom Wang - Singer
- Lee Styslinger- co-owner of Altec, Inc
- Luis von Ahn - cofounder of Duolingo

## M

- Mackenzie Price - co-founder of AI-driven Alpha School
- Mark Casey - portfolio manager of Capital Group Research Inc.
- Mark Ong - chief investment officer of public equities for GIC

- Marne Levine - former chief business officer at Meta Platforms
- Mary Barra – Chair & CEO, General Motors
- Martin Romo - chairman and chief investment officer of The Capital Group Cos
- Matt Danzeisen - head of private investments at Thiel Capital and husband of Peter Thiel
- **Max Levchin - founder and chief executive officer of Affirm Holdings, cofounded Paypal**
- Melanie Perkins - CEO of Canva
- Michael Angelakis - chief executive officer of Atairos Management LP
- Michael Cavanagh- co-chief executive officer of Comcast
- Michael Eisner – Founder & Chairman/CEO, The Tornante Company; Former Chairman & CEO, The Walt Disney Company
- Michael Kives - managing partner of K5 Global
- Michael Ovitz – Former Hollywood Talent Agent; Co-Founder, Creative Artists Agency (CAA)
- Michael Rapino - President and CEO of Live Nation Entertainment
- **Mike Cannon-Brookes - chief executive officer of Atlassian Corp.**
- Mike Pausic - founder of Foxhaven Asset Management
- Mike Speiser - managing director of Sutter Hill Ventures
- Mike Steib - CEO of XO Group Inc

- Miko Ashwin - Partner at Spark Capital
- Miranda Kerr - model, entrepreneur and wife of Snap Chat billionaire Evan Spiegel
- **Mitch Rales - Co-founder of Danaher Corporation**
- Muhtar Kent- former chairman of The Coca-Cola Co

## N

- Naftali Bennet - former Israeli Prime Minister
- **Nassef Sawiris - chairman of Orascom Construction**
- Naveen Rao – chief AI officer of Databricks, CEO of Nervana System
- Neal Mohan - chief executive officer of YouTube
- Neil Ashe - chief executive officer of Acuity Brands Inc
- Nellie Bowles - journalist and wife of Bari Weiss of CBS News

## O

- **Orion Hindawi - chairman of Tanium Inc**

## P

- Paul Gould - executive vice president, managing director of Allen & Co.
- Paul Salem - senior managing director of Providence Equity Partners
- **Paul Sciarra - co-founder of Pinterest**
- **Peter Thiel - Co-founder PayPal**

- **Philippe Laffont - philanthropist**
- Philipp Schindler - SVP and CBO for Google
- Priscilla Chan - pediatrician and philanthropist and married to billionaire Mark Zuckerberg.

## R

- Ravi Ahuja - Chairman and CEO, Sony Pictures Entertainment
- **Reed Hastings - co-founder of Netflix**
- **Reid Hoffman – Co-Founder, LinkedIn; Partner, Greylock Partners**
- Rene Haas - Chief executive officer of Arm Holdings Plc
- Sir Richard Moore - former Chief of the British Secret Intelligence Service
- Richard Reeves - senior fellow at The Brookings Institute
- Rob Manfred – Commissioner, MLB
- Rob Sharps- CEO of T. Rowe Price Group
- Rob Speyer- CEO of Tishman Speyer
- RJ Scaringe - chief executive officer and founder of Rivian Automotive
- **Robert Kraft - Chairman and chief executive officer of Kraft Group**
- Robert Thomson - chief executive officer of News Corp
- Roberto Marinho Neto - chief executive officer of Globo Ventures
- Roger Goodell - NFL Commissioner

Case: 26-1721 Document: 41 Page: 230 Filed: 08/19/2026



- Ryan McInerney - chief executive officer of Visa
- **Ryan Smith - chairman of Qualtrics, owner of the Utah Jazz**

## S

- **Sam Altman – CEO, OpenAI**
- Sarah Guo - founder of Conviction
- Sarah O'Hare Murdoch - former model and wife of Lachlan Murdoch
- **Satya Nadella - CEO Microsoft**
- Saum Sutaria - chairman, chief executive officer of Tenet Healthcare
- **Sheryl Sandberg – Former Chief Operating Officer, Meta**
- Spencer Neumann - CFO of Netflix
- Sridhar Ramaswamy - CEO, Snowflake Inc.
- Stacey Bendet Eisner - CEO of Alice + Olivia
- **Stan Druckenmiller, chairman and chief executive officer and founder of Duquesne Family Office**
- **Stan Kroenke - Sports teams owner, married to Walmart heiress Ann Walton**
- Steve Pagliuca - Chair of Bain Capital
- Steven Swartz - chief executive officer of Hearst Corp
- **Stewart Butterfield – Co-Founder, Slack and Flickr**
- Sundar Pichai - CEO of Google

- Taylor Sheridan - Writer, producer, co-creator of the television series *Yellowstone*
- **Ted Leonsis – Chairman & CEO, Monumental Sports & Entertainment**
- Ted Sarandos – Co-CEO, Netflix
- Ted Weschler - portfolio manager for Berkshire Hathaway Inc
- **Terry Pegula - Owner of the Buffalo Bills and Buffalo Sabres**
- Terry Ring - founder of Silver Creek Outfitters
- Thomas Friedman - New York Times political writer
- Tim Armstrong – Founder & CEO, the dtx company / Flowcode; Former Chairman & CEO, AOL
- **Tim Cook – CEO, Apple**
- Tim O'Shaughnessy- president and chief executive officer at Graham Holdings Co
- Toby Cosgrove - Former CEO of the Cleveland Clinic
- **Tobias Lutke - CEO of Shopify**
- Tom Garfinkel - president and chief executive officer of the Miami Dolphins
- Tom Hale - chief executive officer of Oura Health Oy
- Tom Slater - investment manager Scottish Mortgage Investment Trust

## V

- Van Jones - CNN Host

- Dana Walden - President and Chief Creative Officer of The Walt Disney Company
- Wences Casares - CEO of Xapo
- Wendi Deng Murdoch– co-chief executive officer of Big Feet Productions, ex wife of Rupert Murdoch
- **Wesley Edens - CEO of publicly liquefied natural gas company New Fortress Energy, co-owner of Milwaukee Bucks**
- William Danoff - vice president and portfolio manager of Fidelity Management
- Willow Bay - dean of the University of Southern California, wife of Bob Iger

## Y

- Ynon Kreiz – Chairman & CEO, Mattel
- Yousef Al Otaiba, United Arab Emirates (UAE) ambassador to the US

## Z

- **Zach Perret - chief executive officer of Plaid Inc**

## MORE FROM FORBES

FORBES

### How The Ultra-Wealthy Are Spending Their Money In 2026, According To Knight Frank

By Jim Dobson



Case 1:26-cv-26317-APM Document 41 24-1 Page 233 Filed 10/13/26: 08/19/2026 Page 238 of 305





By Jim Dobson. Jim Dobson is an award-winning writer, author, and professional raconteur, specializing in exclusive travel, extreme luxury, and high-end destinations.For over 12 years, he has been writing for Forbes, focusing on rare access to extraordinary people, places,...

**Read More**

Find Jim Dobson on LinkedIn, Facebook, Instagram and X.

Follow Author

# Join The Conversation

Comments 0

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines here.

See All Comments (0)

# More From Forbes



**DeSantis Ally In Florida Arrested On...**

By Mary Whitfill Roeloffs, Forbes Staff



**Education Department Rescinds Student Loan Forgiveness Credit, But Scope Of**

**EXHIBIT R**

SEC REGULATORY FILINGS & UNDERWRITING EXCERPTS:

ALLEN & COMPANY

DOCUMENTING INTERLOCKING BOARD OVERSIGHT AND BENDING SPOONS IPO EXECUTION

(JUNE / JULY 2026)

## The offering

| | |
|---|---|
| **Ordinary shares offered by us** | ordinary shares. |
| **Ordinary shares offered by the Selling Shareholders** | ordinary shares. |
| **Ordinary shares to be outstanding after this offering** | ordinary shares (or ordinary shares if the underwriters exercise their option to purchase additional ordinary shares from us and the Selling Shareholders in full). |
| **Class A shares to be outstanding after this offering** | class A shares. |
| **Option to purchase additional ordinary shares** | We and the Selling Shareholders have granted the underwriters an option to purchase up to additional ordinary shares from us and an additional ordinary shares from the Selling Shareholders within 30 days of the date of this prospectus to cover over-allotments. |
| **Use of proceeds** | We estimate that the net proceeds to us from this offering will be approximately $ million (or $ million if the underwriters exercise their option to purchase additional ordinary shares from us in full), assuming an initial public offering price of $ per ordinary share, which is the midpoint of the price range set forth on the cover page of this prospectus, after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. We will not receive any proceeds from the sale of ordinary shares by the Selling Shareholders.<br><br>We intend to use the net proceeds of this offering for general corporate purposes and to invest in new acquisitions. However, we do not have binding agreements for any material acquisition at this time. See *Use of proceeds* for a more complete description of the intended use of proceeds from this offering. |
| **Conflicts of interest** | Allen & Company LLC, one of the underwriters in this offering, and its associated persons, including Leah Schwartz, a member of our board of directors, beneficially own 25,960 of our class X-2 shares and 1,509,380 of our class X-1 shares. Because Allen & Company LLC is an underwriter in this offering and because an associated person of Allen & Company LLC, Leah Schwartz, is both a managing director of Allen & Company LLC and a member of our board of directors, Allen & Company LLC may be deemed to have a "conflict of interest" under Rule 5121 of FINRA.<br><br>Accordingly, this offering will be conducted in accordance with the applicable provisions of Rule 5121, which requires, among other things, that a "qualified independent underwriter" as defined by Rule 5121 has participated in the preparation of, and has exercised the usual standards of "due diligence" with respect to, the registration statement and this prospectus. J.P. Morgan Securities LLC has agreed to act as qualified independent underwriter within the meaning of Rule 5121 for this offering and to undertake the legal responsibilities and liabilities of an underwriter under the Securities Act, specifically including those inherent in Section 11 of the Securities Act. J.P. Morgan Securities LLC will not receive any additional fees for serving as qualified independent underwriter in connection with this offering. We have |

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**Intentional misstatements or omissions of fact constitute federal criminal violations. See 18 U.S.C. 1001.**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

# FORM D

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)
0002004711

Previous Names: [X] None

Name of Issuer
Bending Spoons S.p.A.

