| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;<br><br>PETE HEGSETH, in his official capacity as Secretary of Defense; and<br><br>WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,<br><br>Defendants. | Case No. 1:26-cv-03318-APM<br>Judge Amit P. Mehta |

**LETTER TO THE COURT REGARDING MINUTE ORDER OF OCTOBER 14, 2026**

Plaintiff Daitona Carter, pro se, respectfully requests the Court clarify or correct its Minute Order of October 14, 2026, on seven grounds.

## I. Mischaracterization of the Motion

The Minute Order states: *"The court treats Plaintiff's motion as one for reconsideration under Federal Rule of Civil Procedure 54(b)."*

Doc. 22 is captioned: *"EMERGENCY RENEWED MOTION FOR TEMPORARY RESTRICTING ORDER UNDER FED. R. CIV. P. 65(b)."*

These are different procedural vehicles with different standards. Rule 65(b) requires only that *"circumstances have materially changed"* since the prior order. Rule 54(b) reconsideration requires *"patently misunderstood a party," "error of apprehension,"* or *"controlling change in*

*law or facts."* Plaintiff filed a renewed TRO. Plaintiff did not file a motion for reconsideration. The recharacterization changes the applicable standard without explanation.

Rule 65(b) and Rule 54(b) are distinct, well-known standards. The motion's caption, first paragraph, and body identify it as 65(b). The recharacterization alters the legal test applied to an emergency filing without addressing the statutory criteria invoked.

## II. The Court Made a Predictive Judgment About a Pending Appeal

The Minute Order states: *"her insistence that the Massachusetts district court wrongly denied her intervention motion is unconvincing."*

This is not a finding of fact or a ruling on the merits of this case. It is a prediction about the outcome of a pending appeal in the Court of Appeals for the Federal Circuit (No. 26-1721). Briefing in that appeal is complete (opening brief filed June 2026; reply brief filed August 20, 2026). No panel has been assigned. No argument date has been set.

The Court used a prediction about an undecided appeal as the sole basis for denying emergency relief. The TRO motion (Doc. 22) raises independent grounds that do not depend on the Solos appeal: the Feinberg memo's own CAS-preservation language for sole-source development contracts; the APA claims under 5 U.S.C. § 706(2)(A) and (C); the § 1498 and TVPRA preservation needs; the trademark claim; and the alternative preservation-only request. None of these require the Solos appeal to succeed.

Plaintiff is not a party to the Solos case. She moved to intervene under Rule 24(a)(2) as an omitted inventor with a direct interest in the patents' validity. The Solos case is Solos Technology's infringement claim. Plaintiff's claim is inventorship and ownership — a different

legal question. The D. Mass. court's "generalized" finding was made in the context of Solos' infringement theory, not in the context of Plaintiff's inventorship claim.

The alternative preservation-only request (ECF No. 3, ¶ 50) asks the Court to do one thing: preserve the CAS cost-segregation records for the Covered Contracts pending further order. It does not ask the Court to rule on inventorship, on the Solos case, or on the merits of any claim. The "unconvincing" finding does not address this request.

## III. The "Generalized" Finding Conflicts with Indisputable Public Records and Proves the Reality of Irreparable Harm

The text-only Minute Order attempts to justify its denial by quoting a defensive assertion from the opposing party in a separate docket: *"As Solos notes, Carter's filings reflect, at most, 'generalized work in smart glasses technology, software concepts, or prior projects,' without identifying any 'concrete, claim-level contributions' [ECF No. 105 at 7]."*

This reliance is legally and logically erroneous for three independent reasons:

### 1. The Accused Party is Not an Objective Arbiter:

Solos is the primary adversary and the entity accused of misappropriating Plaintiff's architecture. Naturally, an accused party will claim that an inventor's work is merely "generalized." For this Court to adopt the defendant's unproven, self-serving defensive spin as an objective factual finding—while ignoring the granular technical architecture submitted by Plaintiff—is to rely on the fox to guard the henhouse. Solos has every financial and legal incentive to deny Plaintiff's contributions. A court cannot use a thief's own denial as the legal basis to dismiss active statutory claims.

**2. The Catch-22 of Punishing an Intervenor for Suppressed Evidence:**

The Court's order creates an impossible, bad-faith legal trap. First, as a proposed intervenor under Federal Rule of Civil Procedure 24, Plaintiff was seeking to enter the action to protect her rights, not conducting a summary trial on the merits or executing full discovery. Second, when Plaintiff *did* submit granular, highly specific technical proof—specifically, 65 technical exhibits (ECF No. 92) featuring mathematical modeling and baseband firmware architecture—the system hit those filings with negative docket adjustments (-1), suppressing them from public view for 50 days during which no one referenced them. The Court cannot penalize a litigant for a lack of "claim-level contributions" while the docket itself actively locks out, suppresses, and refuses to look at the 65 exhibits submitted to prove those exact contributions. Suppressing the evidence and then claiming it doesn't exist is an engineered evidentiary blackout, not a judicial evaluation.

**3. The Reality Established by Indisputable Public Records (Fed. R. Evid. 201):**

The actual record—unaffected by the -1 suppression—proves concrete, verifiable architecture that matches active rollouts:

- **The Technical Architecture (June 25, 2026):** Plaintiff published a specific, dated technical framework on Technical Disclosure Commons, titled *"System, Method, and Cryptographic Framework for Client-Side and Wearable-Device Base-Station Impersonation Detection and Token-Gated Location Attestation Within Multimodal Smart Eyewear Ecosystems"* (Attachment 3, Art. 10574). This document establishes precise mathematical modeling ($\Delta P = Prx_{actual} - Prx_{expected}$ via the Inverse-Square Law), cryptographic session-token

protocols ($\sigma_{session}$), and baseband firmware architecture down to the code level.

- **Commercial Deployment Synchronization:** The exact architectural categories set forth in Plaintiff's ECF No. 92 technical attachments (Attachment 7) are currently being executed in the marketplace by defendants and their partners:
    - *August–October 2026:* Meta published specific patent applications for smart cameras and hardware privacy mute circuits (Attachment 4).
    - *September 29, 2026:* Meta announced a major partnership with NAVER to deploy voice-guided walking directions on smart glasses (Attachment 2).
    - *October 12, 2026:* NAVER announced an expanded partnership with Meta, Google, and Samsung to deploy location-based AR navigation and contextual local routing across eyewear platforms (Attachment 1).
    - *Oakley Inc. (an EssilorLuxottica subsidiary):* Appears concurrently as a primary manufacturer of consumer smart eyewear and as a key defense contractor tied to the Department of Defense SBMC/IVAS pipeline.

**4. Decades of Prior Conception and Working Prototypes (2009–2019):**

The court’s reliance on the characterization of Plaintiff’s work as "generalized" ignores the actual factual chronology on the record. The court and opposing filings concede that Plaintiff developed smart glasses and optical technology—yet attempt to dismiss it as unprotectable. This is legally untenable. Plaintiff engineered and possessed this technology in modular parts as early as 2009 and 2013, and possessed fully integrated working prototypes featuring every single architectural feature (including those still being commercially announced today) in 2016, 2017, and 2019—years before Solos, Meta, or NAVER ever commercialized or patented these systems.

Having working prototypes containing the exact features years in advance is not "generalized work"; it is foundational, prior conception and reduction to practice. An accused infringer cannot take an inventor's 2016–2019 working prototypes, build commercial products from them in 2026, and then claim the original developer's work was merely "generalized concepts."

Because these implementations match the architecture submitted by Plaintiff (Attachment 3 & Attachment 7), and because the system went to extraordinary lengths to suppress them via -1 lockouts, they are not "generalized concepts"—they are active commercial and defense deployments of Plaintiff's documented work.

## IV. The Parallel Commercial and Defensive Tracks Requiring Preservation

The Minute Order errs by treating the Feinberg memorandum (Attachment 5), the CAS-to-GAAP conversion, and the Anduril $90 billion employee tender offer closing November 9, 2026 (Attachment 6) as isolated administrative or corporate events. As set forth in detail in the accompanying Declaration of Inventor Daitona Carter (Declaration ¶¶ 1–9, TD Commons Series No. 10575), Plaintiff's architecture is not 'generalized'; it is a precise silicon-level hardware enclaving and physical trace severance design that directly contrasts with Meta Patent Application US 2026/0238876 A1, they are directly connected to the ongoing claims:

| Track | Commercial (Meta / EssilorLuxottica / NAVER) | Defensive / Defense Industrial Base (Anduril / DoD / Oakley) |
|---|---|---|
| **Product / Scope** | Ray-Ban Meta & Oakley Meta Smart Glasses (Attachment 1, 2) | IVAS / SBMC Phase Two Tactical AR Headsets |
| **Key Event / Timeline** | October 2026 NAVER-Meta-Google-Samsung integrations (Attachment 1) | Anduril $1.3B employee tender offer closing **November 9, 2026** (Attachment 6) |
| **The Evidence at Issue** | Solos / Meta patent and trade architecture | CAS cost-segregation and labor-hour tracking records under the Feinberg Memo (Attachment 5) |
| **Destruction Mechanism** | Ongoing commercial rollout masking origin | October 14, 2026 CAS-to-GAAP conversion wiping contract audit trails |

The CAS cost-segregation records and labor-hour tracing data under audit are the *only* official government-level documents capable of verifying at the contract and employee-hour level whether the work funded under the IVAS/SBMC contracts originated from Plaintiff. Permitting the October 14 conversion to wipe these records while a massive private equity liquidity event (the Anduril tender closing November 9) proceeds guarantees that the assets and evidence will vanish simultaneously.

## V. The CAFC Docket, the Removal of Defendants as Appellees, and the Coordinated Destruction of the Audit Trail

In CAFC No. 26-1721, the Clerk's Office created the appellate docket and removed the Defendants as appellees. The Defendants in the underlying D. Mass. action are Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica, USA, LLC.

Crucially, this caption alteration and removal occurred **six days before the April 28 rollout with the DoD/Army**. On that exact day—**April 28**—Plaintiff's ECF filing access was simultaneously revoked, completely disabling her ability to file an emergency TRO or responsive papers at the moment the defense transition went live.

Without the Defendants as appellees of record, they had no obligation to file a jurisdictional statement, no obligation to brief the appeal, and no obligation to produce documents in response to the certified record. The defendants' litigation strategy on the lower docket failed them entirely—they said nothing, filed nothing, and offered no defense before the amended appeal because they had no lawful argument to make.

The CAS cost-segregation records in this case are the exact documents that mandatory filings and discovery would have produced. The Clerk's action to strip them from the docket, paired with the sudden ECF lockout and the subsequent **October 14 CAS-to-GAAP conversion**, represent two calculated steps in the exact same sequence: **first, remove the parties who would be required to produce the records and lock out the litigant attempting to stop it; second, convert the records so they no longer exist in the format needed while a massive private equity liquidity event (the Anduril tender closing November 9) proceeds.**

This does not reflect a lack of protectable interest or irreparable harm; it reflects a coordinated administrative remediation to suppress the record before the truth of the commercial and defense pipeline can be exposed.

## VI. What the CAS Records Contain and Why Preservation Is Required Under the APA

The Minute Order and its reliance on premature, incomplete findings completely evade what the CAS cost-segregation records actually contain, how the technology was developed and

extracted without a traditional licensing framework, and why immediate preservation is legally mandatory.

### A. The Contents and Statutory Necessity of the CAS Records

Under 48 C.F.R. Part 9904 (CAS), FAR 31.205-46, and DCMA Chapter 72, the CAS records include detailed labor hours, travel, lodging, materials, subcontractor costs, equipment capitalization, and overhead allocations.

The Feinberg memorandum's stated purpose is "transparency and fairness" and "protecting taxpayers." The CAS cost-segregation records are the mechanism by which that transparency is achieved. Their conversion to GAAP does not modernize the accounting; it destroys contract-level audit trails. The public interest in preserving these records is independent of Plaintiff's individual claims. Furthermore, the Feinberg memo's own preservation language explicitly dictates: *"By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP."* The October 14 conversion unlawfully executed this conversion for sole-source development programs in advance of any CASB action.

### B. Foundational Priority, Working Prototypes, and the Need for Preservation

The Court's characterization of Plaintiff's work as "generalized" ignores the verified factual chronology on the record. Plaintiff engineered and possessed fully working prototypes containing every single architectural feature (including those still being commercially announced today) in **2009, 2013, 2016, 2017, and 2019**—years before Solos, Meta, or NAVER ever entered the market. Having working prototypes containing exact functional specifications years in advance is not "generalized work"; it is foundational prior conception and reduction to practice.

Because Plaintiff's foundational architecture was absorbed into commercial and defense pipelines without a traditional licensing framework, and because the system has utilized administrative blackouts, docket lockouts (-1), and procedural barriers while third parties reap billions from equity events (such as the Anduril tender closing November 9, 2026), the CAS cost-segregation records and labor-hour tracing data are the *only* official documents capable of confirming at the contract level that the work originated from Plaintiff.

### C. The Limited Scope of the Instant APA Action

To be clear, Plaintiff is **not** asking this Court in this APA and mandamus proceeding to adjudicate the merits of separate statutory claims or collateral suits. Plaintiff is asking this Court to enforce administrative compliance and preserve the underlying factual baseline. The duty to preserve evidence arises "at the moment that litigation is reasonably anticipated" (*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216–17 (S.D.N.Y. 2003)). With a pending action in this Court (Case No. 1:26-cv-03318), a pending appeal in the CAFC (No. 26-1721), and anticipated actions under 28 U.S.C. § 1498 in the Court of Federal Claims, the CAS records are necessary to maintain the integrity of the record across these proceedings.

- **The Anduril Tender:** Anduril opened a $90 billion employee tender offer on October 13, 2026, closing November 9, 2026. The CAS records are required to trace contract data before equity converts to cash.
- **The Phase Two Problem:** The October 14 conversion dissolved existing cost pools, but SBMC Phase Two cost data (January–February 2027) has not yet been generated. A preservation order entered now could direct the contractor to resume

CAS-format recordkeeping for all new work going forward, preventing data from being born solely in GAAP format.

The Minute Order completely fails to address the APA claims, the § 1498 preservation needs, or the alternative preservation-only request.

## VII. The Legal Consequences of Spoliation and the Mandate of Judicial Integrity

Plaintiff brings this notice to establish an unambiguous, immutable record of what is occurring. Under Federal Rule of Civil Procedure 37(e)(2), if a party acts with the intent to deprive another party of information's use in litigation, courts may impose severe sanctions, including striking pleadings, entering default judgments, or establishing adverse inferences. Independent of Rule 37, federal courts possess inherent authority to sanction the spoliation of evidence and prevent parties from profiting from the destruction of records.

Government entities and federal officials holding evidence relevant to ongoing or anticipated private litigation—particularly under the Administrative Procedure Act (5 U.S.C. § 706(2)(A))—are bound by legal duties of preservation and rational decision-making. Allowing agency directives (such as the Feinberg memorandum) to be executed in a manner that permanently eradicates the evidentiary basis of pending statutory claims (including active federal human trafficking claims under 18 U.S.C. § 1595) exposes the underlying processes to judicial invalidation and implicates participating institutions in the active destruction of evidence central to an ongoing federal proceeding.

Judicial officers and courts do not operate in a vacuum. A court presented with documented, ongoing destruction of evidence that forms the factual bedrock of active trafficking, intellectual property, and APA claims cannot insulate itself from its affirmative duty to maintain

the status quo. Refusing to address nine out of ten independent grounds for relief, issuing summary denials in the face of imminent evidence destruction (such as the November 9 tender deadline and October 14 CAS conversion), and permitting the systematic dissolution of audit trails without a hearing creates a direct legal record of judicial enablement. The legal consequences for spoliation, obstruction, and participation in the shielding of ongoing unlawful conduct apply across the board. The judiciary's constitutional mandate is to adjudicate and preserve the integrity of the record—not to facilitate its erasure.

## VIII. No Remedy Remains Without Preservation

The sequence to date:

1. **D. Mass. (Apr. 15, 2026):** Intervention denied. 65 technical attachments (ECF 92) filed April 17. Never addressed. Reconsideration (ECF 107) and Rule 60 (ECF 113) denied without engaging the record.
2. **CAFC (pending):** Doc. 19 (preservation motion) filed May 15, 2026. Doc. 47 (show cause) filed Sept. 21, 2026. 28(j) filed Oct. 15, 2026. No panel assigned. No action on any of the three.
3. **D.D.C. (Oct. 13–14, 2026):** Original TRO denied (ECF 21). Renewed TRO recharacterized and denied (Minute Order, Oct. 14). Notice of Appeal filed Oct. 14. D.C. Circuit case assigned Oct. 15 (No. 26-5358).
4. **October 14, 2026:** CAS-to-GAAP conversion executes. Contract-level audit trails permanently dissolved.
5. **November 9, 2026:** Anduril tender closes. Up to $1.3B in equity converts to cash across 16 countries.
6. **Jan–Feb 2027:** SBMC Phase Two cost data generated under GAAP only.

Plaintiff is a current victim of ongoing trafficking under 18 U.S.C. § 1595, not a survivor of past trafficking. The Anduril tender, the NAVER/Meta commercialization, and the SBMC Phase Two data generation are ongoing and upcoming acts. The statute of limitations does not begin to run until the trafficking ends.

Plaintiff is not asking this Court to grant a remedy on the merits. Plaintiff is asking this Court to preserve the only evidence that could produce a remedy in any of the pending

proceedings. The preservation-only request (ECF No. 3, ¶ 50) requires no merits finding, no ruling on the Solos case, no determination of inventorship, and no finding of harm. It asks only that the records continue to exist in the format in which they were created, pending further order.

## IX. Request

Plaintiff requests that the Court either:

1. Clarify the legal standard applied to Doc. 22;
2. Correct the characterization and address Doc. 22 under Rule 65(b);
3. Vacate the Minute Order in light of the October 14 CAS conversion and the November 9 tender deadline;
4. Address the independent grounds in Doc. 22, Sections II.A through II.J, on their own terms, without reliance on findings from a separate case pending in a separate court;
5. Enter the alternative preservation-only order (ECF No. 3, ¶ 50) directing Defendants to preserve, and not direct or permit the modification, conversion, or deletion of, the Covered Records pending further order of this Court;
6. Direct Defendants to resume CAS-format recordkeeping for all SBMC Phase Two work going forward, so that new data is not born in GAAP format only; or
7. Grant an emergency hearing before the November 9, 2026 tender deadline.

October 19, 2026

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

DAITONA CARTER,

Plaintiff,

v.

STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;

PETE HEGSETH, in his official capacity as Secretary of Defense; and

WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,

Defendants.

Case No. 1:26-cv-03318-APM
Judge Amit P. Mehta

**PLAINTIFF'S NOTICE OF FILING ATTACHMENTS 1 THROUGH 8 IN SUPPORT OF LETTER REGARDING MINUTE ORDER OF OCTOBER 14, 2026**

Plaintiff Daitona Carter, pro se, hereby files the following attachments in support of her letter regarding the Court's Minute Order of October 14, 2026. To ensure a complete and accessible record for the Court, copies of these public records, technical disclosures, and official memoranda are attached hereto:

- **Attachment 1:** NAVER-Meta-Google-Samsung AI glasses navigation announcement (**October 12, 2026**).
- **Attachment 2:** Meta-NAVER partnership announcement (**September 29, 2026**).
- **Attachment 3:** Technical Disclosure Commons, Art. 10574, *"System, Method, and Cryptographic Framework for Client-Side and Wearable-Device Base-Station Impersonation Detection..."* (**June 25, 2026**).

- **Attachment 4:** Meta Patent / Public Filings (US 2026/0238876 A1 & hardware privacy mute circuit filing) (**August 2026**).
- **Attachment 5:** Deputy Secretary of Defense (Feinberg) Memorandum, *"Fostering One Strong Industrial Base"* (**September 14/15, 2026**).
- **Attachment 6:** Anduril Industries $90B Employee Tender Offer / Share Sale Announcement (**October 13, 2026**).
- **Attachment 7:** D. Mass. ECF No. 92 — 65 Technical Attachments (unsealed for CAFC transmission on or about **June 5, 2026**).
- **Attachment 8:** D. Mass. ECF No. 107 (or relevant docket text order) characterizing technical work as "generalized" (**April 29, 2026**).

October 19, 2026

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com

**ATTACHMENT 1 SLIP SHEET**

Description: NAVER-Meta-Google-Samsung AI glasses navigation announcement

Date: October 12, 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

The Korea Times

Business > Companies

# Naver Map to offer voice guidance on Meta, Google, Samsung smart glasses




A promotional image for Naver Map's artificial intelligence smart glass feature / Courtesy of Naver

By Jhoo Dong-chan

Published Oct 12, 2026 1:45 PM KST

Naver Map, Korea's most widely used online map service, will offer real-time, step-by-step voice navigation through artificial intelligence (AI)-powered smart glasses, becoming the first Korean

map service to do so, its operator, Naver, said Monday.

The feature is available first on Meta's Ray-Ban Meta and Oakley Meta glasses, according to the internet portal operator. It will also support "intelligent eyewear" being jointly developed by Google and Samsung Electronics, which is set for release later this year.

Users can receive voice directions to their destination without repeatedly checking their smartphone screens. The glasses also tell them which way to turn and whether stairs or escalators lie ahead.

The service will first be available on Android phones, with iPhone support to follow.

Naver Map has also introduced voice commands designed for the glasses. Users can ask questions such as "When will I arrive?" or "Find a convenience store nearby" while walking and get answers right away. On the Google-Samsung glasses, users will also be able to launch Naver Map and start navigation by voice through Gemini, Google's AI assistant.

The move builds on a real-time walking navigation feature that Naver Map launched in June. That feature added car navigation-style voice guidance to walking directions.

Naver said it plans to link the glasses with the local information accumulated on Naver Map, such as restaurant and cafe listings, to connect physical spaces with digital information more naturally. Once glasses with built-in displays become available, the company expects to offer augmented reality walking routes. Users would also see information on nearby stores and available discount coupons.

"Users will be able to focus on walking without constantly checking their smartphone screens while naturally receiving directions and rich local information," said a Naver official in charge of the map service.

*This article was published with the assistance of generative AI and edited by The Korea Times.*

**Map** **Naver**



**Jhoo Dong-chan**

Do not go gentle into that good night, old age should burn and rave at close of day; Rage, rage against the dying of the light, though wise men at their end know dark is right, because

their words had forked no lightning they, do not go gentle into that good night.

**Interesting contents**
Taboola 후원링크

**Kim Jong-un watches live execution**

Former K-pop idol goes viral after group disbands, juggles 4 part-time jobs while starting over at 22

California couple arrested on child abuse charges in horrifying surrogacy probe

It's Not Salt: Heart Surgeons Now Tie High Blood Pressure to a Drink Most Seniors Have

Spinal Stenosis Isn't An Age Problem — The Real Cause May Surprise You(Stop Doing This)

**Recommended Contents For You**
Taboola 후원링크

**Why these Korean stars had breast implants — then chose to remove them**

**Why are more Japanese women drawn to Korean men?**

**Why Japan's average height stopped growing while Korea, China surged**

**Bipartisan US Senate bill reaffirms 'ironclad' nuclear deterrence pledge to S. Korea**

**Still better than Trump**

About Us

Introduction

History

Contact Us

Products & Services

Subscribe

RSS Service

Content Sales

Site Map

Policy

Code of Ethics

Ombudsman

Privacy Policy

Terms of Service

Copyright Policy

Go to Standard Page



Beyond. the boundaries of finance
Beyond. the limits of investment

# Seoul Economic Daily






The latest partnership extends that support to AI glasses.

The company is also adding a voice command function designed for AI glasses. Users can ask questions out loud and receive immediate answers, and the service provides real-time voice information on restaurants and cafes near a destination. On the Intelligent Eyewear jointly developed by Google and Samsung, users will be able to make a voice request to Gemini, which will launch NAVER Map and begin navigation.

NAVER said it plans to link AI glasses with the local information accumulated in its mapping service to connect physical spaces and digital information more seamlessly. On AI glasses equipped with displays, the company expects to offer augmented reality route guidance along with information on nearby stores and Place coupons.

"We expect users will be able to focus on moving rather than repeatedly checking their smartphone screens, while still getting directions and rich local information," said Jung Kyung-hwa, a NAVER leader. "As a platform that connects the physical and digital worlds more vividly, we will continue to provide users with new mapping experiences."

VISUAL BRIEFING NEW
Card News
Daily news as visual cards.

#NAVER #NAVERMap #AIGlasses #RayBanMeta #IntelligentEyewear #VoiceNavigation #AR

## Companies in this story

NAVER




# Seoul Economic Daily

Original reporting by Kim Ji-won for Seoul Economic Daily.



View Korean original ↗ Translation Policy

WATCH · SEOUL ECONOMIC DAILY MORE →




**Chip Stocks Crash, Retail Keeps Buying | October 15 2026**

3:25

## Related Articles

### NAVER's Chzzk Tops 10 Million Downloads on Sports Streaming Push

PUBLISHED 2026.10.14. 18:10:30

### Firms Say Disclosure Rules Undervalue In-House Security Technology

PUBLISHED 2026.10.14. 11:27:23

### DeepX NPU Runs AI on 3 Watts, Featured by Raspberry Pi

PUBLISHED 2026.10.16. 05:37:05

## Most Read This Week

1-5 ‹ ›

1  **Eurozone Rules Out Rescue as France Debt Fears Spread**

2  **FIFA Leaves $4 Million Trump Tower Office Sitting Empty**



Beyond.the boundaries of finance
Beyond.the limits of investment



## Korea Company Atlas PREVIEW ↗

MARKET ONTOLOGY · THE FEEDBACK LOOP

KFTC 2025 · 92 GROUPS · 121,954 ARTICLES

An English ontology of the Korean market — how companies, the media, the government and the National Assembly move each other in a loop. Korea's named controlling persons and designated business groups are a mechanism, not a risk to be priced blind.


Beyond.the boundaries of finance
Beyond.the limits of investment

# Seoul Economic Daily



Click to explore the atlas →

Open Atlas in full screen ↗

## AI KEY PREVIEW ↗

KOREAN CORPORATE INTELLIGENCE HUB

KOSPI · KOSDAQ · 12 SECTORS

A live, cap-weighted view of every KOSPI and KOSDAQ sector, with same-day Korean reporting distilled by company — built for foreign investors, correspondents and analysts who need to scan Korea before the next session.



Beyond.the boundaries of finance
Beyond.the limits of investment

# Seoul Economic Daily



Click to explore AI KEY →

Open AI KEY in full screen ↗

## SIGNAL NOW LIVE ↗

ENGLISH EDITION · CAPITAL MARKETS

M&A · IPO · PE · FUND FLOWS

SIGNAL English Edition is live — Korea's deal desk reporting in English. M&A, IPOs, private equity and fund flows, covered daily for global institutional investors. Browse free; subscriber-only scoops at the 50% intro rate.


Beyond . the boundaries of finance
Beyond . the limits of investment

# Seoul Economic Daily



Click to explore SIGNAL →

Open SIGNAL in full screen ↗



Copyright © Sedaily, All right reserved

**ATTACHMENT 2 SLIP SHEET**

Description: Meta-NAVER partnership announcement

Date: September 29, 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

**ATTACHMENT 3 SLIP SHEET**

Description: Technical Disclosure Commons, Art. 10574, "System, Method, and Cryptographic Framework for Client-Side and Wearable-Device Base-Station Impersonation Detection..."

Date: June 25, 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

Technical Disclosure Commons

Defensive Publications Series

25 Jun 2026

# EYEWEAR-INTEGRATED HARDWARE-ENCLAVED SENSOR GATING INTERFACE UTILIZING ASYNCHRONOUS DATA VALVING AND BIOMECHANICAL INTENT VERIFICATION

Daitona Carter
*Daitona Carter*

Follow this and additional works at: https://www.tdcommons.org/dpubs_series

**Recommended Citation**
Carter, Daitona, "EYEWEAR-INTEGRATED HARDWARE-ENCLAVED SENSOR GATING INTERFACE UTILIZING ASYNCHRONOUS DATA VALVING AND BIOMECHANICAL INTENT VERIFICATION", Technical Disclosure Commons, (June 25, 2026)
https://www.tdcommons.org/dpubs_series/10575

This work is licensed under a Creative Commons Attribution 4.0 License.
This Article is brought to you for free and open access by Technical Disclosure Commons. It has been accepted for inclusion in Defensive Publications Series by an authorized administrator of Technical Disclosure Commons.

# TECHNICAL DISCLOSURE DOCUMENT

## EYEWEAR-INTEGRATED HARDWARE-ENCLAVED SENSOR GATING INTERFACE UTILIZING ASYNCHRONOUS DATA VALVING AND BIOMECHANICAL INTENT VERIFICATION

**Inventor:** Daitona Carter
**Publication Date:** June 2026
**License:** CC BY-ND 4.0 International

## INDEXING METADATA & SYSTEM CROSS-REFERENCES:

Smart Glasses Privacy Hardware, Anti-Spying Smart Eyewear, Always-Listening Microphone Blocker, Wearable Camera Security Enclave, Temporalis Muscle Speech Detection, Daitona Carter Invention, Counter-Surveillance Smart Glasses Architecture, Hardware Microphone Valve.

## CROSS-REFERENCE TO RELATED ART

This disclosure builds upon and explicitly expands the hardware-enclaved isolation and asynchronous valve architecture originally established by the Inventor in *"Method for Hardware-Isolated Dynamic Input Processing Using Secondary Microcontrollers"* (Published May 30, 2026). The foundational input-gating principles detailed therein are adapted and uniquely engineered here to secure multimodal audio/visual environmental sensors.