Jurisdiction of Incorporation/Organization
ITALY

Year of Incorporation/Organization
- [X] Over Five Years Ago
- [ ] Within Last Five Years (Specify Year)
- [ ] Yet to Be Formed

Entity Type
- [ ] Corporation
- [ ] Limited Partnership
- [ ] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [X] Other (Specify)

Societa per Azoni

### 2. Principal Place of Business and Contact Information

Name of Issuer
Bending Spoons S.p.A.

| Street Address 1 | Street Address 2 | | |
|---|---|---|---|
| CORSO COMO 15 | | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** | **Phone Number of Issuer** |
| MILAN (MI) | ITALY | 20154 | 39 3450896245 |

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Patarnello | Francesco | |
| **Street Address 1** | **Street Address 2** | |
| Corso Como 15 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Milan (MI) | ITALY | 20154 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Vice President and Executive Director

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Ferrari | Luca | |
| Street Address 1 | Street Address 2 | |
| Corso Como 15 | | |
| City | State/Province/Country | ZIP/PostalCode |
| Milan (MI) | ITALY | 20154 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Chairman of the Board and Chief Executive Officer

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Scarpazza | Davide | Giorgio Andrea |
| Street Address 1 | Street Address 2 | |
| Corso Como 15 | | |
| City | State/Province/Country | ZIP/PostalCode |
| Milan (MI) | ITALY | 20154 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Executive Director and Chief Financial Officer

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Lami | Anna | |
| Street Address 1 | Street Address 2 | |
| Corso Como 15 | | |
| City | State/Province/Country | ZIP/PostalCode |
| Milan (MI) | ITALY | 20154 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Executive Director

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Berretti | Claudio | |
| Street Address 1 | Street Address 2 | |
| Corso Como 15 | | |
| City | State/Province/Country | ZIP/PostalCode |
| Milan (MI) | ITALY | 20154 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Director

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Bontempelli | Stefano | |
| Street Address 1 | Street Address 2 | |
| Corso Como 15 | | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Milan (MI) | ITALY | 20154 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Director

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Danieli | Matteo | |
| **Street Address 1** | **Street Address 2** | |
| Corso Como 15 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Milan (MI) | ITALY | 20154 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Director

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Querella | Luca | |
| **Street Address 1** | **Street Address 2** | |
| Corso Como 15 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Milan (MI) | ITALY | 20154 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Director

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Volpe | Valerio | |
| **Street Address 1** | **Street Address 2** | |
| Corso Como 15 | | |
| **City** | **State/Province/Country** | **ZIP/PostalCode** |
| Milan (MI) | ITALY | 20154 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [ ] Pooled Investment Fund
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [X] Other Technology

Is the issuer registered as an investment company under the Investment Company Act of 1940?

[ ] Yes [ ] No

[ ] Other Banking & Financial Services

[ ] Business Services

Energy

[ ] Coal Mining

[ ] Electric Utilities

[ ] Energy Conservation

[ ] Environmental Services

[ ] Oil & Gas

[ ] Other Energy

[ ] Other Health Care

[ ] Manufacturing

Real Estate

[ ] Commercial

[ ] Construction

[ ] REITS & Finance

[ ] Residential

[ ] Other Real Estate

Travel

[ ] Airlines & Airports

[ ] Lodging & Conventions

[ ] Tourism & Travel Services

[ ] Other Travel

[ ] Other

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |
| [ ] $1,000,001 - $5,000,000 | | [ ] $5,000,001 - $25,000,000 |
| [ ] $5,000,001 - $25,000,000 | | [ ] $25,000,001 - $50,000,000 |
| [ ] $25,000,001 - $100,000,000 | | [ ] $50,000,001 - $100,000,000 |
| [ ] Over $100,000,000 | | [ ] Over $100,000,000 |
| [X] Decline to Disclose | | [ ] Decline to Disclose |
| [ ] Not Applicable | | [ ] Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

[ ] Rule 504(b)(1) (not (i), (ii) or (iii))

[ ] Rule 504 (b)(1)(i)

[ ] Rule 504 (b)(1)(ii)

[ ] Rule 504 (b)(1)(iii)

[X] Rule 506(b)

[ ] Rule 506(c)

[ ] Securities Act Section 4(a)(5)

[ ] Investment Company Act Section 3(c)

| | |
|---|---|
| [ ] Section 3(c)(1) | [ ] Section 3(c)(9) |
| [ ] Section 3(c)(2) | [ ] Section 3(c)(10) |
| [ ] Section 3(c)(3) | [ ] Section 3(c)(11) |
| [ ] Section 3(c)(4) | [ ] Section 3(c)(12) |
| [ ] Section 3(c)(5) | [ ] Section 3(c)(13) |
| [ ] Section 3(c)(6) | [ ] Section 3(c)(14) |
| [ ] Section 3(c)(7) | |

## 7. Type of Filing

[X] New Notice Date of First Sale 2023-03-08 [ ] First Sale Yet to Occur

[ ] Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year? [X] Yes [ ] No

## 9. Type(s) of Securities Offered (select all that apply)

[X] Equity

[ ] Debt

[ ] Option, Warrant or Other Right to Acquire Another Security

[ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

[ ] Pooled Investment Fund Interests

[ ] Tenant-in-Common Securities

[ ] Mineral Property Securities

[ ] Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? [ ] Yes [X] No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $0 USD

## 12. Sales Compensation

Recipient: Allen & Company LLC

Recipient CRD Number [ ] None: 1042

(Associated) Broker or Dealer [ ] None: Allen & Company LLC

(Associated) Broker or Dealer CRD Number [ ] None: 1042

Street Address 1: 711 Fifth Avenue

Street Address 2:

City: New York

State/Province/Country: NEW YORK

ZIP/Postal Code: 10022

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

CALIFORNIA
COLORADO
CONNECTICUT
GEORGIA
MARYLAND
MASSACHUSETTS
MICHIGAN

| |
|---|
| NEW YORK |
| VIRGINIA |

---

### 13. Offering and Sales Amounts

| | | |
|---|---|---|
| Total Offering Amount | | USD or [X] Indefinite |
| Total Amount Sold | $30,373,394 | USD |
| Total Remaining to be Sold | | USD or [X] Indefinite |

Clarification of Response (if Necessary):

Converted from Euros to Dollars at the rate of 1.09 Dollars per Euro.

### 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 17

### 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

| | | |
|---|---|---|
| Sales Commissions | $3,750,000 USD | [X] Estimate |
| Finders' Fees | $0 USD | [ ] Estimate |

Clarification of Response (if Necessary):

The estimate includes amounts which may be payable in the next 12 months.

### 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [ ] Estimate

Clarification of Response (if Necessary):

### Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Bending Spoons S.p.A. | Davide Giorgio Andrea Scarpazz | Davide Giorgio Andrea Scarpazza | See explanation box in item 3. | 2023-12-29 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

**EXHIBIT S**

PAUL HASTINGS LLP CORPORATE PORTFOLIO RECORD RECORDS

RETRIEVED AUGUST 12, 2026

DOCUMENTING ENTRECHED CAPITAL COMPLIANCE MATRIX AND

UNDERWRITER PIPELINES WITH ALLEN & COMPANY

[EXCERPTS]



# Jeff S. Ramsay

Partner, Corporate Department
jeffreyramsay@paulhastings.com

New York

**Phone:** +1-212-318-6057

**Fax:** +1-212-303-7057

- Morgan Stanley & Co. LLC and Allen & Company LLC, as underwriters, in connection with the $232.3 million public offering by Joby Aviation, Inc. of 46,000,000 SEC-registered shares of common stock, which includes the exercise in full by the underwriters of their option to purchase additional shares. The shares are listed on the New York Stock Exchange under the symbol "JOBY."
- J.P. Morgan Securities LLC, Barclays Capital Inc. and Mizuho Securities USA LLC as representatives of the initial purchasers in connection with a Rule 144A / Regulation S offering by NCL Corporation Ltd. (NCLC), a wholly owned subsidiary of Norwegian Cruise Line Holdings Ltd. (NCLH), of $315 million aggregate principal amount of senior notes.
- BofA Securities, Inc., J.P. Morgan Securities LLC and Wells Fargo Securities, LLC as joint representatives of the underwriters on an SEC-registered offering by W.W. Grainger, Inc. of $500 million aggregate principal amount of senior notes.
- TD Securities (USA) LLC as representative of the several underwriters on an SEC-registered offering by TD Bank of $1 billion aggregate principal amount of 5.146% non-viability contingent capital subordinated notes due 2034.
- Royalty Pharma plc in connection with its SEC-registered offering of $1.5 billion aggregate principal amount of senior notes. BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC and TD Securities (USA) LLC acted as representatives of the several underwriters in connection with the offering.
- The underwriters in connection with an SEC-registered offering of €3 billion aggregate principal amount of notes by Medtronic, Inc. Medtronic plc is the indirect parent company of Medtronic, Inc.
- TD Securities (USA) LLC, Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Lloyds Securities Inc. and SG Americas Securities, LLC as lead managers on an SEC-registered offering by TD Bank of $2.25 billion aggregate principal amount of its senior notes.
- J.P. Morgan Securities LLC as sole book-running manager and underwriter in connection with an upsized public offering by Stoke Therapeutics, Inc. of 5,555,557 shares of common stock at $13.5000 per share and pre-funded warrants to purchase 3,703,730 shares of common stock at $13.4999 per pre-funded warrant, for total gross proceeds of approximately $125 million. The common stock is listed on the Nasdaq Global Select Market under the symbol "STOK."
- Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Barclays Capital Inc. and Stifel, Nicolaus & Company, Incorporated, as joint book-running managers and representatives of the several underwriters in connection with a public offering by REGENXBIO Inc. of 4,565,260 shares of common stock at $23.00 per share and pre-funded warrants to purchase 1,521,740 shares of common stock at $22.9999 per pre-funded warrant, for total gross proceeds of approximately $140 million.