## ABSTRACT

This disclosure details a physical, hardware-enclaved security architecture designed to prevent unauthorized, passive audio and visual data extraction from wearable computing platforms. The framework mechanically decouples micro-electromechanical systems (MEMS) microphone arrays and camera sensors from the primary application processor (AP) and host operating system. Raw environmental data streams are routed exclusively into a hardware-isolated, bare-metal secondary microcontroller core operating a dedicated, secure execution environment.

This secondary core controls an asynchronous data valve: raw sensor inputs are buffered in a one-way FIFO queue completely inaccessible to the host processor unless explicitly released by a verified user intent signal. This physical intent signal is generated natively via localized capacitive frame touch inputs, enclave-verified local acoustic triggers, or direct biomechanical voice activity sensors embedded in the frame

arms (comprising a temporalis muscle-flex array and a cranio-acoustic bone-conduction accelerometer). Absent a verified biomechanical or manual trigger, the outbound data line exposed to the AP is decoupled and flooded with synthetic null-voltage noise, rendering background software-level sensor-scraping vectors fully non-functional.

## BACKGROUND & PROBLEM STATEMENT

Modern wearable smart eyewear architectures enforce an invasive, unbypassable trust paradigm over environmental data collection. Devices utilize low-power Digital Signal Processors (DSPs) to continuously ingest audio and video inputs to listen for trigger words or compile context-aware spatial telemetry.

The structural flaw in these systems is the reliance on a shared memory space, shared Inter-IC Sound (I2S) buses, or software-switched data lines linking the DSP directly to the primary Application Processor (AP). If the host operating system, a kernel-level process, or an upstream cloud server is compromised, malicious actors can silently tap the raw sensor buffers. Because standard status indicators (such as recording LEDs) are bound to software control loops, they can be bypassed entirely. This allows for continuous, invisible ambient audio and video harvesting without the user's knowledge, consent, or physical interaction, turning wearable computing form-factors into active surveillance endpoints.

## SUMMARY OF INNOVATION & NOVELTY

This architecture removes sensor stream authorization entirely from the software layer, enforcing user privacy via physical hardware isolation and asynchronous data gating. The device establishes a zero-trust boundary around raw environmental input:

- **Physical Trace Severance:** Microphones and camera sensors possess no direct copper connections or shared communication buses (I2C/I2S/SPI) with the primary host application processor. All hardware traces run exclusively into an isolated, secure secondary processing enclave.
- **Asynchronous Data Valving:** Captured audio and visual frames are held within a hardware-isolated, one-way FIFO buffer managed by bare-metal firmware. The host AP cannot read, query, or poll these data registers.
- **Biomechanical and Hard-Wired Intent Gating:** The physical data valve only transitions to an open state when a localized, non-bypassable user-intent event occurs. This threshold is met via a physical frame tap, a physical slider activation, enclave-side cryptographic verification of an acoustic wake-word, or via frame-embedded sensors detecting the physical biomechanics of speech (e.g., the flexing of the temporalis muscle or corresponding cranial acoustic vibrations). Absent this verified physical trigger, the communication bus exposed to the AP remains isolated and flooded with synthetic zero-voltage white noise.

## DETAILED IMPLEMENTATION & ARCHITECTURE

### *Sensor Isolation Architecture*

The hardware layout isolates the Pulse-Density Modulation (PDM) or Inter-IC Sound (I2S) channels originating from the MEMS microphone arrays and the imaging buses of the camera modules. The secondary microcontroller operates on bare-metal firmware completely separate from the main operating system. It handles the raw clock lines (CLK) and data lines (DATA) of the sensors natively. The data is parsed into an internal, isolated volatile memory register inaccessible via any external debugging or Direct Memory Access (DMA) channel.

```
              [ MEMS Microphone Array ]
                          |
                          ▼ (Raw PDM / I2S Audio Stream)
            [ HARDWARE-ENCLAVED SECONDARY MCU ]
          (Local Cryptographic & Biomechanical Check)
                          |
          ┌───────────────┴───────────────────┐
          |                                   |
          ▼ (No Trigger / Idle)               ▼ (Verified User
Intent)
 ┌────────────────────────────┐   ┌────────────────────────────┐
 │ ASYNCHRONOUS VALVE:CLOSED  │   │ ASYNCHRONOUS VALVE: OPEN   │
 │  Injects Null-Voltage      │   │    Streams Clean,          │
 │          Noise             │   │  Authenticated Data        │
 └────────────────────────────┘   └────────────────────────────┘
          |                                   |
          └───────────────┬───────────────────┘
                          |
                          ▼
             [ PRIMARY APPLICATION PROCESSOR (AP) ]
              (Untrusted Host OS / Cloud Pipeline)
```

### *Biomechanical Voice Activity Detection (VAD) Enclave Triggers*

To eliminate software-based spoofing of user intent, the secure secondary microcontroller is hardwired to a dual-array of localized biomechanical sensors embedded within the eyewear frame arms:

1. **Temporalis Myographic Array:** Piezoelectric or skin-strain sensors positioned on the interior temple-arms of the frame map mechanical pressure changes caused by the flexion of the user's temporalis muscle during jaw articulation.
2. **Cranial Cranio-Acoustic Accelerometer:** An ultra-low-power MEMS accelerometer integrated into the frame architecture captures microscopic bone-conduction vibrations traveling through the temporal bone during vocalization.

The localized, bare-metal firmware processes these mechanical inputs natively within the secure enclave. By utilizing edge-based pattern analysis, the enclave differentiates intentional speech from non-speech artifacts (e.g., chewing, blinking, swallowing). Because these sensors respond exclusively to the user's physical anatomy, they are impervious to environmental acoustic noise and completely inaccessible to the primary AP.

***The Asynchronous Evaluation Loop***

The firmware inside the isolation enclave continuously executes an un-bypassable three-stage guard loop:

3. **Environmental & Biomechanical Baseline Sampling:** The secure microcontroller ingests raw audio packets into its internal isolated memory, computing localized fast Fourier transform (FFT) algorithms for low-power keyword spotting, while simultaneously polling the temporalis and cranio-acoustic sensors for physical speech validation.
4. **State Verification:** If the application processor (AP) attempts to execute an I2S/SPI read command on the interface while the enclave has *not* registered a valid physical touch event, a verified local acoustic wake-word, or validating biomechanical speech telemetry, the enclave identifies the command as an unauthorized background data exfiltration attempt.
5. **Execution Guard & Noise Injection:** The enclave instantly activates a hard-wired physical switch, disconnecting the external data transit pins and forcing the outbound lines to transmit a continuous null-voltage signal or scrambled noise. The host operating system receives valid packet structures, preventing system crashes, but the payload contains zero intelligible data. Only when local user intent is physically or biomechanically confirmed does the hardware valve shift its registers, allowing clean, buffered data to bridge to the AP for the duration of the authorized command window.

## EXEMPLARY USE CASES & EMBODIMENTS

- **Embodiment A (Anti-Ambient Audio Harvesting):** Smart eyewear featuring an always-listening AI assistant is subjected to an upstream remote code execution exploit targeting the host operating system. The attacker activates a background microphone scraping command to spy on a private conversation. The hardware-enclaved secondary microcontroller detects the incoming data query from the AP, verifies that no physical touch event, local acoustic trigger, or biomechanical temporalis/cranial vibration has occurred, keeps the asynchronous valve closed, and feeds continuous null data to the compromised OS, fully neutralizing the exfiltration vector.

- **Embodiment B (Hardware-Enforced Recording Indicators):** A wearable video-capture headset is commanded via a silent cloud payload to initiate video recording without lighting up the external privacy LED. Because the physical recording LED is wired directly into the power delivery trace of the secure secondary microcontroller's valve controller—rather than a software pin on the AP—the camera data lines cannot physically transfer a single video frame to the host processor unless the LED is drawing current and illuminated. Software manipulation of the recording state without visible user warning is rendered physically impossible by spatial geometry.
- **Embodiment C (Biomechanically Gated System Activation):** The eyewear remains in a zero-power deep-sleep state to preserve battery life, disabling primary audio-processing subsystems. The user begins speaking. The frame-integrated accelerometer detects the physical bone-conduction vibrations of the vocal cords, and the inner temple sensors register the synchronized flexing of the temporalis muscle. This dual-hardware verification triggers a local wake interrupt on the secure secondary MCU, opening the data valve and alerting the main AP to boot the conversational interface instantly, ensuring zero acoustic latency without continuous microphone snooping.

## END OF TECHNICAL DISCLOSURE

**ATTACHMENT 4 SLIP SHEET**

Description: Meta Patent / Public Filings (US 2026/0238876 A1 & hardware privacy mute circuit filing)

Date: August 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

POSTED ON SEPTEMBER 23, 2026 TO SECURITY & PRIVACY

# Bringing Private Processing to Meta AI Glasses



By Pritam Shah, Oskar Linde, Anuj Kumar, Jim Pastos, Suyash S

We believe glasses are the best form factor for having AI help throughout your day. They can understand your personal context better than other kinds of devices and keep you present without picking up a mobile phone.

Most of the time, glasses are helping you see well, protecting your eyes and complementing your look, and that's it. But AI glasses have the capacity to provide superpowers like translating a conversation or summarizing notes or a conversation.

Many directions people give their glasses today, like placing a call or answering a text hands-free, occur entirely on device, though more advanced features would require larger, more capable AI models – far larger than can be packed into a pair of glasses.

And compute is only half the problem. For an AI assistant to be truly useful in everyday life, it must also be stateful and deeply personal — understanding your context, connecting ideas across days or weeks, and working proactively in the background to get things done for you.

Taken together, these demands mean the work has to happen in the cloud. AI glasses present a challenge that traditional cloud architectures were never built to solve: How do you build a hyper-personalized AI that knows your world deeply with enhanced privacy?

Our answer is Private Processing, Meta's confidential computing infrastructure for AI workloads. It extends the trust boundary of AI glasses directly into cloud data centers, executing AI models inside confidential virtual machines (CVMs) such that even Meta cannot access your data.

This isn't a new idea for us. In 2025, we introduced Private Processing for WhatsApp and the Meta AI app, allowing you to have completely private chats with Meta AI, without Meta or WhatsApp ever seeing the data. We've learned from that initial approach and we're expanding

it to bring these same privacy benefits to our AI glasses. This blog highlights how we engineered a cloud runtime that processes personal context at scale.

> *"Personal devices like glasses that understand our context — because they can see what we see, hear what we hear, and interact with us throughout the day — will become our primary computing devices." — Mark Zuckerberg, Personal Superintelligence, July 2025.*

## What are Confidential Computing, the TEE, and Private Processing?

**Confidential Computing is the paradigm.** Historically, the industry encrypted data in two states: *at rest* (on disk) and *in transit* (over the network). The vulnerability has always been the third state: *in use*. Data had to be decrypted in memory to be computed on, leaving it exposed to the host operating system, the hypervisor, and the infrastructure operator. Confidential computing is the industry-wide movement to close that gap, ensuring data remains protected even while being processed.

**The Trusted Execution Environment (TEE) is the hardware primitive.** The TEE is a hardware capability in certain CPUs and GPUs that enables confidential computing. The processor encrypts the memory of a special virtual machine, a CVM, under a key held by dedicated security hardware on the chip. That key is never released to the host operating system, the hypervisor, or anyone operating the machine.

This capability spans host CPUs and GPUs, so a workload that needs both of these compute targets stays inside the trust boundary across them. To the host operating system, the hypervisor, and the infrastructure administrator, the CVM memory is ciphertext.

As defined by the Confidential Computing Consortium (CCC), a TEE physically enforces three strict guarantees:

- **Data Confidentiality:** No one outside the CVM, including Meta and the host operating system, can read data in CVM memory while it is in use.
- **Data Integrity:** No one outside the CVM can add, remove, or alter that data.
- **Code Integrity:** No one can modify the code executing inside the CVM once it has loaded.

The client demands a remote attestation report, signed by a key that exists only inside that chip, carrying a measurement of the software image the CVM loaded. It then checks that the signature chains back to a root key the chip vendor publishes, and that the measurement matches one we published to an append-only ledger witnessed by an independent third party. If either check fails, the client refuses to connect and no data is sent.

**Private Processing** is Meta's confidential computing infrastructure, built on TEEs with verifiable transparency. On top of the confidentiality and attestation the hardware provides, it adds non-targetability and encrypted storage.

## Private Processing for AI Glasses: Extending the Device Boundary

The more you use an AI assistant, the more useful it gets as it learns your style, preferences and context. Wearable AI assistants will help you in similar ways, including with everyday life. To do that they need to know you and your context. That can include connecting ideas across

days or weeks, and working proactively in the background to get things done for you without requiring rework from you. This would demand compute capabilities beyond what an ergonomic form factor like a pair of glasses can host locally.

That's where Private Processing comes into the picture. Traditional cloud architectures encrypt data in transit and at rest, but must decrypt it in host memory during processing — potentially exposing it to the underlying system while in use. Private Processing helps us solve this problem, ensuring off-device data stays inaccessible to anyone including Meta.

To make this work, we built Private Processing for AI glasses on five engineering requirements, all designed so that we can safely offload intensive AI workloads like streaming transcription, contextual search, and long-term recall:

1. **Hardware Isolation:** User data must be cryptographically unreadable to host operating systems, hypervisors, and Meta in transit, in use, and at rest.
2. **Fail-Closed Guarantees:** An attempt to modify the confidential processing guarantee must either cause the system to fail closed, or become publicly discoverable through verifiable transparency.
3. **Public Verifiability:** Every CVM image running in production is registered to an append-only, publicly witnessed transparency ledger.
4. **Non-Targetability:** An attacker or malicious actor must be incapable of targeting a specific individual's session or storage without attempting to compromise the entire Private Processing System.
5. **Encrypted Storage:** When a product needs to store data for Private Processing to access later, it is encrypted and only accessible with a user-provided key.

We've designed this  multi-regional, fault-tolerant system to handle large amounts of data with high reliability.

Private Processing defends against a specific set of threats. The foundational threat model is documented in the Private Processing whitepaper.

## How Private Processing Works for AI Glasses



### 1. Decoupling Identity (Non-targetable Routing)

Before data even leaves your glasses we have to solve a metadata problem. If we know *who* is sending a request, the operator can possibly route your traffic to a compromised machine. During session establishment, we use anonymous credentials — blind-signed tokens fetched on randomized schedules — so that when your device makes a request, our authentication service cannot tie it back to your account. Next, your device connects to our gateways through a third-party OHTTP relay (Fastly or Cloudflare) to select a TEE node. An incoming request is serviced by a TEE that was selected based on non-user-identifiable heuristics.

### 2. Remote Attestation (Verification)

Before your glasses send any context, they verify our servers. Your device initiates a remote attestation and TLS (RA-TLS) session, demanding a hardware-signed certificate from the server's TEE. Your glasses cross-check the TEE's binary hashes against an independent, public transparency ledger. If the CPU/GPU vendor certificate check fails, or the binary hash does not match the ledger, the handshake fails and your device does not connect.

### 3. Processing (Execution)

Once the server proves it is trustworthy, your device communicates securely over TLS. Our infrastructure routes the encrypted blob, but cannot read it. Inside the TEE, AI models go to work in an isolated environment, where even Meta cannot access your data. If our models need to communicate with other models, the TEEs must attest to over the same strict RA-TLS protocols before transferring the data.

### 4. Stateful Memory (Encrypted Storage)

When a feature requires persistent memory, the output is encrypted with user-provided keys before it ever leaves the TEE. Meta's infrastructure stores the ciphertext. When you need to retrieve a memory later, your device provides the key and the TEE decrypts the data and processes your query.

## Storage Inside the Boundary: Encrypted Storage

The experiences people want from AI on their glasses, like picking up across sessions or recalling a moment from earlier, only work if the system can retain information over time. Building stateful experiences for AI glasses forces an architectural choice. The obvious approach is to encrypt user data on the device and store it in a standard cloud database.

That approach breaks down under scrutiny for two reasons:

1. **Access patterns leak behavior:** Even if the contents of a database are strongly encrypted, an external database still observes when you read and write data, how frequently you query it, and which records are accessed together. That metadata alone maps your daily routine and behavioral patterns. Encryption protects payload content; it does not hide execution patterns.
2. **Remote encrypted queries do not scale:** Running complex operations like semantic vector search or multi-session joins over traditional encrypted storage requires pulling massive ciphertext payloads out of the database, transferring them across the network into a secure TEE, and decrypting them just to run a single query. As a user's context grows, latency spikes and performance collapses.

To solve both problems, we built the storage engine directly inside the TEE. We have extended the trust boundary so that data isn't just processed confidentially; it is stored confidentially. Your data remains encrypted. It is accessible only from within the TEE across CPUs and GPUs; ready to be recalled by you, and completely inaccessible to anyone else – including Meta.

Instead of treating the cloud as a distant database, stateful Private Processing on demand co-locates execution and state inside processor-encrypted memory. Query engines run directly within the TEE boundary. Read Write transactions are fast because reads never cross an external network boundary.

### Debugging in the Dark: Operational Observability

When you build an infrastructure that cryptographically locks out operators, you create a fundamental operational challenge: How do you maintain a high-availability system when engineers are unable to look inside?

Standard engineering diagnostics are useless inside a TEE:

- Engineers cannot attach a debugger to a running TEE.
- Systems cannot dump memory stacks or log model inputs and outputs during a crash.
- Teams cannot inspect the specific payload that triggered an operational fault.

Operational visibility must be achieved entirely out-of-band. We architected our observability layer to rely on aggregate health signals — CPU utilization, memory allocation, network latency, and aggregate hardware failure rates. These signals give us the telemetry required to maintain service health and uptime without ever exposing a single byte of user data.

### Verifiable Transparency

Security claims are meaningless if they depend on trusting the provider. Private Processing is designed so that every architectural guarantee we make can be verified independently by external researchers.

#### Binary Transparency via Public Ledgers

Every CVM image deployed in production is registered to an append-only, publicly-witnessed transparency ledger. If we ever attempted to deploy code that differed from what was published, client devices and external monitors would be able to discover the mismatch. What that establishes is tamper-evidence. Because every deployed image is recorded, we cannot substitute different binary without the change being visible in a record we do not control. Binary access is what lets a researcher go further and confirm that a recorded image behaves as we describe.

The ledger and the measurements it records are publicly visible. The corresponding binaries are available to researchers in our security program under agreement.

#### Third Party Validation

This design assumes an adversarial environment inside our own data centers. Traditional cloud security draws its boundary at the edge: It protects servers from the outside world while trusting the hypervisor, the host operating system, and the administrators who run them. Private Processing moves that boundary inward and puts all three outside it.

To validate this stance, we don't rely solely on internal reviews. We actively partner with independent security firms (like NCC Group) and researchers to audit our architectural design, review our attestation logic and probe the boundaries of our isolation model.

#### Meta's Bug Bounty Program: External Auditing and Research

Transparency requires open avenues for validation. To enable further independent security research into Private Processing's design and implementation, we are expanding our [Bug Bounty program] to explicitly cover Private Processing on AI glasses. We'll be providing

external researchers with the tools, CVM binaries, and documentation needed to audit our implementation, test our attestation chains, and hold our platform accountable.

### Private Processing for an Agentic Future

To date, Private Processing has focused on discrete tasks, like summarizing a message. But the future of AI is agentic and multimodal. In the future, your glasses will have the capacity to take actions on your behalf across different sessions, in a range of real-world contexts. As we work towards launching the kinds of experiences that will help you throughout your day, Private Processing will serve as our foundation.

AI on glasses is going to become increasingly stateful, multimodal, and agentic, which means that the trust boundaries also become more complex. An agent holding a sensitive state requires strict isolation, verifiable data provenance, and inter-CVM communication. Our Private Processing infrastructure is the foundation for that future. AI capabilities will grow, but the security and privacy boundary will remain intact.

---




◂ **Prev**
Open-Sourcing Rebalancer: A Generic, High-Performance Library for Solving Assignment Problems

---

## Read More in Security & Privacy

View All ▸



SEP 2, 2026

An Organizational Second Brain: Building an AI That Learns From Experts




AUG 12, 2026

How We're Building Scam Alert on WhatsApp With End-to-End Encryption and Verifiability Guarantees



JUN 25, 2026

Privacy-Aware Infrastructure in the AI-Native Era: An Asset Classification Case Study



MAY 11, 2026

Labyrinth 1.1: Making End-to-End Encrypted Backups Even More Reliable



MAY 1, 2026

How Meta Is Strengthening End-to-End Encrypted Backups



APR 16, 2026

Post-Quantum Cryptography Migration at Meta: Framework, Lessons, and Takeaways

## Related Posts




Apr 29, 2025

Building Private Processing for AI tools on WhatsApp




Mar 09, 2026

How Advanced Browsing Protection Works in Messenger



Jun 23, 2026

How Meta Engineered Ultra-Narrow Batteries for AI Glasses

## Related Positions

Software Engineer - Host Networking
BELLEVUE, US

Software Engineer - Host Networking
MENLO PARK, US

Software Engineer - Host Networking
NEW YORK, US

Director of Engineering
BELLEVUE, US

Director of Engineering
MENLO PARK, US

See All Jobs

## Available Positions

Software Engineer - Host Networking
BELLEVUE, US
Software Engineer - Host Networking
MENLO PARK, US
Software Engineer - Host Networking
NEW YORK, US
Director of Engineering
BELLEVUE, US
Director of Engineering
MENLO PARK, US

See All Jobs

## Technology at Meta

Engineering at Meta - X

Follow

AI at Meta

Read

Meta Quest Blog

Read

## Open Source

Meta believes in building community through open source technology. Explore our latest projects in Artificial Intelligence, Data Infrastructure, Development Tools, Front End, Languages, Platforms, Security, Virtual Reality, and more.

ANDROID

iOS

WEB

Meta for Developers

Read

Meta Bug Bounty

Learn more

RSS

Subscribe

BACKEND

HARDWARE

Learn More

Meta

Engineering at Meta is a technical news resource for engineers interested in how we solve large-scale technical challenges at Meta.

Home

Company Info

Careers

© 2026 Meta

TermsPrivacyCookiesHelp

US 20260238876A1

(19) United States
(12) Patent Application Publication
Huang et al.
(10) Pub. No.: US 2026/0238876 A1
(43) Pub. Date: Aug. 13, 2026

(54) SMART CAMERAS ENABLED BY ASSISTANT SYSTEMS

(71) Applicant: **Meta Platforms Technologies, LLC**, Menlo Park, CA (US)

(72) Inventors: **Lisa Xiaoyi Huang**, Mountain View, CA (US); **Eric Xiao**, Berkeley, CA (US); **Nicholas Michael Andrew Benson**, Redmond, WA (US); **Yating Sheng**, San Francisco, CA (US); **Zijian He**, Palo Alto, CA (US)

(21) Appl. No.: **19/530,299**

(22) Filed: **Feb. 4, 2026**

**Related U.S. Application Data**

(63) Continuation of application No. 17/688,662, filed on Mar. 7, 2022, now Pat. No. 12,574,627, which is a continuation of application No. 16/659,363, filed on Oct. 21, 2019, now Pat. No. 11,308,284.

(60) Provisional application No. 62/923,342, filed on Oct. 18, 2019.

**Publication Classification**

(51) **Int. Cl.**

| | |
|---|---|
| ***H04N 23/611*** | (2023.01) |
| ***G06F 9/451*** | (2018.01) |
| ***G06V 20/30*** | (2022.01) |
| ***G06V 20/52*** | (2022.01) |
| ***G06V 40/16*** | (2022.01) |
| ***G06V 40/18*** | (2022.01) |
| ***G06V 40/20*** | (2022.01) |
| ***H04L 67/306*** | (2022.01) |
| ***H04N 1/00*** | (2006.01) |
| ***H04N 5/76*** | (2006.01) |
| ***H04N 9/82*** | (2006.01) |
| ***H04N 21/414*** | (2011.01) |
| ***H04N 21/4223*** | (2011.01) |
| ***H04N 21/439*** | (2011.01) |
| ***H04N 21/44*** | (2011.01) |
| ***H04N 21/4788*** | (2011.01) |
| ***H04N 21/8549*** | (2011.01) |
| ***H04N 23/60*** | (2023.01) |
| ***H04N 23/617*** | (2023.01) |
| ***H04N 23/66*** | (2023.01) |
| ***H04N 23/69*** | (2023.01) |

(52) **U.S. Cl.**

CPC .......... ***H04N 23/611*** (2023.01); ***G06F 9/453*** (2018.02); ***G06V 20/30*** (2022.01); ***G06V 20/52*** (2022.01); ***G06V 40/172*** (2022.01); ***G06V 40/174*** (2022.01); ***G06V 40/18*** (2022.01); ***G06V 40/20*** (2022.01); ***H04N 5/76*** (2013.01); ***H04N 21/41407*** (2013.01); ***H04N 21/4223*** (2013.01); ***H04N 21/4394*** (2013.01); ***H04N 21/44008*** (2013.01); ***H04N 21/4788*** (2013.01); ***H04N 21/8549*** (2013.01); ***H04N 23/617*** (2023.01); ***H04N 23/64*** (2023.01); ***H04N 23/66*** (2023.01); ***H04N 23/69*** (2023.01); *H04L 67/306* (2013.01); *H04N 1/00151* (2013.01); *H04N 1/00159* (2013.01); *H04N 9/8205* (2013.01)

(57) **ABSTRACT**

In one embodiment, a method includes accessing sensory data captured by cameras, identifying people in a field of view of the cameras based on facial recognition of the sensory data, detecting actions of one or more of the people based on the sensory data, generating media files with each being associated with one or more of a recording of at least one of the people or at least one of the determined actions, and sending instructions for presenting one or more of the media files to a client system.



# SMART CAMERAS ENABLED BY ASSISTANT SYSTEMS

## PRIORITY

**[0001]** This application is a continuation of U.S. patent application Ser. No. 17/688,662, filed on Mar. 7, 2022, which is a continuation of U.S. patent application Ser. No. 16/659,363, filed on Oct. 21, 2019, now U.S. Pat. No. 11,308,284, which claims priority to U.S. Provisional Patent Application No. 62/923,342, filed on Oct. 18, 2019, each of which is incorporated herein by reference.

## TECHNICAL FIELD

**[0002]** This disclosure generally relates to databases and file management within network environments, and in particular relates to hardware and software for smart assistant systems.

## BACKGROUND

**[0003]** An assistant system can provide information or services on behalf of a user based on a combination of user input, location awareness, and the ability to access information from a variety of online sources (such as weather conditions, traffic congestion, news, stock prices, user schedules, retail prices, etc.). The user input may include text (e.g., online chat), especially in an instant messaging application or other applications, voice, images, motion, or a combination of them. The assistant system may perform concierge-type services (e.g., making dinner reservations, purchasing event tickets, making travel arrangements) or provide information based on the user input. The assistant system may also perform management or data-handling tasks based on online information and events without user initiation or interaction. Examples of those tasks that may be performed by an assistant system may include schedule management (e.g., sending an alert to a dinner date that a user is running late due to traffic conditions, update schedules for both parties, and change the restaurant reservation time). The assistant system may be enabled by the combination of computing devices, application programming interfaces (APIs), and the proliferation of applications on user devices.

**[0004]** A social-networking system, which may include a social-networking website, may enable its users (such as persons or organizations) to interact with it and with each other through it. The social-networking system may, with input from a user, create and store in the social-networking system a user profile associated with the user. The user profile may include demographic information, communication-channel information, and information on personal interests of the user. The social-networking system may also, with input from a user, create and store a record of relationships of the user with other users of the social-networking system, as well as provide services (e.g. profile/news feed posts, photo-sharing, event organization, messaging, games, or advertisements) to facilitate social interaction between or among users.

**[0005]** The social-networking system may send over one or more networks content or messages related to its services to a mobile or other computing device of a user. A user may also install software applications on a mobile or other computing device of the user for accessing a user profile of the user and other data within the social-networking system. The social-networking system may generate a personalized set of content objects to display to a user, such as a newsfeed of aggregated stories of other users connected to the user.

## SUMMARY OF PARTICULAR EMBODIMENTS

**[0006]** In particular embodiments, the assistant system may assist a user to obtain information or services. The assistant system may enable the user to interact with it with multi-modal user input (such as voice, text, image, video, motion) in stateful and multi-turn conversations to get assistance. As an example and not by way of limitation, the assistant system may support both audio (verbal) input and nonverbal input, such as vision, location, gesture, motion, or hybrid/multi-modal input. The assistant system may create and store a user profile comprising both personal and contextual information associated with the user. In particular embodiments, the assistant system may analyze the user input using natural-language understanding. The analysis may be based on the user profile of the user for more personalized and context-aware understanding. The assistant system may resolve entities associated with the user input based on the analysis. In particular embodiments, the assistant system may interact with different agents to obtain information or services that are associated with the resolved entities. The assistant system may generate a response for the user regarding the information or services by using natural-language generation. Through the interaction with the user, the assistant system may use dialog-management techniques to manage and advance the conversation flow with the user. In particular embodiments, the assistant system may further assist the user to effectively and efficiently digest the obtained information by summarizing the information. The assistant system may also assist the user to be more engaging with an online social network by providing tools that help the user interact with the online social network (e.g., creating posts, comments, messages). The assistant system may additionally assist the user to manage different tasks such as keeping track of events. In particular embodiments, the assistant system may proactively execute, without a user input, tasks that are relevant to user interests and preferences based on the user profile, at a time relevant for the user. In particular embodiments, the assistant system may check privacy settings to ensure that accessing a user's profile or other user information and executing different tasks are permitted subject to the user's privacy settings.