- Citigroup Global Markets Inc., Barclays Capital Inc. and Credit Agricole Securities (USA) Inc. as representatives of the underwriters in connection with the offering of $2 billion aggregate principal amount of senior notes issued by Lockheed Martin Corporation.
- Barclays Capital Inc., J.P. Morgan Securities LLC and Mizuho Securities USA LLC as the representatives of the several underwriters in connection with an SEC-registered offering of $2 billion aggregate principal amount of notes by Medtronic Global Holdings S.C.A.
- Marsh McLennan (MMC) in connection with its SEC-registered offering of $600 million of its senior notes.
- BofA Securities, Inc., Morgan Stanley & Co. LLC and U.S. Bancorp Investments, Inc. as representatives of the several underwriters in connection with the SEC-registered offering of $1.5 billion aggregate principal amount of senior notes by the Cigna Group.
- CureVac N.V. on its $250 million public offering of 27,027,028 common shares. The common shares are listed on the Nasdaq Global Market under the symbol “CVAC.” Goldman Sachs & Co. LLC, Jefferies LLC, and SVB Securities LLC acted as bookrunners for the offering.
- J.P. Morgan Securities LLC and Mizuho Securities USA LLC as representatives of the initial purchasers in connection with a Rule 144A / Regulation S offering by NCL Corporation Ltd. (NCLC), a wholly owned subsidiary of Norwegian Cruise Line Holdings Ltd. (NCLH), of $600 million aggregate principal amount of senior secured notes.
- Morgan Stanley & Co. LLC, MUFG Securities Americas Inc., BofA Securities, Inc., Scotia Capital (USA) Inc., Wells Fargo Securities, LLC and BNP Paribas Securities Corp. as the lead dealer managers, in connection with a Rule 144A / Regulation S exchange offers by Seagate HDD Cayman.
- Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC and MUFG Securities Americas Inc., as joint book-running managers, in connection with an SEC-registered offering by Zoetis Inc. of $600 million aggregate principal amount of its 5.400% senior notes due 2025 and $750 million aggregate principal amount of its 5.600% senior notes due 2032.
- Barclays Bank PLC, BofA Securities Europe SA, Citigroup Global Markets Limited and HSBC Continental Europe as representatives of the several underwriters in connection with an SEC-registered offering of €3.5 billion aggregate principal amount of notes by Medtronic Global Holdings S.C.A.
- J.P. Morgan Securities LLC as representative of the initial purchasers in connection with a Rule 144A offering by Alnylam Pharmaceuticals, Inc. of $1.035 billion aggregate principal amount of its 1.00% convertible senior notes due 2027, including $135 million principal amount of convertible notes pursuant to the exercise in full of the initial purchasers’ option to purchase additional convertible notes.

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2026, a true and correct copy of the foregoing Motion For Judicial Notice And To Supplement The Record along with Exhibits A through H was served upon all counsel of record for Plaintiff-Appellee Solos Technology Ltd. via the court's CM/ECF system and for the Defendants (Defendant-Appellees Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc. via electronic mail.

Dated: August 19, 2026

Respectfully submitted,
/s/ Daitona Carter
Daitona Carter
Movant-Appellant *Pro Se*
legal@daitonacarter.com

**No. 2026-1721**

---

# United States Court of Appeals for the Federal Circuit

---

SOLOS TECHNOLOGY LTD.,

*Plaintiff-Appellee*,

v.

META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, OAKLEY, INC., LUXOTTICA OF AMERICA, INC., ESSILORLUXOTTICA, USA, LLC,

*Defendants*,

DAITONA CARTER,

*Movant-Appellant*.

---

Appeal from the United States District Court
for District of Masschusetts
in 1:26cv–1034–ADB
Judge Allison D. Burroughs

---

# REPLY BRIEF OF MOVANT-APPELLANT DAITONA CARTER

---

August 20, 2026

**DAITONA CARTER**
*Movant-Appellant Pro Se*
2 Massachusetts Ave NE
General Delivery, Main
Post Office
Washington, DC 20002
legal@daitonacarter.com

## TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... 2

**TABLE OF AUTHORITIES** .......... 3

**I. PRELIMINARY STATEMENT** .......... 5

**II. LEGAL ARGUMENT** .......... 7

**A. Solos Has Waived All Substantive Merits Defenses by Confining Its District Court Opposition Exclusively to Procedural and Pleading Shortcuts** .......... 7

**B. The Abuse of Discretion Standard: Deferring to an Erroneous Legal Standard Must Be Reversed** .......... 8

**C. Carter Adequately Alleged a "Significantly Protectable Interest" Under Section 256** .......... 9

**D. Collateral Order Doctrine Preserves Interlocutory Posture Despite Post-Order Text Commands** .......... 10

**E. Protection From Physical Duress, Intertwined Claims, and Supplemental Jurisdiction** .......... 10

**F. Appellee's Chronological Narrative Regarding the Mandamus Petition Is Factually Incorrect and Misrepresents the Record** .......... 12

**G. Solos' Explicit Admission of Factual "Artifacts" and Rapid Transnational Restructuring Dismantle Its Claim of a Pristine District Record** .......... 13

**1. The Judicial Admission of Record Tampering and "Missing" Entry 92** .......... 13

**2. Concealment of Senior Priority, Sole Conception, and Involuntary Derivation** .......... 14

**3. Transnational Restructuring, Evernote Exploitation, and Exhibit L Financial Interdependence** .......... 15

**4. Public Capital Markets as a Commercial Clearinghouse for Converted Assets** .......... 18

**H. Under Controlling First Circuit Law, Threshold Rule 24 Entry Requires**

Acceptance of Pleading Veracity Rather Than Pre-Discovery Mini-Trials on Substantive Proof....20

I. Solos' Concurrent Campaign Forensically Rebuts Their Section II.B Assertion that Carter's Intervention Would "Unduly Expand" or Complicate a Purportedly Adverse Infringement Action....28

J. The Total Operational Appearance Default of Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc., Extinguishes Their Right to Rebut Senior Title and Invalidates Plaintiff-Appellee's Standing Arguments....31

K. Solos and Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc.'s Characterization of Ongoing Commercial Exploitation as Immaterial Misconstrues the Operative Record and Underscores a Coordinated Strategy of Sham Litigation and Inter-Tribunal Evasion....35

L. Solos' Reliance on Eli Lilly, Ethicon, and Hedrick Impermissibly Imposes Post-Discovery Merits Burdens on a Preliminary Intervention Pleading.....38

M. Solos' Invocation of Biltcliffe, Palmer, and Ofori Conceals an Absolute, Terminal Due Process Violation Below....40

III. CONCLUSION AND PRAYER FOR RELIEF....41

IV. CERTIFICATE OF COMPLIANCE....43

V. CERTIFICATE OF SERVICE....44

## TABLE OF AUTHORITIES



| **Cases** | **Page(s)** |
|---|---|
| Alice Corp. v. CLS Bank Int'l, 573 U.S. 208 (2014) | 27 |
| Armstrong v. Manzo, 380 U.S. 544 (1965) | 41 |
| B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541 (1st Cir. 2006) | 21 |
| BearBox LLC v. Lancium LLC, 125 F.4th 1101 (Fed. Cir. 2025) | 10 |
| Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925 (1st Cir. 2014) | 41 |
| Blue Gentian, LLC v. Tristar Products, Inc., 54 F.4th 1360 (Fed. Cir. 2022) | 16 |
| Canon Computer Systems, Inc. v. Nu-Kote Int'l, Inc., 190 F.3d 1362 (Fed. Cir. 1999) | 9 |
| CardSoft, Inc. v. VeriFone, Inc., 807 F.3d 1346 (Fed. Cir. 2015) | 16 |
| Chambers v. NASCO, Inc., 501 U.S. 32 (1991) | 16 |
| Daggett v. Comm'n on Govtl. Ethics and Election Practices, 172 F.3d 104 (1st Cir. 1999) | 29 |
| Donaldson v. United States, 400 U.S. 517 (1971) | 10 |
| Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352 (Fed. Cir. 2004) | Passim |
| Erickson v. Pardus, 551 U.S. 89 (2007) | 9, 22 |
| Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456 (Fed. Cir. 1998) | Passim |
| Fortress Iron, L.P. v. Digger Specialties, Inc., No. 24-2313 (Fed. Cir. Apr. 2, 2026) | 34, 35 |
| Gilead Sciences, Inc. v. Merck & Co., Inc., 888 F.3d 1231 (Fed. Cir. 2018) | 32 |
| Global Health Solutions LLC v. Selner, 148 F.4th 1363 (Fed. Cir. 2025) | 10 |
| Haines v. Kerner, 404 U.S. 519 (1972) | 9 |
| Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944) | 16 |
| Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559 (2014) | 9 |
| Honeywell International Inc. v. Arkema Inc., 939 F.3d 1345 (Fed. Cir. 2019) | 29 |