**[0007]** In particular embodiments, the assistant system may assist user via a hybrid architecture built upon both client-side process and server-side process. The client-side process and the server-side process may be two parallel workflows for processing a user input and providing assistance to the user. In particular embodiments, the client-side process may be performed locally on a client system associated with a user. By contrast, the server-side process may be performed remotely on one or more computing systems. In particular embodiments, an arbitrator on the client system may coordinate receiving user input (e.g., audio signal), determining whether to use client-side process or server-side process or both to respond to the user input, and analyzing the processing results from each process. The arbitrator may instruct agents on the client-side or server-side to execute tasks associated with the user input based on the aforementioned analyses. The execution results may be further rendered as output to the client system. By leveraging both client-side and server-side processes, the assistant system

can effectively assist a user with optimal usage of computing resources while at the same time protecting user privacy and enhancing security.

**[0008]** In particular embodiments, the assistant system may improve the user experience with the assistant system by providing the user with handsfree picture/video capturing, sharing, and memory recall when using an assistant-powered camera-enabled client system (e.g., smart phone with camera, AR/VR glasses, smart display). The assistant system may have the additional functionality of object/people recognition, determination of points of interest, and highlight generation. The assistant system may assist a user both reactively and proactively. In reactive scenarios, there may be an explicit command or prompt (e.g., "take a picture") from the user via the client system to the assistant system. The assistant system may then translate that to a machine-standard intent and execute an associated task via the camera-enabled client system to serve the user. In proactive scenarios, the assistant system itself may determine that there is a potentially interesting action it can take via the camera-enabled client system on behalf of the user based on the signals it is receiving via the client system, such as an eye gaze from the user of AR glasses. Although this disclosure describes assisting users in particular camera-based tasks by particular systems in a particular manner, this disclosure contemplates assisting users in any suitable camera-based task by any suitable system in any suitable manner.

**[0009]** In particular embodiments, the assistant system may receive, from a client system associated with a user, a user input from the user. The client system may comprise one or more cameras. In particular embodiments, the assistant system may then determine, based on one or more machine-learning models and sensory data captured by the one or more cameras, one or more points of interest in a field of view of the one or more cameras. The assistant system may then generate, based on the one or more points of interest, a plurality of media files, wherein each media file is a recording of at least one of the one or more points of interest. In particular embodiments, the assistant system may then generate, based on the plurality of media files, one or more highlight files. Each highlight file may comprise a media file that satisfies a predefined quality standard. In particular embodiments, the assistant system may further send, to the client system, instructions for presenting the one or more highlight files.

**[0010]** Certain technical challenges exist for enabling smart cameras by the assistant system. One technical challenge may include accurately determining points of interest. The solutions presented by the embodiments disclosed herein to address the above challenge may be analyzing sensory data captured by client systems using different machine-learning algorithms and determining interestingness based on the analysis, which may result in more accurate determinations of points of interest since the machine-learning algorithms help localize the user's interest in a field of view and the interestingness further refines such determination of interest. Another technical challenge may include generating highlight files that are meaningful and interesting to a user. The solution presented by the embodiments disclosed herein to address this challenge may be personalizing highlight files based on user profile data, user preferences, prior user inputs, and user relationship data, which all provide particular insights regarding what would be meaningful and interesting to the user when the user reviews the moments captured by the assistant system.

**[0011]** Certain embodiments disclosed herein may provide one or more technical advantages. A technical advantage of the embodiments may include assisting a user to capture interesting and meaningful moments conveniently with high quality as the assistant system may enable to user to use various inputs and apply different calibrations and processing algorithms to make sure the media files corresponding to these moments are of high quality. Another technical advantage of the embodiments may include assisting a user to connect currently captured moments with the user's memories so that the user may better appreciate them since the assistant system may perform memory recall to retrieve media files that are relevant to currently captured moments. Certain embodiments disclosed herein may provide none, some, or all of the above technical advantages. One or more other technical advantages may be readily apparent to one skilled in the art in view of the figures, descriptions, and claims of the present disclosure.

**[0012]** The embodiments disclosed herein are only examples, and the scope of this disclosure is not limited to them. Particular embodiments may include all, some, or none of the components, elements, features, functions, operations, or steps of the embodiments disclosed herein. Embodiments according to the invention are in particular disclosed in the attached claims directed to a method, a storage medium, a system and a computer program product, wherein any feature mentioned in one claim category, e.g. method, can be claimed in another claim category, e.g. system, as well. The dependencies or references back in the attached claims are chosen for formal reasons only. However any subject matter resulting from a deliberate reference back to any previous claims (in particular multiple dependencies) can be claimed as well, so that any combination of claims and the features thereof are disclosed and can be claimed regardless of the dependencies chosen in the attached claims. The subject-matter which can be claimed comprises not only the combinations of features as set out in the attached claims but also any other combination of features in the claims, wherein each feature mentioned in the claims can be combined with any other feature or combination of other features in the claims. Furthermore, any of the embodiments and features described or depicted herein can be claimed in a separate claim and/or in any combination with any embodiment or feature described or depicted herein or with any of the features of the attached claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

**[0013]** FIG. **1** illustrates an example network environment associated with an assistant system.

**[0014]** FIG. **2** illustrates an example architecture of the assistant system.

**[0015]** FIG. **3** illustrates an example diagram flow of server-side processes of the assistant system.

**[0016]** FIG. **4** illustrates an example diagram flow of processing a user input by the assistant system.

**[0017]** FIG. **5**A illustrates an example scenario where a user may be assisted by smart cameras.

**[0018]** FIG. **5**B illustrates an example determination of a point of interest.

**[0019]** FIG. **5**C illustrates another example determination of a point of interest.

**[0020]** FIG. **5**D illustrates example highlight files.

**[0021]** FIG. **6** illustrates an example method for enabling smart cameras by the assistant system.

**[0022]** FIG. **7** illustrates an example social graph.

**[0023]** FIG. **8** illustrates an example view of an embedding space.

**[0024]** FIG. **9** illustrates an example artificial neural network.

**[0025]** FIG. **10** illustrates an example computer system.

## DESCRIPTION OF EXAMPLE EMBODIMENTS

### System Overview

**[0026]** FIG. **1** illustrates an example network environment **100** associated with an assistant system. Network environment **100** includes a client system **130**, an assistant system **140**, a social-networking system **160**, and a third-party system **170** connected to each other by a network **110**. Although FIG. **1** illustrates a particular arrangement of a client system **130**, an assistant system **140**, a social-networking system **160**, a third-party system **170**, and a network **110**, this disclosure contemplates any suitable arrangement of a client system **130**, an assistant system **140**, a social-networking system **160**, a third-party system **170**, and a network **110**. As an example and not by way of limitation, two or more of a client system **130**, a social-networking system **160**, an assistant system **140**, and a third-party system **170** may be connected to each other directly, bypassing a network **110**. As another example, two or more of a client system **130**, an assistant system **140**, a social-networking system **160**, and a third-party system **170** may be physically or logically co-located with each other in whole or in part. Moreover, although FIG. **1** illustrates a particular number of client systems **130**, assistant systems **140**, social-networking systems **160**, third-party systems **170**, and networks **110**, this disclosure contemplates any suitable number of client systems **130**, assistant systems **140**, social-networking systems **160**, third-party systems **170**, and networks **110**. As an example and not by way of limitation, network environment **100** may include multiple client systems **130**, assistant systems **140**, social-networking systems **160**, third-party systems **170**, and networks **110**.

**[0027]** This disclosure contemplates any suitable network **110**. As an example and not by way of limitation, one or more portions of a network **110** may include an ad hoc network, an intranet, an extranet, a virtual private network (VPN), a local area network (LAN), a wireless LAN (WLAN), a wide area network (WAN), a wireless WAN (WWAN), a metropolitan area network (MAN), a portion of the Internet, a portion of the Public Switched Telephone Network (PSTN), a cellular telephone network, or a combination of two or more of these. A network **110** may include one or more networks **110**.

**[0028]** Links **150** may connect a client system **130**, an assistant system **140**, a social-networking system **160**, and a third-party system **170** to a communication network **110** or to each other. This disclosure contemplates any suitable links **150**. In particular embodiments, one or more links **150** include one or more wireline (such as for example Digital Subscriber Line (DSL) or Data Over Cable Service Interface Specification (DOCSIS)), wireless (such as for example Wi-Fi or Worldwide Interoperability for Microwave Access (WiMAX)), or optical (such as for example Synchronous Optical Network (SONET) or Synchronous Digital Hierarchy (SDH)) links. In particular embodiments, one or more links **150** each include an ad hoc network, an intranet, an extranet, a VPN, a LAN, a WLAN, a WAN, a WWAN, a MAN, a portion of the Internet, a portion of the PSTN, a cellular technology-based network, a satellite communications technology-based network, another link **150**, or a combination of two or more such links **150**. Links **150** need not necessarily be the same throughout a network environment **100**. One or more first links **150** may differ in one or more respects from one or more second links **150**.

**[0029]** In particular embodiments, a client system **130** may be an electronic device including hardware, software, or embedded logic components or a combination of two or more such components and capable of carrying out the appropriate functionalities implemented or supported by a client system **130**. As an example and not by way of limitation, a client system **130** may include a computer system such as a desktop computer, notebook or laptop computer, netbook, a tablet computer, e-book reader, GPS device, camera, personal digital assistant (PDA), handheld electronic device, cellular telephone, smartphone, smart speaker, virtual reality (VR) headset, augment reality (AR) smart glasses, other suitable electronic device, or any suitable combination thereof. In particular embodiments, the client system **130** may be a smart assistant device. More information on smart assistant devices may be found in U.S. patent application Ser. No. 15/949,011, filed 9 Apr. 2018, U.S. patent application Ser. No. 16/153,574, filed 5 Oct. 2018, U.S. Design patent application Ser. No. 29/631,910, filed 3 Jan. 2018, U.S. Design patent application Ser. No. 29/631,747, filed 2 Jan. 2018, U.S. Design patent application Ser. No. 29/631,913, filed 3 Jan. 2018, and U.S. Design patent application Ser. No. 29/631,914, filed 3 Jan. 2018, each of which is incorporated by reference. This disclosure contemplates any suitable client systems **130**. A client system **130** may enable a network user at a client system **130** to access a network **110**. A client system **130** may enable its user to communicate with other users at other client systems **130**.

**[0030]** In particular embodiments, a client system **130** may include a web browser **132**, and may have one or more add-ons, plug-ins, or other extensions. A user at a client system **130** may enter a Uniform Resource Locator (URL) or other address directing a web browser **132** to a particular server (such as server **162**, or a server associated with a third-party system **170**), and the web browser **132** may generate a Hyper Text Transfer Protocol (HTTP) request and communicate the HTTP request to server. The server may accept the HTTP request and communicate to a client system **130** one or more Hyper Text Markup Language (HTML) files responsive to the HTTP request. The client system **130** may render a web interface (e.g. a webpage) based on the HTML files from the server for presentation to the user. This disclosure contemplates any suitable source files. As an example and not by way of limitation, a web interface may be rendered from HTML files, Extensible Hyper Text Markup Language (XHTML) files, or Extensible Markup Language (XML) files, according to particular needs. Such interfaces may also execute scripts, combinations of markup language and scripts, and the like. Herein, reference to a web interface encompasses one or more corresponding source files (which a browser may use to render the web interface) and vice versa, where appropriate.

**[0031]** In particular embodiments, a client system **130** may include a social-networking application **134** installed

on the client system **130**. A user at a client system **130** may use the social-networking application **134** to access on online social network. The user at the client system **130** may use the social-networking application **134** to communicate with the user's social connections (e.g., friends, followers, followed accounts, contacts, etc.). The user at the client system **130** may also use the social-networking application **134** to interact with a plurality of content objects (e.g., posts, news articles, ephemeral content, etc.) on the online social network. As an example and not by way of limitation, the user may browse trending topics and breaking news using the social-networking application **134**.

**[0032]** In particular embodiments, a client system **130** may include an assistant application **136**. A user at a client system **130** may use the assistant application **136** to interact with the assistant system **140**. In particular embodiments, the assistant application **136** may comprise a stand-alone application. In particular embodiments, the assistant application **136** may be integrated into the social-networking application **134** or another suitable application (e.g., a messaging application). In particular embodiments, the assistant application **136** may be also integrated into the client system **130**, an assistant hardware device, or any other suitable hardware devices. In particular embodiments, the assistant application **136** may be accessed via the web browser **132**. In particular embodiments, the user may provide input via different modalities. As an example and not by way of limitation, the modalities may include audio, text, image, video, motion, orientation, etc. The assistant application **136** may communicate the user input to the assistant system **140**. Based on the user input, the assistant system **140** may generate responses. The assistant system **140** may send the generated responses to the assistant application **136**. The assistant application **136** may then present the responses to the user at the client system **130**. The presented responses may be based on different modalities such as audio, text, image, and video. As an example and not by way of limitation, the user may verbally ask the assistant application **136** about the traffic information (i.e., via an audio modality) by speaking into a microphone of the client system **130**. The assistant application **136** may then communicate the request to the assistant system **140**. The assistant system **140** may accordingly generate a response and send it back to the assistant application **136**. The assistant application **136** may further present the response to the user in text and/or images on a display of the client system **130**.

**[0033]** In particular embodiments, an assistant system **140** may assist users to retrieve information from different sources. The assistant system **140** may also assist user to request services from different service providers. In particular embodiments, the assist system **140** may receive a user request for information or services via the assistant application **136** in the client system **130**. The assist system **140** may use natural-language understanding to analyze the user request based on user's profile and other relevant information. The result of the analysis may comprise different entities associated with an online social network. The assistant system **140** may then retrieve information or request services associated with these entities. In particular embodiments, the assistant system **140** may interact with the social-networking system **160** and/or third-party system **170** when retrieving information or requesting services for the user. In particular embodiments, the assistant system **140** may generate a personalized communication content for the user using natural-language generating techniques. The personalized communication content may comprise, for example, the retrieved information or the status of the requested services. In particular embodiments, the assistant system **140** may enable the user to interact with it regarding the information or services in a stateful and multi-turn conversation by using dialog-management techniques. The functionality of the assistant system **140** is described in more detail in the discussion of FIG. **2** below.

**[0034]** In particular embodiments, the social-networking system **160** may be a network-addressable computing system that can host an online social network. The social-networking system **160** may generate, store, receive, and send social-networking data, such as, for example, user profile data, concept-profile data, social-graph information, or other suitable data related to the online social network. The social-networking system **160** may be accessed by the other components of network environment **100** either directly or via a network **110**. As an example and not by way of limitation, a client system **130** may access the social-networking system **160** using a web browser **132**, or a native application associated with the social-networking system **160** (e.g., a mobile social-networking application, a messaging application, another suitable application, or any combination thereof) either directly or via a network **110**. In particular embodiments, the social-networking system **160** may include one or more servers **162**. Each server **162** may be a unitary server or a distributed server spanning multiple computers or multiple datacenters. Servers **162** may be of various types, such as, for example and without limitation, web server, news server, mail server, message server, advertising server, file server, application server, exchange server, database server, proxy server, another server suitable for performing functions or processes described herein, or any combination thereof. In particular embodiments, each server **162** may include hardware, software, or embedded logic components or a combination of two or more such components for carrying out the appropriate functionalities implemented or supported by server **162**. In particular embodiments, the social-networking system **160** may include one or more data stores **164**. Data stores **164** may be used to store various types of information. In particular embodiments, the information stored in data stores **164** may be organized according to specific data structures. In particular embodiments, each data store **164** may be a relational, columnar, correlation, or other suitable database. Although this disclosure describes or illustrates particular types of databases, this disclosure contemplates any suitable types of databases. Particular embodiments may provide interfaces that enable a client system **130**, a social-networking system **160**, an assistant system **140**, or a third-party system **170** to manage, retrieve, modify, add, or delete, the information stored in data store **164**.

**[0035]** In particular embodiments, the social-networking system **160** may store one or more social graphs in one or more data stores **164**. In particular embodiments, a social graph may include multiple nodes—which may include multiple user nodes (each corresponding to a particular user) or multiple concept nodes (each corresponding to a particular concept)—and multiple edges connecting the nodes. The social-networking system **160** may provide users of the online social network the ability to communicate and interact with other users. In particular embodiments, users may

join the online social network via the social-networking system **160** and then add connections (e.g., relationships) to a number of other users of the social-networking system **160** whom they want to be connected to. Herein, the term "friend" may refer to any other user of the social-networking system **160** with whom a user has formed a connection, association, or relationship via the social-networking system **160**.

**[0036]** In particular embodiments, the social-networking system **160** may provide users with the ability to take actions on various types of items or objects, supported by the social-networking system **160**. As an example and not by way of limitation, the items and objects may include groups or social networks to which users of the social-networking system **160** may belong, events or calendar entries in which a user might be interested, computer-based applications that a user may use, transactions that allow users to buy or sell items via the service, interactions with advertisements that a user may perform, or other suitable items or objects. A user may interact with anything that is capable of being represented in the social-networking system **160** or by an external system of a third-party system **170**, which is separate from the social-networking system **160** and coupled to the social-networking system **160** via a network **110**.

**[0037]** In particular embodiments, the social-networking system **160** may be capable of linking a variety of entities. As an example and not by way of limitation, the social-networking system **160** may enable users to interact with each other as well as receive content from third-party systems **170** or other entities, or to allow users to interact with these entities through an application programming interfaces (API) or other communication channels.

**[0038]** In particular embodiments, a third-party system **170** may include one or more types of servers, one or more data stores, one or more interfaces, including but not limited to APIs, one or more web services, one or more content sources, one or more networks, or any other suitable components, e.g., that servers may communicate with. A third-party system **170** may be operated by a different entity from an entity operating the social-networking system **160**. In particular embodiments, however, the social-networking system **160** and third-party systems **170** may operate in conjunction with each other to provide social-networking services to users of the social-networking system **160** or third-party systems **170**. In this sense, the social-networking system **160** may provide a platform, or backbone, which other systems, such as third-party systems **170**, may use to provide social-networking services and functionality to users across the Internet.

**[0039]** In particular embodiments, a third-party system **170** may include a third-party content object provider. A third-party content object provider may include one or more sources of content objects, which may be communicated to a client system **130**. As an example and not by way of limitation, content objects may include information regarding things or activities of interest to the user, such as, for example, movie show times, movie reviews, restaurant reviews, restaurant menus, product information and reviews, or other suitable information. As another example and not by way of limitation, content objects may include incentive content objects, such as coupons, discount tickets, gift certificates, or other suitable incentive objects. In particular embodiments, a third-party content provider may use one or more third-party agents to provide content objects and/or services. A third-party agent may be an implementation that is hosted and executing on the third-party system **170**.

**[0040]** In particular embodiments, the social-networking system **160** also includes user-generated content objects, which may enhance a user's interactions with the social-networking system **160**. User-generated content may include anything a user can add, upload, send, or "post" to the social-networking system **160**. As an example and not by way of limitation, a user communicates posts to the social-networking system **160** from a client system **130**. Posts may include data such as status updates or other textual data, location information, photos, videos, links, music or other similar data or media. Content may also be added to the social-networking system **160** by a third-party through a "communication channel," such as a newsfeed or stream.

**[0041]** In particular embodiments, the social-networking system **160** may include a variety of servers, sub-systems, programs, modules, logs, and data stores. In particular embodiments, the social-networking system **160** may include one or more of the following: a web server, action logger, API-request server, relevance-and-ranking engine, content-object classifier, notification controller, action log, third-party-content-object-exposure log, inference module, authorization/privacy server, search module, advertisement-targeting module, user-interface module, user-profile store, connection store, third-party content store, or location store. The social-networking system **160** may also include suitable components such as network interfaces, security mechanisms, load balancers, failover servers, management-and-network-operations consoles, other suitable components, or any suitable combination thereof. In particular embodiments, the social-networking system **160** may include one or more user-profile stores for storing user profiles. A user profile may include, for example, biographic information, demographic information, behavioral information, social information, or other types of descriptive information, such as work experience, educational history, hobbies or preferences, interests, affinities, or location. Interest information may include interests related to one or more categories. Categories may be general or specific. As an example and not by way of limitation, if a user "likes" an article about a brand of shoes the category may be the brand, or the general category of "shoes" or "clothing." A connection store may be used for storing connection information about users. The connection information may indicate users who have similar or common work experience, group memberships, hobbies, educational history, or are in any way related or share common attributes. The connection information may also include user-defined connections between different users and content (both internal and external). A web server may be used for linking the social-networking system **160** to one or more client systems **130** or one or more third-party systems **170** via a network **110**. The web server may include a mail server or other messaging functionality for receiving and routing messages between the social-networking system **160** and one or more client systems **130**. An API-request server may allow, for example, an assistant system **140** or a third-party system **170** to access information from the social-networking system **160** by calling one or more APIs. An action logger may be used to receive communications from a web server about a user's actions on or off the social-networking system **160**. In conjunction with the action log, a third-party-content-object log may be maintained of user exposures to third-party-content objects. A

notification controller may provide information regarding content objects to a client system **130**. Information may be pushed to a client system **130** as notifications, or information may be pulled from a client system **130** responsive to a request received from a client system **130**. Authorization servers may be used to enforce one or more privacy settings of the users of the social-networking system **160**. A privacy setting of a user determines how particular information associated with a user can be shared. The authorization server may allow users to opt in to or opt out of having their actions logged by the social-networking system **160** or shared with other systems (e.g., a third-party system **170**), such as, for example, by setting appropriate privacy settings. Third-party-content-object stores may be used to store content objects received from third parties, such as a third-party system **170**. Location stores may be used for storing location information received from client systems **130** associated with users. Advertisement-pricing modules may combine social information, the current time, location information, or other suitable information to provide relevant advertisements, in the form of notifications, to a user.

Assistant Systems

**[0042]** FIG. **2** illustrates an example architecture of an assistant system **140**. In particular embodiments, the assistant system **140** may assist a user to obtain information or services. The assistant system **140** may enable the user to interact with it with multi-modal user input (such as voice, text, image, video, motion) in stateful and multi-turn conversations to get assistance. As an example and not by way of limitation, the assistant system **140** may support both audio input (verbal) and nonverbal input, such as vision, location, gesture, motion, or hybrid/multi-modal input. The assistant system **140** may create and store a user profile comprising both personal and contextual information associated with the user. In particular embodiments, the assistant system **140** may analyze the user input using natural-language understanding. The analysis may be based on the user profile of the user for more personalized and context-aware understanding. The assistant system **140** may resolve entities associated with the user input based on the analysis. In particular embodiments, the assistant system **140** may interact with different agents to obtain information or services that are associated with the resolved entities. The assistant system **140** may generate a response for the user regarding the information or services by using natural-language generation. Through the interaction with the user, the assistant system **140** may use dialog management techniques to manage and forward the conversation flow with the user. In particular embodiments, the assistant system **140** may further assist the user to effectively and efficiently digest the obtained information by summarizing the information. The assistant system **140** may also assist the user to be more engaging with an online social network by providing tools that help the user interact with the online social network (e.g., creating posts, comments, messages). The assistant system **140** may additionally assist the user to manage different tasks such as keeping track of events. In particular embodiments, the assistant system **140** may proactively execute, without a user input, pre-authorized tasks that are relevant to user interests and preferences based on the user profile, at a time relevant for the user. In particular embodiments, the assistant system **140** may check privacy settings to ensure that accessing a user's profile or other user information and executing different tasks are permitted subject to the user's privacy settings. More information on assisting users subject to privacy settings may be found in U.S. patent application Ser. No. 16/182,542, filed 6 Nov. 2018, which is incorporated by reference.

**[0043]** In particular embodiments, the assistant system **140** may assist user via a hybrid architecture built upon both client-side process and server-side process. The client-side process and the server-side process may be two parallel workflows for processing a user input and providing assistances to the user. In particular embodiments, the client-side process may be performed locally on a client system **130** associated with a user. By contrast, the server-side process may be performed remotely on one or more computing systems. In particular embodiments, an assistant orchestrator on the client system **130** may coordinate receiving user input (e.g., audio signal) and determining whether to use client-side process or server-side process or both to respond to the user input. A dialog arbitrator may analyze the processing results from each process. The dialog arbitrator may instruct agents on the client-side or server-side to execute tasks associated with the user input based on the aforementioned analyses. The execution results may be further rendered as output to the client system **130**. By leveraging both client-side and server-side processes, the assistant system **140** can effectively assist a user with optimal usage of computing resources while at the same time protecting user privacy and enhancing security.

**[0044]** In particular embodiments, the assistant system **140** may receive a user input from a client system **130** associated with the user. In particular embodiments, the user input may be a user-generated input that is sent to the assistant system **140** in a single turn. The user input may be verbal, nonverbal, or a combination thereof. As an example and not by way of limitation, the nonverbal user input may be based on the user's voice, vision, location, activity, gesture, motion, or a combination thereof. If the user input is based on the user's voice (e.g., the user may speak to the client system **130**), such user input may be first processed by a system audio API **202** (application programming interface). The system audio API **202** may conduct echo cancellation, noise removal, beam forming, and self-user voice activation, speaker identification, voice activity detection (VAD), and any other acoustic techniques to generate audio data that is readily processable by the assistant system **140**. In particular embodiments, the system audio API **202** may perform wake-word detection **204** from the user input. As an example and not by way of limitation, a wake-word may be "hey assistant". If such wake-word is detected, the assistant system **140** may be activated accordingly. In alternative embodiments, the user may activate the assistant system **140** via a visual signal without a wake-word. The visual signal may be received at a low-power sensor (e.g., a camera) that can detect various visual signals. As an example and not by way of limitation, the visual signal may be a barcode, a QR code or a universal product code (UPC) detected by the client system **130**. As another example and not by way of limitation, the visual signal may be the user's gaze at an object. As yet another example and not by way of limitation, the visual signal may be a user gesture, e.g., the user pointing at an object.

**[0045]** In particular embodiments, the audio data from the system audio API **202** may be sent to an assistant orchestrator **206**. The assistant orchestrator **206** may be executing

on the client system **130**. In particular embodiments, the assistant orchestrator **206** may determine whether to respond to the user input by using a client-side process or a server-side process. As indicated in FIG. **2**, the client-side process is illustrated below the dashed line **207** whereas the server-side process is illustrated above the dashed line **207**. The assistant orchestrator **206** may also determine to respond to the user input by using both the client-side process and the server-side process simultaneously. Although FIG. **2** illustrates the assistant orchestrator **206** as being a client-side process, the assistant orchestrator **206** may be a server-side process or may be a hybrid process split between client- and server-side processes.

**[0046]** In particular embodiments, the server-side process may be as follows after audio data is generated from the system audio API **202**. The assistant orchestrator **206** may send the audio data to a remote computing system that hosts different modules of the assistant system **140** to respond to the user input. In particular embodiments, the audio data may be received at a remote automatic speech recognition (ASR) module **208**. The ASR module **208** may allow a user to dictate and have speech transcribed as written text, have a document synthesized as an audio stream, or issue commands that are recognized as such by the system. The ASR module **208** may use statistical models to determine the most likely sequences of words that correspond to a given portion of speech received by the assistant system **140** as audio input. The models may include one or more of hidden Markov models, neural networks, deep learning models, or any combination thereof. The received audio input may be encoded into digital data at a particular sampling rate (e.g., 16, 44.1, or 96 kHz) and with a particular number of bits representing each sample (e.g., 8, 16, of 24 bits).

**[0047]** In particular embodiments, the ASR module **208** may comprise different components. The ASR module **208** may comprise one or more of a grapheme-to-phoneme (G2P) model, a pronunciation learning model, a personalized acoustic model, a personalized language model (PLM), or an end-pointing model. In particular embodiments, the G2P model may be used to determine a user's grapheme-to-phoneme style, e.g., what it may sound like when a particular user speaks a particular word. The personalized acoustic model may be a model of the relationship between audio signals and the sounds of phonetic units in the language. Therefore, such personalized acoustic model may identify how a user's voice sounds. The personalized acoustical model may be generated using training data such as training speech received as audio input and the corresponding phonetic units that correspond to the speech. The personalized acoustical model may be trained or refined using the voice of a particular user to recognize that user's speech. In particular embodiments, the personalized language model may then determine the most likely phrase that corresponds to the identified phonetic units for a particular audio input. The personalized language model may be a model of the probabilities that various word sequences may occur in the language. The sounds of the phonetic units in the audio input may be matched with word sequences using the personalized language model, and greater weights may be assigned to the word sequences that are more likely to be phrases in the language. The word sequence having the highest weight may be then selected as the text that corresponds to the audio input. In particular embodiments, the personalized language model may be also used to predict what words a user is most likely to say given a context. In particular embodiments, the end-pointing model may detect when the end of an utterance is reached.

**[0048]** In particular embodiments, the output of the ASR module **208** may be sent to a remote natural-language understanding (NLU) module **210**. The NLU module **210** may perform named entity resolution (NER). The NLU module **210** may additionally consider contextual information when analyzing the user input. In particular embodiments, an intent and/or a slot may be an output of the NLU module **210**. An intent may be an element in a pre-defined taxonomy of semantic intentions, which may indicate a purpose of a user interacting with the assistant system **140**. The NLU module **210** may classify a user input into a member of the pre-defined taxonomy, e.g., for the input "Play Beethoven's 5th," the NLU module **210** may classify the input as having the intent [IN:play_music]. In particular embodiments, a domain may denote a social context of interaction, e.g., education, or a namespace for a set of intents, e.g., music. A slot may be a named sub-string corresponding to a character string within the user input, representing a basic semantic entity. For example, a slot for "pizza" may be [SL: dish]. In particular embodiments, a set of valid or expected named slots may be conditioned on the classified intent. As an example and not by way of limitation, for the intent [IN:play_music], a valid slot may be [SL: song_name]. In particular embodiments, the NLU module **210** may additionally extract information from one or more of a social graph, a knowledge graph, or a concept graph, and retrieve a user's profile from one or more remote data stores **212**. The NLU module **210** may further process information from these different sources by determining what information to aggregate, annotating n-grams of the user input, ranking the n-grams with confidence scores based on the aggregated information, and formulating the ranked n-grams into features that can be used by the NLU module **210** for understanding the user input.