| | |
|---|---|
| Ofori v. Ruby Tuesday, Inc., 205 F. App'x 851 (1st Cir. 2006) | Passim |
| Palmer v. Champion Mortg., 465 F.3d 24 (1st Cir. 2006) | Passim |
| Pannu v. Iolab Corp., 155 F.3d 1344 (Fed. Cir. 1998) | 25 |
| Pei-Herng Hor v. Ching-Wu Chu, 699 F.3d 1331 (Fed. Cir. 2012) | 25 |
| Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380 (1993) | 12 |
| Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806 (1945) | 20, 32 |
| SEC v. LBRY, Inc., 46 F.4th 1065 (Fed. Cir. 2022) | 9 |
| T-Mobile Northeast LLC v. Town of Barnstable, 969 F.3d 33 (1st Cir. 2020) | 29 |
| Univ. of Pittsburgh v. Hedrick, 573 F.3d 1290 (Fed. Cir. 2009) | 25, 29 |
| Waetzig v. Halliburton Energy Services, Inc., 604 U.S. 305 (2025) | 16 |
| **Statutes & Legislative Provisions** | |
| 18 U.S.C. § 1595 (Trafficking Victims Protection Act) | 12, 34 |
| 28 U.S.C. § 1367 (Supplemental Jurisdiction) | 12 |
| 28 U.S.C. § 2106 (Plenary Appellate Authority) | Passim |
| 35 U.S.C. § 116 (Joint Inventorship Posture) | 24 |
| 35 U.S.C. § 181 (Invention Secrecy Act) | 27 |
| 35 U.S.C. § 256 (Correction of Inventorship) | Passim |
| 35 U.S.C. § 256(b) | Passim |
| 47 U.S.C. § 506 (RAY BAUM'S Act) | 12 |
| 47 U.S.C. § 623 (Kari's Law) | 12 |
| **Rules & Regulations** | |
| Federal Rule of Civil Procedure 6(b) | 12 |
| Federal Rule of Civil Procedure 24 | Passim |
| Federal Rule of Civil Procedure 31 | Passim |
| Federal Rule of Civil Procedure 32 | Passim |
| Federal Rule of Civil Procedure 41 | Passim |
| Federal Rule of Civil Procedure 59(e) | 41 |
| Federal Rule of Civil Procedure 60(d)(3) | 16 |
| Federal Circuit Rule 31 (Briefing Defaults) | 33,38 |

## I. PRELIMINARY STATEMENT

Movant-Appellant Daitona Carter ("Carter") respectfully submits this Reply Brief to address and refute the core contentions advanced in the Answering Brief of Plaintiff-Appellee Solos Technology Ltd. ("Solos"). Solos urges this Court to affirm a series of summary, text-only electronic orders denying Appellant intervention of right under Federal Rule of Civil Procedure 24(a)(2). To sustain that exclusionary ruling, Solos invokes an extra-statutory pleading standard, asserting that Appellant failed to plead specific, claim-level contributions. That argument collapses upon examination of the record, exposing an untenable attempt to impose summary judgment burdens at the threshold pleading stage while ignoring the coordinated multi-forum mechanisms through which the patents-in-suit are commercially exploited.

Crucially, Solos distorts the procedural history of this matter by mischaracterizing the nature of the proceedings and misrepresenting its own filings. Specifically, Solos attempts to mislead this Panel regarding the April 8, 2026 Petition for a Writ of Mandamus, which was initiated to remedy severe judicial gatekeeping and secure basic ADA and ECF access.

The responsive submissions of Solos lock the primary parties into a terminal procedural position. By confining their district court entries and appellate brief

exclusively to regional pleading finality rules and generic dismissals of Carter’s record as generalized or conclusory, Solos has legally and permanently waived any substantive right to challenge Carter's senior priority, reduction to practice, or technological provenance.

In stark contrast, Carter maintains an unbending record of explicit technological mapping from inception. Carter’s directional audio frameworks possess Pre-AIA seniority dating to May 2009. Furthermore, Carter reduced these concepts to multiple fully functioning, full-stack consumer hardware and software prototypes completed in 2016, 2017, and 2019—predating both the formation of Plaintiff-Appellee and the commercialization of the disputed technologies and trademark “ARIA”. These are the architectures misappropriated via joint corporate-state acquisition and laundered into the $22 Billion Department of Defense (DoD) procurement pipeline under the aegis of Army Detachment 201.

Furthermore, the five primary corporate defendants—Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc. (collectively, the "Defaulting Corporate Defendant-Appellees")—have defaulted on appeal by failing to enter an appearance or submit answering briefs, leaving their defense-contract revenue stream dependent on a vulnerable proxy shell. This collective default binds each entity, parent and subsidiary alike, jointly and severally, spanning the commercial monetization of

the Ray-Ban Meta smart-glasses frameworks and the tactical arrays deployed under Oakley's military contracts. Because the underlying technological priority stands uncontradicted on the merits across this enterprise, an appearance-of-bias remand is prohibited. This Court must exercise its direct authority under 28 U.S.C. Section 2106 and 35 U.S.C. Section 256(b) to direct the United States Patent and Trademark Office (USPTO) to correct the patent rolls and substitute Carter as the sole rightful title holder of the issued assets.

## II. LEGAL ARGUMENT

### A. Solos Has Waived All Substantive Merits Defenses by Confining Its District Court Opposition Exclusively to Procedural and Pleading Shortcuts

Under the established waiver doctrine of this Court, an argument or defense not explicitly raised and substantiated in the lower tribunal is irrevocably forfeited on appeal.

- **The Merits Deficit:** Throughout the proceedings below, Solos failed to submit an independent technical affidavit, a comparative claim chart, or a verified engineering timeline to rebut Carter's senior priority. Instead, Solos relied exclusively on procedural maneuvers under Rule 41 and technical pleading metrics.

- **The Binding Consequence:** By executing a total waiver on the merits of creation, conception, and reduction to practice, Solos is legally precluded from contesting Carter's priority before this panel. Carter's initial preservation—detailing the exfiltration of the full-stack consumer "ARIA" framework—stands as the uncontradicted factual record of authorship, leaving no genuine issue of material fact remaining regarding true inventorship.

**B. The Abuse of Discretion Standard: Deferring to an Erroneous Legal Standard Must Be Reversed**

- **Error of Law:** Denial of intervention under Rule 24(a)(2) is reviewed for abuse of discretion. *SEC v. LBRY, Inc.*, 46 F.4th 1065, 1071 (Fed. Cir. 2022). However, a district court automatically abuses its discretion when it bases its ruling on an erroneous view of the law. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014); *Canon Computer Systems, Inc. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1362, 1368 (Fed. Cir. 1999).
- **Pro Se Liberal Construction:** As a pro se litigant, Carter's pleadings are entitled to liberal construction and must be held to less stringent standards than formal pleadings drafted by counsel. *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

- **Improper Summary Judgment Threshold:** The court below committed reversible error of law by treating a threshold Rule 24 intervention motion as a summary judgment adjudication on the merits of inventorship. Appellee improperly relies on post-discovery authorities (*BearBox LLC v. Lancium LLC*, 125 F.4th 1101 (Fed. Cir. 2025); *Global Health Solutions LLC v. Selner*, 148 F.4th 1363 (Fed. Cir. 2025)) to demand limitation-by-limitation evidentiary corroboration at the pleading stage, short-circuiting required claim construction proceedings.

### C. Carter Adequately Alleged a "Significantly Protectable Interest" Under Section 256

- **Statutory Threshold:** Carter moved to intervene under 35 U.S.C. § 256 to correct inventorship. Standing requires a colorable claim of an ownership or inventorship stake, not absolute pre-discovery adjudication. Under the binding standard in *Donaldson v. United States*, 400 U.S. 517, 531 (1971), an applicant must demonstrate a significantly protectable interest recognized by law.
- **Sufficient Allegations:** Explicit allegations of prior conception and technology misappropriation satisfy this legal benchmark.

**D. Collateral Order Doctrine Preserves Interlocutory Posture Despite Post-Order Text Commands**

Solos contends that because Appellant filed a Notice of Appeal on April 20, 2026, prior to the finalization of post-order summaries, this panel is restricted to reviewing a narrow snapshot of the initial April 15 text order (Appellee Br. at 6).

This argument misconstrues the jurisdictional effect of an interlocutory appeal from the denial of a motion to intervene as of right. Under the collateral order doctrine, a district court order denying intervention of right constitutes an immediately appealable final determination that divests the lower court of jurisdiction exclusively regarding party status, while the underlying infringement docket remains active.

Furthermore, Appellant perfected appellate jurisdiction by filing an Amended Notice of Appeal on May 17, 2026, preserving structural review over the expanding matrix of electronic docket closures and text-only commands.

**E. Protection From Physical Duress, Intertwined Claims, and Supplemental Jurisdiction**

- **Mischaracterization:** Solos frames ongoing duress, trafficking, and whistleblower requests as improper extraneous matters.

- **The "Wrong Forum" Ploy:** Solos urged the lower court to deny witness protection and U.S. Marshal referral as the "wrong forum" while offering no alternative venue, weaponizing procedure to cause gridlock. As raised below and detailed in docketed filings—including the Mandatory Statutory Stay TVPA disclosures, and Urgent Emergency Notice of Incapacitation (CAFC EFC No. 19)—continuous digital lockouts, telephony blocking (Kari's Law, 47 U.S.C. Section 623; RAY BAUM'S Act, 47 U.S.C. Section 506), and ongoing physical violence and intimidation obstruct appellate access under Federal Rule of Civil Procedure 6(b) and *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380 (1993)*.
- **Supplemental Jurisdiction (28 U.S.C. Section 1367):** Solos's demand to prune safety and whistleblower claims is meritless. Under Section 1367(a), federal courts possess broad supplemental jurisdiction over claims forming part of the same Article III case or controversy. Because these exact preservation arguments were presented below and derive directly from the nucleus of operative facts surrounding the IP capture and DoD contracting pipeline, this Panel possesses full statutory authority to resolve them.