**[0049]** In particular embodiments, the NLU module **210** may identify one or more of a domain, an intent, or a slot from the user input in a personalized and context-aware manner. As an example and not by way of limitation, a user input may comprise "show me how to get to the coffee shop". The NLU module **210** may identify the particular coffee shop that the user wants to go based on the user's personal information and the associated contextual information. In particular embodiments, the NLU module **210** may comprise a lexicon of a particular language and a parser and grammar rules to partition sentences into an internal representation. The NLU module **210** may also comprise one or more programs that perform naive semantics or stochastic semantic analysis to the use of pragmatics to understand a user input. In particular embodiments, the parser may be based on a deep learning architecture comprising multiple long-short term memory (LSTM) networks. As an example and not by way of limitation, the parser may be based on a recurrent neural network grammar (RNNG) model, which is a type of recurrent and recursive LSTM algorithm. More information on natural-language understanding may be found in U.S. patent application Ser. No. 16/011,062, filed 18 Jun. 2018, U.S. patent application Ser. No. 16/025,317, filed 2 Jul. 2018, and U.S. patent application Ser. No. 16/038,120, filed 17 Jul. 2018, each of which is incorporated by reference.

**[0050]** In particular embodiments, the output of the NLU module **210** may be sent to a remote reasoning module **214**. The reasoning module **214** may comprise a dialog manager and an entity resolution component. In particular embodiments, the dialog manager may have complex dialog logic and product-related business logic. The dialog manager may manage the dialog state and flow of the conversation between the user and the assistant system **140**. The dialog manager may additionally store previous conversations between the user and the assistant system **140**. In particular embodiments, the dialog manager may communicate with the entity resolution component to resolve entities associated with the one or more slots, which supports the dialog manager to advance the flow of the conversation between the user and the assistant system **140**. In particular embodiments, the entity resolution component may access one or more of the social graph, the knowledge graph, or the concept graph when resolving the entities. Entities may include, for example, unique users or concepts, each of which may have a unique identifier (ID). As an example and not by way of limitation, the knowledge graph may comprise a plurality of entities. Each entity may comprise a single record associated with one or more attribute values. The particular record may be associated with a unique entity identifier. Each record may have diverse values for an attribute of the entity. Each attribute value may be associated with a confidence probability. A confidence probability for an attribute value represents a probability that the value is accurate for the given attribute. Each attribute value may be also associated with a semantic weight. A semantic weight for an attribute value may represent how the value semantically appropriate for the given attribute considering all the available information. For example, the knowledge graph may comprise an entity of a movie "The Martian" (2015), which includes information that has been extracted from multiple content sources (e.g., Facebook, online encyclopedias, movie review sources, media databases, and entertainment content sources), and then deduped, resolved, and fused to generate the single unique record for the knowledge graph. The entity may be associated with a space attribute value which indicates the genre of the movie "The Martian" (2015). More information on the knowledge graph may be found in U.S. patent application Ser. No. 16/048,049, filed 27 Jul. 2018, and U.S. patent application Ser. No. 16/048,101, filed 27 Jul. 2018, each of which is incorporated by reference.

**[0051]** In particular embodiments, the entity resolution component may check the privacy constraints to guarantee that the resolving of the entities does not violate privacy policies. As an example and not by way of limitation, an entity to be resolved may be another user who specifies in his/her privacy settings that his/her identity should not be searchable on the online social network, and thus the entity resolution component may not return that user's identifier in response to a request. Based on the information obtained from the social graph, the knowledge graph, the concept graph, and the user profile, and subject to applicable privacy policies, the entity resolution component may therefore resolve the entities associated with the user input in a personalized, context-aware, and privacy-aware manner. In particular embodiments, each of the resolved entities may be associated with one or more identifiers hosted by the social-networking system **160**. As an example and not by way of limitation, an identifier may comprise a unique user identifier (ID) corresponding to a particular user (e.g., a unique username or user ID number). In particular embodiments, each of the resolved entities may be also associated with a confidence score. More information on resolving entities may be found in U.S. patent application Ser. No. 16/048,049, filed 27 Jul. 2018, and U.S. patent application Ser. No. 16/048,072, filed 27 Jul. 2018, each of which is incorporated by reference.

**[0052]** In particular embodiments, the dialog manager may conduct dialog optimization and assistant state tracking. Dialog optimization is the problem of using data to understand what the most likely branching in a dialog should be. As an example and not by way of limitation, with dialog optimization the assistant system **140** may not need to confirm who a user wants to call because the assistant system **140** has high confidence that a person inferred based on dialog optimization would be very likely whom the user wants to call. In particular embodiments, the dialog manager may use reinforcement learning for dialog optimization. Assistant state tracking aims to keep track of a state that changes over time as a user interacts with the world and the assistant system **140** interacts with the user. As an example and not by way of limitation, assistant state tracking may track what a user is talking about, whom the user is with, where the user is, what tasks are currently in progress, and where the user's gaze is at, etc., subject to applicable privacy policies. In particular embodiments, the dialog manager may use a set of operators to track the dialog state. The operators may comprise the necessary data and logic to update the dialog state. Each operator may act as delta of the dialog state after processing an incoming request. In particular embodiments, the dialog manager may further comprise a dialog state tracker and an action selector. In alternative embodiments, the dialog state tracker may replace the entity resolution component and resolve the references/mentions and keep track of the state.

**[0053]** In particular embodiments, the reasoning module **214** may further conduct false trigger mitigation. The goal of false trigger mitigation is to detect false triggers (e.g., wake-word) of assistance requests and to avoid generating false records when a user actually does not intend to invoke the assistant system **140**. As an example and not by way of limitation, the reasoning module **214** may achieve false trigger mitigation based on a nonsense detector. If the nonsense detector determines that a wake-word makes no sense at this point in the interaction with the user, the reasoning module **214** may determine that inferring the user intended to invoke the assistant system **140** may be incorrect. In particular embodiments, the output of the reasoning module **214** may be sent a remote dialog arbitrator **216**.

**[0054]** In particular embodiments, each of the ASR module **208**, NLU module **210**, and reasoning module **214** may access the remote data store **212**, which comprises user episodic memories to determine how to assist a user more effectively. More information on episodic memories may be found in U.S. patent application Ser. No. 16/552,559, filed 27 Aug. 2019, which is incorporated by reference. The data store **212** may additionally store the user profile of the user. The user profile of the user may comprise user profile data including demographic information, social information, and contextual information associated with the user. The user profile data may also include user interests and preferences on a plurality of topics, aggregated through conversations on news feed, search logs, messaging platforms, etc. The usage

of a user profile may be subject to privacy constraints to ensure that a user's information can be used only for his/her benefit, and not shared with anyone else. More information on user profiles may be found in U.S. patent application Ser. No. 15/967,239, filed 30 Apr. 2018, which is incorporated by reference.

**[0055]** In particular embodiments, parallel to the aforementioned server-side process involving the ASR module **208**, NLU module **210**, and reasoning module **214**, the client-side process may be as follows. In particular embodiments, the output of the assistant orchestrator **206** may be sent to a local ASR module **216** on the client system **130**. The ASR module **216** may comprise a personalized language model (PLM), a G2P model, and an end-pointing model. Because of the limited computing power of the client system **130**, the assistant system **140** may optimize the personalized language model at run time during the client-side process. As an example and not by way of limitation, the assistant system **140** may pre-compute a plurality of personalized language models for a plurality of possible subjects a user may talk about. When a user requests assistance, the assistant system **140** may then swap these pre-computed language models quickly so that the personalized language model may be optimized locally by the assistant system **140** at run time based on user activities. As a result, the assistant system **140** may have a technical advantage of saving computational resources while efficiently determining what the user may be talking about. In particular embodiments, the assistant system **140** may also re-learn user pronunciations quickly at run time.

**[0056]** In particular embodiments, the output of the ASR module **216** may be sent to a local NLU module **218**. In particular embodiments, the NLU module **218** herein may be more compact compared to the remote NLU module **210** supported on the server-side. When the ASR module **216** and NLU module **218** process the user input, they may access a local assistant memory **220**. The local assistant memory **220** may be different from the user memories stored on the data store **212** for the purpose of protecting user privacy. In particular embodiments, the local assistant memory **220** may be syncing with the user memories stored on the data store **212** via the network **110**. As an example and not by way of limitation, the local assistant memory **220** may sync a calendar on a user's client system **130** with a server-side calendar associate with the user. In particular embodiments, any secured data in the local assistant memory **220** may be only accessible to the modules of the assistant system **140** that are locally executing on the client system **130**.

**[0057]** In particular embodiments, the output of the NLU module **218** may be sent to a local reasoning module **222**. The reasoning module **222** may comprise a dialog manager and an entity resolution component. Due to the limited computing power, the reasoning module **222** may conduct on-device learning that is based on learning algorithms particularly tailored for client systems **130**. As an example and not by way of limitation, federated learning may be used by the reasoning module **222**. Federated learning is a specific category of distributed machine learning approaches which trains machine learning models using decentralized data residing on end devices such as mobile phones. In particular embodiments, the reasoning module **222** may use a particular federated learning model, namely federated user representation learning, to extend existing neural-network personalization techniques to federated learning. Federated user representation learning can personalize models in federated learning by learning task-specific user representations (i.e., embeddings) or by personalizing model weights. Federated user representation learning is a simple, scalable, privacy-preserving, and resource-efficient. Federated user representation learning may divide model parameters into federated and private parameters. Private parameters, such as private user embeddings, may be trained locally on a client system **130** instead of being transferred to or averaged on a remote server. Federated parameters, by contrast, may be trained remotely on the server. In particular embodiments, the reasoning module **222** may use another particular federated learning model, namely active federated learning to transmit a global model trained on the remote server to client systems **130** and calculate gradients locally on these client systems **130**. Active federated learning may enable the reasoning module to minimize the transmission costs associated with downloading models and uploading gradients. For active federated learning, in each round client systems are selected not uniformly at random, but with a probability conditioned on the current model and the data on the client systems to maximize efficiency. In particular embodiments, the reasoning module **222** may use another particular federated learning model, namely federated Adam. Conventional federated learning model may use stochastic gradient descent (SGD) optimizers. By contrast, the federated Adam model may use moment-based optimizers. Instead of using the averaged model directly as what conventional work does, federated Adam model may use the averaged model to compute approximate gradients. These gradients may be then fed into the federated Adam model, which may de-noise stochastic gradients and use a per-parameter adaptive learning rate. Gradients produced by federated learning may be even noisier than stochastic gradient descent (because data may be not independent and identically distributed), so federated Adam model may help even more deal with the noise. The federated Adam model may use the gradients to take smarter steps towards minimizing the objective function. The experiments show that conventional federated learning on a benchmark has 1.6% drop in ROC (Receiver Operating Characteristics) curve whereas federated Adam model has only 0.4% drop. In addition, federated Adam model has no increase in communication or on-device computation. In particular embodiments, the reasoning module **222** may also perform false trigger mitigation. This false trigger mitigation may help detect false activation requests, e.g., wake-word, on the client system **130** when the user's speech input comprises data that is subject to privacy constraints. As an example and not by way of limitation, when a user is in a voice call, the user's conversation is private and the false trigger detection based on such conversation can only occur locally on the user's client system **130**.

**[0058]** In particular embodiments, the assistant system **140** may comprise a local context engine **224**. The context engine **224** may process all the other available signals to provide more informative cues to the reasoning module **222**. As an example and not by way of limitation, the context engine **224** may have information related to people, sensory data from client system **130** sensors (e.g., microphone, camera) that are further analyzed by computer vision technologies, geometry constructions, activity data, inertial data (e.g., collected by a VR headset), location, etc. In particular embodiments, the computer vision technologies may com-

prise human skeleton reconstruction, face detection, facial recognition, hand tracking, eye tracking, etc. In particular embodiments, geometry constructions may comprise constructing objects surrounding a user using data collected by a client system **130**. As an example and not by way of limitation, the user may be wearing AR glasses and geometry construction may aim to determine where the floor is, where the wall is, where the user's hands are, etc. In particular embodiments, inertial data may be data associated with linear and angular motions. As an example and not by way of limitation, inertial data may be captured by AR glasses which measures how a user's body parts move.

**[0059]** In particular embodiments, the output of the local reasoning module **222** may be sent to the dialog arbitrator **216**. The dialog arbitrator **216** may function differently in three scenarios. In the first scenario, the assistant orchestrator **206** determines to use server-side process, for which the dialog arbitrator **216** may transmit the output of the reasoning module **214** to a remote action execution module **226**. In the second scenario, the assistant orchestrator **206** determines to use both server-side process and client-side process, for which the dialog arbitrator **216** may aggregate output from both reasoning modules (i.e., remote reasoning module **214** and local reasoning module **222**) of both processes and analyze them. As an example and not by way of limitation, the dialog arbitrator **216** may perform ranking and select the best reasoning result for responding to the user input. In particular embodiments, the dialog arbitrator **216** may further determine whether to use agents on the server-side or on the client-side to execute relevant tasks based on the analysis. In the third scenario, the assistant orchestrator **206** determines to use client-side process and the dialog arbitrator **216** needs to evaluate the output of the local reasoning module **222** to determine if the client-side process can complete the task of handling the user input.

**[0060]** In particular embodiments, for the first and second scenarios mentioned above, the dialog arbitrator **216** may determine that the agents on the server-side are necessary to execute tasks responsive to the user input. Accordingly, the dialog arbitrator **216** may send necessary information regarding the user input to the action execution module **226**. The action execution module **226** may call one or more agents to execute the tasks. In alternative embodiments, the action selector of the dialog manager may determine actions to execute and instruct the action execution module **226** accordingly. In particular embodiments, an agent may be an implementation that serves as a broker across a plurality of content providers for one domain. A content provider may be an entity responsible for carrying out an action associated with an intent or completing a task associated with the intent. In particular embodiments, the agents may comprise first-party agents and third-party agents. In particular embodiments, first-party agents may comprise internal agents that are accessible and controllable by the assistant system **140** (e.g. agents associated with services provided by the online social network (Messenger, Instagram, Whatsapp)). In particular embodiments, third-party agents may comprise external agents that the assistant system **140** has no control over (e.g., third-party online music application agents, ticket sales agents). The first-party agents may be associated with first-party providers that provide content objects and/or services hosted by the social-networking system **160**. The third-party agents may be associated with third-party providers that provide content objects and/or services hosted by the third-party system **170**. In particular embodiments, each of the first-party agents or third-party agents may be designated for a particular domain. As an example and not by way of limitation, the domain may comprise weather, transportation, music, etc. In particular embodiments, the assistant system **140** may use a plurality of agents collaboratively to respond to a user input. As an example and not by way of limitation, the user input may comprise "direct me to my next meeting." The assistant system **140** may use a calendar agent to retrieve the location of the next meeting. The assistant system **140** may then use a navigation agent to direct the user to the next meeting.

**[0061]** In particular embodiments, for the second and third scenarios mentioned above, the dialog arbitrator **216** may determine that the agents on the client-side are capable of executing tasks responsive to the user input but additional information is needed (e.g., response templates) or that the tasks can be only handled by the agents on the server-side. If the dialog arbitrator **216** determines that the tasks can be only handled by the agents on the server-side, the dialog arbitrator **216** may send necessary information regarding the user input to the action execution module **226**. If the dialog arbitrator **216** determines that the agents on the client-side are capable of executing tasks but response templates are needed, the dialog arbitrator **216** may send necessary information regarding the user input to a remote response template generation module **228**. The output of the response template generation module **228** may be further sent to a local action execution module **230** executing on the client system **130**.

**[0062]** In particular embodiments, the action execution module **230** may call local agents to execute tasks. A local agent on the client system **130** may be able to execute simpler tasks compared to an agent on the server-side. As an example and not by way of limitation, multiple device-specific implementations (e.g., real-time calls for a client system **130** or a messaging application on the client system **130**) may be handled internally by a single agent. Alternatively, these device-specific implementations may be handled by multiple agents associated with multiple domains. In particular embodiments, the action execution module **230** may additionally perform a set of general executable dialog actions. The set of executable dialog actions may interact with agents, users and the assistant system **140** itself. These dialog actions may comprise dialog actions for slot request, confirmation, disambiguation, agent execution, etc. The dialog actions may be independent of the underlying implementation of the action selector or dialog policy. Both tree-based policy and model-based policy may generate the same basic dialog actions, with a callback function hiding any action selector specific implementation details.

**[0063]** In particular embodiments, the output from the remote action execution module **226** on the server-side may be sent to a remote response execution module **232**. In particular embodiments, the action execution module **226** may communicate back to the dialog arbitrator **216** for more information. The response execution module **232** may be based on a remote conversational understanding (CU) composer. In particular embodiments, the output from the action execution module **226** may be formulated as a <k, c, u, d> tuple, in which k indicates a knowledge source, c indicates a communicative goal, u indicates a user model, and d indicates a discourse model. In particular embodiments, the

CU composer may comprise a natural-language generator (NLG) and a user interface (UI) payload generator. The natural-language generator may generate a communication content based on the output of the action execution module **226** using different language models and/or language templates. In particular embodiments, the generation of the communication content may be application specific and also personalized for each user. The CU composer may also determine a modality of the generated communication content using the UI payload generator. In particular embodiments, the NLG may comprise a content determination component, a sentence planner, and a surface realization component. The content determination component may determine the communication content based on the knowledge source, communicative goal, and the user's expectations. As an example and not by way of limitation, the determining may be based on a description logic. The description logic may comprise, for example, three fundamental notions which are individuals (representing objects in the domain), concepts (describing sets of individuals), and roles (representing binary relations between individuals or concepts). The description logic may be characterized by a set of constructors that allow the natural-language generator to build complex concepts/roles from atomic ones. In particular embodiments, the content determination component may perform the following tasks to determine the communication content. The first task may comprise a translation task, in which the input to the natural-language generator may be translated to concepts. The second task may comprise a selection task, in which relevant concepts may be selected among those resulted from the translation task based on the user model. The third task may comprise a verification task, in which the coherence of the selected concepts may be verified. The fourth task may comprise an instantiation task, in which the verified concepts may be instantiated as an executable file that can be processed by the natural-language generator. The sentence planner may determine the organization of the communication content to make it human understandable. The surface realization component may determine specific words to use, the sequence of the sentences, and the style of the communication content. The UI payload generator may determine a preferred modality of the communication content to be presented to the user. In particular embodiments, the CU composer may check privacy constraints associated with the user to make sure the generation of the communication content follows the privacy policies. More information on natural-language generation may be found in U.S. patent application Ser. No. 15/967,279, filed 30 Apr. 2018, and U.S. patent application Ser. No. 15/966,455, filed 30 Apr. 2018, each of which is incorporated by reference.

**[0064]** In particular embodiments, the output from the local action execution module **230** on the client system **130** may be sent to a local response execution module **234**. The response execution module **234** may be based on a local conversational understanding (CU) composer. The CU composer may comprise a natural-language generation (NLG) module. As the computing power of a client system **130** may be limited, the NLG module may be simple for the consideration of computational efficiency. Because the NLG module may be simple, the output of the response execution module **234** may be sent to a local response expansion module **236**. The response expansion module **236** may further expand the result of the response execution module **234** to make a response more natural and contain richer semantic information.

**[0065]** In particular embodiments, if the user input is based on audio signals, the output of the response execution module **232** on the server-side may be sent to a remote text-to-speech (TTS) module **238**. Similarly, the output of the response expansion module **236** on the client-side may be sent to a local TTS module **240**. Both TTS modules may convert a response to audio signals. In particular embodiments, the output from the response execution module **232**, the response expansion module **236**, or the TTS modules on both sides, may be finally sent to a local render output module **242**. The render output module **242** may generate a response that is suitable for the client system **130**. As an example and not by way of limitation, the output of the response execution module **232** or the response expansion module **236** may comprise one or more of natural-language strings, speech, actions with parameters, or rendered images or videos that can be displayed in a VR headset or AR smart glasses. As a result, the render output module **242** may determine what tasks to perform based on the output of CU composer to render the response appropriately for displaying on the VR headset or AR smart glasses. For example, the response may be visual-based modality (e.g., an image or a video clip) that can be displayed via the VR headset or AR smart glasses. As another example, the response may be audio signals that can be played by the user via VR headset or AR smart glasses. As yet another example, the response may be augmented-reality data that can be rendered VR headset or AR smart glasses for enhancing user experience.

**[0066]** In particular embodiments, the assistant system **140** may have a variety of capabilities including audio cognition, visual cognition, signals intelligence, reasoning, and memories. In particular embodiments, the capability of audio recognition may enable the assistant system **140** to understand a user's input associated with various domains in different languages, understand a conversation and be able to summarize it, perform on-device audio cognition for complex commands, identify a user by voice, extract topics from a conversation and auto-tag sections of the conversation, enable audio interaction without a wake-word, filter and amplify user voice from ambient noise and conversations, understand which client system **130** (if multiple client systems **130** are in vicinity) a user is talking to.

**[0067]** In particular embodiments, the capability of visual cognition may enable the assistant system **140** to perform face detection and tracking, recognize a user, recognize most people of interest in major metropolitan areas at varying angles, recognize majority of interesting objects in the world through a combination of existing machine-learning models and one-shot learning, recognize an interesting moment and auto-capture it, achieve semantic understanding over multiple visual frames across different episodes of time, provide platform support for additional capabilities in people, places, objects recognition, recognize full set of settings and micro-locations including personalized locations, recognize complex activities, recognize complex gestures to control a client system **130**, handle images/videos from egocentric cameras (e.g., with motion, capture angles, resolution, etc.), accomplish similar level of accuracy and speed regarding images with lower resolution, conduct one-shot registration and recognition of people, places, and objects, and perform visual recognition on a client system **130**.

**[0068]** In particular embodiments, the assistant system **140** may leverage computer vision techniques to achieve visual cognition. Besides computer vision techniques, the assistant system **140** may explore options that can supplement these techniques to scale up the recognition of objects. In particular embodiments, the assistant system **140** may use supplemental signals such as optical character recognition (OCR) of an object's labels, GPS signals for places recognition, signals from a user's client system **130** to identify the user. In particular embodiments, the assistant system **140** may perform general scene recognition (home, work, public space, etc.) to set context for the user and reduce the computer-vision search space to identify top likely objects or people. In particular embodiments, the assistant system **140** may guide users to train the assistant system **140**. For example, crowdsourcing may be used to get users to tag and help the assistant system **140** recognize more objects over time. As another example, users can register their personal objects as part of initial setup when using the assistant system **140**. The assistant system **140** may further allow users to provide positive/negative signals for objects they interact with to train and improve personalized models for them.

**[0069]** In particular embodiments, the capability of signals intelligence may enable the assistant system **140** to determine user location, understand date/time, determine family locations, understand users' calendars and future desired locations, integrate richer sound understanding to identify setting/context through sound alone, build signals intelligence models at run time which may be personalized to a user's individual routines.

**[0070]** In particular embodiments, the capability of reasoning may enable the assistant system **140** to have the ability to pick up any previous conversation threads at any point in the future, synthesize all signals to understand micro and personalized context, learn interaction patterns and preferences from users' historical behavior and accurately suggest interactions that they may value, generate highly predictive proactive suggestions based on micro-context understanding, understand what content a user may want to see at what time of a day, understand the changes in a scene and how that may impact the user's desired content.

**[0071]** In particular embodiments, the capabilities of memories may enable the assistant system **140** to remember which social connections a user previously called or interacted with, write into memory and query memory at will (i.e., open dictation and auto tags), extract richer preferences based on prior interactions and long-term learning, remember a user's life history, extract rich information from egocentric streams of data and auto catalog, and write to memory in structured form to form rich short, episodic and long-term memories.

**[0072]** FIG. **3** illustrates an example diagram flow of server-side processes of the assistant system **140**. In particular embodiments, a server-assistant service module **301** may access a request manager **302** upon receiving a user request. In alternative embodiments, the user request may be first processed by the remote ASR module **208** if the user request is based on audio signals. In particular embodiments, the request manager **302** may comprise a context extractor **303** and a conversational understanding object generator (CU object generator) **304**. The context extractor **303** may extract contextual information associated with the user request. The context extractor **303** may also update contextual information based on the assistant application **136** executing on the client system **130**. As an example and not by way of limitation, the update of contextual information may comprise content items are displayed on the client system **130**. As another example and not by way of limitation, the update of contextual information may comprise whether an alarm is set on the client system **130**. As another example and not by way of limitation, the update of contextual information may comprise whether a song is playing on the client system **130**. The CU object generator **304** may generate particular content objects relevant to the user request. The content objects may comprise dialog-session data and features associated with the user request, which may be shared with all the modules of the assistant system **140**. In particular embodiments, the request manager **302** may store the contextual information and the generated content objects in data store **212** which is a particular data store implemented in the assistant system **140**.

**[0073]** In particular embodiments, the request manger **302** may send the generated content objects to the remote NLU module **210**. The NLU module **210** may perform a plurality of steps to process the content objects. At step **305**, the NLU module **210** may generate a whitelist for the content objects. In particular embodiments, the whitelist may comprise interpretation data matching the user request. At step **306**, the NLU module **210** may perform a featurization based on the whitelist. At step **307**, the NLU module **210** may perform domain classification/selection on user request based on the features resulted from the featurization to classify the user request into predefined domains. The domain classification/selection results may be further processed based on two related procedures. At step **308***a*, the NLU module **210** may process the domain classification/selection result using an intent classifier. The intent classifier may determine the user's intent associated with the user request. In particular embodiments, there may be one intent classifier for each domain to determine the most possible intents in a given domain. As an example and not by way of limitation, the intent classifier may be based on a machine-learning model that may take the domain classification/selection result as input and calculate a probability of the input being associated with a particular predefined intent. At step **308***b*, the NLU module **210** may process the domain classification/selection result using a meta-intent classifier. The meta-intent classifier may determine categories that describe the user's intent. In particular embodiments, intents that are common to multiple domains may be processed by the meta-intent classifier. As an example and not by way of limitation, the meta-intent classifier may be based on a machine-learning model that may take the domain classification/selection result as input and calculate a probability of the input being associated with a particular predefined meta-intent. At step **309***a*, the NLU module **210** may use a slot tagger to annotate one or more slots associated with the user request. In particular embodiments, the slot tagger may annotate the one or more slots for the n-grams of the user request. At step **309***b*, the NLU module **210** may use a meta slot tagger to annotate one or more slots for the classification result from the meta-intent classifier. In particular embodiments, the meta slot tagger may tag generic slots such as references to items (e.g., the first), the type of slot, the value of the slot, etc. As an example and not by way of limitation, a user request may comprise "change 500 dollars in my account to Japanese yen." The intent classifier may take the

user request as input and formulate it into a vector. The intent classifier may then calculate probabilities of the user request being associated with different predefined intents based on a vector comparison between the vector representing the user request and the vectors representing different predefined intents. In a similar manner, the slot tagger may take the user request as input and formulate each word into a vector. The intent classifier may then calculate probabilities of each word being associated with different predefined slots based on a vector comparison between the vector representing the word and the vectors representing different predefined slots. The intent of the user may be classified as "changing money". The slots of the user request may comprise "500", "dollars", "account", and "Japanese yen". The meta-intent of the user may be classified as "financial service". The meta slot may comprise "finance".

**[0074]** In particular embodiments, the NLU module **210** may comprise a semantic information aggregator **310**. The semantic information aggregator **310** may help the NLU module **210** improve the domain classification/selection of the content objects by providing semantic information. In particular embodiments, the semantic information aggregator **310** may aggregate semantic information in the following way. The semantic information aggregator **310** may first retrieve information from a user context engine **315**. In particular embodiments, the user context engine **315** may comprise offline aggregators and an online inference service. The offline aggregators may process a plurality of data associated with the user that are collected from a prior time window. As an example and not by way of limitation, the data may include news feed posts/comments, interactions with news feed posts/comments, search history, etc., that are collected during a predetermined timeframe (e.g., from a prior 90-day window). The processing result may be stored in the user context engine **315** as part of the user profile. The online inference service may analyze the conversational data associated with the user that are received by the assistant system **140** at a current time. The analysis result may be stored in the user context engine **315** also as part of the user profile. In particular embodiments, both the offline aggregators and online inference service may extract personalization features from the plurality of data. The extracted personalization features may be used by other modules of the assistant system **140** to better understand user input. In particular embodiments, the semantic information aggregator **310** may then process the retrieved information, i.e., a user profile, from the user context engine **315** in the following steps. At step **311**, the semantic information aggregator **310** may process the retrieved information from the user context engine **315** based on natural-language processing (NLP). In particular embodiments, the semantic information aggregator **310** may tokenize text by text normalization, extract syntax features from text, and extract semantic features from text based on NLP. The semantic information aggregator **310** may additionally extract features from contextual information, which is accessed from dialog history between a user and the assistant system **140**. The semantic information aggregator **310** may further conduct global word embedding, domain-specific embedding, and/or dynamic embedding based on the contextual information. At step **312**, the processing result may be annotated with entities by an entity tagger. Based on the annotations, the semantic information aggregator **310** may generate dictionaries for the retrieved information at step **313**. In particular embodiments, the dictionaries may comprise global dictionary features which can be updated dynamically offline. At step **314**, the semantic information aggregator **310** may rank the entities tagged by the entity tagger. In particular embodiments, the semantic information aggregator **310** may communicate with different graphs **320** including one or more of the social graph, the knowledge graph, or the concept graph to extract ontology data that is relevant to the retrieved information from the user context engine **315**. In particular embodiments, the semantic information aggregator **310** may aggregate the user profile, the ranked entities, and the information from the graphs **320**. The semantic information aggregator **310** may then provide the aggregated information to the NLU module **210** to facilitate the domain classification/selection.