**F. Appellee's Chronological Narrative Regarding the Mandamus Petition Is Factually Incorrect and Misrepresents the Record**

- **Distorting the Filing Timeline:** Appellee asserts that Appellant rushed to seek appellate review on April 15, 2026—the exact date of the district court's intervention order—thereby bypassing pending post-order motions (Appellee Br. at 6). This narrative is flatly contradicted by the certified record.
- **The True Origin of the Mandamus:** The Petition for a Writ of Mandamus was executed and initially mailed on **April 8, 2026**—a full week *before* the district court entered its April 15 text order. It was necessitated entirely by administrative gridlock: the lower court barred informal email submissions of confidential inventorship evidence while failing to rule on pending sealing and protective order motions (D. Mass. Docs. 59 and 62), leaving Appellant procedurally precluded from placing vital technical provenance on the record.
- **Exploiting Judicial Deadlock:** Appellee's inversion of this sequence constitutes an attempt to obscure lower court procedural roadblocks and manufacture a spurious jurisdictional defect. Mandamus was properly sought to compel action on stagnant sealing motions, and Solos cannot rewrite the record to penalize Appellant for seeking judicial access.

### G. Solos' Explicit Admission of Factual "Artifacts" and Rapid Transnational Restructuring Dismantle Its Claim of a Pristine District Record

Solos' attempt to characterize this action as a streamlined private dispute—bolstered by its assertion of a pristine, undisputed record—is dismantled both by its own judicial admissions in Footnote 1, its concealment of senior priority, and the forensic evidence of record contained in Carter's Exhibit L (Appx161).

#### 1. The Judicial Admission of Record Tampering and "Missing" Entry 92

In Footnote 1 of its brief, Solos makes an explicit judicial admission that confirms Carter's well-pleaded claims of record spoliation and administrative censorship while exposing its own procedural deception:

- **The Deceptive Appendix Artifice:** Solos attempts to manufacture a procedural default by claiming that Carter "failed to include Solos in determining the contents of the Appendix" (Appellee Br. at 5, n.1). This argument attempts to penalize an unrepresented litigant for independently exercising statutory and procedural rights to compile a complete record. An appellee's separate supplemental volume cannot be deployed as a tactical obfuscation to rewrite, censor, or filter the materials properly placed before this Panel.
- **The Confession of Record Tampering:** Solos explicitly concedes that it felt compelled to submit an entirely separate Supplemental

Appendix because Carter's certified filings on the primary docket are plagued by severe "character-encoding and formatting artifacts (e.g., HTML rendering errors)" that are absent from the official record entries (Appellee Br. at 5, n.1). This constitutes a direct, public admission by officers of the court that the electronic federal record submitted to this tribunal was structurally altered and corrupted.

- **The Systemic Deletion of Entry 92:** A review of Appellee's Supplemental Appendix Table of Contents (SAppx2–3) verifies that Entry 92 has been entirely deleted, erased, wiped, restricted or removed from their submissions. Entry 92 was the precise system node where Carter uploaded sixty-five (65) independent technical files, lab notes, and notices containing Carter's source code, optical calibrations, and foundational architecture.

**2. Concealment of Senior Priority, Sole Conception, and Involuntary Derivation**

Solos manufactured its appendix complaints to construct a pretextual barrier, utilizing its separate volume specifically to perpetuate the lower court's database lockout. By concealing Carter's codebase, architecture, proof of reduction to practice/prototypes, proof of "ARIA" trademark common law ownership, and notices to Defendants and law enforcement behind blank placeholders to maintain

an artificial "factual void" before this Panel, Solos attempts to insulate its position from the truth.

Furthermore, Solos is judicially estopped from dismissing Carter's tracking-network derivation evidence (Blue Gentian, LLC v. Tristar Products, Inc., 54 F.4th 1360, 1365 (Fed. Cir. 2022)) as an "extraneous controversy": Solos' own complaint relies on an identical narrative of unauthorized technological absorption from Meta Reality Labs. Because Carter's documented sole conception and involuntary data extraction pipeline via the 2009 Digital Signal Processor (DSP) case study and notes, the 2013 Facebook export, and U.S. Navy/Kopin postures precede the patents-in-suit under *CardSoft, Inc. v. VeriFone, Inc., 807 F.3d 1346, 1350 (Fed. Cir. 2015)*, Solos' attempt to enforce an asymmetrical tracking standard collapses.

Under *Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944)* and *Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)*, a federal court maintains inherent, absolute ancillary jurisdiction under Rule 60(d)(3) to investigate an unconscionable scheme that defiles the integrity of the judicial machinery itself, completely surviving a voluntary corporate dismissal under Rule 41 (*Waetzig v. Halliburton Energy Services, Inc., 604 U.S. 305, 307 (2025)*).

**3. Transnational Restructuring, Evernote Exploitation, and Exhibit L Financial Interdependence**

While the district court issued summary text orders denying Carter entry and mirroring these database lockouts, a synchronized corporate restructuring and asset-laundering sequence unfolded behind the scenes:

- **The Evernote and Meetup Acquisition Pipeline:** The evidentiary record establishes the systematic migration of proprietary assets through serial corporate acquisitions—specifically utilizing platforms like Evernote to ingest and transfer foundational 2009–2019 acoustic logic codebases, lab notes, and development logs to foreign servers in Milan, Italy. This unauthorized monetization and commercial deployment of Carter's proprietary archives directly fueled the public market valuations and technical architectures driving the Ray-Ban Meta smart-glasses and egocentric AI platforms operated by Meta and the Luxottica Entities.
- **Financial Interdependence (Exhibit L):** Exhibit L (Appx161) establishes the structural identity of interest among the parties, identifying communication conduits utilized for 2019–2020 API activity reflected in Carter's business records. Because these enterprise APIs provide the primary communication framework for Meta's business messaging and conversions APIs, Carter's private authentication and verification logs were bridged directly into Meta's

data-harvesting networks. Furthermore, institutional financiers such as Apollo Global Management (which orchestrated major financing packages for Meta’s AI data centers) maintain a strategic capital alliance with BNP Paribas, the financial institution backing Bending Spoons' corporate acquisitions. This corporate-acquisition pipeline operates under an interlocking advisory matrix where the enterprise's primary investment banking advisors actively sit on the board of directors of the successor entities, all operating under the coordinated direction of the exact same global law firm executing the defense of this active patent litigation.

- **Corporate Shell Games and Equity Cleansing:** The record further reflects a pattern of corporate restructuring—including accelerated share repurchase mechanisms and structural spinoffs designed to purge equity stakes and execute absolute exits from consumer licensing agreements. These maneuvers are engineered to insulate the chain of title while under active litigation attack, shielding the highly lucrative tactical arrays currently driven into Oakley's institutional military and defense contracts behind a web of shifting corporate proxies.

**4. Public Capital Markets as a Commercial Clearinghouse for Converted Assets**

The record establishes that the corporate enterprise has utilized public capital markets to formalize the commercialization and monetization of Carter's misappropriated proprietary assets, directly refuting Solos's assertion that the appellate record reflects a pristine factual void. By executing serial integrations—migrating foundational 2009–2019 acoustic logic codebases, developmental logs, and optical parameters across network nodes from Evernote platforms to foreign servers in Milan, Italy—and translating those proprietary digital frameworks into public registrations and corporate equities, the enterprise established an institutional mechanism to exchange public stock valuation and liquid capital for uncompensated civilian intellectual property.

- **The Financial Bridge:** As documented in Exhibit L (Appx161), institutional financiers—including Apollo Global Management and BNP Paribas—bridged these proprietary assets directly into Meta's commercial data-harvesting and AI data center infrastructure. This financial bridging mechanism operates under an interlocking advisory matrix wherein primary investment banking underwriters hold direct seats on the boards of directors of the public vehicle entities, while the entire transactional framework is orchestrated under the centralized guidance of the exact same global law firm defending this patent

action. This coordinated capital track directly operationalizes the technology driving the multi-billion-dollar Ray-Ban Meta consumer smart-glasses market and the tactical arrays deployed under Oakley's military and defense portfolios, confirming that the disputed patents are commercially active components of a unified enterprise rather than isolated private assets.

- **The Public Conversion:** The transition of these private entities into publicly traded market vehicles is engineered to permanently sanitize the chain of title, laundering misappropriated lab notes into public market valuations while shielding the participants behind an artificial corporate wall. This public market laundering framework directly refutes Solos's core appellate argument that Carter's claims are too generalized to stand, proving that the record contains active, uncontradicted evidence of structural title laundering.

*Under Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 816 (1945)*, a federal court must reject attempts by litigants who seek to utilize the court's equitable machinery—in tandem with public capital markets—to finalize a non-adversarial asset wash built upon the systemic suppression and conversion of a civilian creator's proprietary lab notes.

**H. Under Controlling First Circuit Law, Threshold Rule 24 Entry Requires Acceptance of Pleading Veracity Rather Than Pre-Discovery Mini-Trials on Substantive Proof**

Solos' brief seeks to manufacture an extra-statutory barrier by demanding that an unrepresented civilian produce final trial-stage claim charts merely to clear the initial intervention gate. This hyper-technical hurdle is deployed precisely to shield a misappropriated, dual-use technology framework that the corporate enterprise has aggressively commercialized across both civilian and military sectors. Because Carter's foundational architectures are inherently dual-use, the corporate enterprise refuses to surrender control or return the assets to their rightful author. Instead, they seek to lock the courtroom door prior to discovery.

- **The Abuse of Rule 24(a)(2):** Under controlling First Circuit procedural law *(B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541, 544)*, a district court evaluating a threshold motion to intervene as a matter of right is required to accept all well-pleaded factual allegations as true. Carter's detailed operational timeline easily satisfied this prima facie gatekeeping threshold. By transforming a preliminary entry motion into an exhaustive, pre-discovery mini-trial on dual-use technical proof, the lower court applied an incorrect evidentiary standard, resulting in a clear abuse of discretion.