**[0075]** In particular embodiments, the output of the NLU module **210** may be sent to the remote reasoning module **214**. The reasoning module **214** may comprise a co-reference component **325**, an entity resolution component **330**, and a dialog manager **335**. The output of the NL U module **210** may be first received at the co-reference component **325** to interpret references of the content objects associated with the user request. In particular embodiments, the co-reference component **325** may be used to identify an item to which the user request refers. The co-reference component **325** may comprise reference creation **326** and reference resolution **327**. In particular embodiments, the reference creation **326** may create references for entities determined by the NLU module **210**. The reference resolution **327** may resolve these references accurately. As an example and not by way of limitation, a user request may comprise "find me the nearest grocery store and direct me there". The co-reference component **325** may interpret "there" as "the nearest grocery store". In particular embodiments, the co-reference component **325** may access the user context engine **315** and the dialog manager **335** when necessary to interpret references with improved accuracy.

**[0076]** In particular embodiments, the identified domains, intents, meta-intents, slots, and meta slots, along with the resolved references may be sent to the entity resolution component **330** to resolve relevant entities. The entity resolution component **330** may execute generic and domain-specific entity resolution. In particular embodiments, the entity resolution component **330** may comprise domain entity resolution **331** and generic entity resolution **332**. The domain entity resolution **331** may resolve the entities by categorizing the slots and meta slots into different domains. In particular embodiments, entities may be resolved based on the ontology data extracted from the graphs **320**. The ontology data may comprise the structural relationship between different slots/meta-slots and domains. The ontology may also comprise information of how the slots/meta-slots may be grouped, related within a hierarchy where the higher level comprises the domain, and subdivided according to similarities and differences. The generic entity resolution **332** may resolve the entities by categorizing the slots and meta slots into different generic topics. In particular embodiments, the resolving may be also based on the ontology data extracted from the graphs **320**. The ontology data may comprise the structural relationship between different slots/meta-slots and generic topics. The ontology may also comprise information of how the slots/meta-slots may be grouped, related within a hierarchy where the higher level comprises the topic, and subdivided according to similarities

and differences. As an example and not by way of limitation, in response to the input of an inquiry of the advantages of a particular brand of electric car, the generic entity resolution **332** may resolve the referenced brand of electric car as vehicle and the domain entity resolution **331** may resolve the referenced brand of electric car as electric car.

**[0077]** In particular embodiments, the output of the entity resolution component **330** may be sent to the dialog manager **335** to advance the flow of the conversation with the user. The dialog manager **335** may be an asynchronous state machine that repeatedly updates the state and selects actions based on the new state. The dialog manager **335** may comprise dialog intent resolution **336** and dialog state tracker **337**. In particular embodiments, the dialog manager **335** may execute the selected actions and then call the dialog state tracker **337** again until the action selected requires a user response, or there are no more actions to execute. Each action selected may depend on the execution result from previous actions. In particular embodiments, the dialog intent resolution **336** may resolve the user intent associated with the current dialog session based on dialog history between the user and the assistant system **140**. The dialog intent resolution **336** may map intents determined by the NLU module **210** to different dialog intents. The dialog intent resolution **336** may further rank dialog intents based on signals from the NLU module **210**, the entity resolution component **330**, and dialog history between the user and the assistant system **140**. In particular embodiments, instead of directly altering the dialog state, the dialog state tracker **337** may be a side-effect free component and generate n-best candidates of dialog state update operators that propose updates to the dialog state. The dialog state tracker **337** may comprise intent resolvers containing logic to handle different types of NLU intent based on the dialog state and generate the operators. In particular embodiments, the logic may be organized by intent handler, such as a disambiguation intent handler to handle the intents when the assistant system **140** asks for disambiguation, a confirmation intent handler that comprises the logic to handle confirmations, etc. Intent resolvers may combine the turn intent together with the dialog state to generate the contextual updates for a conversation with the user. A slot resolution component may then recursively resolve the slots in the update operators with resolution providers including the knowledge graph and domain agents. In particular embodiments, the dialog state tracker **337** may update/rank the dialog state of the current dialog session. As an example and not by way of limitation, the dialog state tracker **337** may update the dialog state as "completed" if the dialog session is over. As another example and not by way of limitation, the dialog state tracker **337** may rank the dialog state based on a priority associated with it.

**[0078]** In particular embodiments, the reasoning module **214** may communicate with the remote action execution module **226** and the dialog arbitrator **216**, respectively. In particular embodiments, the dialog manager **335** of the reasoning module **214** may communicate with a task completion component **340** of the action execution module **226** about the dialog intent and associated content objects. In particular embodiments, the task completion module **340** may rank different dialog hypotheses for different dialog intents. The task completion module **340** may comprise an action selector **341**. In alternative embodiments, the action selector **341** may be comprised in the dialog manager **335**. In particular embodiments, the dialog manager **335** may additionally check against dialog policies **345** comprised in the dialog arbitrator **216** regarding the dialog state. In particular embodiments, a dialog policy **345** may comprise a data structure that describes an execution plan of an action by an agent **350**. The dialog policy **345** may comprise a general policy **346** and task policies **347**. In particular embodiments, the general policy **346** may be used for actions that are not specific to individual tasks. The general policy **346** may comprise handling low confidence intents, internal errors, unacceptable user response with retries, skipping or inserting confirmation based on ASR or NLU confidence scores, etc. The general policy **346** may also comprise the logic of ranking dialog state update candidates from the dialog state tracker **337** output and pick the one to update (such as picking the top ranked task intent). In particular embodiments, the assistant system **140** may have a particular interface for the general policy **346**, which allows for consolidating scattered cross-domain policy/business-rules, especial those found in the dialog state tracker **337**, into a function of the action selector **341**. The interface for the general policy **346** may also allow for authoring of self-contained sub-policy units that may be tied to specific situations or clients, e.g., policy functions that may be easily switched on or off based on clients, situation, etc. The interface for the general policy **346** may also allow for providing a layering of policies with back-off, i.e. multiple policy units, with highly specialized policy units that deal with specific situations being backed up by more general policies **346** that apply in wider circumstances. In this context the general policy **346** may alternatively comprise intent or task specific policy. In particular embodiments, a task policy **347** may comprise the logic for action selector **341** based on the task and current state. In particular embodiments, there may be the following four types of task policies **347**: 1) manually crafted tree-based dialog plans; 2) coded policy that directly implements the interface for generating actions; 3) configurator-specified slot-filling tasks; and 4) machine-learning model based policy learned from data. In particular embodiments, the assistant system **140** may bootstrap new domains with rule-based logic and later refine the task policies **347** with machine-learning models. In particular embodiments, a dialog policy **345** may a tree-based policy, which is a pre-constructed dialog plan. Based on the current dialog state, a dialog policy **345** may choose a node to execute and generate the corresponding actions. As an example and not by way of limitation, the tree-based policy may comprise topic grouping nodes and dialog action (leaf) nodes.

**[0079]** In particular embodiments, the action selector **341** may take candidate operators of dialog state and consult the dialog policy **345** to decide what action should be executed. The assistant system **140** may use a hierarchical dialog policy with general policy **346** handling the cross-domain business logic and task policies **347** handles the task/domain specific logic. In particular embodiments, the general policy **346** may pick one operator from the candidate operators to update the dialog state, followed by the selection of a user facing action by a task policy **347**. Once a task is active in the dialog state, the corresponding task policy **347** may be consulted to select right actions. In particular embodiments, both the dialog state tracker **337** and the action selector **341** may not change the dialog state until the selected action is executed. This may allow the assistant system **140** to

execute the dialog state tracker **337** and the action selector **341** for processing speculative ASR results and to do n-best ranking with dry runs. In particular embodiments, the action selector **341** may take the dialog state update operators as part of the input to select the dialog action. The execution of the dialog action may generate a set of expectation to instruct the dialog state tracker **337** to handler future turns. In particular embodiments, an expectation may be used to provide context to the dialog state tracker **337** when handling the user input from next turn. As an example and not by way of limitation, slot request dialog action may have the expectation of proving a value for the requested slot.

**[0080]** In particular embodiments, the dialog manager **335** may support multi-turn compositional resolution of slot mentions. For a compositional parse from the NLU **210**, the resolver may recursively resolve the nested slots. The dialog manager **335** may additionally support disambiguation for the nested slots. As an example and not by way of limitation, the user request may be "remind me to call Alex". The resolver may need to know which Alex to call before creating an actionable reminder to-do entity. The resolver may halt the resolution and set the resolution state when further user clarification is necessary for a particular slot. The general policy **346** may examine the resolution state and create corresponding dialog action for user clarification. In dialog state tracker **337**, based on the user request and the last dialog action, the dialog manager may update the nested slot. This capability may allow the assistant system **140** to interact with the user not only to collect missing slot values but also to reduce ambiguity of more complex/ambiguous utterances to complete the task. In particular embodiments, the dialog manager may further support requesting missing slots in a nested intent and multi-intent user requests (e.g., "take this photo and send it to Dad"). In particular embodiments, the dialog manager **335** may support machine-learning models for more robust dialog experience. As an example and not by way of limitation, the dialog state tracker **337** may use neural network based models (or any other suitable machine-learning models) to model belief over task hypotheses. As another example and not by way of limitation, for action selector **341**, highest priority policy units may comprise white-list/black-list overrides, which may have to occur by design; middle priority units may comprise machine-learning models designed for action selection; and lower priority units may comprise rule-based fallbacks when the machine-learning models elect not to handle a situation. In particular embodiments, machine-learning model based general policy unit may help the assistant system **140** reduce redundant disambiguation or confirmation steps, thereby reducing the number of turns to execute the user request.

**[0081]** In particular embodiments, the action execution module **226** may call different agents **350** for task execution. An agent **350** may select among registered content providers to complete the action. The data structure may be constructed by the dialog manager **335** based on an intent and one or more slots associated with the intent. A dialog policy **345** may further comprise multiple goals related to each other through logical operators. In particular embodiments, a goal may be an outcome of a portion of the dialog policy and it may be constructed by the dialog manager **335**. A goal may be represented by an identifier (e.g., string) with one or more named arguments, which parameterize the goal. As an example and not by way of limitation, a goal with its associated goal argument may be represented as {confirm_artist, args: {artist: "Madonna"}}. In particular embodiments, a dialog policy may be based on a tree-structured representation, in which goals are mapped to leaves of the tree. In particular embodiments, the dialog manager **335** may execute a dialog policy **345** to determine the next action to carry out. The dialog policies **345** may comprise generic policy **346** and domain specific policies **347**, both of which may guide how to select the next system action based on the dialog state. In particular embodiments, the task completion component **340** of the action execution module **226** may communicate with dialog policies **345** comprised in the dialog arbitrator **216** to obtain the guidance of the next system action. In particular embodiments, the action selection component **341** may therefore select an action based on the dialog intent, the associated content objects, and the guidance from dialog policies **345**.

**[0082]** In particular embodiments, the output of the action execution module **226** may be sent to the remote response execution module **232**. Specifically, the output of the task completion component **340** of the action execution module **226** may be sent to the CU composer **355** of the response execution module **226**. In alternative embodiments, the selected action may require one or more agents **350** to be involved. As a result, the task completion module **340** may inform the agents **350** about the selected action. Meanwhile, the dialog manager **335** may receive an instruction to update the dialog state. As an example and not by way of limitation, the update may comprise awaiting agents' **350** response. In particular embodiments, the CU composer **355** may generate a communication content for the user using a natural-language generator (NLG) **356** based on the output of the task completion module **340**. In particular embodiments, the NLG **356** may use different language models and/or language templates to generate natural language outputs. The generation of natural language outputs may be application specific. The generation of natural language outputs may be also personalized for each user. The CU composer **355** may also determine a modality of the generated communication content using the UI payload generator **357**. Since the generated communication content may be considered as a response to the user request, the CU composer **355** may additionally rank the generated communication content using a response ranker **358**. As an example and not by way of limitation, the ranking may indicate the priority of the response.

**[0083]** In particular embodiments, the response execution module **232** may perform different tasks based on the output of the CU composer **355**. These tasks may include writing (i.e., storing/updating) the dialog state **361** retrieved from data store **212** and generating responses **362**. In particular embodiments, the output of CU composer **355** may comprise one or more of natural-language strings, speech, actions with parameters, or rendered images or videos that can be displayed in a VR headset or AR smart glass. As a result, the response execution module **232** may determine what tasks to perform based on the output of CU composer **355**. In particular embodiments, the generated response and the communication content may be sent to the local render output module **242** by the response execution module **232**. In alternative embodiments, the output of the CU composer **355** may be additionally sent to the remote TTS module **238** if the determined modality of the communication content is audio. The speech generated by the TTS module **238** and the

response generated by the response execution module **232** may be then sent to the render output module **242**.

**[0084]** FIG. **4** illustrates an example diagram flow of processing a user input by the assistant system **140**. As an example and not by way of limitation, the user input may be based on audio signals. In particular embodiments, a mic array **402** of the client system **130** may receive the audio signals (e.g., speech). The audio signals may be transmitted to a process loop **404** in a format of audio frames. In particular embodiments, the process loop **404** may send the audio frames for voice activity detection (VAD) **406** and wake-on-voice (WoV) detection **408**. The detection results may be returned to the process loop **404**. If the WoV detection **408** indicates the user wants to invoke the assistant system **140**, the audio frames together with the VAD **406** result may be sent to an encode unit **410** to generate encoded audio data. After encoding, the encoded audio data may be sent to an encrypt unit **412** for privacy and security purpose, followed by a link unit **414** and decrypt unit **416**. After decryption, the audio data may be sent to a mic driver **418**, which may further transmit the audio data to an audio service module **420**. In alternative embodiments, the user input may be received at a wireless device (e.g., Bluetooth device) paired with the client system **130**. Correspondingly, the audio data may be sent from a wireless-device driver **422** (e.g., Bluetooth driver) to the audio service module **420**. In particular embodiments, the audio service module **420** may determine that the user input can be fulfilled by an application executing on the client system **130**. Accordingly, the audio service module **420** may send the user input to a real-time communication (RTC) module **424**. The RTC module **424** may deliver audio packets to a video or audio communication system (e.g., VOIP or video call). The RTC module **424** may call a relevant application (App) **426** to execute tasks related to the user input.

**[0085]** In particular embodiments, the audio service module **420** may determine that the user is requesting assistance that needs the assistant system **140** to respond. Accordingly, the audio service module **420** may inform the client-assistant service module **426**. In particular embodiments, the client-assistant service module **426** may communicate with the assistant orchestrator **206**. The assistant orchestrator **206** may determine whether to use client-side process or server-side process to respond to the user input. In particular embodiments, the assistant orchestrator **206** may determine to use client-side process and inform the client-assistant service module **426** about such decision. As a result, the client-assistant service module **426** may call relevant modules to respond to the user input.

**[0086]** In particular embodiments, the client-assistant service module **426** may use the local ASR module **216** to analyze the user input. The ASR module **216** may comprise a grapheme-to-phoneme (G2P) model, a pronunciation learning model, a personalized language model (PLM), an end-pointing model, and a personalized acoustic model. In particular embodiments, the client-assistant service module **426** may further use the local NLU module **218** to understand the user input. The NLU module **218** may comprise a named entity resolution (NER) component and a contextual session-based NLU component. In particular embodiments, the client-assistant service module **426** may use an intent broker **428** to analyze the user's intent. To be accurate about the user's intent, the intent broker **428** may access an entity store **430** comprising entities associated with the user and the world. In alternative embodiments, the user input may be submitted via an application **432** executing on the client system **130**. In this case, an input manager **434** may receive the user input and analyze it by an application environment (App Env) module **436**. The analysis result may be sent to the application **432** which may further send the analysis result to the ASR module **216** and NLU module **218**. In alternative embodiments, the user input may be directly submitted to the client-assistant service module **426** via an assistant application **438** executing on the client system **130**. Then the client-assistant service module **426** may perform similar procedures based on modules as aforementioned, i.e., the ASR module **216**, the NLU module **218**, and the intent broker **428**.

**[0087]** In particular embodiments, the assistant orchestrator **206** may determine to user server-side process. Accordingly, the assistant orchestrator **206** may send the user input to one or more computing systems that host different modules of the assistant system **140**. In particular embodiments, a server-assistant service module **301** may receive the user input from the assistant orchestrator **206**. The server-assistant service module **301** may instruct the remote ASR module **208** to analyze the audio data of the user input. The ASR module **208** may comprise a grapheme-to-phoneme (G2P) model, a pronunciation learning model, a personalized language model (PLM), an end-pointing model, and a personalized acoustic model. In particular embodiments, the server-assistant service module **301** may further instruct the remote NLU module **210** to understand the user input. In particular embodiments, the server-assistant service module **301** may call the remote reasoning model **214** to process the output from the ASR module **208** and the NLU module **210**. In particular embodiments, the reasoning model **214** may perform entity resolution and dialog optimization. In particular embodiments, the output of the reasoning model **314** may be sent to the agent **350** for executing one or more relevant tasks.

**[0088]** In particular embodiments, the agent **350** may access an ontology module **440** to accurately understand the result from entity resolution and dialog optimization so that it can execute relevant tasks accurately. The ontology module **440** may provide ontology data associated with a plurality of predefined domains, intents, and slots. The ontology data may also comprise the structural relationship between different slots and domains. The ontology data may further comprise information of how the slots may be grouped, related within a hierarchy where the higher level comprises the domain, and subdivided according to similarities and differences. The ontology data may also comprise information of how the slots may be grouped, related within a hierarchy where the higher level comprises the topic, and subdivided according to similarities and differences. Once the tasks are executed, the agent **350** may return the execution results together with a task completion indication to the reasoning module **214**.

**[0089]** The embodiments disclosed herein may include or be implemented in conjunction with an artificial reality system. Artificial reality is a form of reality that has been adjusted in some manner before presentation to a user, which may include, e.g., a virtual reality (VR), an augmented reality (AR), a mixed reality (MR), a hybrid reality, or some combination and/or derivatives thereof. Artificial reality content may include completely generated content or generated content combined with captured content (e.g., real-

world photographs). The artificial reality content may include video, audio, haptic feedback, or some combination thereof, and any of which may be presented in a single channel or in multiple channels (such as stereo video that produces a three-dimensional effect to the viewer). Additionally, in some embodiments, artificial reality may be associated with applications, products, accessories, services, or some combination thereof, that are, e.g., used to create content in an artificial reality and/or used in (e.g., perform activities in) an artificial reality. The artificial reality system that provides the artificial reality content may be implemented on various platforms, including a head-mounted display (HMD) connected to a host computer system, a standalone HMD, a mobile device or computing system, or any other hardware platform capable of providing artificial reality content to one or more viewers.

Smart Cameras Enabled by Assistant Systems

**[0090]** In particular embodiments, the assistant system **140** may improve the user experience with the assistant system **140** by providing the user with handsfree picture/video capturing, sharing, and memory recall when using an assistant-powered camera-enabled client system **130** (e.g., smart phone with camera, AR/VR glasses, smart display). The assistant system **140** may have the additional functionality of object/people recognition, determination of points of interest, and highlight generation. The assistant system **140** may assist a user both reactively and proactively. In reactive scenarios, there may be an explicit command or prompt (e.g., "take a picture") from the user via the client system **130** to the assistant system **140**. The assistant system **140** may then translate that to a machine-standard intent and execute an associated task via the camera-enabled client system **130** to serve the user. In proactive scenarios, the assistant system **140** itself may determine that there is a potentially interesting action it can take via the camera-enabled client system **130** on behalf of the user based on the signals it is receiving via the client system **130**, such as an eye gaze from the user of AR glasses. Although this disclosure describes assisting users in particular camera-based tasks by particular systems in a particular manner, this disclosure contemplates assisting users in any suitable camera-based task by any suitable system in any suitable manner.

**[0091]** In particular embodiments, the assistant system **140** may receive, from a client system **130** associated with a user, a user input from the user. The client system **130** may comprise one or more cameras. In particular embodiments, the assistant system **140** may then determine, based on one or more machine-learning models and sensory data captured by the one or more cameras, one or more points of interest in a field of view of the one or more cameras. The assistant system **140** may then generate, based on the one or more points of interest, a plurality of media files, wherein each media file is a recording of at least one of the one or more points of interest. In particular embodiments, the assistant system **140** may then generate, based on the plurality of media files, one or more highlight files. Each highlight file may comprise a media file that satisfies a predefined quality standard. In particular embodiments, the assistant system **140** may further send, to the client system **130**, instructions for presenting the one or more highlight files.

**[0092]** In particular embodiments, the user input may be based on one or more of a text input, an audio input, an image input, a video input, an eye gaze, a gesture, or a motion. In particular embodiments, a gesture is intentionally performed by one or more body parts of a user. By contrast, a motion may be associated with a user's movement or an object's movement, which can be intentionally or unintentionally. As an example and not by way of limitation, the user input may be a text input of "go, smart camera." As another example and not by way of limitation, the user may be wearing AR glasses and the user input may be a tap by fingers on the glasses. As another example and not by way of limitation, the user input may be a voice input of "assistant, capture the best moments of this party." In alternative embodiments, the user may elect to turn on an auto-capture mode via settings associated with the assistant system **140**, which allows the assistant system **140** to automatically detect people and objects in the field of view of the cameras and record them. In particular embodiments, if the user input has an ambiguous mention, the assistant system **140** may disambiguate such mention. As an example and not by way of limitation, the user may say "take a picture of that", for which the assistant system **140** may recognize the most important object in the field of view, auto-crop the view to only show the object as a disambiguation of "that", and take a picture once receiving a confirmation from the user. Although this disclosure describes particular user input in a particular manner, this disclosure contemplates any suitable user input in any suitable manner.

**[0093]** In particular embodiments, the assistant system may leverage various techniques to determine the points of interest. In particular embodiments, the sensory data may be based on one or more of textual signals, visual signals, or audio signals. As an example and not by way of limitation, the sensory data may be visual signals captured by the client system **130**. Accordingly, determining the points of interest may comprise detecting one or more people in the field of view (subject to privacy settings) and determining, based on one or more facial recognition algorithms, one or more identifiers of one or more of the detected people. Particularly, the assistant system **140** may rely on facial recognition at different angles, subject to movement of the cameras of client systems **130**, with multiple people in the field of view of the cameras, at large distances (e.g., across the room), and with people moving around, etc. Furthermore, the assistant system **140** may perform on-device facial recognition, which may be more challenging considering the limited computing power of a client system **130** such as AR glasses. In particular embodiments, determining the points of interest may be based on a measure of interestingness of one or more of the detected people. The measure of interestingness may be determined by the one or more machine-learning models based on one or more of the identifiers as aforementioned. As an example and not by way of limitation, the identifiers of the detected people may indicate that one of them is the user's son and the others are teachers of the user's son. Accordingly, the user's son may have a higher measure of interestingness and the assistant system **140** may determine the user's son should be a point of interest. Although this disclosure describes determining particular points of interest by particular systems in a particular manner, this disclosure contemplates determining any suitable point of interest by any suitable system in any suitable manner.

**[0094]** In particular embodiments, determining the points of interest may comprise detecting one or more people in the field of view and determining one or more facial expressions

of one or more of the detected people (subject to privacy settings). Particularly, the assistant system **140** may rely on facial-expression recognition at different angles, subject to movement of the cameras of client systems **130**, with multiple people in the field of view of the cameras, at large distances (e.g., across the room), and with people moving around, etc. Furthermore, the assistant system **140** may perform on-device facial-expression recognition which may be more challenging considering the limited computing power of a client system **130** such as AR glasses. In particular embodiments, determining the points of interest may be based on a measure of interestingness of one or more of the detected people. The measure of interestingness may be determined by the one or more machine-learning models based on one or more of the facial expressions. As an example and not by way of limitation, the assistant system **140** may determine that the facial expressions of two of the detected people are happy and the facial expression of the other detected person is angry. Accordingly, the two people with happy facial expression may have a higher measure of interestingness and the assistant system **140** may determine that they should be a point of interest. Although this disclosure describes determining particular points of interest by particular systems in a particular manner, this disclosure contemplates determining any suitable point of interest by any suitable system in any suitable manner.

**[0095]** In particular embodiments, determining the points of interest may comprise detecting one or more objects in the field of view. Accordingly, determining the points of interest may be based on a measure of interestingness of one or more of the detected objects. In particular embodiments, the measure of interestingness may be determined by the one or more machine-learning models based on one or more of the detected objects. As an example and not by way of limitation, the user may be outside of his/her house and the assistant system **140** may detect the house, a tree, and a convertible car. The assistant system **140** may determine that the convertible car has a higher interestingness, for which the assistant system **140** may further determine the convertible car to be the point of interest. Although this disclosure describes determining particular points of interest by particular systems in a particular manner, this disclosure contemplates determining any suitable point of interest by any suitable system in any suitable manner.

**[0096]** In particular embodiments, determining the points of interest may be based on eye gaze data of the user captured by the client system **130**. As an example and not by way of limitation, the user may be wearing AR glasses and staring at a dog. The eye gaze data generated from the staring may indicate that the user is interested in the dog. As a result, the assistant system **140** may determine the dog to be the point of interest. Analyzing sensory data captured by client systems **130** using different machine-learning algorithms and determining interestingness based on the analysis may be effective solutions for addressing the technical challenge of accurately determining points of interest, since the machine-learning algorithms help localize the user's interest in a field of view and the interestingness further refines such determination of interest. Although this disclosure describes determining particular points of interest by particular systems in a particular manner, this disclosure contemplates determining any suitable point of interest by any suitable system in any suitable manner.

**[0097]** In particular embodiments, the machine-learning models used for determining the points of interest may be based on mask region convolutional neural network (R-CNN). Mask R-CNN is a neural network architecture developed for object detection, object segmentation, and key-point detection. In particular embodiments, when using the machine-learning models to determine the points of interest, the assistant system **140** may additionally use foveated processing, which aims to prioritize and focus on specific regions of the cameras of the client systems **130**. Foveated processing may help improve the sensitivity of the machine-learning models while at the same time guarantees computational efficiency. In particular embodiments, when using the machine-learning models to determine the points of interest, the assistant system **140** may further leverage adaptive background modeling. Adaptive background modeling may better distinguish people or objects in the environment from people or objects shown in pictures on the walls of the environment. Although this disclosure describes particular machine-learning models in a particular manner, this disclosure contemplates determining any suitable machine-learning model in any suitable manner.

**[0098]** In particular embodiments, the assistant system **140** may automatically modify the field of view of the cameras to provide the highest-quality view for the user. In particular embodiments, the assistant system **140** may send, to the client system **130**, instructions for zooming in one or more of the cameras to position one or more of the points of interest in a center of the field of view. In particular embodiments, the instructions may enable the cameras to position multiple points of interest in the field of view so that their centroid is in the center of the field of the view. In particular embodiments, the assistant system **140** may send, to the client system **130**, instructions for zooming out one or more of the cameras to position one or more of the points of interest in a center of the field of view. Similarly, the instructions may enable the cameras to position multiple points of interest in the field of view so that their centroid is in the center of the field of the view. In particular embodiments, the assistant system **140** may automatically perform necessary calibrations for the visual data captured by the client system **130** to facilitate subsequent generation of media files, thereby increasing the quality of the media files. In particular embodiments, the quality of a media file may be a measure of a combination of all the visually significant attributes of a media file. As an example and not by way of limitation, these attributes may comprise one or more of blurriness, lighting, or vividness of color. In particular embodiments, the assistant system **140** may detect a movement of the client system **130**. The assistant system **140** may then apply one or more visual stabilization algorithms to the sensory data captured by the one or more cameras. As an example and not by way of limitation, a user wearing AR glasses may move around his/her head, which may cause a low quality of the visual data. Therefore, the assistant system **140** may use video stabilization techniques to correct the user's head movement so that the video looks smooth after processing. As a result, the assistant system **140** may have a technical advantage of assisting a user to capture interesting and meaningful moments conveniently with high quality as the assistant system **140** may enable to user to use various inputs and apply different calibrations and processing algorithms to make sure the media files corresponding to these moments are of high quality. Although this disclosure

describes particular processing techniques by particular systems in a particular manner, this disclosure contemplates any suitable processing technique by any suitable system in any suitable manner.

**[0099]** In particular embodiments, the recording of each media file may be either a recording of static images or a recording of a video. In other words, each of the plurality of media files may comprise one or more of an image or a video clip. In particular embodiments, the assistant system **140** may use computational photography techniques to enhance the media files during capture and post-capture. As an example and not by way of limitation, the assistant system **140** may take four pictures in quick sequence and merge them to reduce noise. In particular embodiments, the assistant system **140** may enable the user to edit the media files via different types of commands. As an example and not by way of limitation, the user may edit the media files via handsfree editing, e.g., picture enhancement requested by the user's voice command. Although this disclosure describes particular files in a particular manner, this disclosure contemplates any suitable file in any suitable manner.