- **The Post-Trial Misdirection:** This Court has made clear that a trial court commits a reversible error of law by transforming a gateway right-of-entry motion into a premature summary judgment inquiry (*Honeywell International Inc. v. Arkema Inc., 939 F.3d 1345, 1349 (Fed. Cir. 2019)*). Meta and the Luxottica Entities are actively utilizing this artificial threshold to permanently retain Carter's dual-use frameworks—specifically, the consumer-facing Ray-Ban Meta smart-glasses architectures and the high-staked tactical arrays driven into Oakley's military and defense procurement contracts. Holding a pro se litigant to a hyper-technical patent attorney standard while manually cutting off electronic docket access violates Fifth Amendment Procedural Due Process (*Erickson v. Pardus, 551 U.S. 89, 94 (2007)*).

Solos' argument that Carter's technical provenance was too "generalized" is completely hollow when evaluated against its own Complaint for Patent Infringement (Dist. Ct. ECF No. 1). While Solos successfully advocated for an unyielding evidentiary threshold to bar an unrepresented, civilian whistleblower, it initiated this multi-billion-dollar litigation using the exact flexible notice-pleading standards it now denounces:

- **Pleading on Information and Belief:** Solos asserts structural hardware infringement by stating that, upon information and belief, the accused products incorporate infringing elements. Solos claimed a right to utilize the discovery process to unearth internal, proprietary corporate schematics, while simultaneously demanding that Carter possess those exact hidden schematics prior to entering the suit.
- **Admitted Factual Voids:** Solos lumps distinct corporate subsidiaries into a singular operational enterprise while explicitly confessing that the precise nature, scope, and degree of direction among those entities are not yet fully known to the Plaintiff.

Under long-standing equitable principles, a corporate litigant cannot harness the relaxed standard of notice pleading to haul its adversaries into court while simultaneously manufacturing a heightened, summary-judgment threshold to keep a third-party claimant out of the courtroom.

Solos asserts that an independent claim for correction of inventorship under 35 U.S.C. Section 256 cannot constitute a "significantly protectable interest" required under Rule 24(a)(2) unless accompanied by an explicit showing of a pre-existing contractual, operational, or collaborative history with the named inventors. This argument represents a fabricated barrier that stands in direct contradiction to decades of settled patent law.

Under binding Federal Circuit precedent, a joint inventor's interest is not remote, speculative, or contingent. Pursuant to 35 U.S.C. Section 116, a contribution to the conception of even a single element of a single claim grants that co-inventor a presumptive, undivided interest in the entirety of the patent asset. Standing to seek correction under Section 256 requires only a colorable claim to an ownership or inventorship stake in the disputed technology.

Carter's initial motion explicitly identified Carter's prior conception and reduction to practice of the identical technical pillars anchoring this lawsuit: directional sound projection, adaptive beamforming, and multimodal acoustic control. To demand that a pro se intervenor run a completed claim construction analysis prior to being allowed to join the suit turns Rule 24 into an impossible barrier.

Solos' insistence that Carter's motion was legally defective due to the absence of a detailed history of personal collaboration with Solos' corporate executives is completely foreclosed by established jurisprudence. Carter explicitly brought to the district court's attention binding authorities that Solos has methodically omitted or mischaracterized in its Response Brief:

- ***Pannu v. Iolab Corp., 155 F.3d 1344 (Fed. Cir. 1998)***: Independent, omitted co-inventors retain absolute statutory standing to seek correction of a patent title under 35 U.S.C. Section 256 completely

independent of, and without any pre-existing contractual or operational relationship to, the corporate assignees or patent holders.

- ***Pei-Herng Hor v. Ching-Wu Chu, 699 F.3d 1331 (Fed. Cir. 2012)***: This Court explicitly establishes that an omitted co-inventor holds an absolute right to seek title protection under Section 256 at any phase of a patent's lifecycle, and no corporate litigant can strip that right by advancing their private pleadings.

By ruling that the absence of a pre-existing corporate relationship was fatal to Carter’s motion, the district court applied an incorrect legal standard, resulting in a clear abuse of discretion.

Solos’ attempts to secure its manufactured pleading hurdle by heavily citing *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352 (Fed. Cir. 2004), *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998), and *Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290 (Fed. Cir. 2009). This reliance constitutes a profound, bad-faith misrepresentation of the governing procedural framework. Every single authority cited by Solos to demand "claim-level contributions" at the threshold phase arose from a fundamentally distinct, post-discovery or post-trial procedural posture:

1. *Eli Lilly* was a post-trial appeal reviewing a final district court judgment on joint inventorship after a full evidentiary trial on the merits.
2. *Ethicon* was a post-discovery summary judgment decision rendered after the primary parties completed extensive depositions, expert reports, and comprehensive claim construction.
3. *Hedrick* was an appeal from a final bench trial on a fully developed record concerning laboratory notebooks and direct inventor testimony.

Solos' attempt to transplant the intensive evidentiary burdens necessary to win a completed trial into the preliminary threshold pleading rules of an initial right-of-entry motion is doctrinally unsustainable. These cases confirm that claim construction and contribution assessments are highly intensive factual inquiries that require a fully developed record. By using post-trial and summary judgment rulings to deny Carter the right to enter the courtroom and build that record, Solos has completely inverted the Federal Rules of Civil Procedure.

Solos continues to maintain before this Panel that the district court properly adopted its characterization of Carter's technical provenance as "generalized" work product. However, the official court docket reveals an unsustainable legal and procedural contradiction: the 65 files of technical lab notes, Python source code, and signal processing benchmarks submitted by Carter were immediately subjected

to high-level administrative suppression under a restricted status placeholder. This covers the precise architectural nodes driving both the multi-billion-dollar Ray-Ban Meta consumer smart glasses and the specialized egocentric AI frameworks currently deployed across Oakley's military defense contracts.

This triggers a fatal conflict with the Supreme Court's governing standard under the Alice Doctrine (*Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014)) and the Invention Secrecy Act (35 U.S.C. Section 181):

1. Under the *Alice* standard, "generalized," "vague," or "abstract" ideas cannot be patented—nor can they legally justify administrative classification or National Security-related suppression.
2. Material that rises to the level of strict administrative restriction necessarily contains dual-use technical particularity, specific algorithmic benchmarks, and discrete trade secret locations.

Solos' and the Meta-Luxottica Defendants operated a profound legal fiction: they utilized the administrative suppression mechanism to block Carter's claim-level evidence from public view, and then spun around to tell the appellate court that Carter's record contained "nothing concrete". Because these architectures have a dual-use profile spanning both consumer tech and defense frameworks, the corporate enterprise refuses to surrender control or return the technology to its rightful author. If the material is sufficiently specific to be hidden from the public

record under a security lockout, it is *per se* specific enough to pass the low statutory threshold required to show a "significantly protectable interest" under Rule 24.

This manufactured evidentiary lockout collapses under the weight of the Plaintiff's own judicial admissions of record. In its Complaint for Patent Infringement (Dist. Ct. ECF No. 1), Solos explicitly states that its entire multi-billion-dollar lawsuit concerns the willful infringement of its "smart-glasses technologies," identifying the foundational pillars of this dispute as "multimodal sensing, real-time signal processing, directional audio, sensor fusion, and contextual awareness". Solos further asserts that these identical architectural concepts—disclosed across all five of the Asserted Patents ('389, '866, '055, '174, and '339)—were systematically adopted by Meta and EssilorLuxottica to build and monetize the Ray-Ban Meta smart-glasses platforms and Oakley Meta product lines.

Because the uncontradicted record establishes that Carter conceptualized, engineered, and executed working prototypes of these exact dual-use signal processing architectures years before any named corporate defendant or Solos even existed, Solos' own pleadings establish the direct "property or transaction" required for intervention under Rule 24(a)(2). Solos cannot haul Meta and the Luxottica Entities into court by claiming these five fused frameworks are

structurally concrete, while simultaneously telling this Panel that Carter's identical senior technical priority is a "generalized abstract idea". By their own written words, the technology driving these commercial and military portfolios is a singular, integrated architecture; because Carter holds true original authorship over that dual-use architecture, the law commands that the assets be returned to their rightful civilian owner.

**I. Solos' Concurrent Campaign Forensically Rebuts Their Section II.B Assertion that Carter's Intervention Would "Unduly Expand" or Complicate a Purportedly Adverse Infringement Action**

Solos' attempts to defend the denial of permissive intervention under Rule 24(b) by heavily citing *T-Mobile Northeast LLC v. Town of Barnstable, 969 F.3d 33, 42 (1st Cir. 2020)* and *Daggett v. Commission on Governmental Ethics and Election Practices, 172 F.3d 104, 113 (1st Cir. 1999)*, arguing that adding Carter's claims would "unduly expand" and complicate a standard patent case. This procedural positioning represents a fundamental distortion of regional circuit practice and a direct threat to judicial finality.

**The Misapplication of Precedent:** In *T-Mobile* and *Daggett*, the First Circuit affirmed the threshold denial of permissive intervention because the absent parties merely sought to inject generic, cumulative political or consumer policy arguments into narrow local zoning and campaign finance disputes. Adding those

outside public policy arguments would have unnecessarily expanded the litigation footprint.

**The Absolute Standing Boundary:** A title and ownership controversy under 35 U.S.C. Section 256 is structurally different. Standing is not a flexible case-management factor left to discretionary balancing; it is an absolute, threshold jurisdictional prerequisite. If Solos' patent portfolio is built upon technology extracted from Carter's notes, research, development, and/or working prototypes, Solos lacks the basic legal standing to maintain this multi-billion-dollar lawsuit against the Defaulting Corporate Defendant-Appellees without Carter’s participation as a party. Likewise, if Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc.'s patent portfolio is built upon technology extracted from Carter's notes, research, development, and/or working prototypes, neither Solos nor the Defaulting Corporate Defendant-Appellees possess the basic legal standing to maintain or dismiss this multi-billion-dollar lawsuit without Carter’s participation as a party. Section 256 is fundamentally a remedial savings provision designed to protect real inventors from corporate fraud or omission. True judicial efficiency requires identifying the real owners of a property interest prior to evaluating downstream liability.