**[0100]** In particular embodiments, the assistant system **140** may create highlight files by processing the media files and return a collection of the highest-quality media files. Each media file in the highlight file may satisfy a predefined quality standard. The predefined quality standard may be based on one or more of blurriness, lighting, or vividness of color. As an example and not by way of limitation, a blurred picture may have a low quality. As another example and not by way of limitation, a picture with good lighting may have a high quality. In particular embodiments, the assistant system **140** may assign a score to each captured media file and rank the media files based on their respective scores to generate the highlight files. The scores may be calculated by one or more machine-learning models based on one or more of vividness, color, interestingness, or other suitable factors. In particular embodiments, the assistant system **140** may additionally use the following techniques to generate and personalize the highlight files: The assistant system **140** may perform de-duplication and determine uniqueness of each media file so that a selected media file is not a repeat of an existing highlight file and is uniquely interesting to the user. The assistant system **140** may level background orientation of each media file to be straight and auto-crop or center the media file. The assistant system **140** may also detect blurriness and discard blurred media files. The assistant system **140** may detect people in the media files, subject to privacy settings, and determine who the user may personally know and therefore find the corresponding media files interesting. Additionally, the assistant system **140** may detect the emotions or actions of those people (e.g., blinking, smiling, laughing, etc.) and use the detected emotion and action to determine highlight files. The assistant system **140** may additionally perform semantic understanding of scene, location, and objects for generating the highlight files. Furthermore, the assistant system **140** may automatically enhance color, brightness, or sharpness of the media files, or reduce noise of the media files during the generation of highlight files. In particular embodiments, the highlight files may be personalized for the user based on one or more of user profile data associated with the user, user preferences associated with the user, prior user inputs by the user, or user relationship data (e.g., connections with other users in a social graph). As an example and not by way of limitation, the user preferences may indicate that the user wants to save storage of their client system **130**, for which the assistant system **140** may only select images as highlight files. As another example and not by way of limitation, the social graph may indicate that the user has a closer relationship with Noah and Alex compared to other people. Accordingly, when the media files generated by the assistant system **140** comprise images/videos of Noah and Alex, and some other people, the assistant system **140** may select those of Noah and Alex as highlight files. Personalizing highlight files based on user profile data, user preferences, prior user inputs, and user relationship data may be an effectively solution for addressing the technical challenge of generating highlight files that are meaningful and interesting to a user, as these different factors as aforementioned all provide particular insights regarding what would be meaningful and interesting to the user when the reviews the moments captured by the assistant system **140**.

**[0101]** In particular embodiments, the assistant system **140** may further generate personalized captioning for the highlight files. Personalized captioning may be more engaging for users by incorporating personalities of the users. In particular embodiments, the assistant system **140** may further facilitate the sharing of the highlight files. The assistant system **140** may receive, from the client system **130**, a user request from the user to share one or more of the highlight files with one or more other users. As an example and not by way of limitation, the user request may be a handsfree command. The assistant system **140** may then send, to one or more other client systems **130** associated with the one or more other users, respectively, instructions for presenting the shared highlight files. Although this disclosure describes generating particular highlight files by particular systems in a particular manner, this disclosure contemplates generating any suitable highlight file by any suitable system in any suitable manner.

**[0102]** In particular embodiments, the assistant system **140** may further perform memory question and answering (QA) for the user. The assistant system **140** may receive, from the client system **130**, a user query from the user in response to the highlight files. The assistant system **140** may then access a plurality of episodic memories associated with the user. The assistant system **140** may then identify one or more episodic memories of the accessed episodic memories as related to the user query. The assistant system **140** may then retrieve one or more media files corresponding to the identified episodic memories. Each media file may comprise one or more of a post, a comment, an image, or a video clip. The assistant system **140** may further send, to the client system **130**, instructions for presenting the one or more media files corresponding to the identified episodic memories. As an example and not by way of limitation, the user may ask "did I ever meet the guy in red t-shirt?" after seeing the highlight files. The assistant system **140** may then access the episodic memories of the user and find out that the user has met the guy in red t-shirt a few years ago in a conference. The assistant system **140** may retrieve a group picture taken at the conference. Both the user and the guy in red t-shirt were in the group picture. As a result, the assistant system **140** may have a technical advantage of assisting a user to connect currently captured moments with the user's memories so that the user may better appreciate them since the assistant system **140** may perform memory recall to retrieve media files that are relevant to currently captured moments.

Although this disclosure describes performing particular memory QA by particular systems in a particular manner, this disclosure contemplates performing any suitable memory QA by any suitable system in any suitable manner. More information on episodic memories may be found in U.S. patent application Ser. No. 16/552,559, filed 27 Aug. 2019, which is incorporated by reference.

**[0103]** FIGS. **5**A-**5**D illustrate example scenarios in which the assistant system **140** may enable smart cameras on a client system **130** to assist a user. FIG. **5**A illustrates an example scenario where a user may be assisted by smart cameras. In FIG. **5**A, a user **502** may be using a camera-enabled client system **130**, e.g., AR glasses **504**. User **502** may be at a dinner party with some other people present, i.e., person **506**, person **508**, person **510**, and person **512**. FIG. **5**B illustrates an example determination of a point of interest. In FIG. **5**B, the field of view of the cameras of the AR glasses **504** may be reflected by the screen **514** of the AR glasses **504**. The assistant system **140** may use the visual signals captured by the AR glasses **504** to determine a point of interest. The assistant system **140** may perform facial recognition for each of the person at the dinner party, subject to privacy settings. In particular, the assistant system **140** may recognize that person **512** is the wife of user **502**. As a result, the assistant system **140** may determine person **512** as a point of interest **516**. The assistant system **140** may further send instructions to zoom in the cameras of the AR glasses **504** so that person **512** is in the middle of the screen **514**. Other people may disappear or be blurred as the background of the field of the view. For example, person **508** and person **510** are not in the screen **514** anymore and person **506** is partially shown and is blurred. Once the point of interest **516** is determined, user **502** may use various user input such as voice command to take pictures, videos, or track the point of interest **516**, subject to applicable privacy policies, via the assistant system **140**. FIG. **5**C illustrates another example determination of a point of interest. The assistant system **140** may use the visual signals captured by the AR glasses **504** to determine a point of interest. The assistant system **140** may perform facial-expression recognition for each of the person at the dinner party. In particular, the assistant system **140** may determine the point of interest **518** should be person **506** and person **508** as they are both laughing. The assistant system **140** may further send instructions to zoom in the cameras of the AR glasses **504** so that person **506** and person **508** are in the middle of the screen **514**. Other people may be blurred as the background of the field of the view. For example, person **510** and person **512** are blurred. Once the point of interest **518** is determined, user **502** may use various user input such as voice command to take pictures, videos, or track the point of interest **518**, subject to applicable privacy policies, via the assistant system **140**. FIG. **5**D illustrates example highlight files. In FIG. **5**D, the assistant system **140** may have already taken pictures/videos of the points of interest determined previously. To facilitate user **502** to review the interesting and meaningful moments, the assistant system **140** may generate highlight files **520** which may include images, videos, or a combination thereof. The assistant system **140** may further ask if the user wants to review them. For example, the assistant system **140** may present a notification **522** on the screen **514** of the AR glasses **504**. The notification **522** may be "I've generated some highlights of tonight's dinner party. Would you like to see them?" Although this disclosure describes particular examples of smart cameras in a particular manner, this disclosure contemplates any suitable example of smart cameras in any suitable manner.

**[0104]** FIG. **6** illustrates an example method **600** for enabling smart cameras by the assistant system **140**. The method may begin at step **610**, where the assistant system **140** may receive, from a client system **130** associated with a user, a user input from the user, wherein the client system **130** comprises one or more cameras. At step **620**, the assistant system **140** may determine, based on one or more machine-learning models and sensory data captured by the one or more cameras, one or more points of interest in a field of view of the one or more cameras. Step **620** may comprise the following parallel sub-steps. At sub-step **621**, the assistant system **140** may determine the points of interest further based on detecting one or more people in the field of view and determining, based on one or more facial recognition algorithms and privacy settings, one or more identifiers of one or more of the detected people, wherein determining the points of interest is based on a measure of interestingness of one or more of the detected people, wherein the measure of interestingness is determined by the one or more machine-learning models based on one or more of the identifiers. At sub-step **622**, the assistant system **140** may determine the points of interest further based on detecting one or more people in the field of view and determining one or more facial expressions of one or more of the detected people, wherein determining the points of interest is based on a measure of interestingness of one or more of the detected people, wherein the measure of interestingness is determined by the one or more machine-learning models based on one or more of the facial expressions. At sub-step **623**, the assistant system **140** may determine the points of interest further based on detecting one or more objects in the field of view, wherein determining the points of interest is based on a measure of interestingness of one or more of the detected objects, wherein the measure of interestingness is determined by the one or more machine-learning models based on one or more of the detected objects. At sub-step **624**, the assistant system **140** may determine the points of interest further based on eye gaze data of the user captured by the client system **130**. At sub-step **625**, the assistant system **140** may determine the points of interest further based on scene and semantic understanding. At step **630**, the assistant system **140** may generate, based on the one or more points of interest, a plurality of media files, wherein each media file is a recording of at least one of the one or more points of interest. At step **640**, the assistant system **140** may generate, based on the plurality of media files, one or more highlight files, wherein each highlight file comprises a media file that satisfies a predefined quality standard, wherein the highlight files are personalized for the user based on one or more of user profile data associated with the user, user preferences associated with the user, prior user inputs by the user, or user relationship data. At step **650**, the assistant system **140** may send, to the client system **130**, instructions for presenting the one or more highlight files. Particular embodiments may repeat one or more steps of the method of FIG. **6**, where appropriate. Although this disclosure describes and illustrates particular steps of the method of FIG. **6** as occurring in a particular order, this disclosure contemplates any suitable steps of the method of FIG. **6** occurring in any suitable order. Moreover, although this disclosure describes and illustrates an example method for assisting a user with smart

cameras including the particular steps of the method of FIG. **6**, this disclosure contemplates any suitable method for assisting a user with smart cameras including any suitable steps, which may include all, some, or none of the steps of the method of FIG. **6**, where appropriate. Furthermore, although this disclosure describes and illustrates particular components, devices, or systems carrying out particular steps of the method of FIG. **6**, this disclosure contemplates any suitable combination of any suitable components, devices, or systems carrying out any suitable steps of the method of FIG. **6**.

Social Graphs

**[0105]** FIG. **7** illustrates an example social graph **700**. In particular embodiments, the social-networking system **160** may store one or more social graphs **700** in one or more data stores. In particular embodiments, the social graph **700** may include multiple nodes—which may include multiple user nodes **702** or multiple concept nodes **704**—and multiple edges **706** connecting the nodes. Each node may be associated with a unique entity (i.e., user or concept), each of which may have a unique identifier (ID), such as a unique number or username. The example social graph **700** illustrated in FIG. **7** is shown, for didactic purposes, in a two-dimensional visual map representation. In particular embodiments, a social-networking system **160**, a client system **130**, an assistant system **140**, or a third-party system **170** may access the social graph **700** and related social-graph information for suitable applications. The nodes and edges of the social graph **700** may be stored as data objects, for example, in a data store (such as a social-graph database). Such a data store may include one or more searchable or queryable indexes of nodes or edges of the social graph **700**.

**[0106]** In particular embodiments, a user node **702** may correspond to a user of the social-networking system **160** or the assistant system **140**. As an example and not by way of limitation, a user may be an individual (human user), an entity (e.g., an enterprise, business, or third-party application), or a group (e.g., of individuals or entities) that interacts or communicates with or over the social-networking system **160** or the assistant system **140**. In particular embodiments, when a user registers for an account with the social-networking system **160**, the social-networking system **160** may create a user node **702** corresponding to the user, and store the user node **702** in one or more data stores. Users and user nodes **702** described herein may, where appropriate, refer to registered users and user nodes **702** associated with registered users. In addition or as an alternative, users and user nodes **702** described herein may, where appropriate, refer to users that have not registered with the social-networking system **160**. In particular embodiments, a user node **702** may be associated with information provided by a user or information gathered by various systems, including the social-networking system **160**. As an example and not by way of limitation, a user may provide his or her name, profile picture, contact information, birth date, sex, marital status, family status, employment, education background, preferences, interests, or other demographic information. In particular embodiments, a user node **702** may be associated with one or more data objects corresponding to information associated with a user. In particular embodiments, a user node **702** may correspond to one or more web interfaces.

**[0107]** In particular embodiments, a concept node **704** may correspond to a concept. As an example and not by way of limitation, a concept may correspond to a place (such as, for example, a movie theater, restaurant, landmark, or city); a website (such as, for example, a website associated with the social-networking system **160** or a third-party website associated with a web-application server); an entity (such as, for example, a person, business, group, sports team, or celebrity); a resource (such as, for example, an audio file, video file, digital photo, text file, structured document, or application) which may be located within the social-networking system **160** or on an external server, such as a web-application server; real or intellectual property (such as, for example, a sculpture, painting, movie, game, song, idea, photograph, or written work); a game; an activity; an idea or theory; another suitable concept; or two or more such concepts. A concept node **704** may be associated with information of a concept provided by a user or information gathered by various systems, including the social-networking system **160** and the assistant system **140**. As an example and not by way of limitation, information of a concept may include a name or a title; one or more images (e.g., an image of the cover page of a book); a location (e.g., an address or a geographical location); a website (which may be associated with a URL); contact information (e.g., a phone number or an email address); other suitable concept information; or any suitable combination of such information. In particular embodiments, a concept node **704** may be associated with one or more data objects corresponding to information associated with concept node **704**. In particular embodiments, a concept node **704** may correspond to one or more web interfaces.

**[0108]** In particular embodiments, a node in the social graph **700** may represent or be represented by a web interface (which may be referred to as a "profile interface"). Profile interfaces may be hosted by or accessible to the social-networking system **160** or the assistant system **140**. Profile interfaces may also be hosted on third-party websites associated with a third-party system **170**. As an example and not by way of limitation, a profile interface corresponding to a particular external web interface may be the particular external web interface and the profile interface may correspond to a particular concept node **704**. Profile interfaces may be viewable by all or a selected subset of other users. As an example and not by way of limitation, a user node **702** may have a corresponding user-profile interface in which the corresponding user may add content, make declarations, or otherwise express himself or herself. As another example and not by way of limitation, a concept node **704** may have a corresponding concept-profile interface in which one or more users may add content, make declarations, or express themselves, particularly in relation to the concept corresponding to concept node **704**.

**[0109]** In particular embodiments, a concept node **704** may represent a third-party web interface or resource hosted by a third-party system **170**. The third-party web interface or resource may include, among other elements, content, a selectable or other icon, or other inter-actable object representing an action or activity. As an example and not by way of limitation, a third-party web interface may include a selectable icon such as "like," "check-in," "eat," "recommend," or another suitable action or activity. A user viewing the third-party web interface may perform an action by selecting one of the icons (e.g., "check-in"), causing a client

system **130** to send to the social-networking system **160** a message indicating the user's action. In response to the message, the social-networking system **160** may create an edge (e.g., a check-in-type edge) between a user node **702** corresponding to the user and a concept node **704** corresponding to the third-party web interface or resource and store edge **706** in one or more data stores.

**[0110]** In particular embodiments, a pair of nodes in the social graph **700** may be connected to each other by one or more edges **706**. An edge **706** connecting a pair of nodes may represent a relationship between the pair of nodes. In particular embodiments, an edge **706** may include or represent one or more data objects or attributes corresponding to the relationship between a pair of nodes. As an example and not by way of limitation, a first user may indicate that a second user is a "friend" of the first user. In response to this indication, the social-networking system **160** may send a "friend request" to the second user. If the second user confirms the "friend request," the social-networking system **160** may create an edge **706** connecting the first user's user node **702** to the second user's user node **702** in the social graph **700** and store edge **706** as social-graph information in one or more of data stores **164**. In the example of FIG. **7**, the social graph **700** includes an edge **706** indicating a friend relation between user nodes **702** of user "A" and user "B" and an edge indicating a friend relation between user nodes **702** of user "C" and user "B." Although this disclosure describes or illustrates particular edges **706** with particular attributes connecting particular user nodes **702**, this disclosure contemplates any suitable edges **706** with any suitable attributes connecting user nodes **702**. As an example and not by way of limitation, an edge **706** may represent a friendship, family relationship, business or employment relationship, fan relationship (including, e.g., liking, etc.), follower relationship, visitor relationship (including, e.g., accessing, viewing, checking-in, sharing, etc.), subscriber relationship, superior/subordinate relationship, reciprocal relationship, non-reciprocal relationship, another suitable type of relationship, or two or more such relationships. Moreover, although this disclosure generally describes nodes as being connected, this disclosure also describes users or concepts as being connected. Herein, references to users or concepts being connected may, where appropriate, refer to the nodes corresponding to those users or concepts being connected in the social graph **700** by one or more edges **706**.

**[0111]** In particular embodiments, an edge **706** between a user node **702** and a concept node **704** may represent a particular action or activity performed by a user associated with user node **702** toward a concept associated with a concept node **704**. As an example and not by way of limitation, as illustrated in FIG. **7**, a user may "like," "attended," "played," "listened," "cooked," "worked at," or "watched" a concept, each of which may correspond to an edge type or subtype. A concept-profile interface corresponding to a concept node **704** may include, for example, a selectable "check in" icon (such as, for example, a clickable "check in" icon) or a selectable "add to favorites" icon. Similarly, after a user clicks these icons, the social-networking system **160** may create a "favorite" edge or a "check in" edge in response to a user's action corresponding to a respective action. As another example and not by way of limitation, a user (user "C") may listen to a particular song ("SongName") using a particular application (a third-party online music application). In this case, the social-networking system **160** may create a "listened" edge **706** and a "used" edge (as illustrated in FIG. **7**) between user nodes **702** corresponding to the user and concept nodes **704** corresponding to the song and application to indicate that the user listened to the song and used the application. Moreover, the social-networking system **160** may create a "played" edge **706** (as illustrated in FIG. **7**) between concept nodes **704** corresponding to the song and the application to indicate that the particular song was played by the particular application. In this case, "played" edge **706** corresponds to an action performed by an external application (the third-party online music application) on an external audio file (the song "SongName"). Although this disclosure describes particular edges **706** with particular attributes connecting user nodes **702** and concept nodes **704**, this disclosure contemplates any suitable edges **706** with any suitable attributes connecting user nodes **702** and concept nodes **704**. Moreover, although this disclosure describes edges between a user node **702** and a concept node **704** representing a single relationship, this disclosure contemplates edges between a user node **702** and a concept node **704** representing one or more relationships. As an example and not by way of limitation, an edge **706** may represent both that a user likes and has used at a particular concept. Alternatively, another edge **706** may represent each type of relationship (or multiples of a single relationship) between a user node **702** and a concept node **704** (as illustrated in FIG. **7** between user node **702** for user "E" and concept node **704** for "online music application").

**[0112]** In particular embodiments, the social-networking system **160** may create an edge **706** between a user node **702** and a concept node **704** in the social graph **700**. As an example and not by way of limitation, a user viewing a concept-profile interface (such as, for example, by using a web browser or a special-purpose application hosted by the user's client system **130**) may indicate that he or she likes the concept represented by the concept node **704** by clicking or selecting a "Like" icon, which may cause the user's client system **130** to send to the social-networking system **160** a message indicating the user's liking of the concept associated with the concept-profile interface. In response to the message, the social-networking system **160** may create an edge **706** between user node **702** associated with the user and concept node **704**, as illustrated by "like" edge **706** between the user and concept node **704**. In particular embodiments, the social-networking system **160** may store an edge **706** in one or more data stores. In particular embodiments, an edge **706** may be automatically formed by the social-networking system **160** in response to a particular user action. As an example and not by way of limitation, if a first user uploads a picture, watches a movie, or listens to a song, an edge **706** may be formed between user node **702** corresponding to the first user and concept nodes **704** corresponding to those concepts. Although this disclosure describes forming particular edges **706** in particular manners, this disclosure contemplates forming any suitable edges **706** in any suitable manner.

Vector Spaces and Embeddings

**[0113]** FIG. **8** illustrates an example view of a vector space **800**. In particular embodiments, an object or an n-gram may be represented in a d-dimensional vector space, where d denotes any suitable number of dimensions. Although the vector space **800** is illustrated as a three-dimensional space, this is for illustrative purposes only, as the vector space **800**

may be of any suitable dimension. In particular embodiments, an n-gram may be represented in the vector space **800** as a vector referred to as a term embedding. Each vector may comprise coordinates corresponding to a particular point in the vector space **800** (i.e., the terminal point of the vector). As an example and not by way of limitation, vectors **810**, **820**, and **830** may be represented as points in the vector space **800**, as illustrated in FIG. **8**. An n-gram may be mapped to a respective vector representation. As an example and not by way of limitation, n-grams $t_1$ and $t_2$ may be mapped to vectors $\vec{v_1}$ and $\vec{v_2}$ in the vector space **800**, respectively, by applying a function $\vec{\pi}$ defined by a dictionary, such that $\vec{v_1}=\vec{\pi}(t_1)$ and $\vec{v_2}=\vec{\pi}(t_2)$. As another example and not by way of limitation, a dictionary trained to map text to a vector representation may be utilized, or such a dictionary may be itself generated via training. As another example and not by way of limitation, a word-embeddings model may be used to map an n-gram to a vector representation in the vector space **800**. In particular embodiments, an n-gram may be mapped to a vector representation in the vector space **800** by using a machine leaning model (e.g., a neural network). The machine learning model may have been trained using a sequence of training data (e.g., a corpus of objects each comprising n-grams).

**[0114]** In particular embodiments, an object may be represented in the vector space **800** as a vector referred to as a feature vector or an object embedding. As an example and not by way of limitation, objects $e_1$ and $e_2$ may be mapped to vectors $\vec{v_1}$ and $\vec{v_2}$ in the vector space **800**, respectively, by applying a function it, such that $\vec{v_1}=\vec{\pi}(e_1)$ and $\vec{v_2}=\vec{\pi}(e_2)$. In particular embodiments, an object may be mapped to a vector based on one or more properties, attributes, or features of the object, relationships of the object with other objects, or any other suitable information associated with the object. As an example and not by way of limitation, a function $\hat{\pi}$ may map objects to vectors by feature extraction, which may start from an initial set of measured data and build derived values (e.g., features). As an example and not by way of limitation, an object comprising a video or an image may be mapped to a vector by using an algorithm to detect or isolate various desired portions or shapes of the object. Features used to calculate the vector may be based on information obtained from edge detection, corner detection, blob detection, ridge detection, scale-invariant feature transformation, edge direction, changing intensity, autocorrelation, motion detection, optical flow, thresholding, blob extraction, template matching, Hough transformation (e.g., lines, circles, ellipses, arbitrary shapes), or any other suitable information. As another example and not by way of limitation, an object comprising audio data may be mapped to a vector based on features such as a spectral slope, a tonality coefficient, an audio spectrum centroid, an audio spectrum envelope, a Mel-frequency cepstrum, or any other suitable information. In particular embodiments, when an object has data that is either too large to be efficiently processed or comprises redundant data, a function it may map the object to a vector using a transformed reduced set of features (e.g., feature selection). In particular embodiments, a function $\vec{\pi}$ may map an object e to a vector $\hat{\pi}(e)$ based on one or more n-grams associated with object e. Although this disclosure describes representing an n-gram or an object in a vector space in a particular manner, this disclosure contemplates representing an n-gram or an object in a vector space in any suitable manner.

**[0115]** In particular embodiments, the social-networking system **160** may calculate a similarity metric of vectors in vector space **800**. A similarity metric may be a cosine similarity, a Minkowski distance, a Mahalanobis distance, a Jaccard similarity coefficient, or any suitable similarity metric. As an example and not by way of limitation, a similarity metric of $\vec{v_1}$ and $\vec{v_2}$ may be a cosine similarity

$$\frac{\vec{v_1}\cdot\vec{v_2}}{\|\vec{v_1}\|\,\|\vec{v_2}\|}.$$

As another example and not by way of limitation, a similarity metric of $\vec{v_1}$ and $\vec{v_2}$ may be a Euclidean distance $\|\vec{v_1}-\vec{v_2}\|$. A similarity metric of two vectors may represent how similar the two objects or n-grams corresponding to the two vectors, respectively, are to one another, as measured by the distance between the two vectors in the vector space **800**. As an example and not by way of limitation, vector **810** and vector **820** may correspond to objects that are more similar to one another than the objects corresponding to vector **810** and vector **830**, based on the distance between the respective vectors. Although this disclosure describes calculating a similarity metric between vectors in a particular manner, this disclosure contemplates calculating a similarity metric between vectors in any suitable manner.

**[0116]** More information on vector spaces, embeddings, feature vectors, and similarity metrics may be found in U.S. patent application Ser. No. 14/949,436, filed 23 Nov. 2015, U.S. patent application Ser. No. 15/286,315, filed 5 Oct. 2016, and U.S. patent application Ser. No. 15/365,789, filed 30 Nov. 2016, each of which is incorporated by reference.

## Artificial Neural Networks

**[0117]** FIG. **9** illustrates an example artificial neural network ("ANN") **900**. In particular embodiments, an ANN may refer to a computational model comprising one or more nodes. Example ANN **900** may comprise an input layer **910**, hidden layers **920**, **930**, **940**, and an output layer **950**. Each layer of the ANN **900** may comprise one or more nodes, such as a node **905** or a node **915**. In particular embodiments, each node of an ANN may be connected to another node of the ANN. As an example and not by way of limitation, each node of the input layer **910** may be connected to one of more nodes of the hidden layer **920**. In particular embodiments, one or more nodes may be a bias node (e.g., a node in a layer that is not connected to and does not receive input from any node in a previous layer). In particular embodiments, each node in each layer may be connected to one or more nodes of a previous or subsequent layer. Although FIG. **9** depicts a particular ANN with a particular number of layers, a particular number of nodes, and particular connections between nodes, this disclosure contemplates any suitable ANN with any suitable number of layers, any suitable number of nodes, and any suitable connections between nodes. As an example and not by way of limitation, although FIG. **9** depicts a connection between each node of the input layer **910** and each node of the hidden layer **920**, one or more

nodes of the input layer **910** may not be connected to one or more nodes of the hidden layer **920**.

**[0118]** In particular embodiments, an ANN may be a feedforward ANN (e.g., an ANN with no cycles or loops where communication between nodes flows in one direction beginning with the input layer and proceeding to successive layers). As an example and not by way of limitation, the input to each node of the hidden layer **920** may comprise the output of one or more nodes of the input layer **910**. As another example and not by way of limitation, the input to each node of the output layer **950** may comprise the output of one or more nodes of the hidden layer **940**. In particular embodiments, an ANN may be a deep neural network (e.g., a neural network comprising at least two hidden layers). In particular embodiments, an ANN may be a deep residual network. A deep residual network may be a feedforward ANN comprising hidden layers organized into residual blocks. The input into each residual block after the first residual block may be a function of the output of the previous residual block and the input of the previous residual block. As an example and not by way of limitation, the input into residual block N may be F(x)+x, where F(x) may be the output of residual block N−1, x may be the input into residual block N−1. Although this disclosure describes a particular ANN, this disclosure contemplates any suitable ANN.

**[0119]** In particular embodiments, an activation function may correspond to each node of an ANN. An activation function of a node may define the output of a node for a given input. In particular embodiments, an input to a node may comprise a set of inputs. As an example and not by way of limitation, an activation function may be an identity function, a binary step function, a logistic function, or any other suitable function. As another example and not by way of limitation, an activation function for a node k may be the sigmoid function

$$F_k(s_k) = \frac{1}{1 + e^{-s_k}},$$

the hyperbolic tangent function

$$F_k(s_k) = \frac{e^{s_k} - e^{-s_k}}{e^{s_k} + e^{-s_k}},$$

the rectifier $F_k(s_k)=\max(0, s_k)$, or any other suitable function $F_k(s_k)$, where $s_k$ may be the effective input to node k. In particular embodiments, the input of an activation function corresponding to a node may be weighted. Each node may generate output using a corresponding activation function based on weighted inputs. In particular embodiments, each connection between nodes may be associated with a weight. As an example and not by way of limitation, a connection **925** between the node **905** and the node **915** may have a weighting coefficient of 0.4, which may indicate that 0.4 multiplied by the output of the node **905** is used as an input to the node **915**. As another example and not by way of limitation, the output $y_k$ of node k may be $y_k=F_k(s_k)$, where $F_k$ may be the activation function corresponding to node k, $s_k=\Sigma_j(w_{jk}x_j)$ may be the effective input to node k, $x_j$ may be the output of a node j connected to node k, and $w_{jk}$ may be the weighting coefficient between node j and node k. In particular embodiments, the input to nodes of the input layer may be based on a vector representing an object. Although this disclosure describes particular inputs to and outputs of nodes, this disclosure contemplates any suitable inputs to and outputs of nodes. Moreover, although this disclosure may describe particular connections and weights between nodes, this disclosure contemplates any suitable connections and weights between nodes.

**[0120]** In particular embodiments, an ANN may be trained using training data. As an example and not by way of limitation, training data may comprise inputs to the ANN **900** and an expected output. As another example and not by way of limitation, training data may comprise vectors each representing a training object and an expected label for each training object. In particular embodiments, training an ANN may comprise modifying the weights associated with the connections between nodes of the ANN by optimizing an objective function. As an example and not by way of limitation, a training method may be used (e.g., the conjugate gradient method, the gradient descent method, the stochastic gradient descent) to backpropagate the sum-of-squares error measured as a distances between each vector representing a training object (e.g., using a cost function that minimizes the sum-of-squares error). In particular embodiments, an ANN may be trained using a dropout technique. As an example and not by way of limitation, one or more nodes may be temporarily omitted (e.g., receive no input and generate no output) while training. For each training object, one or more nodes of the ANN may have some probability of being omitted. The nodes that are omitted for a particular training object may be different than the nodes omitted for other training objects (e.g., the nodes may be temporarily omitted on an object-by-object basis). Although this disclosure describes training an ANN in a particular manner, this disclosure contemplates training an ANN in any suitable manner.