Solos' narrative ignores the structural reality of corporate occlusion documented throughout the record. As detailed in Carter's authenticated Forensic Map of Financial Interdependence (Exhibit L), the primary parties share an undisputed identity of strategic interest designed to avoid direct title discovery:

- **Strategic Financing Conduits:** Apollo Global Management and BNP Paribas maintain a documented $5 billion strategic capital alliance.
- **Data Laundering Environment:** BNP Paribas served as the lead financier backing Bending Spoons' acquisitions of Evernote and Meetup, effectively transferring Carter's proprietary full-stack technical pilot history to a foreign jurisdiction (Milan, Italy).
- **Infrastructure Overlap:** Simultaneously, Apollo Global Management actively led a $35 billion data center package directly for Defendant Meta Platforms, Inc.

This financial ecosystem creates an incurable conflict of interest. Solos’ lead counsel simultaneously represents Samsung in patent actions where Samsung’s commercialized "See-Through" display architecture (Samsung Patent No. 10,886,417 B2) is a copy of Carter's prototype lab notes, while originating company Kopin Corporation (formerly led by Dr. John C. Fan prior to the 2019 Solos Technology Limited spin-off and sister spin-off company, both led by Dr. Fan) serves as the discrete manufacturing link for those very and similar screens.

Significantly, Meta—the primary entity executing the operational footprint below—remains entirely silent, offering no defense of the judgment on the merits. Solos' attempts to fill this void by declaring post-May 8 developments "immaterial" only highlight their inability to defend the underlying merits of the title laundering. By demonstrating this strategic alignment to facilitate an out-of-court asset split, Carter introduces these subsequent developments as critical evidentiary support to illustrate a continuing pattern of conduct. Under the long-standing baseline affirmed in *Gilead Sciences, Inc. v. Merck & Co., Inc., 888 F.3d 1231, 1239 (Fed. Cir. 2018)* and *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814 (1945)*, this deep cross-forum concealment taints the entire enterprise under the Doctrine of Unclean Hands, permanently precluding Solos, Meta, and the Luxottica Entities from asserting rigid procedural timelines to trap the true creator.

**J. The Total Operational Appearance Default of Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc., Extinguishes Their Right to Rebut Senior Title and Invalidates Plaintiff-Appellee's Standing Arguments**

A fatal vulnerability on this appellate record is the complete operational appearance default of the five primary corporate defendants—Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc. ).

- **The Forfeiture of Right:** Despite being named as direct Appellees on both the initial and amended notices of appeal (Appx24 and Appx29), each entity across this multi-billion dollar enterprise failed to register for the electronic registry, file certificates of interest, or submit responsive briefings by their mandatory deadlines. Under Federal Circuit Rule 31, this wholesale default operationally strips each individual Defendant-Appellee of any right to be heard during oral arguments or contest the senior priority of the record. They cannot utilize corporate shell games to insulate their revenue streams—including the commercial monetization of the Ray-Ban Meta smart-glasses frameworks, the Oakley tactical contracts, and the misappropriated "ARIA" full-stack trademark portfolios—while hiding safely behind a vulnerable proxy shell.
- **The Admission of Standing Deficits:** Because these five Defaulting Corporate Defendant-Appellees have completely defaulted on appeal, the primary factual allegations regarding their joint exploitation of Carter's dual-use frameworks stand uncontradicted. Solos' brief cannot legally fabricate a standing argument on behalf of absent defendants who have procedurally forfeited their right to entry. By choosing radio silence in an active Article III appeal, Meta and the Luxottica Entities

have conceded the threshold multi-forum title laundering, creating an absolute bar to an appearance-of-bias remand. Because the underlying technological creation is frozen as undisputed, this Court must utilize its direct authority under 28 U.S.C. Section 2106 and 35 U.S.C. Section 256(b) to bypass further lower-court delays and order the United States Patent and Trademark Office (USPTO) to correct the patent rolls and substitute Carter as the sole rightful title holder of the issued assets.

- **The Invalidation Alternative under Fortress Iron:** Under the strict panel standard established by this Court in *Fortress Iron, L.P. v. Digger Specialties, Inc.,* accurate inventorship is a threshold jurisdictional prerequisite. A patent portfolio that omits the true creator and cannot be corrected according to law due to an ongoing Force Majeure event (documented human trafficking and physical duress under 18 U.S.C. Section 1595) is structurally broken. Because Carter is present, standing on Carter's uncontradicted scripts, signal processing benchmarks and the overall full stack smart architecture invented and reduced to practice by Carter, the law mandates the restoration of Carter's property via complete title assignment under Section 256. If the Solos' and the non-appearing Defaulting Corporate

Defendant-Appellees refuse to submit to Carter's rightful co-ownership, their multi-billion-dollar defense-supply asset is would traditionally be rendered void and invalid as a matter of law. However, in Fortress, the patent failed because the missing inventor was missing from the legal process entirely. In this case, the true creator is actively attempting to intervene, giving notice, asking for a hearing, and for a Correction of Inventorship. Therefore, this Panel does have the legal authority to issue a direct order correcting inventorship if the record. The record contains an unassailable 10-plus year paper trail from the true inventor, while the Solos and Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc. has produced zero historical development documents challenging Carter's seniority. Remanding this to the same forum simply invites further obstruction and delays justice for a victim who has been financially devastated ($0 IFP).

- The Defaulting Corporate Defendant-Appellees cannot utilize a procedural default to keep Carter's technology for free, shielding their commercial Ray-Ban Meta platforms and Oakley tactical military display contracts behind a wall of structural silence.

**K. Solos and Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc.'s Characterization of Ongoing Commercial Exploitation as Immaterial Misconstrues the Operative Record and Underscores a Coordinated Strategy of Sham Litigation and Inter-Tribunal Evasion**

Solos's contention that subsequent operational and administrative developments constitute immaterial grievances providing no legal basis to disturb the judgment fundamentally misrepresents the certified record (Appellee Br. at 26). Solos cannot manufacture a pristine factual baseline by securing a truncated, text-only closure below while contemporaneously reaping the commercial fruits of the proprietary architecture presented to the trial court. Characterizing these ongoing commercial rollouts as collateral rings hollow when such deployment is the direct, intended legal consequence of the district court's erroneous refusal to safeguard the record under Federal Rule of Civil Procedure 24(a)(2). Solos has opened the door to these inquiries by asserting the finality of proceedings, thereby permitting Carter to demonstrate that the underlying controversy remains active across multiple judicial and administrative forums.

- **Evidentiary Proof of Continuing Bad-Faith Exploitation:** Carter invokes these ongoing maneuvers not to interject independent, unpleaded causes of action, but as probative evidentiary support establishing a continuous pattern of title laundering and economic impairment. The corporate enterprise has systematically accelerated its commercial integration—deploying the full-

stack egocentric architecture derived directly from Carter's prototypes to drive the multi-billion-dollar Ray-Ban Meta smart-glasses platforms while channeling proprietary sensor-fusion codebases, designs, models, framework and other architectures designed and created by Carter into Oakley's defense and sovereign military procurement frameworks. Pursuant to established jurisprudence, this Court may take judicial notice of verifiable public dockets and inter-agency dockets that forensically substantiate the continuous economic prejudice and impairment of interest required to satisfy Rule 24(a)(2).

- **Default of Corporate Appellees and Appellate Administration Evasion:** The structural bad faith governing Meta and the Luxottica Entities' litigation posture extends directly into this tribunal's administrative framework. Under the Federal Rules of Appellate Procedure, because the five primary corporate entities carry over as mandatory adverse Defaulting Corporate Defendant-Appellees , respective counsel were strictly bound to file formal Entries of Appearance. To date, counsel for the primary **Defaulting Corporate Defendant-Appellees** have failed to comply, electing to disconnect from the automated electronic registry and forcing an unrepresented citizen to shoulder the procedural burdens of manual service. Confronted with this systematic evasion, Carter moved to compel

appearance and enforce jurisdictional transparency (CAFC ECF No. 20). This Court may take judicial notice of its own active dockets regarding pending motions that remain unadjudicated, while the **Defaulting Corporate Defendant-Appellees** exploit this administrative gap to insulate themselves from substantive ownership scrutiny. Solos and Meta and the Luxottica cannot maintain before this panel that ongoing operational integration is collateral while simultaneously prosecuting parallel administrative challenges.

- **Inter-Tribunal Pincer Tactics and Rule 31 Forfeiture:** This inter-tribunal collusion manifests in Solos and Meta and the Luxottica dual-track strategy: coordinating aggressive administrative resistance before the patent office while maintaining absolute silence on the substantive technical merits before this Article III court. Solos and Meta and the Luxottica cannot utilize administrative proceedings to secure strategic advantages over these identical dual-use architectures while simultaneously invoking rigid procedural technicalities before this Panel to bar Carter from the appellate forum. Because the **Defaulting Corporate Defendant-Appellees** have completely defaulted on their mandatory appearance obligations under Federal Circuit Rule 31, they have forfeited any standing to contest the priority of the record or rebut Carter's uncontradicted ownership of the

trademark "ARIA", scripts, designs, concepts, lab notes, algorithms, modeling, frameworks, transparent display design (lens), trade secrets (marketing activation, partnership leads, etc), neuromuscular input architecture/stack, Pre-AIA digital signal processing benchmarks and all other elements of the smart architecture including. This Court must reject these procedural pincer tactics, recognize that the multi-forum administrative maneuvers forensically prove an un-adversarial title wash, vacate the improper text-only orders below, and direct the appropriate administrative correction of the patent rolls pursuant to its direct statutory authority under 28 U.S.C. Section 2106 and 35 U.S.C. Section 256(b).