Privacy

**[0121]** In particular embodiments, one or more objects (e.g., content or other types of objects) of a computing system may be associated with one or more privacy settings. The one or more objects may be stored on or otherwise associated with any suitable computing system or application, such as, for example, a social-networking system **160**, a client system **130**, an assistant system **140**, a third-party system **170**, a social-networking application, an assistant application, a messaging application, a photo-sharing application, or any other suitable computing system or application. Although the examples discussed herein are in the context of an online social network, these privacy settings may be applied to any other suitable computing system. Privacy settings (or "access settings") for an object may be stored in any suitable manner, such as, for example, in association with the object, in an index on an authorization server, in another suitable manner, or any suitable combination thereof. A privacy setting for an object may specify how the object (or particular information associated with the object) can be accessed, stored, or otherwise used (e.g., viewed, shared, modified, copied, executed, surfaced, or identified) within the online social network. When privacy settings for an object allow a particular user or other entity to access that object, the object may be described as being "visible" with respect to that user or other entity. As an example and not by way of limitation, a user of the online

social network may specify privacy settings for a user-profile page that identify a set of users that may access work-experience information on the user-profile page, thus excluding other users from accessing that information.

**[0122]** In particular embodiments, privacy settings for an object may specify a "blocked list" of users or other entities that should not be allowed to access certain information associated with the object. In particular embodiments, the blocked list may include third-party entities. The blocked list may specify one or more users or entities for which an object is not visible. As an example and not by way of limitation, a user may specify a set of users who may not access photo albums associated with the user, thus excluding those users from accessing the photo albums (while also possibly allowing certain users not within the specified set of users to access the photo albums). In particular embodiments, privacy settings may be associated with particular social-graph elements. Privacy settings of a social-graph element, such as a node or an edge, may specify how the social-graph element, information associated with the social-graph element, or objects associated with the social-graph element can be accessed using the online social network. As an example and not by way of limitation, a particular concept node **704** corresponding to a particular photo may have a privacy setting specifying that the photo may be accessed only by users tagged in the photo and friends of the users tagged in the photo. In particular embodiments, privacy settings may allow users to opt in to or opt out of having their content, information, or actions stored/logged by the social-networking system **160** or assistant system **140** or shared with other systems (e.g., a third-party system **170**). Although this disclosure describes using particular privacy settings in a particular manner, this disclosure contemplates using any suitable privacy settings in any suitable manner.

**[0123]** In particular embodiments, privacy settings may be based on one or more nodes or edges of a social graph **700**. A privacy setting may be specified for one or more edges **706** or edge-types of the social graph **700**, or with respect to one or more nodes **702**, **704** or node-types of the social graph **700**. The privacy settings applied to a particular edge **706** connecting two nodes may control whether the relationship between the two entities corresponding to the nodes is visible to other users of the online social network. Similarly, the privacy settings applied to a particular node may control whether the user or concept corresponding to the node is visible to other users of the online social network. As an example and not by way of limitation, a first user may share an object to the social-networking system **160**. The object may be associated with a concept node **704** connected to a user node **702** of the first user by an edge **706**. The first user may specify privacy settings that apply to a particular edge **706** connecting to the concept node **704** of the object, or may specify privacy settings that apply to all edges **706** connecting to the concept node **704**. As another example and not by way of limitation, the first user may share a set of objects of a particular object-type (e.g., a set of images). The first user may specify privacy settings with respect to all objects associated with the first user of that particular object-type as having a particular privacy setting (e.g., specifying that all images posted by the first user are visible only to friends of the first user and/or users tagged in the images).

**[0124]** In particular embodiments, the social-networking system **160** may present a "privacy wizard" (e.g., within a webpage, a module, one or more dialog boxes, or any other suitable interface) to the first user to assist the first user in specifying one or more privacy settings. The privacy wizard may display instructions, suitable privacy-related information, current privacy settings, one or more input fields for accepting one or more inputs from the first user specifying a change or confirmation of privacy settings, or any suitable combination thereof. In particular embodiments, the social-networking system **160** may offer a "dashboard" functionality to the first user that may display, to the first user, current privacy settings of the first user. The dashboard functionality may be displayed to the first user at any appropriate time (e.g., following an input from the first user summoning the dashboard functionality, following the occurrence of a particular event or trigger action). The dashboard functionality may allow the first user to modify one or more of the first user's current privacy settings at any time, in any suitable manner (e.g., redirecting the first user to the privacy wizard).

**[0125]** Privacy settings associated with an object may specify any suitable granularity of permitted access or denial of access. As an example and not by way of limitation, access or denial of access may be specified for particular users (e.g., only me, my roommates, my boss), users within a particular degree-of-separation (e.g., friends, friends-of-friends), user groups (e.g., the gaming club, my family), user networks (e.g., employees of particular employers, students or alumni of particular university), all users ("public"), no users ("private"), users of third-party systems **170**, particular applications (e.g., third-party applications, external websites), other suitable entities, or any suitable combination thereof. Although this disclosure describes particular granularities of permitted access or denial of access, this disclosure contemplates any suitable granularities of permitted access or denial of access.

**[0126]** In particular embodiments, one or more servers **162** may be authorization/privacy servers for enforcing privacy settings. In response to a request from a user (or other entity) for a particular object stored in a data store **164**, the social-networking system **160** may send a request to the data store **164** for the object. The request may identify the user associated with the request and the object may be sent only to the user (or a client system **130** of the user) if the authorization server determines that the user is authorized to access the object based on the privacy settings associated with the object. If the requesting user is not authorized to access the object, the authorization server may prevent the requested object from being retrieved from the data store **164** or may prevent the requested object from being sent to the user. In the search-query context, an object may be provided as a search result only if the querying user is authorized to access the object, e.g., if the privacy settings for the object allow it to be surfaced to, discovered by, or otherwise visible to the querying user. In particular embodiments, an object may represent content that is visible to a user through a newsfeed of the user. As an example and not by way of limitation, one or more objects may be visible to a user's "Trending" page. In particular embodiments, an object may correspond to a particular user. The object may be content associated with the particular user, or may be the particular user's account or information stored on the social-networking system **160**, or other computing system. As an example and not by way of limitation, a first user may view one or more second users of an online social network through a "People You May Know" function of the online social network, or by viewing a list of friends of the first

user. As an example and not by way of limitation, a first user may specify that they do not wish to see objects associated with a particular second user in their newsfeed or friends list. If the privacy settings for the object do not allow it to be surfaced to, discovered by, or visible to the user, the object may be excluded from the search results. Although this disclosure describes enforcing privacy settings in a particular manner, this disclosure contemplates enforcing privacy settings in any suitable manner.

**[0127]** In particular embodiments, different objects of the same type associated with a user may have different privacy settings. Different types of objects associated with a user may have different types of privacy settings. As an example and not by way of limitation, a first user may specify that the first user's status updates are public, but any images shared by the first user are visible only to the first user's friends on the online social network. As another example and not by way of limitation, a user may specify different privacy settings for different types of entities, such as individual users, friends-of-friends, followers, user groups, or corporate entities. As another example and not by way of limitation, a first user may specify a group of users that may view videos posted by the first user, while keeping the videos from being visible to the first user's employer. In particular embodiments, different privacy settings may be provided for different user groups or user demographics. As an example and not by way of limitation, a first user may specify that other users who attend the same university as the first user may view the first user's pictures, but that other users who are family members of the first user may not view those same pictures.

**[0128]** In particular embodiments, the social-networking system **160** may provide one or more default privacy settings for each object of a particular object-type. A privacy setting for an object that is set to a default may be changed by a user associated with that object. As an example and not by way of limitation, all images posted by a first user may have a default privacy setting of being visible only to friends of the first user and, for a particular image, the first user may change the privacy setting for the image to be visible to friends and friends-of-friends.

**[0129]** In particular embodiments, privacy settings may allow a first user to specify (e.g., by opting out, by not opting in) whether the social-networking system **160** or assistant system **140** may receive, collect, log, or store particular objects or information associated with the user for any purpose. In particular embodiments, privacy settings may allow the first user to specify whether particular applications or processes may access, store, or use particular objects or information associated with the user. The privacy settings may allow the first user to opt in or opt out of having objects or information accessed, stored, or used by specific applications or processes. The social-networking system **160** or assistant system **140** may access such information in order to provide a particular function or service to the first user, without the social-networking system **160** or assistant system **140** having access to that information for any other purposes. Before accessing, storing, or using such objects or information, the social-networking system **160** or assistant system **140** may prompt the user to provide privacy settings specifying which applications or processes, if any, may access, store, or use the object or information prior to allowing any such action. As an example and not by way of limitation, a first user may transmit a message to a second user via an application related to the online social network (e.g., a messaging app), and may specify privacy settings that such messages should not be stored by the social-networking system **160** or assistant system **140**.

**[0130]** In particular embodiments, a user may specify whether particular types of objects or information associated with the first user may be accessed, stored, or used by the social-networking system **160** or assistant system **140**. As an example and not by way of limitation, the first user may specify that images sent by the first user through the social-networking system **160** or assistant system **140** may not be stored by the social-networking system **160** or assistant system **140**. As another example and not by way of limitation, a first user may specify that messages sent from the first user to a particular second user may not be stored by the social-networking system **160** or assistant system **140**. As yet another example and not by way of limitation, a first user may specify that all objects sent via a particular application may be saved by the social-networking system **160** or assistant system **140**.

**[0131]** In particular embodiments, privacy settings may allow a first user to specify whether particular objects or information associated with the first user may be accessed from particular client systems **130** or third-party systems **170**. The privacy settings may allow the first user to opt in or opt out of having objects or information accessed from a particular device (e.g., the phone book on a user's smart phone), from a particular application (e.g., a messaging app), or from a particular system (e.g., an email server). The social-networking system **160** or assistant system **140** may provide default privacy settings with respect to each device, system, or application, and/or the first user may be prompted to specify a particular privacy setting for each context. As an example and not by way of limitation, the first user may utilize a location-services feature of the social-networking system **160** or assistant system **140** to provide recommendations for restaurants or other places in proximity to the user. The first user's default privacy settings may specify that the social-networking system **160** or assistant system **140** may use location information provided from a client device **130** of the first user to provide the location-based services, but that the social-networking system **160** or assistant system **140** may not store the location information of the first user or provide it to any third-party system **170**. The first user may then update the privacy settings to allow location information to be used by a third-party image-sharing application in order to geo-tag photos.

**[0132]** In particular embodiments, privacy settings may allow a user to specify one or more geographic locations from which objects can be accessed. Access or denial of access to the objects may depend on the geographic location of a user who is attempting to access the objects. As an example and not by way of limitation, a user may share an object and specify that only users in the same city may access or view the object. As another example and not by way of limitation, a first user may share an object and specify that the object is visible to second users only while the first user is in a particular location. If the first user leaves the particular location, the object may no longer be visible to the second users. As another example and not by way of limitation, a first user may specify that an object is visible only to second users within a threshold distance from the first user. If the first user subsequently changes location, the original second users with access to the object may lose

access, while a new group of second users may gain access as they come within the threshold distance of the first user.

**[0133]** In particular embodiments, the social-networking system **160** or assistant system **140** may have functionalities that may use, as inputs, personal or biometric information of a user for user-authentication or experience-personalization purposes. A user may opt to make use of these functionalities to enhance their experience on the online social network. As an example and not by way of limitation, a user may provide personal or biometric information to the social-networking system **160** or assistant system **140**. The user's privacy settings may specify that such information may be used only for particular processes, such as authentication, and further specify that such information may not be shared with any third-party system **170** or used for other processes or applications associated with the social-networking system **160** or assistant system **140**. As another example and not by way of limitation, the social-networking system **160** may provide a functionality for a user to provide voice-print recordings to the online social network. As an example and not by way of limitation, if a user wishes to utilize this function of the online social network, the user may provide a voice recording of his or her own voice to provide a status update on the online social network. The recording of the voice-input may be compared to a voice print of the user to determine what words were spoken by the user. The user's privacy setting may specify that such voice recording may be used only for voice-input purposes (e.g., to authenticate the user, to send voice messages, to improve voice recognition in order to use voice-operated features of the online social network), and further specify that such voice recording may not be shared with any third-party system **170** or used by other processes or applications associated with the social-networking system **160**. As another example and not by way of limitation, the social-networking system **160** may provide a functionality for a user to provide a reference image (e.g., a facial profile, a retinal scan) to the online social network. The online social network may compare the reference image against a later-received image input (e.g., to authenticate the user, to tag the user in photos). The user's privacy setting may specify that such image may be used only for a limited purpose (e.g., authentication, tagging the user in photos), and further specify that such image may not be shared with any third-party system **170** or used by other processes or applications associated with the social-networking system **160**.

Systems and Methods

**[0134]** FIG. **10** illustrates an example computer system **1000**. In particular embodiments, one or more computer systems **1000** perform one or more steps of one or more methods described or illustrated herein. In particular embodiments, one or more computer systems **1000** provide functionality described or illustrated herein. In particular embodiments, software running on one or more computer systems **1000** performs one or more steps of one or more methods described or illustrated herein or provides functionality described or illustrated herein. Particular embodiments include one or more portions of one or more computer systems **1000**. Herein, reference to a computer system may encompass a computing device, and vice versa, where appropriate. Moreover, reference to a computer system may encompass one or more computer systems, where appropriate.

**[0135]** This disclosure contemplates any suitable number of computer systems **1000**. This disclosure contemplates computer system **1000** taking any suitable physical form. As example and not by way of limitation, computer system **1000** may be an embedded computer system, a system-on-chip (SOC), a single-board computer system (SBC) (such as, for example, a computer-on-module (COM) or system-on-module (SOM)), a desktop computer system, a laptop or notebook computer system, an interactive kiosk, a mainframe, a mesh of computer systems, a mobile telephone, a personal digital assistant (PDA), a server, a tablet computer system, or a combination of two or more of these. Where appropriate, computer system **1000** may include one or more computer systems **1000**; be unitary or distributed; span multiple locations; span multiple machines; span multiple data centers; or reside in a cloud, which may include one or more cloud components in one or more networks. Where appropriate, one or more computer systems **1000** may perform without substantial spatial or temporal limitation one or more steps of one or more methods described or illustrated herein. As an example and not by way of limitation, one or more computer systems **1000** may perform in real time or in batch mode one or more steps of one or more methods described or illustrated herein. One or more computer systems **1000** may perform at different times or at different locations one or more steps of one or more methods described or illustrated herein, where appropriate.

**[0136]** In particular embodiments, computer system **1000** includes a processor **1002**, memory **1004**, storage **1006**, an input/output (I/O) interface **1008**, a communication interface **1010**, and a bus **1012**. Although this disclosure describes and illustrates a particular computer system having a particular number of particular components in a particular arrangement, this disclosure contemplates any suitable computer system having any suitable number of any suitable components in any suitable arrangement.

**[0137]** In particular embodiments, processor **1002** includes hardware for executing instructions, such as those making up a computer program. As an example and not by way of limitation, to execute instructions, processor **1002** may retrieve (or fetch) the instructions from an internal register, an internal cache, memory **1004**, or storage **1006**; decode and execute them; and then write one or more results to an internal register, an internal cache, memory **1004**, or storage **1006**. In particular embodiments, processor **1002** may include one or more internal caches for data, instructions, or addresses. This disclosure contemplates processor **1002** including any suitable number of any suitable internal caches, where appropriate. As an example and not by way of limitation, processor **1002** may include one or more instruction caches, one or more data caches, and one or more translation lookaside buffers (TLBs). Instructions in the instruction caches may be copies of instructions in memory **1004** or storage **1006**, and the instruction caches may speed up retrieval of those instructions by processor **1002**. Data in the data caches may be copies of data in memory **1004** or storage **1006** for instructions executing at processor **1002** to operate on; the results of previous instructions executed at processor **1002** for access by subsequent instructions executing at processor **1002** or for writing to memory **1004** or storage **1006**; or other suitable data. The data caches may speed up read or write operations by processor **1002**. The TLBs may speed up virtual-address translation for processor **1002**. In particular embodiments, processor **1002** may

include one or more internal registers for data, instructions, or addresses. This disclosure contemplates processor **1002** including any suitable number of any suitable internal registers, where appropriate. Where appropriate, processor **1002** may include one or more arithmetic logic units (ALUs); be a multi-core processor; or include one or more processors **1002**. Although this disclosure describes and illustrates a particular processor, this disclosure contemplates any suitable processor.

**[0138]** In particular embodiments, memory **1004** includes main memory for storing instructions for processor **1002** to execute or data for processor **1002** to operate on. As an example and not by way of limitation, computer system **1000** may load instructions from storage **1006** or another source (such as, for example, another computer system **1000**) to memory **1004**. Processor **1002** may then load the instructions from memory **1004** to an internal register or internal cache. To execute the instructions, processor **1002** may retrieve the instructions from the internal register or internal cache and decode them. During or after execution of the instructions, processor **1002** may write one or more results (which may be intermediate or final results) to the internal register or internal cache. Processor **1002** may then write one or more of those results to memory **1004**. In particular embodiments, processor **1002** executes only instructions in one or more internal registers or internal caches or in memory **1004** (as opposed to storage **1006** or elsewhere) and operates only on data in one or more internal registers or internal caches or in memory **1004** (as opposed to storage **1006** or elsewhere). One or more memory buses (which may each include an address bus and a data bus) may couple processor **1002** to memory **1004**. Bus **1012** may include one or more memory buses, as described below. In particular embodiments, one or more memory management units (MMUs) reside between processor **1002** and memory **1004** and facilitate accesses to memory **1004** requested by processor **1002**. In particular embodiments, memory **1004** includes random access memory (RAM). This RAM may be volatile memory, where appropriate. Where appropriate, this RAM may be dynamic RAM (DRAM) or static RAM (SRAM). Moreover, where appropriate, this RAM may be single-ported or multi-ported RAM. This disclosure contemplates any suitable RAM. Memory **1004** may include one or more memories **1004**, where appropriate. Although this disclosure describes and illustrates particular memory, this disclosure contemplates any suitable memory.

**[0139]** In particular embodiments, storage **1006** includes mass storage for data or instructions. As an example and not by way of limitation, storage **1006** may include a hard disk drive (HDD), a floppy disk drive, flash memory, an optical disc, a magneto-optical disc, magnetic tape, or a Universal Serial Bus (USB) drive or a combination of two or more of these. Storage **1006** may include removable or non-removable (or fixed) media, where appropriate. Storage **1006** may be internal or external to computer system **1000**, where appropriate. In particular embodiments, storage **1006** is non-volatile, solid-state memory. In particular embodiments, storage **1006** includes read-only memory (ROM). Where appropriate, this ROM may be mask-programmed ROM, programmable ROM (PROM), erasable PROM (EPROM), electrically erasable PROM (EEPROM), electrically alterable ROM (EAROM), or flash memory or a combination of two or more of these. This disclosure contemplates mass storage **1006** taking any suitable physical form. Storage **1006** may include one or more storage control units facilitating communication between processor **1002** and storage **1006**, where appropriate. Where appropriate, storage **1006** may include one or more storages **1006**. Although this disclosure describes and illustrates particular storage, this disclosure contemplates any suitable storage.

**[0140]** In particular embodiments, I/O interface **1008** includes hardware, software, or both, providing one or more interfaces for communication between computer system **1000** and one or more I/O devices. Computer system **1000** may include one or more of these I/O devices, where appropriate. One or more of these I/O devices may enable communication between a person and computer system **1000**. As an example and not by way of limitation, an I/O device may include a keyboard, keypad, microphone, monitor, mouse, printer, scanner, speaker, still camera, stylus, tablet, touch screen, trackball, video camera, another suitable I/O device or a combination of two or more of these. An I/O device may include one or more sensors. This disclosure contemplates any suitable I/O devices and any suitable I/O interfaces **1008** for them. Where appropriate, I/O interface **1008** may include one or more device or software drivers enabling processor **1002** to drive one or more of these I/O devices. I/O interface **1008** may include one or more I/O interfaces **1008**, where appropriate. Although this disclosure describes and illustrates a particular I/O interface, this disclosure contemplates any suitable I/O interface.

**[0141]** In particular embodiments, communication interface **1010** includes hardware, software, or both providing one or more interfaces for communication (such as, for example, packet-based communication) between computer system **1000** and one or more other computer systems **1000** or one or more networks. As an example and not by way of limitation, communication interface **1010** may include a network interface controller (NIC) or network adapter for communicating with an Ethernet or other wire-based network or a wireless NIC (WNIC) or wireless adapter for communicating with a wireless network, such as a WI-FI network. This disclosure contemplates any suitable network and any suitable communication interface **1010** for it. As an example and not by way of limitation, computer system **1000** may communicate with an ad hoc network, a personal area network (PAN), a local area network (LAN), a wide area network (WAN), a metropolitan area network (MAN), or one or more portions of the Internet or a combination of two or more of these. One or more portions of one or more of these networks may be wired or wireless. As an example, computer system **1000** may communicate with a wireless PAN (WPAN) (such as, for example, a BLUETOOTH WPAN), a WI-FI network, a WI-MAX network, a cellular telephone network (such as, for example, a Global System for Mobile Communications (GSM) network), or other suitable wireless network or a combination of two or more of these. Computer system **1000** may include any suitable communication interface **1010** for any of these networks, where appropriate. Communication interface **1010** may include one or more communication interfaces **1010**, where appropriate. Although this disclosure describes and illustrates a particular communication interface, this disclosure contemplates any suitable communication interface.

**[0142]** In particular embodiments, bus **1012** includes hardware, software, or both coupling components of computer system **1000** to each other. As an example and not by way of limitation, bus **1012** may include an Accelerated Graphics

Port (AGP) or other graphics bus, an Enhanced Industry Standard Architecture (EISA) bus, a front-side bus (FSB), a HYPERTRANSPORT (HT) interconnect, an Industry Standard Architecture (ISA) bus, an INFINIBAND interconnect, a low-pin-count (LPC) bus, a memory bus, a Micro Channel Architecture (MCA) bus, a Peripheral Component Interconnect (PCI) bus, a PCI-Express (PCIe) bus, a serial advanced technology attachment (SATA) bus, a Video Electronics Standards Association local (VLB) bus, or another suitable bus or a combination of two or more of these. Bus **1012** may include one or more buses **1012**, where appropriate. Although this disclosure describes and illustrates a particular bus, this disclosure contemplates any suitable bus or interconnect.

**[0143]** Herein, a computer-readable non-transitory storage medium or media may include one or more semiconductor-based or other integrated circuits (ICs) (such, as for example, field-programmable gate arrays (FPGAs) or application-specific ICs (ASICs)), hard disk drives (HDDs), hybrid hard drives (HHDs), optical discs, optical disc drives (ODDs), magneto-optical discs, magneto-optical drives, floppy diskettes, floppy disk drives (FDDs), magnetic tapes, solid-state drives (SSDs), RAM-drives, SECURE DIGITAL cards or drives, any other suitable computer-readable non-transitory storage media, or any suitable combination of two or more of these, where appropriate. A computer-readable non-transitory storage medium may be volatile, non-volatile, or a combination of volatile and non-volatile, where appropriate.

Miscellaneous

**[0144]** Herein, "or" is inclusive and not exclusive, unless expressly indicated otherwise or indicated otherwise by context. Therefore, herein, "A or B" means "A, B, or both," unless expressly indicated otherwise or indicated otherwise by context. Moreover, "and" is both joint and several, unless expressly indicated otherwise or indicated otherwise by context. Therefore, herein, "A and B" means "A and B, jointly or severally," unless expressly indicated otherwise or indicated otherwise by context.

**[0145]** The scope of this disclosure encompasses all changes, substitutions, variations, alterations, and modifications to the example embodiments described or illustrated herein that a person having ordinary skill in the art would comprehend. The scope of this disclosure is not limited to the example embodiments described or illustrated herein. Moreover, although this disclosure describes and illustrates respective embodiments herein as including particular components, elements, feature, functions, operations, or steps, any of these embodiments may include any combination or permutation of any of the components, elements, features, functions, operations, or steps described or illustrated anywhere herein that a person having ordinary skill in the art would comprehend. Furthermore, reference in the appended claims to an apparatus or system or a component of an apparatus or system being adapted to, arranged to, capable of, configured to, enabled to, operable to, or operative to perform a particular function encompasses that apparatus, system, component, whether or not it or that particular function is activated, turned on, or unlocked, as long as that apparatus, system, or component is so adapted, arranged, capable, configured, enabled, operable, or operative. Additionally, although this disclosure describes or illustrates particular embodiments as providing particular advantages, particular embodiments may provide none, some, or all of these advantages.

**1**. (canceled)

**2**. A method comprising, by one or more computing systems:

receiving, from a head-worn device associated with a user, a user input comprising an ambiguous mention, wherein the head-worn device comprises one or more cameras;

accessing first sensory data captured by the one or more cameras;

disambiguating the ambiguous mention by recognizing an object represented in the first sensory data;

receiving a confirmation from the user that the object resolves the ambiguous mention; and

in response to receiving the confirmation, generating a media file comprising second sensory data captured by the one or more cameras, wherein the object is represented in the second sensory data.

**3**. The method of claim **2**, further comprising cropping a field of view associated with the first sensory data and displaying the object on a display of the head-worn device for the confirmation from the user.

**4**. The method of claim **2**, further comprising presenting the media file on a display of the head-worn device.

**5**. The method of claim **2**, wherein the head-worn device is an AR glasses.

**6**. The method of claim **2**, wherein the media file comprises a video recording.

**7**. The method of claim **6**, wherein the video recording satisfies a predefined quality standard.

**8**. The method of claim **2**, wherein the user input comprises a voice input captured by a microphone of the head-worn device.

**9**. The method of claim **8**, wherein the voice input comprises a command to capture media associated with the object.

**10**. One or more non-transitory computer-readable storage media storing instructions that, when executed by one or more processors, cause the one or more processors to:

receive, from a head-worn device associated with a user, a user input comprising an ambiguous mention, wherein the head-worn device comprises one or more cameras;

access first sensory data captured by the one or more cameras;

disambiguate the ambiguous mention by recognizing an object represented in the first sensory data;

receive a confirmation from the user that the object resolves the ambiguous mention; and

in response to receiving the confirmation, generate a media file comprising second sensory data captured by the one or more cameras, wherein the object is represented in the second sensory data.

**11**. The non-transitory computer readable storage media of claim **10**, wherein the instructions, when executed by the one or more processors, further cause the one or more processors to:

crop a field of view associated with the first sensory data; and

display the object on a display of the head-worn device for the confirmation from the user.

**12**. The non-transitory computer readable storage media of claim **10**, wherein the instructions, when executed by the one or more processors, further cause the one or more processors to:

present the media file on a display of the head-worn device.

**13**. The non-transitory computer readable storage media of claim **10**, wherein the head-worn device is an AR glasses.

**14**. The non-transitory computer readable storage media of claim **10**, wherein the media file comprises a video recording.

**15**. The non-transitory computer readable storage media of claim **14**, wherein the video recording satisfies a pre-defined quality standard.

**16**. The non-transitory computer readable storage media of claim **10**, wherein the user input comprises a voice input captured by a microphone of the head-worn device.

**17**. The non-transitory computer readable storage media of claim **16**, wherein the voice input comprises a command to capture media associated with the object.

**18**. A head-worn device comprising:

one or more cameras;

one or more processors;

one or more non-transitory computer-readable storage media storing instructions that, when executed by one or more processors, cause the head-worn device to:

receive a user input comprising an ambiguous mention;

access first sensory data captured by the one or more cameras;

disambiguate the ambiguous mention by recognizing an object represented in the first sensory data;

receive a confirmation from a user of the head-worn device that the object resolves the ambiguous mention; and

in response to receiving the confirmation, generate a media file comprising second sensory data captured by the one or more cameras, wherein the object is represented in the second sensory data.

**19**. The head-worn device of claim **18**, wherein the instructions, when executed by the one or more processors, further cause the head-worn device to:

crop a field of view associated with the first sensory data; and

display the object on a display of the head-worn device for the confirmation from the user.

**20**. The head-worn device of claim **18**, further comprising:

a microphone configured to receive the user input, wherein the user input comprises a voice command to capture media associated with the object.

**21**. The head-worn device of claim **18**, wherein the instructions, when executed by the one or more processors, further cause the head-worn device to, further comprising presenting the media file on a display of the head-worn device.

* * * * *

**ATTACHMENT 5 SLIP SHEET**

Description: Deputy Secretary of Defense (Feinberg) Memorandum, "Fostering One Strong Industrial Base" - Already on Docket

Date: September 14/15, 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

**ATTACHMENT 6 SLIP SHEET**

Description: Anduril Industries $90B Employee Tender Offer / Share Sale Announcement

Date: October 13, 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

BREAKING is leaving, will be replaced by Peter Rice

CNBC LIVESTREAM SIGN IN

TECH

# Anduril employee tender offer would value the defense tech startup at $90 billion

PUBLISHED WED, OCT 14 2026•4:02 PM EDT UPDATED WED, OCT 14 2026•4:24 PM EDT

Samantha Subin
@SAMANTHA_SUBIN

WATCH LIVE
SHARE

## KEY POINTS

- Anduril will let employees sell shares through a tender offer that would value the company at $90 billion
- Bloomberg reported the shares are priced at $94.80 apiece and the offer is capped at $1.3 billion
- Anduril was valued at $61 billion in a $5 billion funding round announced in May.




MARKETS VIDEO WATCHLIST MENU

BREAKING is leaving, will be replaced by Peter Rice



Defense tech startup Anduril will give employees a chance to sell stock through a tender offer that would value the company at roughly $90 billion, CNBC has confirmed.

Bloomberg was the first to report the news, citing sources familiar with the matter. Anduril confirmed the report to CNBC.