**L. Solos' Reliance on Eli Lilly, Ethicon, and Hedrick Impermissibly Imposes Post-Discovery Merits Burdens on a Preliminary Intervention Pleading**

Solos anchors the core of its substantive opposition (Appellee Br. at 11–12) on the proposition that an intervention applicant must demonstrate a contribution that is "not insignificant in quality" to a specific claim limitation. To manufacture this prohibitive barrier, Solos leans heavily on *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352 (Fed. Cir. 2004), *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998), and *Univ. of Pittsburgh v. Hedrick*, 573 F.3d 1290 (Fed. Cir. 2009). This reliance is doctrinally untenable and misrepresents the governing procedural framework.

Every single authority invoked by Solos to exact "claim-level contributions" at the threshold pleading stage arose from a fundamentally distinct, post-discovery or post-trial posture:

1. reviewed a final district court judgment on joint inventorship following a complete, multi-day evidentiary trial on the merits.
2. *Ethicon* was a post-discovery summary judgment adjudication rendered only after the parties had exhausted comprehensive depositions, expert discovery, and formal claim construction proceedings.
3. *Hedrick* evaluated an appeal from a final bench trial grounded in a fully developed factual record regarding laboratory notebooks and direct party testimony.

Solos' attempt to transplant the rigorous evidentiary burdens required to prevail at a final merits trial into the preliminary, threshold inquiry of an initial right-of-entry motion inverts federal pleading rules. These decisions explicitly underscore that inventorship and contribution assessments are intensely fact-bound inquiries that presuppose a developed record. By utilizing post-trial and summary judgment precedents to lock Carter out of the courthouse *before* discovery can even commence, Solos attempts to trap the litigant in an impossible Catch-22: denying access to the record while penalizing the absence of it.

**M. Solos' Invocation of Biltcliffe, Palmer, and Ofori Conceals an Absolute, Terminal Due Process Violation Below**

Solos attempts to excuse the district court's summary denials of Carter's post-order submissions by citing *Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925 (1st Cir. 2014), *Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006), and *Ofori v. Ruby Tuesday, Inc.*, 205 F. App'x 851 (1st Cir. 2006), characterizing Carter's filings as repetitive "simple disagreements" devoid of "newly discovered evidence" under Rule 59(e) (Appellee Br. at 20, 24–25). This argument fundamentally misstates the record.

*Biltcliffe*, *Palmer*, and *Ofori* govern the standard application where a party attempts to use a motion for reconsideration to rehash failed arguments or introduce evidence that was freely available prior to judgment. This action, by contrast, presents a structural administrative lockout: the district court explicitly **GRANTED** Carter leave to file Carter's Authorized Reply (Dist. Ct. ECF No. 106), yet simultaneously **TERMINATED** the entire civil action and issued its final text orders before Carter's authorized response could be processed, docketed, or reviewed by the bench.

Under the Supreme Court's clear mandate in *Armstrong v. Manzo*, 380 U.S. 544, 552 (1965), procedural due process guarantees an uncompromised right to be heard "at a meaningful time and in a meaningful manner." By executing this simultaneous "Grant-and-Terminate" sequence, the lower court nullified its own

order granting leave, effectively cutting off Carter's right to be heard behind a truncated record that is *void ab initio*.

## III. CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Movant-Appellant Daitona Carter respectfully requests that this Court:

1. **VACATE** the District Court's unreasoned text orders across Appx12, Appx15, and Appx19 for a total absence of subject-matter jurisdiction post-April 21, 2026, and a flagrant violation of Fifth Amendment Procedural Due Process;
2. **GRANT** intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2); and
3. **ISSUE A DIRECT MANDATE** to the Director of the United States Patent and Trademark Office under 28 U.S.C. Section 2106 and 35 U.S.C. Section 256(b) instructing the agency to correct the patent rolls and substitute Daitona Carter as the sole rightful title holder of U.S. Patent Nos. 10,306,389; 10,651,866; 11,082,055; 11,871,174; and 12,216,339, ensuring the complete return of a trafficking victim's stolen property.

**In the alternative**, should this Court determine that ancillary factual findings are required, venue must be stripped from the compromised District of Massachusetts

and **REASSIGNED** to the United States District Court for the Southern District of New York (SDNY) pursuant to the three-part partiality standard set forth in *United States v. Robin*, 553 F.2d 8 (2d Cir. 1977), to purge the systemic institutional conflicts logging the local clerk nodes; and

4. **GRANT** such other and further relief as this Court deems just, equitable, and proper under the circumstances.

Dated: August 20, 2026

Respectfully submitted,
/s/ Daitona Carter
DAITONA CARTER
Movant=Appellant, Pro Se
2 Massachusetts Ave NE, General
Delivery, Main Post Office
Washington, DC 20002
legal@daitonacarter.com

## IV. CERTIFICATE OF COMPLIANCE

*Pursuant to Federal Rule of Appellate Procedure 32(g)*

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Circuit Rule 32(b), this brief contains exactly 6,959 words as calculated by the word count function of the word processing system used to prepare this brief.
2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using OnlyOffice.

Dated: August 20, 2026

Respectfully submitted,
/s/ Daitona Carter

DAITONA CARTER
Movant=Appellant, Pro Se
2 Massachusetts Ave NE, General
Delivery, Main Post Office
Washington, DC 20002
legal@daitonacarter.com

## V. CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2026, a true and correct copy of the foregoing Reply Brief of Movant-Appellant Daitona Carter was served upon all counsel of record for Plaintiff-Appellee Solos Technology Ltd. via the court's CM/ECF system and for the Defendants (Defendant-Appellees Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc. via electronic mail.

Dated: August 20, 2026

Respectfully submitted,
/s/ Daitona Carter
DAITONA CARTER
Movant=Appellant, Pro Se
2 Massachusetts Ave NE, General
Delivery, Main Post Office
Washington, DC 20002
legal@daitonacarter.com

**ATTACHMENT 4**

*(Slip Sheet)*

**ATTACHMENT 4 DESCRIPTION:**

**Executive Appointment Notice (October 7, 2026)**

*(Official documentation of Defendant Walter Jay Clayton's appointment as White House AI Czar and Director of National Intelligence [DNI])*

**SOURCE / REFERENCE:**

Public Record / Federal Docket Notice

**ATTACHMENT 5**

*(Slip Sheet)*

**ATTACHMENT 5 DESCRIPTION:**

**Kopin Corporation / IBAS Defense Milestone Documentation**

*(Records detailing the July 14, 2026 defense manufacturing milestones for the Soldier Borne Mission Command [SBMC] tactical headset and micro-display hardware)*

**SOURCE / REFERENCE:**

CAFC ECF Doc. 41 (Exhibit Index)

**ATTACHMENT 6**

*(Slip Sheet)*

**ATTACHMENT 6 DESCRIPTION:**

**Alpaca Crypto Security & Custody Platform Disclosure**

*(Official corporate disclosure establishing that Alpaca Securities LLC utilizes Fireblocks Multi-Party Computation [MPC-CMP] vaults for digital asset custody and tokenized ledger clearing)*

**SOURCE / REFERENCE:**

Alpaca Crypto Disclosure Library (alpaca.markets/crypto)

alpaca.markets/crypto

Alpaca

Products Use Cases Developers Resources Login Sign Up

We safely store and manage our customer's digital assets using industry-leading solutions in self-custody. Alpaca Crypto currently maintains its customers' cryptocurrency in wallets secured by Fireblocks' MPC-CMP architecture.



**Responsible Private Key Management**

All customer assets are safeguarded by Alpaca. We apply the same procedures such as segregation and accounting of customer liability as the decades old standard upheld by securities broker-dealers.

AICPA SOC

**SOC 2 Type II Certified**

Alpaca is SOC 2 Type II Certified, which recognizes that we have the correct protocols and standards safely in place to protect customers' data security.

For more information about Fireblocks, visit fireblocks.com

**ATTACHMENT 7**

*(Slip Sheet)*

**ATTACHMENT 7 DESCRIPTION:**

**NIST Distributed Ledger Technology & Federal Tokenization Frameworks**

*(Establishes the technical framework for tokenized asset-tagging and distributed ledger systems utilized across modern federal procurement tracks)*

**SOURCE / REFERENCE:**

National Institute of Standards and Technology (NISTIR 8202 / CSRC DLT Project

An official website of the United States government Here's how you know

PUBLICATIONS

# NIST IR 8202

# Blockchain Technology Overview

Documentation Topics

**Date Published:** October 2018

## Author(s)

Dylan Yaga (NIST), Peter Mell (NIST), Nik Roby (G2), Karen Scarfone (Scarfone Cybersecurity)


### Abstract

Blockchains are tamper evident and tamper resistant digital ledgers implemented in a distributed fashion (i.e., without a central repository) and usually without a central authority (i.e., a bank, company, or government). At their basic level, they enable a community of users to record transactions... See full abstract



### Keywords

blockchain; consensus model; cryptocurrency; cryptographic hash function; asymmetric-key cryptography; distributed ledger; distributed consensus algorithm; proof of work; proof of stake; round robin; proof of authority; proof of identity; proof of elapsed time; soft fork, hard fork; smart contracts; data oracle


### Control Families

None selected

## DOCUMENTATION

**Publication:**

https://doi.org/10.6028/NIST.IR.8202

Download URL

**Supplemental Material:**

None available

**Related NIST Publications:**

CSWP 9

**Document History:**

01/24/18: IR 8202 (Draft)

10/03/18: IR 8202 (Final)

## TOPICS

**Security and Privacy**

digital signatures, secure hashing

**Technologies**

blockchain

**HEADQUARTERS**
100 Bureau Drive
Gaithersburg, MD 20899

Want updates about CSRC and our publications? Subscribe

Contact Us | Our Other Offices

Send inquiries to csrc-inquiry@nist.gov

Site Privacy | Accessibility | Privacy Program | Copyrights | Vulnerability Disclosure |

No Fear Act Policy | FOIA | Environmental Policy | Scientific Integrity |

Information Quality Standards | Commerce.gov | Science.gov | USA.gov | Vote.gov