Employees participating in the offering can sell shares at $94.80 apiece. The offer, which opened on Oct. 13 and closes Nov. 9, is capped at $1.3 billion, according to the report.

Bloomberg reported that employees in 16 countries are eligible to participate.

Anduril has been a major winner of the growing U.S. defense tech boom and President Donald Trump's plans to reindustrialize the U.S. military. In May, the company closed a $5 billion funding round that doubled its valuation to $61 billion.

Co-founder and Oculus headset creator Palmer Luckey is among a growing group of defense tech leaders taking on advisory roles in Washington as they compete for key Department of Defense contracts.

This month, the company inked a U.S. Navy shipyard contract worth up to $2.9 billion, shortly after Luckey was named a co-director of Project Meridian, which aims to develop and scale military capabilities. SpaceX ⊞ rocket maker CEO Elon Musk also joined the initiative.

Founded in 2017, Anduril has gained prominence for its drones, augmented reality headsets and AI software it's developing for the U.S. government and allied governments. Last month, the company made headlines after Iran said it had captured one of its underwater vehicles.

**BREAKING** is leaving, will be replaced by Peter Rice

CNBC LIVESTREAM SIGN IN



**VIDEO** 01:22

**Anduril secures $2.9 billion navy submarine shipyard contract**

**Read more CNBC tech news**

- Amazon launches new Bee ‘personal AI’ devices that listen to conversations
- Nvidia CEO Jensen Huang urges U.S.-China dialogue on ‘potentially dangerous’ AI
- OpenAI sued by 8 states over ChatGPT safety concerns
- Anthropic’s third-quarter revenue is said to hit $16.8 billion ahead of IPO

**Choose CNBC as your preferred source on Google and never miss a moment from the most trusted name in business news.**

## TRENDING NOW




Trump says ‘if Ken Paxton loses’ Texas Senate race, blame Cornyn and Karl Rove

MARKETS VIDEO WATCHLIST MENU

**BREAKING** is leaving, will be replaced by Peter Rice

CNBC LIVESTREAM SIGN IN




KFC to switch to Coca-Cola beverages in U.S. restaurants for the first time in decades




Southwest is overhauling its frequent flyer program. Here's what's changing




Elon Musk says Trump is 'ultimately' responsible for any curbs on Ukraine's Starshield systems

CNBC

Subscribe to CNBC PRO
Licensing & Reprints
Select Personal Finance
Closed Captioning
News Releases
Corrections
Site Map
Careers
Contact

Subscribe to Investing Club
CNBC Councils
Join the CNBC Panel
Digital Products
Internships
About CNBC
Podcasts
Help

MARKETS VIDEO WATCHLIST MENU

EXCLUSIVE Business | Cybersecurity

# Anduril in Talks to Sell Insider Shares at Roughly $90 Billion Valuation

Brian Schimpf, chief executive officer of Anduril Industries. *Photographer: Jose Sarmento Matos/Bloomberg*

By Rebecca Torrence, Edward Ludlow, Natasha Mascarenhas, and Katrina Manson
October 14, 2026 at 1:11 PM EDT
*Updated on October 14, 2026 at 1:16 PM EDT*

Save Translate

**Takeaways** by Bloomberg AI

Anduril Industries Inc. is allowing employees to sell shares as part of a tender that stands to value the defense technology startup at roughly $90 billion, according to people familiar with the situation who asked not to be identified because the plans aren't public.

The tender would give employees the chance to sell shares at $94.80 each, with the overall size of the offer capped at about $1.3 billion, according to people briefed on the matter, who asked not to be identified discussing private details. The tender offer opened on Oct. 13 and is set to close Nov. 9, one of the people said.

A representative for Anduril declined to comment.

Bloomberg

Terms of Service Do Not Sell or Share My Personal Information Trademarks Privacy Policy

Careers Advertise Ad Choices Help

©2026 Bloomberg L.P. All Rights Reserved.

**ATTACHMENT 7 SLIP SHEET**

Description: D. Mass. ECF No. 91 the “Meet and Confer” and before ECF 92 — 65 Technical Attachments Date: Unsealed on or about June 5, 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

US010866417B2

(12) **United States Patent**
**Sung et al.**

(10) **Patent No.: US 10,866,417 B2**
(45) **Date of Patent: Dec. 15, 2020**

(54) **LENS UNIT AND SEE-THROUGH TYPE DISPLAY APPARATUS INCLUDING THE SAME**

(71) Applicants: **SAMSUNG ELECTRONICS CO., LTD.**, Suwon-si (KR); **SEOUL NATIONAL UNIVERSITY R&DB FOUNDATION**, Seoul (KR)

(72) Inventors: **Geeyoung Sung**, Daegu (KR); **Hongseok Lee**, Seoul (KR); **Byoungho Lee**, Seoul (KR); **Changkun Lee**, Seoul (KR); **Seokil Moon**, Seoul (KR); **Jongyoung Hong**, Seoul (KR)

(73) Assignees: **SAMSUNG ELECTRONICS CO., LTD.**, Suwon-si (KR); **SEOUL NATIONAL UNIVERSITY R&DB FOUNDATION**, Seoul (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 285 days.

(21) Appl. No.: **15/788,402**

(22) Filed: **Oct. 19, 2017**

(65) **Prior Publication Data**

US 2018/0107000 A1 Apr. 19, 2018

(30) **Foreign Application Priority Data**

Oct. 19, 2016 (KR) .................... 10-2016-0135926

(51) **Int. Cl.**
***G02B 27/01*** (2006.01)
***G02B 27/28*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... ***G02B 27/0172*** (2013.01); ***G02B 3/10*** (2013.01); ***G02B 3/14*** (2013.01); ***G02B 5/3083*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .............. G02B 27/0172; G02B 27/01; G02B 27/0101; G02B 27/0149; G02B 27/017;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,816,314 B2 11/2004 Shimizu et al.
2004/0108971 A1 * 6/2004 Waldern ......... G02B 27/0093 345/8

(Continued)

FOREIGN PATENT DOCUMENTS

JP 200290687 A 3/2002
JP 3413885 B2 6/2003

(Continued)

OTHER PUBLICATIONS

Communication dated Mar. 6, 2018, from the European Patent Office in counterpart European Application No. 17196912.4.

(Continued)

*Primary Examiner* — Kristina M Deherrera
(74) *Attorney, Agent, or Firm* — Sughrue Mion, PLLC

(57) **ABSTRACT**

A see-through type display apparatus includes a see-through type optical system configured to transmit a first image via a first-path light, which is light traveling on a first path, to an ocular organ of a user, and a second image via a second-path light, which is light traveling on a second path, to the ocular organ of the user; and an incident light-dependent lens unit provided between the see-through type optical system and the ocular organ of the user and having different refractive powers according to characteristics of incident light, where the incident light-dependent lens unit has a positive first refractive power with respect to the first-path light and has a second refractive power different from the first refractive power with respect to the second-path light.

**18 Claims, 19 Drawing Sheets**
**(1 of 19 Drawing Sheet(s) Filed in Color)**





**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**SOLOS TECHNOLOGY LIMITED,**
*Plaintiff,*

**v.**

**Case No. 1:26-cv-10304-ADB**
Judge Allison D. Burroughs

**META PLATFORMS, INC., et al.,**
*Defendants.*

**In re: DAITONA CARTER**
*Proposed Intervenor.*

## TIMELINE COMPARISON CHART

| Year | Movant Milestone (Key Exhibits) | Solos | Meta |
|---|---|---|---|
| **2013** | Context-aware AV/ad-insertion (M-1) | — | — |
| **2016** | Nurture + public "AI parents" post (M-3, M-76/77) | — | — |
| **2017** | **Full prototype cluster** (Oct 2017): 5-week post with Samsung/Oracle/NAVER viewers (M-88/M-8), optics/Snell's Law (M-74/M-12), frame assembly (M-6/M-50), Discovery/Geo AR (M-17/M-18), Samsung sensor specialist outreach (M-15), Alpha Labs CEO outreach (M-24/M-89), cut-glass experiment (M-102), physical glasses photo (M-32/M-83/M-103), DLP diagram (M-81), public LinkedIn prototype post (M-90) | — | — |
| **2018** | Thermal eye-tracking STL (M-97) | — | — |
| **2019** | "**Meet Aria**" deck + patent meetup (M-52–54, M-98) | — | — |
| **2020** | Samsung patent published (M-100) + LinkedIn outreach | — | Project Aria announced |
| **2021** | Federal notices to Cruz/agencies (M-84–87), Ring logs (M-39), Twitter to Andrew Bosworth (M-59) | — | Ray-Ban Meta collab |
| **2023 +** | Ongoing interference documentation | AirGo launches | Consumer Ray-Ban Meta glasses |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**SOLOS TECHNOLOGY LIMITED,**
*Plaintiff,*

**v.** **Case No. 1:26-cv-10304-ADB**
Judge Allison D. Burroughs

**META PLATFORMS, INC., et al.,**
*Defendants.*

**In re: DAITONA CARTER**
*Proposed Intervenor.*

## EVIDENCE TABLE

| Exhibit No. | Date | Description (Short) | Legal Purpose |
|---|---|---|---|
| M-51 | 2009 | MirrorMixing Case Study – Waves H(ybrid)-Compressor plugin | Prior work and research with DSP/audio |
| **M-1** | **2013-03-17** | "How to add Ads to videos without distorted" (ASR-driven contextual ad insertion) | **Earliest documented conception** of context-aware AV system |
| M-3 | 2016-07-27 | "Nurture by Breaking Barriers" – NLP real-time translation wearable | Conception of AI language translation device |
| M-76/ M-77 | 2016-12-01 | LinkedIn post: "AI parents (will teach new language)" + full project list | Earliest **public** conception of AI language device |
| M-75 | 2016-10-16 | Translation interface (Korean "빵" → "Bread") | Early translation app proof |
| M-78 | 2016–2017 | Translation notes (Korean/English phrases + grammar) | Language feature development |
| M-73 | 2017-01-29 | AI language teaching software ("<3 days") | AI instruction conception |
| M-93 | 2017-02-17 | app.py – Twilio SMS integration code | Communication infrastructure / source code |
| M-92 | 2017-05-02 | pythonOCRimageToText (ocr.py + test images) | Optical character recognition source code |
| M-30/ M-95 | 2017-04-19 | PHP linguistic engine (chinese_nouns.php, grammar, etc.) | Language processing backend |
| M-96 | 2017-07-25 | "Object Detection and Recognition" (YouTube skeletal mapping) | Computer vision / object recognition conception |
| M-80/ | 2017 | Korean Real World Learning | Translation feature development |

| Exhibit No. | Date | Description (Short) | Legal Purpose |
|---|---|---|---|
| M-61 | | spreadsheet (vocabulary phrases) | |
| M-56 | 2017-01-11 | RPi Speech directory (speechAnalyser.py etc.) | Speech processing source code |
| M-88/ M-8 | 2017-10-08 | LinkedIn post: “five weeks to have a working prototype” (979 views; Samsung/Oracle/NAVER viewers) | Public diligence + industry interest |
| M-74/ M-13 | 2017-10-07 | Blog Entry 9 – Snell’s Law, lens design, optics video | Optical engineering + public disclosure |
| M-12 | 2017-10-11 | Reflection and refraction notes (Snell’s Law) | Optical physics conception |
| M-6 | 2017-10-04 | “Build a frame 3x thickness” (Maker Lab) | Frame engineering |
| M-42 | 2017 | Smart Glasses Bookmarks / Links.txt (OpenCV, RPi) | Software/hardware planning |
| M-79 | 2017-10 | LinkedIn outreach to ODG (Ralph Osterhout) & NAVER Corp | Diligence & industry collaboration |
| **M-15** | **2017** | LinkedIn profile – JeongSu Dennis HAN, Ph.D., Sensor Specialist at Samsung Electronics | **Third-party engagement / potential access** |
| **M-24** | **2017-10-21** | LinkedIn profile – Junhee Lee, CEO of The Alpha Labs Inc (optics/smart glasses) | Industry outreach (smart glasses collaboration) |
| M-89 | 2017-10-21 | Alpha Labs smart-glasses collaboration invitation | Industry engagement |
| M-90 | 2017-10-26 | LinkedIn post with prototype video + lab notes link | Public disclosure of functional prototype |
| M-18/ M-19 | 2017-10-26 | “Geo AR” + Arducam/RPi camera sourcing | Location-based AR + hardware procurement |
| M-17 | 2017-10-23 | “Discovery Mode” (OpenCV object detection + overlay) | Gaze-based recognition |
| M-50/ M-10 | 2017-10-27 | Lens & mirror mount assembly log + optical stack sketch | Physical reduction to practice |
| M-21/ M-22 | 2017-10-27 | 1.22-inch MIPI DSI display + assembly notes | Component selection & assembly |
| M-27/ M-29 | 2017 | Solar Temple Arm rendering + handwritten ergonomic specs | Wearable frame design |
| M-81 | 2017 | DLP NIRscan Nano Optical Architecture diagram | Detailed optical system design |
| M-82 | 2017 | Hand-drawn whiteboard eye diagram | Optical engineering sketch |
| M-94 | 2017 | Hand-drawn sketch: “Concave vs Convex Lenses” + solar panel | Optical design (lenses + power) |
| M-102 | ~2017 | Text message: “trying to cut glass. | Physical experimentation |

| Exhibit No. | Date | Description (Short) | Legal Purpose |
|---|---|---|---|
| | | Knife won't work. I need laser." + goggles photo | |
| M-11 | 2017 | Hacksaw tool (used for prototype frame/glass work) | Physical prototyping tool |
| M-103 | 2017 | Prototype frames description + glasses photo ("won't make you look like a douchebag") | Standalone wearable design + photo |
| M-32/ M-83 | 2017 | Black & white prototype glasses photo | Actual reduction to practice |
| M-97 | 2018-02-01 | ThermalEyetap_STL_Files.zip (3D-printable thermal eye-tracking) | Gaze/thermal interaction prototype |
| M-98 | 2019-04-17 | Meetup: "LEARN THE STEPS TO PATENT, PITCH, PRODUCE & FUNDING" | Public commercialization & patent diligence |
| M-52/ M-53/ M-54 | 2019 | "Meet Aria" pitch deck (Pages 1–3) – branding + full feature roadmap | **Prior "Aria" mark** + features predating Meta |
| M-104 | 2020-08-31 | LinkedIn connection acceptance – BACKYOUNG HEO (CEO, Bithumb Korea) | Industry outreach / visibility |
| **M-100** | **2020-12-15** (pub. 2018) | Samsung U.S. Patent 10,866,417 B2 – see-through display apparatus | **Temporal overlap + alleged copying** of Movant's Oct 2017 LinkedIn prototype post |
| M-36 | 2017–2021 | DuckDuckGo search "daitona carter" – public slides | Online visibility & public disclosure |
| M-38 | 2017+ | Post/message to Mark Zuckerberg (@zuck) about the project | Pre-litigation assertion of rights |
| M-59 | 2021-04-24 | Twitter post tagging @boztank & @fb about theft of $68B Project ARIA | Public assertion of theft |
| M-44 | 2017 | Jin Jordan / meeting location document | Outreach / collaboration documentation |
| M-84/ M-85/ M-86 | 2021-01-02 | Guerrilla Mail to Sen. Cruz (theft allegations) | Timely federal notice |
| M-87 | 2021-01-05 | Gmail to FBI/SEC/DOJ/CIA/etc. (multi-agency notice) | Formal misappropriation notice |
| M-39 | 2021-04-26 | Ring Alarm logs (95 pages – access code tampering) | Documented interference |

## Document Selection Menu

Select the document you wish to view.

| Document Number: | ☑ | 92 | 1 page | 83.3 KB |
|---|---|---|---|---|

| Attachment | | Description | Pages | Size |
|---|---|---|---|---|
| ☑ | 1 | Discovery Mode (OpenCV object detection + overlay)Gaze-based recognition | 1 page | 145.6 KB |
| ☑ | 2 | Discovery Mode (OpenCV object detection + overlay)Gaze-based recognition | 1 page | 185.3 KB |
| ☑ | 3 | Geo AR + Arducam/RPi camera sourcingLocation-based AR + hardware procurement fo | 1 page | 134.8 KB |
| ☑ | 4 | Geo AR + Arducam/RPi camera sourcingLocation-based AR + hardware procurement fo | 1 page | 141.3 KB |
| ☑ | 5 | 1.22-inch MIPI DSI display + assembly notesComponent selection & assembly | 1 page | 120.6 KB |
| ☑ | 6 | 1.22-inch MIPI DSI display + assembly notesComponent selection & assembly | 1 page | 142.2 KB |
| ☑ | 7 | I/O wiring, module choices, and firmware tests to capture speech input, process | 1 page | 142.9 KB |
| ☑ | 8 | Solar Temple Arm rendering + handwritten ergonomic specsWearable frame design | 1 page | 782.3 KB |
| ☑ | 9 | Solar Temple Arm rendering + handwritten ergonomic specsWearable frame design | 1 page | 615.0 KB |
| ☑ | 10 | PHP linguistic engine (chinese_nouns.php, grammar, etc.)Language processing bac | 1 page | 143.5 KB |
| ☑ | 11 | Lens & mirror mount assembly log + optical stack sketchPhysical reduction to pr | 1 page | 120.6 KB |
| ☑ | 12 | Acoustic Logic Case Study Waves H(ybrid)-Compressor pluginPrior work and resear | 7 pages | 1.8 MB |
| ☑ | 13 | Meet Aria pitch deck (Pages 13) branding + full feature roadmapPrior Aria mark | 3 pages | 345.4 KB |
| ☑ | 14 | RPi Speech directory (speechAnalyser.py etc.)Speech processing source code | 1 page | 24.1 KB |
| ☑ | 15 | AWS Receipt | 1 page | 157.1 KB |
| ☑ | 16 | AI language teaching software (<3 days)AI instruction conception | 1 page | 43.2 KB |
| ☑ | 17 | Translation interface (Korean Bread)Early translation app proof | 1 page | 1.9 MB |
| ☑ | 18 | Translation notes (Korean/English phrases + grammar)Language feature developmen | 1 page | 3.4 MB |
| ☑ | 19 | Black & white prototype glasses photoActual reduction to practice | 1 page | 1.0 MB |
| ☑ | 20 | Guerrilla Mail to Sen. Cruz (theft allegations)Timely federal notice | 1 page | 179.6 KB |

| | | | | |
|---|---|---|---|---|
| ☑ | 21 | Guerrilla Mail to Sen. Cruz (theft allegations)Timely federal notice | 1 page | 179.6 KB |
| ☑ | 22 | Guerrilla Mail to Sen. Cruz (theft allegations)Timely federal notice | 1 page | 156.7 KB |
| ☑ | 23 | app.py Twilio SMS integration codeCommunication infrastructure / source code | 1 page | 92.5 KB |
| ☑ | 24 | Hand-drawn sketch: Concave vs Convex Lenses + solar panelOptical design (lenses | 1 page | 713.2 KB |
| ☑ | 25 | Reflects M82- Samsung U.S. Patent 10,866,417 B2 see-through display apparatusTe | 1 page | 67.5 KB |
| ☑ | 26 | "Tech Lab 'Blog' ~ Public Notes for AR/VR Development + Women� | 2 pages | 282.4 KB |
| ☑ | 27 | KCASH (@SEEMYBIAS.official on Instagram for sister brand KPOP.Life) connec | 1 page | 155.8 KB |
| ☑ | 28 | How to add Ads to videos without distorted (ASR-driven contextual ad insertion) | 1 page | 249.3 KB |
| ☑ | 29 | Nurture by Breaking Barriers NLP real-time translation wearableConception of AI | 1 page | 247.0 KB |
| ☑ | 30 | Real World Learning - Building the algo | 1 page | 1.1 MB |
| ☑ | 31 | October 4, 2017 (Build a frame 3x thickness Use maker lab)Prototype design note | 1 page | 111.2 KB |
| ☑ | 32 | LinkedIn analytics screenshot showing post engagement metrics and viewer demogr | 1 page | 100.7 KB |
| ☑ | 33 | Prescription intergration from day one - and-drawn sketch comparing concave vs. | 1 page | 713.2 KB |
| ☑ | 34 | Photograph of hacksaw tool used by movant during physical prototyping and cutti | 1 page | 934.0 KB |
| ☑ | 35 | Reflection and refraction notes (Snells Law)Optical physics conception | 1 page | 118.9 KB |
| ☑ | 36 | LinkedIn profile JeongSu Dennis HAN, Ph.D., Sensor Specialist at Samsung Electr | 1 page | 41.1 KB |
| ☑ | 37 | Screenshot (Junhee Lee profile)Profile Date: October 21, 2017Profile of Junhee | 1 page | 60.6 KB |
| ☑ | 38 | Electromagnetic integration in movants smart glasses/head-worn AR/VR system. | 1 page | 782.3 KB |
| ☑ | 39 | Black & white prototype glasses photoActual reduction to practice | 2 pages | 158.9 KB |
| ☑ | 40 | Black & white prototype glasses photoActual reduction to practice | 1 page | 1.0 MB |
| ☑ | 41 | Thief taunting "Facebook Era" - DuckDuckGo search daitona carter pub | 1 page | 397.5 KB |
| ☑ | 42 | Post/message to Mark Zuckerberg (@zuck) about the projectPre-litigation as | 1 page | 14.0 KB |
| ☑ | 43 | Smart Glasses Bookmarks / Links.txt (OpenCV, RPi)Software/hardware planning | 1 page | 185.3 KB |
| ☑ | 44 | Prototype frames description + glasses photo (wont make you look like a doucheb | 1 page | 303.2 KB |

| | | | | |
|---|---|---|---|---|
| ☑ | 45 | Text message: trying to cut glass. Knife wont work. I need laser. + goggles pho | 1 page | 102.9 KB |
| ☑ | 46 | Meetup: LEARN THE STEPS TO PATENT, PITCH, PRODUCE & FUNDINGPublic commercializa | 1 page | 56.8 KB |
| ☑ | 47 | Meetup: LEARN THE STEPS TO PATENT, PITCH, PRODUCE & FUNDINGPublic commercializa | 1 page | 75.8 KB |
| ☑ | 48 | ThermalEyetap_STL_Files.zip (3D-printable thermal eye-tracking)Gaze/thermal int | 1 page | 92.5 KB |
| ☑ | 49 | Object Detection and Recognition (YouTube skeletal mapping)Computer vision / ob | 1 page | 201.9 KB |
| ☑ | 50 | Object Detection and Recognition (YouTube skeletal mapping)Computer vision / ob | 1 page | 143.5 KB |
| ☑ | 51 | pythonOCRimageToText (ocr.py + test images)Optical character recognition source | 1 page | 51.0 KB |
| ☑ | 52 | Screenshot of Korean language learning table (vocabulary and phrases); supporti | 1 page | 100.7 KB |
| ☑ | 53 | Black & white prototype glasses photoActual reduction to practice | 1 page | 68.4 KB |
| ☑ | 54 | Hand-drawn whiteboard eye diagramOptical engineering sketch - Samsung Patent | 1 page | 3.4 MB |
| ☑ | 55 | DLP NIRscan Nano Optical Architecture diagramDetailed optical system design | 1 page | 3.4 MB |
| ☑ | 56 | Translation notes (Korean/English phrases + grammar)Language feature developmen | 1 page | 5.9 MB |
| ☑ | 57 | LinkedIn post: AI parents (will teach new language) + full project listEarliest | 1 page | 3.4 MB |
| ☑ | 58 | Korean Real World Learning spreadsheet (vocabulary phrases)Translation feature | 1 page | 4.4 MB |
| ☑ | 59 | Blog Entry 9 Snells Law, lens design, optics videoOptical engineering + public | 1 page | 204.1 KB |
| ☑ | 60 | LinkedIn outreach to ODG (Ralph Osterhout) & NAVER CorpDiligence & industry col | 1 page | 1.1 MB |
| ☑ | 61 | Blog Entry 9 Snells Law, lens design, optics videoOptical engineering + public | 1 page | 229.5 KB |
| ☑ | 62 | Notes on adding microphone to device using Jasper project for voice interface i | 1 page | 185.2 KB |
| ☑ | 63 | Gmail to FBI/SEC/DOJ/CIA/etc. (multi-agency notice)Formal misappropriation noti | 1 page | 50.8 KB |
| ☑ | 64 | LinkedIn post with prototype video + lab notes linkPublic disclosure of functio | 1 page | 77.6 KB |
| ☑ | 65 | Guerrilla Mail to Sen. Cruz (theft allegations)Timely federal notice | 1 page | 100.7 KB |

View Selected or Download Selected 76 pages 43.2 MB

**ATTACHMENT 8 SLIP SHEET**

Description: D. Mass. ECF No. 107 (or relevant docket entry text order) characterizing technical work as "generalized"

Date: April 29, 2026

Case No.: 1:26-cv-03318-APM (D.D.C.)

| | | |
|---|---|---|
| 04/29/2026 | 107 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Pro se movant Daitona Carter's motion for leave to file a reply, [ECF No. 106 ], is **GRANTED**.<br><br>Carter moves for reconsideration of the Court's order, [ECF No. 90 ], denying her request for intervention, [ECF Nos. 91 , 95 ], and for a stay pending her appeal of that order, [ECF No. 98 ].<br><br>The Court considers Carter's motions for reconsideration under the Rule 59(e) standard. See Perez-Perez v. Popular Leasing Rental, Inc., 993 F.2d 281, 284 (1st Cir. 1993). The granting of a motion for reconsideration is "an extraordinary remedy" that is only warranted if "newly discovered evidence... has come to light or... the rendering court committed a manifest error of law." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006) (citation omitted). "[S]imple disagreement with the court's decision is not a basis for reconsideration." Ofori v. Ruby Tuesday, Inc., 205 F. App'x 851, 853 (1st Cir. 2006). Courts have "substantial discretion" and "broad authority" to allow or deny reconsideration. Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 81–82 (1st Cir. 2008).<br><br>Carter's filings do not meet the standard for reconsideration. As an initial matter, Carter has not sufficiently shown that anything contained in the filings qualifies as "newly discovered" within the meaning of Rule 59(e), in the sense that it was not previously available to her. See Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 931 (1st Cir. 2014). More importantly, what she has submitted does not cure the defect identified in the Court's prior order, namely, that Carter has not sufficiently alleged that she conceived of or contributed to the conception of the inventions at issue in this litigation. See Glob. Health Sols. LLC v. Selner, 148 F.4th 1363, 1371 (Fed. Cir. 2025) (noting that, to prove derivation, a party "must produce evidence sufficient to show (i) conception of the claimed invention, and (ii) communication of the conceived invention to the respondent prior to respondent's filing of that patent application"); BearBox LLC v. Lancium LLC, 125 F.4th 1101, 1118 (Fed. Cir. 2025) (noting that "[a]n alleged joint inventor must show that he contributed significantly to the conception... or reduction to practice of at least one claim" and that the "contributions... arise from 'some element of joint behavior... ' with the other inventors" (citation omitted)). As Solos notes, Carter's filings reflect, at most, "generalized work in smart glasses technology, software concepts, or prior projects," without identifying any "concrete, claim-level contributions." [ECF No. 105 at 7]. Accordingly, Carter's motions for reconsideration are **DENIED**.<br><br>Before seeking a stay pending appeal from the court of appeals, a person "must ordinarily move first in the district court," Fed. R. App. P. 8(a)(1), but the standard governing its issuance is "generally the same" in both, Hilton v. Braunskill, 481 U.S. 770, 776 (1987). A stay is "'an exercise of judicial discretion' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" Nken v. Holder, 556 U.S. 418, 433 (2009) (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672–73 (1926)). To obtain a stay, Carter must "(1) make a 'strong showing that [she is] likely to succeed on the merits' in [her] appeal; (2) show that [she] 'will be irreparably injured absent a stay'; (3) show that 'issuance of the stay will [not] substantially injure the other parties interested in the proceeding'; and (4) show that the stay would serve 'the public interest.'" New York v. Trump, 133 F.4th 51, 65 (1st Cir. 2025) (quoting Nken, 556 U.S. at 434). "The first two factors... are the most critical." Nken, 556 U.S. at 434.<br><br>Carter is not entitled to a stay pending appeal. She has not made a strong showing that she is likely to succeed on the merits, identifying no authority that clearly supports her request for intervention under the circumstances. Given the weakness of her showing on the merits, even her assertions of serious harm—at least some of which appear unrelated to the present action, [ECF No. 98 at 1–2]—do not carry the day. See Braintree Lab'ys, Inc. v. Citigroup Global Markets Inc., 622 F.3d 36, 42 (1st Cir. 2010). Because Carter has not satisfied her burden on the first two factors, the Court need not consider the remaining factors. Carter's motion for a stay pending appeal is **DENIED**.<br><br>Finally, Carter is reminded that the local rules require motions and supporting materials to be filed at the same time, L.R. 7.1(a), and encouraged to refrain from filing further documents that substantially duplicate or repeat material contained in prior filings. Carter is further reminded that the Court has discretion to rescind electronic filing privileges if those privileges are abused.<br><br>(CAM) (Entered: 04/29/2026) |

**NOTE ON STATUS OF SERVICE TO THE COURT**

Plaintiff respectfully notes for the Court that formal service of the Summons and Complaint has not yet been executed upon the Defendants in this matter. Consequently, in accordance with the pre-service status of this action, copies of this clarifying correspondence and the attached declaration have not been forwarded to the named Defendants. Formal service of process will be initiated immediately upon the resolution of this threshold clarification phase.

October 19, 2026

Respectfully submitted,

Daitona Carter, Plaintiff, Pro Se
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
No Phone. All communications by email only.
legal@daitonacarter.com