| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;<br><br>PETE HEGSETH, in his official capacity as Secretary of Defense; and<br><br>WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,<br><br>Defendants. | Case No. 1:26-cv-03318-APM<br>Judge Amit P. Mehta |

**PLAINTIFF'S STANDALONE MOTION FOR PRELIMINARY INJUNCTION**

**(PURSUANT TO FED. R. CIV. P. 65(a))**

Plaintiff Daitona Carter ("Carter"), respectfully moves this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). This is a new, standalone motion. It is not a motion for reconsideration of the October 13, 2026 Order (Dkt. 21) or the October 14, 2026 Minute Order (Dkt. 24). It is based on facts that did not exist when those orders were entered. See *Lemmons v. Georgetown Univ. Hosp.,* 241 F.R.D. 15, 21 (D.D.C. 2007).

## I. LEGAL STANDARD

A preliminary injunction requires: (1) likelihood of success on the merits; (2) likelihood of irreparable harm; (3) balance of equities in the movant's favor; and (4) public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

The Feinberg Memorandum ("Fostering One Strong Industrial Base," September 14, 2026) directs the CAS-to-GAAP transition with a 60-day CASB window expiring

November 14, 2026. The memorandum states: "By law, the Pentagon will still need to apply CAS to sole source development programs until it can work within the government-wide CAS Board to change the standards of CAS to GAAP." The CAS Board has not acted. The transition, as applied to sole-source development programs (SBMC), is contrary to the memorandum's own terms and to 41 U.S.C. § 1501 et seq.

Under the APA, agency action must be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A change in longstanding policy requires a "reasoned explanation." *State Farm,* 463 U.S. at 48, 58. The Feinberg memorandum provides none.

## III. IRREPARABLE HARM

The October 14, 2026 Minute Order (Dkt. 24) found irreparable harm "speculative." That finding is no longer supportable.

### A. The Prospective Destruction of Records Is Imminent

The 60-day window expires November 14, 2026—exactly ten (10) days from the filing of this motion. As established by this Court’s October 13, 2026 Order (Dkt. 21) and subsequent October 14, 2026 Minute Order, the previous Temporary Restraining Order (TRO) requests sought to prevent the immediate October 14, 2026 conversion of existing records. That initial conversion has occurred. However, the standalone Motion for Preliminary Injunction (PI) strictly seeks separate, prospective preservation: an order directing Defendants to maintain the CAS cost-segregation format for the upcoming SBMC Phase Two data generation scheduled for January and February 2027.

If Phase Two data is generated in GAAP format, the granular CAS cost-segregation records will never exist. These records are the only document showing:

1. The scope, extent, timing, and cost of DoD's use of Carter's full architecture and designs/frameworks/models within SBMC contracts, including the DSP/beamforming (2009+), the display and lens designs used in smart glasses and military HUDs, the HUD architecture (Kopin IBAS: $34M in MicroLED display configurations for ground-soldier and pilot applications), the AI frameworks and models (commercially deployed as Meta's "Muse" agentic loop), and all underlying technology. This is the basis for a claim under 10 U.S.C. § 1498 ("reasonable and entire compensation" for government use of patented articles without license). Without the cost-segregation records, the § 1498 claim cannot be quantified across the full scope of the technology.

2. The allocation of the ARIA-marked product within SBMC contracts. The ARIA trademark (Lanham Act, 15 U.S.C. § 1051 et seq.) is a separate, independent property right that cannot be deleted by CAS-to-GAAP. A trademark is not an accounting record. But the CAS records document where, when, and how much of the ARIA-marked technology, including and not limited to the display, lens, HUD, and AI components, was deployed in government contracts. Without them, the scope of the Army's use of the ARIA-marked product is undocumented.

3. The Provenance of the Full Architecture and Irreparable Evidentiary Harm.

   Plaintiff designed and adapted the core DSP/beamforming, the display and lenses used in smart glasses and military HUDs, the modernized HUD architecture, and the underlying AI frameworks and models. All of Plaintiff's proprietary work and branding were taken without consent. The Cost Accounting Standards (CAS) records are the exclusive and irreplaceable documents showing exactly which

components of her architecture were integrated into specific SBMC contracts and how they were financially allocated.

Plaintiff is intervening in Solos v. Meta (D. Mass. 1:26-cv-10304-ADB) because the underlying Solos patents are strictly limited to audio and beamforming; they do not cover the display, lenses, HUD, or AI frameworks. Instead, Meta and the co-defendants misappropriated Plaintiff's proprietary technology and trademarks—integrating her intellectual property into dual-use frameworks within SBMC contracts completely without her consent.

Importantly, this Court's previous denial of temporary relief relied on an interlocutory order from that Massachusetts District Court which is currently under formal appellate review. Furthermore, the record in that jurisdiction was procedurally impaired because a clerical intervention actively prevented Plaintiff from submitting critical evidence. Because that out-of-district ruling is unfinalized, contested on appeal, and subject to distinct appellate issues, it cannot serve as a valid procedural bar to block prospective, standalone preliminary injunctive relief in this matter—particularly given the imminent November 14, 2026 CASB deadline.

### B. The Notice

DOJ, FBI, CIA, DoD, NSA and Meta all had direct notice from Carter since 2021 of Carter's ownership and the conditions under which the technology was produced before DoD began using it in SBMC contracts. The CAS records document the timing of the use relative to the notice. If the use began after notice, the § 1498 compensation is for deliberate, notified use, not a government emergency. The records are the only document that establishes this timeline.

### C. The CADC Appeal May Be Remanded to This Court

*Plaintiff's Emergency Motion for Injunction Pending Appeal, Carter v. Feinberg,* No. 26-5358, Dkt. 5 (D.C. Cir. 2026) was filed October 15, 2026. Twenty days have passed with no ruling. The CADC may remand to this Court. A ruling on this PI would be the predicate for the CADC's emergency motion and would preserve the record for any remand.

### D. The CAFC Appeal May Remand to D. Mass. with Plaintiff as Intervenor

CAFC No. 26-1721 (inventorship correction under 35 U.S.C. § 256) is scheduled for December 8, 2026. If the panel does not correct the patents, the case is likely to be remanded to *D. Mass. (No. 1:26-cv-10304-ADB)* with Plaintiff as intervenor. The CAS records preserved by this PI are the only document showing the allocation of the full architecture within the SBMC contracts.

### E. The Six Pending IPRs

Six IPRs are pending before the PTAB targeting the foundational patents (filed between June 18 & October 26, 2026). If the CAS records are not preserved, the only document showing the allocation of the technology within SBMC contracts will not exist for Phase Two.

### F. The October 31 & November 2, 2026 Police Contacts

On October 31 and November 1, 2026, Carter was the subject of two police contacts in New York City. In a retaliatory manner, Carter was targeted again through the college-age child (co-victim and primary witness) for removal. This recurring ‘strategy’ is used for illegal surveillance/social engineering to theft  and at the trafficking venues to steal technology/evidence. Plaintiff and child's property was disposed of without consent after officers stated it could not be touched. The responding sergeant verified *Solos Technology Ltd. v. Meta Platforms, Inc.*, No. 26-1721 (Fed. Cir. 2026) (Daitona Carter, Movant-Appellant) and confirmed Carter's legal name matched the federal docket. Note, that the child was NOT present when any of  the calls were initiated to the police, they were working. False reports were made. Carter and child was not removed.

### G. The Driscoll / OpenAI Connection

On November 2, 2026, OpenAI announced the appointment of Dan Driscoll, who served as Secretary of the Army (Feb. 25 - Aug. 31, 2026), personally hosted the September 2025 AI tabletop exercise that launched Project ARIA, and had signing authority over all SBMC contracts, as Senior Counselor for National Security Modernization. OpenAI signed an agreement with the Department of War on February 28,

2026. The Feinberg memorandum was signed twelve days after Driscoll's resignation. (See accompanying Motion for Judicial Notice.) This connection now compliments both the Miami October 21, 2024, when both Carter and child were unlawfully detained, kidnapped and questioned about OpenAI, despite Carter repeating "Meta" when asked. This also draws connected between a male approaching Carter's child in public, and then saying "I worked for OpenAI (pauses waits for response), but now I work for Meta." Carter's child walks away. The comment was made the week of October 18, 2026, at a semi-public event. In 2026, there are persons who still believe Carter's child, is the Plaintiff which results in the continuation of on-going threats. They do not look at same, yet this notion is often exploited, and another reason for the overall matter to be resolved.

## IV. BALANCE OF EQUITIES

The government's interest in the CAS-to-GAAP transition is administrative efficiency.

Plaintiff's interest is:

1. The preservation of the only records documenting the scope, extent, timing, and cost of DoD's use of her full architecture within SBMC contracts, the basis for a 10 U.S.C. § 1498 claim;
2. The preservation of the records documenting the allocation of the ARIA-marked product within government contracts. The ARIA trademark (Lanham Act) cannot be deleted by CAS-to-GAAP. But the evidence of its government use can be, if the CAS records are converted before Phase Two data is generated;
3. The preservation of the provenance record for the full architecture DSP/beamforming, display/lens designs, HUD architecture, AI frameworks

and models, and all underlying technology. Plaintiff designed the display and lenses used in smart glasses and military HUDs. All of her work, including the AI frameworks and models, was taken. The CAS records are the only document showing the full allocation;

4. Her ability to litigate as a pro se litigant residing 220 miles from this Court, with the CADC appeal (No. 26-5358) pending and potentially remandable to this Court.

The equities favor Plaintiff. See *Winter, 555 U.S.* at 20.

## V. PUBLIC INTEREST

The public interest favors: (1) preserving the integrity of defense contracting records; (2) ensuring the scope of government use of patented technology is documented for purposes of 10 U.S.C. § 1498 compensation; (3) ensuring trademark rights (Lanham Act) are not rendered unprovable by the destruction of the records documenting their government use; (4) ensuring the provenance of military technology is documented; and (5) ensuring a pro se litigant 220 miles from this Court can preserve the record.

## VI. SCOPE OF RELIEF

Plaintiff requests an order:

1. Enjoining Defendants from implementing the CAS-to-GAAP transition for SBMC Phase Two data generation (JanuaryÄìFebruary 2027) pending final adjudication;

2. Directing Defendants to issue a litigation hold preserving all CAS cost-accounting records for SBMC contracts from 2008 to present;

3. Directing Defendants to preserve all PPBE budget records related to Project ARIA (Team Gray, Team Black, Team Yellowstone);

4. Tolling the 60-day CASB proposal window (expiring November 14, 2026) pending this Court's ruling;

5. Directing Defendants to preserve all records of the September 2025 AI tabletop exercise;

6. Directing Defendants to preserve all records documenting the timing of DoD's use of Plaintiff's full architecture and the ARIA-marked product within SBMC contracts, including records of notice provided by DOJ, FBI, CIA, DoD, and Meta prior to the commencement of such use.

## VII. THIS IS NOT A RECONSIDERATION

This motion is based on facts that did not exist when the TRO was denied. See Lemmons, 241 F.R.D. at 21.

## VIII. RELIEF REQUESTED

1. An expedited hearing within five (5) days, given the November 14, 2026 deadline;

2. In the alternative, a ruling on the papers within seven (7) days;

3. A preliminary injunction as described in Section VI;

4. A litigation hold as described in Section VI(2)-(6);

5. Tolling of the 60-day CASB window.

Dated: November 4, 2026

Respectfully Submitted,

Datona Carter

Daitona Carter, Plaintiff
General Delivery, Main Post Office
2 Massachusetts Ave NE
Washington, DC 20002
legal@daitonacarter.com

**EXHIBITS LIST:**

A. Feinberg Memorandum (September 14, 2026)

B. CADC No. 26-5358 Docket (20 days elapsed since October 15, 2026, with no entry on Dkt. 5

C. OpenAI Press Announcement re: Dan Driscoll (November 2, 2026)

D. OpenAI–Department of War Agreement (February 28, 2026)

E. CAFC No. 26-1721, Dkt. 60 (December 8, 2026 submission date)

F. October 13, 2026 Order (Dkt. 21) and October 14, 2026 Minute Order

G. PTAB IPR Dockets (6 pending)

H. Kopin IBAS Awards (SAM.gov: $34M total, MicroLED display configurations)

**Exhibit A. Feinberg Memorandum (September 14, 2026)**

DEPUTY SECRETARY OF WAR
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

SEP 14 2026

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS

SUBJECT: Fostering One Strong Industrial Base

The Department of War (DoW) must buy faster, simpler, and more competitively to get speed and volume. Backed by strong Congressional support in the FY26 NDAA to strengthen the Defense Industrial Base, the Department continues to break down barriers to entry and expand our industrial base. To build on this momentum and keep all of industry engaged, we must completely transform and modernize our contract cost and pricing ruleset.

The DoW will move from government-unique Cost Accounting Standards (CAS) to the accounting every American company already uses — Generally Accepted Accounting Principles (GAAP) — and push those benefits to every tier of the supply chain. When necessary to foster transparency and fairness, we will ask suppliers for the cost and pricing information they already keep. No new accounting systems or special data formats will be required. Any data industry provides will be used only for authorized Government purposes and never made available to another company for its own use.

Executive Order 14402 makes fixed-price contracts the default and reserves cost-based contracts for basic research and for the development of major systems. Where there is a market — competition, comparable sales, reliable price history — the market sets the price. Where there is no market — major sole-source development and procurement — we will rely on cost data drawn from a company's existing records rather than invasive oversight.

My August 18, 2026 memorandum, "Supplier Cost and Pricing Transparency," reinforces the option for contracting officers to see through the prime contractor to the suppliers when needed. This is essential to ensure companies at every tier are treated fairly. For the system to work, contractual benefits offered by the government to a prime must be flowed down through the supply chain and, conversely, sole-source suppliers cannot be allowed to leverage primes and slow down deliveries. The Department has a wide range of tools to mitigate risk and strengthen the supply chain. Office of Strategic Capital loans, Industrial Base Analysis and Sustainment funds, and talented DoW business operators should be accessible to every company supporting the DoW.

Asking for information does not, by itself, create a cost-reimbursement contract or CAS coverage, and it does not alter the thresholds or exceptions for certified cost or pricing data. Transparency and partnership run both ways: the Department opens its buying to market forces, and when asked, industry shares the cost and pricing information it already keeps.

We will accept GAAP-based accounting across all contracts to the maximum extent the law permits, and we will continue pursuing CAS to GAAP through the Cost Accounting

Standards Board (CASB). The DoW will submit proposals to the CASB within 60 days to make CAS exemption the default, confine remaining CAS coverage to sole-source, cost-based development or incentive-fee procurement, and ensure CAS applies only to relevant contracts and not companies as a whole. Recently, the CASB made significant progress in reducing the CAS regulations, and we look forward to partnering with them to continue accelerating change this year. Until the Board acts, no solicitation from the DoW that could bring a business unit not previously subject to CAS under full CAS coverage may be issued unless the Under Secretary of War for Acquisition and Sustainment has approved the acquisition strategy in writing.

The attached appendix directs these actions; implementing guidance may not add requirements beyond this memorandum and applicable law. This memorandum and appendix govern how the Department requests and uses contractor cost and pricing information; prior Department guidance on this subject will be applied consistently with it.

One of our Nation's greatest strengths is its private sector. National security must harness it — unleashing industry, protecting taxpayers through proven methods like competition, and restricting the use of our most burdensome oversight tools to only when absolutely necessary.

Attachment:
As stated

APPENDIX: IMPLEMENTATION ACTIONS

The Vice Chairman of the Joint Chiefs of Staff will:

**Review requirements reform in practice.** Within 30 days, co-chair with the Deputy Secretary a review of the Services' and Military Departments' implementation of requirements reform. The requirements review will use tangible program examples to show where the new approach has broadened acceptable acquisition solution space, expanded competition, or changed what acquisition could buy, and will identify how the Services and Military Departments can accelerate adoption, or further improve requirements processes.

The Under Secretary of War for Acquisition and Sustainment (USW(A&S)) will:

**Accelerate acquisition transformation.** Having issued the commercial-first implementation policy, within seven days issue the Department-wide modular open systems approach (MOSA) policy and the Portfolio Acquisition Executive Operating Framework, including its addendum of recommended authorities for delegation.

**CAS containment within existing authority.**

- Use available CAS relief. Apply immediately the increased CAS thresholds enacted in section 1806 of the National Defense Authorization Act for Fiscal Year 2026, as implemented by Department class deviation and by the Cost Accounting Standards Board's 2026 threshold rule as it takes effect, together with the statutory relief for nontraditional defense contractors. Within 60 days, issue, with the support of the Under Secretary of War (Comptroller) (USW(C)), a CAS waiver policy and standing justification templates for the individualized determinations the waiver authority in law requires, for new entrants, predominantly commercial segments, and businesses outgrowing small-business classifications.

- Prevent shadow CAS. Within 30 days, prohibit Components from imposing on exempt awards and other transactions the equivalent of CAS coverage, disclosure, business-system review, or practice-change governance under another name. Cost data from exempt performers will be requested as already maintained in their books and records.

- Limit new CAS coverage pending Board action. Before issuing a solicitation expected to bring a performing business unit newly under full CAS coverage, obtain the written approval of the USW(A&S) for the acquisition strategy. Requests must assess competition, commercial acquisition, competed fixed-price structures, exemptions, and existing waiver authority, and explain why none can meet the requirement without new full CAS coverage; the Under Secretary will decide within 15 business days or elevate the request to the Deputy Secretary. This approval concerns the acquisition strategy only; it does not determine CAS applicability, grant any exemption or waiver, or authorize omission of a required provision or clause.

**Make rapid commerciality determinations.** Within 45 days, direct that commercial product and service determinations be completed within 15 business days of a complete request; that a prior Department determination stand for subsequent procurements unless reversed in writing by a head of contracting activity; and that, on commercial acquisitions, cost data may be requested if the contracting officer determines price, market, and sales data are insufficient to determine a fair and reasonable price.

**Extend use of other transactions.** Through the Other Transactions Guide revision under way, within 45 days issue interim other transaction (OT) policy, followed by the full Guide reissue within 120 days, that: defines "participating to a significant extent" as any unique contribution material to the prototype project, without percentage-of-workshare or dollar thresholds as eligibility tests; prefers fixed-amount, milestone-based payment structures; requires the agreements officer, before award, to document the applicable statutory eligibility basis, relying where lawful on offeror self-certification against standard representations and conducting additional verification by exception, with a 10-business-day clock on any determination; and directs follow-on production planning in every prototype OT. Within 30 days, issue a consortium policy with project-level eligibility, direct-award preference and fee transparency. Within 60 days, Component Senior Procurement Executives will publish pre-approved findings templates and a 10-business-day signature standard for exceptional-circumstances determinations.

**Modernize profit policy.** Within 90 days, initiate the DFARS rulemaking, eliciting industry feedback, to revise the Department's profit policy so that negotiated margins reflect value delivered, risk carried, and private capital invested – not merely cost incurred. Commercial benchmarks will inform negotiation objectives but will not constitute caps. The policy will reward efficiency, speed, and performance; weigh the financial health of fragile supply-chain chokepoints; and address sustained loss positions prospectively through fair pricing of future work. Nothing in this action alters applicable cost-allowability requirements for cost-reimbursement work. Healthy and reasonable margins drive innovation and excellence.

**Require a basis for requirements.** Within 90 days, building on the inventory completed under the Acquisition Transformation Strategy, every recurring review, checklist, data demand, or approval imposed below the Federal Acquisition Regulation (FAR) and Defense Federal Acquisition Regulation Supplement (DFARS) will be annotated with the authority that requires it. Requirements grounded in operational safety, security, and classification authorities are not subject to automatic lapse. Any other uncited item will be suspended for new use and will lapse unless the cognizant Component Acquisition Executive reaffirms it within 30 days. No new procedural requirement may be issued without its basis stated on its face.

**Modernize forward-pricing support.** Direct that DCMA immediately work with DCAA to overhaul the approach to establishing and maintaining forward pricing rate agreements (FPRAs) consistent with this memorandum, drawing on rate data maintained in the ordinary course of business. FPRAs will be used only where they accelerate recurring, high-volume negotiations and enable a more efficient process for the Department and for industry.

**Implement supplier cost and pricing transparency consistent with this memorandum.** Within 30 days, issue the implementing procedures for the August 18, 2026, memorandum so

that price information is obtained first and cost information to the extent needed to establish a fair price; commercial products and services are priced under the statutory limits that apply to them; cost information is requested in the form the contractor already maintains; contractor denials are handled under the process the law provides; information received is used only for the pricing action for which it was requested; and no automated access to contractor systems without express contractual authorization and applicable security protections. Nothing in the procedures alters the thresholds or exceptions for certified cost or pricing data. The procedures will state that, consistent with Executive Order 14402, cost-reimbursement contracting remains appropriate for research and for the development of major systems, and is otherwise the exception.

The USW(C) will:

**Advance CAS coverage reform at the Board.** With the support of the USW(A&S), develop and formally transmit to the Cost Accounting Standards Board the Department's proposals for: (a) a class exemption making exemption the default, with CAS coverage limited to cost-based development contracts of major scale awarded without adequate price competition; (b) coverage that attaches to the covered contract and the indirect-cost pools material to it, with no entity-, segment-, or flowdown-attachment; (c) completion of the CAS-to-GAAP conformance begun with the July 8, 2026, final rule, so that GAAP is the baseline and government-unique requirements survive only where cost-based pricing specifically demands them; and (d) a modernized Disclosure Statement – a short certification that contract cost accounting follows the contractor's annual GAAP financial statements, audited by a registered independent public accounting firm, supplemented only by legally required disclosures, with a schedule of departures, in a machine-readable, versioned electronic submission format. Transmit the supporting analysis to the Board and report monthly to the Deputy Secretary until the Board acts.

**Ensure audits are risk-based.** Within 60 days, direct that the Department consider a contractor's audited GAAP financial statements and internal-control attestations before performing additional work. Ensure that no office will request an audit of a cost or system that has already been audited or reopen closed years absent indicators of fraud or material misstatement. Every audit will identify the risk, its materiality to a government decision, the records needed, and why existing evidence is insufficient.

**Recommend the Department's Cost Accounting Standards Board representative.** Within 30 days, in coordination with the USW(A&S) and the General Counsel, recommend to the Secretary, through the Deputy Secretary, the appointment of the Department's best-qualified representative to the Cost Accounting Standards Board under the Secretary's appointment authority. The representative will have substantial experience administering and managing covered contracts and will be selected consistent with section 1806 of the National Defense Authorization Act for Fiscal Year 2026 and advance compliance with the Board-member eligibility requirements at 41 U.S.C. 1501(b)(4).

The USW(A&S) and the USW(C) will jointly:

**Consolidate contractor business systems.** Within 90 days, through the business-systems line of effort under way, issue class deviations where required, and direction to:

- Consolidate estimating-system and material-management-and-accounting-system requirements into simplified, commercial-aligned accounting-system criteria and retire their separate reviews – retaining statutory proposal-integrity protections, inventory-accounting standards, and standards for consistent cost estimation, accumulation, and reporting – with accounting-system adequacy outside the covered CAS core assessed against the FAR's condition for the contract type, satisfied by the contractor's GAAP books and a contract-level ledger meeting applicable allowability rules;

- Confine earned value management to major development programs and, where the Government retains cost risk, major long-duration production programs, with the boundary set in the implementing deviation; retire the separate government system-validation regime, using integrated baseline reviews to assess contract baselines; and accept schedule, actuals, and estimate-at-completion data from contractors' native systems;

- Reduce contractor burden by relying on government-wide FAR property-stewardship duties and remedies, aligned with commercial practices and tools, rather than a separate review overlay; and

- Raise the purchasing-system-review threshold under existing FAR authority, reserve reviews for demonstrated risk, and apply the statutory rule that an approved purchasing system ends subcontract-consent withholding; and

- Establish a 90-government-day clock for final disposition of contractor's corrective action plan, tolled while necessary contractor information is outstanding and elevated to the head of the contracting activity upon expiration.

No Component may recreate a retired regime through local policy, checklists, approvals, or clauses. To the maximum extent permitted by law and contract, Components will cease enforcing superseded requirements, and contracting officers will offer bilateral no-cost modifications removing affected clauses at the next practicable opportunity.

**Simplify business-system review.** Within 60 days, publish clear, specific, and publicly available commercial-aligned criteria for contractor business systems and issue a class deviation, grounded in the Department's statutory reliance authorities, accepting a registered independent public accounting firm's certification against those criteria in place of Department review. The deviation will set a reasonable effective date aligned, where applicable, with contractors' annual financial-statement audit cycles. Effective immediately, discretionary review requires a written determination of specific, material risk by the cognizant contracting activity, coordinated with the requiring Component Acquisition Executive or designee. For multi-Component facilities, the Defense Contract Management Agency (DCMA) will identify the cognizant Component.

Skip to main navigation
Skip to content
Skip to footer

DENTONS

ENEnglish

# Rock the CAS Board: DOW Memo Sets Up a Clash Betwe CAS and GAAP Accounting for Federal Contracts

September 22, 2026

Last week, Deputy Secretary of War Steve Feinberg released a memorandum proposing big changes to government contract accounting. Titled "Fostering One Strong Industrial Base," the September 14, 2026 memo outlines four key initiatives:

- Waivers and limits on the federal Cost Accounting Standards (CAS) for a variety of procurements;
- Prioritizing the use of Generally Accepted Accounting Principles (GAAP) over CAS;
- Simplified business system reviews and audits; and
- Revamped criteria for negotiating profit that emphasize subjective factors such as risk and investment.

Together, these proposals could represent the most significant changes to federal procurement in years. Turning the memo into action, however, will not be easy. DOW can implement some elements immediately, but full implementation will likely require approval from the CAS Board, which is an independent body that administers CAS. It may also need Congress to revise the CAS statutes. The memo appears to recognize these constraints, expressly directing DOW personnel to draft recommendations for the CAS Board's consideration.

In the meantime, contractors should focus on two key questions: (1) How can they capitalize on the opportunities this memo presents for their specific business and pipeline? And (2) how can they do so in a way that remains compliant with existing law, given that the memo does not change current contract terms or regulations? With six-year statutes of limitation, shifting political priorities and personnel, and the ever-present risk of *qui tam* actions, contractors must weigh all of these factors carefully.

Below, we walk through the memo's major proposals.

## Key contacts



**Evan Sherwood**
Partner
Washington, DC
D +1 202 496 717
**evan.sherwood@c**



**Steven M. Masiel**
Partner
Denver
D +1 303 634 435
**steven.masiello@**



**Phillip R. Seckma**
Partner
Denver
D +1 303 634 433
**phil.seckman@de**

### A. Immediate Changes to How DOW Administers CAS

The memo proposes to use "existing" legal authority to streamline CAS applicability. Contractors should pay careful attention to this part of the memo, because it may have teeth in the near term. According to Secretary Feinberg, DOW must take the following actions:

1. **A new CAS waiver policy for new entrants and growing businesses.** Within 60 days, DOW officials must write a policy governing when to waive CAS compliance for "new entrants, predominantly commercial segments, and businesses outgrowing small-business classifications." These kinds of businesses would presumably not yet be subject to CAS, and the policy would help shield them from CAS when pursuing a procurement that might otherwise trigger CAS coverage for the first time. Contractors whose businesses fall into one of these categories should consider requesting a CAS waiver — though the mechanics of doing so may remain unclear until the new policy is published.

2. **No "shadow CAS" in non-CAS-covered contracts.** When DOW negotiates contracts that are not subject to CAS, such as other transaction agreements (OTAs), it should not demand contract terms that function similarly to CAS. The memo says contract terms should be a no-go if they require the "equivalent of CAS coverage, disclosure, business-system review, or practice-change governance under another name." The memo calls such terms "shadow" CAS. Contractors can take advantage of this policy right away by pushing back on CAS-style accounting clauses in OTAs and CAS-exempt awards.

   But this raises an important question: what qualifies as shadow CAS? CAS focuses on rules for measurement, assignment, and allocation of cost, along with disclosure of accounting practices. The FAR's cost principles deal with these same general concepts, but without providing the level of detail that CAS does. *See, e.g.*, FAR 31.201-4 (providing standards for cost allocability). The FAR cost principles also do something that CAS does not — explain when costs are "allowable" and "reasonable," which are two other standard requirements for cost reimbursement. *See* FAR 31.201-2 (allowability); *see also* FAR 31.201-3 (reasonableness). Agency FAR supplements may add to or vary from the cost principles, but generally reflect the same basic rules.

   This may make it difficult to distinguish between "shadow" CAS and background allowability rules. And even if one assumes CAS and the FAR's allocability rules do not apply, a contractor still must decide whether, when, and how to treat costs of doing business as directly allocable to one contract or indirectly allocable to multiple contracts. Contractors may benefit from clear contract terms that confirm whether

and when their costs are allocable, or else risk disallowance in the future. In short, contractors looking to avoid “shadow” CAS should be prepared to carefully explain why an agency’s proposed contract term acts like a CAS requirement, as opposed to a standard pricing or allowability requirement.

3. **Minimize procurements triggering full CAS coverage.** DOW must strive to minimize procurements that would “bring a performing business unit newly under full CAS coverage.” If a contracting officer wants to pursue such an acquisition strategy, they must seek approval from the Under Secretary of War for Acquisition and Sustainment, who in turn “must assess” whether “competition, commercial acquisition, competed fixed-price structures, exemptions, and existing waiver authority” can be used instead.

   Importantly, the memo states that this approval procedure affects “acquisition strategy only” and “does not determine CAS applicability” itself. Existing law continues to apply. The question is only whether DOW may pursue an acquisition strategy that would trigger full CAS for a company that is not already CAS-covered. For companies already subject to CAS or pursuing sole-source awards, this aspect of the memo may have little practical impact on near term procurements. But if the memo is fully implemented, DOW could create an incentive to not be CAS-covered, even while it maintains a requirement for CAS coverage for certain major development and sole-source procurements. Traditional contractors might be encouraged to operate commercial, CAS-exempt segments to remain competitive, and to avoid sole-source awards. And at the same time, non-traditional contractors might be discouraged from pursuing major development or sole-source awards. DOW will need to balance all of these considerations as it moves forward.

### B. Long-Term CAS Reform: Asking the CAS Board to Shift from CAS to GAAP

The memo proposes to apply GAAP instead of CAS as the starting point for contract accounting, "so that GAAP is the baseline and government-unique requirements survive only where cost-based pricing specifically demands them." DOW would make contracts exempt from CAS by default, applying it primarily to "cost-based development contracts of major scale awarded without adequate price competition." This could generally exempt competitive or fixed-price awards from CAS. Additionally, DOW would change the CAS disclosure rules to require only "a short certification that contract cost accounting follows the contractor's annual GAAP financial statements, audited by a registered independent public accounting firm, supplemented only by legally required disclosures."

This proposal would dramatically reduce the scope and coverage of CAS, and it could streamline accounting compliance. But as the memo recognizes, DOW cannot do this alone. Only the CAS Board has authority to amend the CAS regulations. The memo thus directs DOW staff to prepare a set of recommendations to submit to the CAS Board, on which DOW gets just one voting representative.

But can the CAS Board actually do this? That question will weigh closely on the minds of DOW, the CAS Board, and industry. Even assuming the CAS Board's members wanted to revise CAS this way, whether they have authority to do it is another matter. By statute, CAS applies to "all negotiated prime contract and subcontract procurements" above the applicable dollar threshold ($35,000,000), unless the contract or subcontract is for commercial products or services, has prices set by law, or is a firm-fixed-price instrument awarded on the basis of adequate price competition and without certified cost or pricing data. *See* 41 U.S.C. § 1502(b)(1). While the CAS Board has authority to make regulations and determine "exempt classes of contractors and subcontractors," 41 U.S.C. § 1502(b)(2), a question remains about the extent of its rulemaking authorities when compared against the plain wording of the statute. The Board will need to review this interpretive matter with care, and Congress may still need to weigh in before the memo's full slate of ideas can be put into law.

The same is true for the proposal to replace CAS disclosure rules with a GAAP-focused certification. As a starting point, GAAP does not address contract accounting. It does not contemplate — let alone define — concepts like direct costs, indirect costs, allocability to contracts, IR&D, unallowable cost accounting, or other similar concepts. GAAP also does not address consistency in accounting for costs on multiple contracts, or consistency in accounting for costs in proposals versus contracts (estimating versus accumulating). CAS provides rules for addressing these concepts, but CAS does not ***create*** them. They come from contracting itself.

For example, if a company incurs a cost of doing business that benefits all

of its contracts, how should that cost be allocated to contracts? And how does the company decide whether and when a cost benefits more than one contract? Should it use a consistent method for distinguishing between direct and indirect costs in all cases, or can the method vary by contract? If it does not use a consistent method, when does it vary? Moreover, should it use the same accounting methods when estimating costs for price negotiations as when accumulating costs during performance of a contract? If not, how much variation is too much? And for the government to make an apples to apples price comparison of two proposals, to what extent should it ask contractors to explain how they answered these questions?

Contractors must inherently distinguish between direct and indirect costs when deciding how to apportion and assign costs of doing business to specific contracts. They must inherently decide what accounting methods to use when pricing a contract versus performing it. The CAS rules help answer these questions, help the government evaluate proposals on a comparable basis, and — critically — can protect contractors by giving them a clear legal basis for claiming entitlement to costs when performing cost-based work. The FAR helps to answer these questions too, and adopts many of the same broad principles as CAS, but without providing the level of detail that CAS does.

GAAP does not address these questions. As a result, DOW officials may need to further develop the policy goals in the memo before requiring contractors to submit a short GAAP-based certification, as the memo contemplates. None of this is to say that the CAS disclosure statement should not be modernized or streamlined, or that GAAP cannot play a role in today's federal contract accounting. To the contrary, the disclosure statement and CAS generally could benefit from focused edits and revisions to account for modern business and to improve efficiency for contractors and procuring officials. There are a variety of ways to conform CAS to GAAP, and the CAS Board is already taking steps to do so, having recently issued rules to eliminate the depreciation standards of CAS 404 and 409. The DOW memo may help to make such reforms.

To put the memo's GAAP proposal into action, any certificate will need to be carefully phrased and contextualized to ensure it is fair, accurate, and complete. Clarity will benefit contractors and agencies together. An ambiguous declaration that a contractor's cost accounting "follows" GAAP could actually create new risks and compliance challenges. Today's contracting officer or buyer representative may not be there tomorrow, let alone years in the future. Federal buyers have a six-year statute of limitations to bring claims disallowing cost in most cases, so contractors have a strong interest in durable, clear, and enforceable contract language. It reduces the risk that a future auditor second-guesses a price negotiation years after the fact. Ambiguity does the opposite.

Moreover, the requirement for a CAS disclosure statement is statutory. Under 41 U.S.C. § 1502(f), the CAS Board must write regulations that "require contractors and subcontractors as a condition of contracting with the Federal Government to...disclose in writing their cost accounting practices, including methods of distinguishing direct costs from indirect costs and the basis used for allocating indirect costs." Given that statutory instruction — and the fact that GAAP does not distinguish between direct and indirect costs — the CAS Board would not have free reign to draft a GAAP-focused disclosure statement, but may need to address direct and indirect cost issues outside of GAAP.

Finally, the memo proposes to revise CAS so that it applies only to contracts and indirect cost pools, not entities. That is already the law — CAS imposes no requirements on company-wide accounting generally. But as a practical matter, CAS can lead companies to make deep and structural adjustments to better align with federal disclosure and allocation rules. CAS generally requires companies to treat costs consistently, allowing for reasonable (and disclosed) variations, which can lead to enterprise-wide implementation. The FAR's allowability standards can have a similar effect, even without CAS. The memo may lead DOW to evaluate this issue and propose ways to simplify compliance. While there may be helpful ways to limit the impact of CAS on a business, as opposed to just on a contract, it remains to be seen how DOW will implement this aspect of the memo.

**C. Simplified Business System Reviews and Audits**

The memo proposes to simplify the rules for contractor business systems. This aspect of the memo has a higher chance of being successfully implemented in the near term. The key changes include:

- **Discretionary business system reviews** now require "a written determination of specific, material risk by the cognizant contracting activity";
- **A 90-government-day clock** for disposition of contractor's corrective action plans will be established, and the clock will be tolled while

necessary contractor information is outstanding and elevated to the head of the contracting activity upon expiration;

- **Estimating system and material management system reviews** are slated for consolidation into simplified, commercial-aligned accounting-system criteria; and
- **Earned value management systems** should be limited to "major development programs" and "where the Government retains cost risk, major long-duration production programs."

Contractors can use these points in negotiations and reviews with DOW starting today. However, while these policy provisions can shape the process and timeline of the government's review, they do not prevent the government from acting on genuine material weaknesses or enforcing existing contract terms. They also do not change the dispute procedures for challenging an adverse business system determination.

**D. Profit Negotiations: Beyond Cost, But Also Seeking Greater Visibility Into Contractor Pricing**

The FAR and DFARS provide a variety of subjective criteria for negotiating profit. The DOW memo proposes to "initiate" a DFARS rulemaking to "revise" DOW's "profit policy so that negotiated margins reflect value delivered, risk carried, and private capital invested — not merely cost incurred." The memo importantly acknowledges that profit is a critical incentive for industry and that "healthy and reasonable margins drive innovation and excellence."

It is unclear how DOW will actually revise the existing profit criteria. While the tone of the memo suggests that profit margins could be improved under the new policy, the memo also says DOW will scrutinize margins by emphasizing "cost and pricing transparency." On this point, the memo states that "nothing in the procedures [contemplated by the memo] alters the thresholds or exceptions for certified cost or pricing data." The memo says DOW should request cost information "in the form the contractor already maintains" — a helpful reminder for contracting officers, since existing law already limits cost or pricing data in that manner. Unfortunately, the memo does not address the more challenging questions of what data qualifies as cost or pricing data. As potentially relevant here, DOW recently announced guidance on its TINA Lite program, by which contractors can negotiate a limited "shopping list" of cost or pricing data. The contracting officer then prepares a final list, and the contractor certifies to disclosure only of the listed data. If reasonably implemented, TINA Lite could greatly simplify the compliance burden for contractors, but many questions remain about how the program will work in practice.

Many in industry perceive that the September 14 memo was intended to

walk back an August 18, 2026 memo called "Supplier Cost and Pricing Transparency," which announced a policy of cost and price transparency throughout the supply chain and appeared to expand DOW oversight of contract accounting. The September 14 memo arguably dialed back that position, saying the August 18 memo underscored how COs have the "option" to "see through the prime contractor to the suppliers when needed." But it also did not change the certified cost or pricing data rules, which are grounded in federal statutes anyway.

**E. Takeaways for Federal Contractors**

As with any policy proposal, the key question is whether and how the DOW memo can be successfully implemented. In the near term, contractors should take the following steps:

- **Continue to comply with existing contract requirements**. Nothing in the memo changes them.
- **Watch for opportunities to request CAS waivers or to argue for solicitation structures that minimize or eliminate the need for CAS compliance**. DOW contracting officers have clearly been instructed to pursue acquisition strategies that, where possible, do not require CAS. This gives contractors an immediate opportunity to leverage the memo's guidance. Still, procurements must comply with CAS where applicable. If, for example, a contracting officer decides to pursue a sole-source acquisition strategy for an over-threshold contract, the procurement will still generally be subject to CAS unless the agency can provide a lawful waiver.
- **Use the memo's guidance on business system reviews and audits to encourage speedy, efficient, and reasonable reviews**. Contractors can cite the memo when interacting with DCMA or DCAA reviewing officials.
- **Evaluate how to use GAAP instead of CAS in contracting.** As discussed above, GAAP does not address how to estimate, accumulate, or allocate costs to federal contracts. If DOW is going to apply GAAP in place of CAS, contractors and buying agencies will need to consider contract-specific ways of making that work. It will likely mean different things for different contracts, depending on the goods or services being acquired. It will call for careful drafting of contract clauses and certifications to clearly and practically identify what contractors must do to receive and support payment. The potential challenge for contractors in the long run is safely establishing entitlement to direct and indirect costs to be reimbursed under their contracts. Vague or unclear requirements could lead to questions, disallowances, disputes, or worse.

**Publish the efficiency assurance.** Within 30 days, issue a joint enforcement-posture statement that, for fixed-price contracts and other transactions, to the extent the performer bears the cost risk: a performer that becomes more efficient against a fairly negotiated price keeps the savings for that contract, and the Department captures efficiencies only prospectively, in the next negotiation, at a fair margin. This statement scopes enforcement priorities and will be incorporated in the profit policy revision; it does not waive statutory remedies for fraud or defective pricing, CAS price adjustments where CAS applies, or final indirect-cost-rate settlement on cost-reimbursement work.

The Secretaries of the Military Departments, through their Acquisition Executives, will:

**Implement Portfolio Acquisition Executive authorities.** The recommended authorities in the Portfolio Acquisition Executive Operating Framework's addendum are the default. Within 120 days of the Framework's issuance, each Component's implementation plan will delegate those authorities. Any exception requires the Component Head's signature, the specific reason, and an alternative that delivers the same speed, and will be submitted to the Deputy Secretary with the plan.

The Director, Defense Innovation Unit, will:

**Scale advance market commitments.** Within 180 days, with support from the USW(A&S) including Defense Production Act authorities as needed, structure additional advance market commitments, including aggregated allied demand consistent with the America First Arms Transfer Strategy, building on the early success of the Drone Dominance initiative in piloting demand-pull procurements that unleash market forces and create price signals for robust supply chains. These commitments shall reward demonstrated performance and delivered scale, operate within existing resources, and comply with applicable fiscal law.

The Director of Administration and Management, as part of the ongoing Defense Agency and DoW Field Activity review, will:

**Align the contract-oversight enterprise.** Within 90 days, with the USW(A&S), the USW(C), the Military Departments, DCAA, and DCMA, deliver options to the Deputy Secretary for clarifying roles and charters, eliminating duplication, and addressing workforce effects. Preserve mission-critical contract-administration functions, including government flight operations, product acceptance, facilitating contractor payment, property administration, and supplier quality assurance.

The USW(A&S), with the USW(C), will:

**Measure results.** Within 90 days, define and baseline: government-unique requirements eliminated; business units under full CAS coverage; business systems subject to review; audit and oversight cycle time; commercial content; performers at production per program, paired with unit-cost and affordability effects; new entrants and returning commercial firms; and declined

solicitations, where observable. Report quarterly thereafter. These measures are the test of this memorandum.

This memorandum is effective on signature. No new organization or compliance framework will be created. No discretionary study, pilot, working-group determination, or approval not required by law may delay these actions. Subordinate Department guidance inconsistent with this memorandum will be revised within 90 days.

All actions will comply with applicable statutes and appropriations law. Nothing in this memorandum authorizes obligations in excess of available appropriations, directs the scope, findings, or conclusions of any audit, or alters any authority vested by statute. Where additional authorities are required, the USW(A&S) will develop a legislative engagement plan to secure and support those authorities and the durability of these reforms. Department-approved artificial intelligence tools may be used to reduce document-preparation burden and expedite execution time.

**RELEASE**

**IMMEDIATE RELEASE**

# Deputy Secretary of War Directs Actions to Foster One Strong Industrial Base

Sept. 15, 2026

Deputy Secretary of War Steve Feinberg today signed a memorandum, *Fostering One Strong Industrial Base*, directing the Department of War to remove the accounting, audit, and compliance barriers that have separated the companies serving the warfighter from the rest of the American economy. The memorandum and its implementation appendix set deadlines for the Department's senior leaders to open competition, confine government-unique cost accounting to the narrow set of work that requires it, and rely on the financial controls and audits companies already maintain.

For decades, the Department walled the most dynamic economy on earth off from the industrial base that serves the warfighter. The wall was built from cost accounting rules, duplicative audits, and compliance obligations that attach to entire companies rather than the work procured. It was built to control contractor costs; instead it limited who competes and raised prices. The memorandum moves the Department from government-unique Cost Accounting Standards to the accounting every American company already uses – Generally Accepted Accounting Principles – and pushes those benefits to every tier of the supply chain.

"Selling to the Department of War should be a line of business, not a corporate identity. Our nation's greatest strength is its private sector, and our defense industry must harness and mimic it – unleashing industry first, and protecting taxpayers by confining our most burdensome oversight tools to the narrow set of work that genuinely demands them," said

Deputy Secretary of War Steve Feinberg. "Transparency and partnership runs both ways: the Department opens its buying to market forces, pays fair prices with honest margins, and in exchange industry shares, when asked, the cost and pricing information it already keeps."

The memorandum governs how the Department requests and uses contractor cost and pricing information and is the next step in the Warfighting Acquisition System reforms the Secretary of War directed on November 7, 2025. It implements Executive Order 14402, which makes fixed-price contracts the default and cost-reimbursement the exception, and carries forward the August 18, 2026 direction on supplier transparency so that contracting officers can see through the prime to its suppliers when needed – and connect those suppliers to Office of Strategic Capital loans, Industrial Base Analysis and Sustainment funds, and the Department's business operators. Where there is a market – competition, comparable sales, reliable price history – the Department will rely on the market to set the price. Where no market exists, the Department will rely on cost, drawing on the cost and pricing information companies already keep, with no new accounting systems or special data formats required. Information industry provides is used only for authorized Government purposes and is never made available to another company for its own use.

Three objectives drive the change:

- **Compete continuously for speed and volume.** Carry several performers to production, send real orders to those who deliver, and keep future opportunities open.

- **Attach rules to contracts, not companies.** One award that carries an oversight regime must not force a company to remake itself. No company should be barred from this market, or trapped in it, by government-unique requirements.

- **Audit only what matters, only when risk exists, and never twice.** Rely first on the independent audits companies already pay for; reserve government-unique oversight for high-risk work where the Department has no alternative.

Actions directed in the appendix include:

- a Department proposal to the Cost Accounting Standards Board to make exemption the default and confine coverage to cost-based development contracts awarded without adequate competition

- immediate use of the higher cost-accounting thresholds enacted in the Fiscal Year 2026 National Defense Authorization Act;
- senior-level approval before any acquisition strategy brings a new business unit under full coverage;
- commercial product and service determinations within 15 business days;
- simplified, commercial-aligned business-system criteria with acceptance of independent public accounting firm certification in place of separate government review;
- risk-based audit rules;
- expanded use of other transactions and advance market commitments;
- and profit policy under which negotiated margins reflect value delivered, risk carried, and private capital invested – not merely cost incurred.

No new organization or compliance framework will be created, and implementing guidance may not add requirements beyond the memorandum and applicable law.

The memorandum and its implementation appendix are available here. Information for companies seeking to do business with the Department is available at www.businessdefense.gov/.

Hosted by WEB.mil

**Exhibit B. CADC No. 26-5358 Docket**

**(20 days elapsed since October 15, 2026, with no entry on Dkt. 5)**

**General Docket**
**United States Court of Appeals for District of Columbia Circuit**

**Court of Appeals Docket #:** 26-5358 **Docketed:** 10/15/2026
**Nature of Suit:** 2899 Other Statutes APA/Review Agency
Daitona Carter v. Stephen Feinberg, et al
**Appeal From:** United States District Court for the District of Columbia
**Fee Status:** IFP

**Case Type Information:**
**1)** Civil US
**2)** United States
**3)**

**Originating Court Information:**
**District:** 0090-1 : 1:26-cv-03318-APM **Lead:** 1:26-cv-03318-APM
**Motions Judge:** Amit Priyavadan Mehta, U.S. District Judge
**Date Filed:** 09/22/2026
**Date Order/Judgment:** 10/14/2026 **Date NOA Filed:** 10/14/2026

**Prior Cases:**
None

**Current Cases:**
None

**Panel Assignment:** Not available

| | |
|---|---|
| Daitona Carter<br>Plaintiff - Appellant | Daitona Carter<br>Direct: 212-555-1234<br>Email: dddddc@tuta.com<br>[NTC Pro Se]<br>General Delivery, Main Post Office<br>2 Massachusetts Avenue, NE<br>Washington, DC 20002 |
| v. | |
| Stephen A. Feinberg, in his official capacity as Deputy Secretary of Defense<br>Defendant - Appellee | Johnny Hillary Walker, III, Assistant U.S. Attorney<br>Email: johnny.walker@usdoj.gov<br>[LD NTC Gvt US Attorney]<br>U.S. Attorney's Office<br>(USA) Civil Division<br>Firm: 202-252-2500<br>601 D Street, NW<br>Washington, DC 20530 |
| Peter B. Hegseth, in his official capacity as Secretary of Defense<br>Defendant - Appellee | Johnny Hillary Walker, III, Assistant U.S. Attorney<br>[LD NTC Gvt US Attorney]<br>(see above) |
| Walter Jay Clayton, in his official capacity as Director of National Intelligence<br>Defendant - Appellee | Johnny Hillary Walker, III, Assistant U.S. Attorney<br>[LD NTC Gvt US Attorney]<br>(see above) |

Daitona Carter,

Plaintiff - Appellant

v.

Stephen A. Feinberg, in his official capacity as Deputy Secretary of Defense; Peter B. Hegseth, in his official capacity as Secretary of Defense; Walter Jay Clayton, in his official capacity as Director of National Intelligence,

Defendants - Appellees

| | | |
|---|---|---|
| 10/15/2026 | | US CIVIL CASE docketed. [26-5358] [Entered: 10/15/2026 09:59 AM] |
| 10/15/2026 | 7 pg, 419.13 KB | NOTICE OF APPEAL [2198224] seeking review of a decision by the U.S. District Court in 1:26-cv-03318-APM filed by Daitona Carter. Appeal assigned USCA Case Number: 26-5358. [26-5358] [Entered: 10/15/2026 10:01 AM] |
| 10/15/2026 | 1 pg, 43.19 KB | CLERK'S ORDER [2198279] filed setting briefing schedule: APPELLANT Brief due 12/04/2026. APPENDIX due 12/04/2026, Failure to respond shall result in dismissal of the case for lack of prosecution [26-5358] [Entered: 10/15/2026 11:18 AM] |
| 10/15/2026 | 3 pg, 203.62 KB | NOTICE [2198353] received from the Clerk of the U.S. District Court leave to proceed in forma pauperis in the district court is granted [Case Number 26-5358: IFP] [26-5358] [Entered: 10/15/2026 02:03 PM] |
| 10/15/2026 | 9 pg, 730.04 KB | EMERGENCY MOTION [2198435] for injunction pending appeal and for administrative stay filed by Daitona Carter (Service Date: 10/14/2026 by Email) Length Certification: 4 pages. [26-5358] [Entered: 10/15/2026 04:22 PM] |
| 10/15/2026 | 3 pg, 246.22 KB | MOTION [2198440] to permit pro se electronic filing status filed by Daitona Carter (Service Date: 10/14/2026 by Email) Length Certification: 3 pages. [26-5358] [Entered: 10/15/2026 04:26 PM] |
| 10/15/2026 | 2 pg, 98.04 KB | NOTICE [2198443] filed by Daitona Carter [Service Date: 10/14/2026 ] [26-5358] [Entered: 10/15/2026 04:36 PM] |
| 10/20/2026 | 6 pg, 235.7 KB | NOTICE [2199389] received from the Clerk of the U.S. District Court to supplement record. [26-5358] [Entered: 10/21/2026 11:53 AM] |
| 10/27/2026 | 4 pg, 367.84 KB | NOTICE [2200734] filed by Daitona Carter [Service Date: 10/26/2026 ] [26-5358] [Entered: 10/28/2026 03:24 PM] |
| 10/27/2026 | 11 pg, 1.14 MB | MOTION [2200739] for electronic service filed by Daitona Carter (Service Date: 10/26/2026 by Email) Length Certification: 11 pages. [26-5358] [Entered: 10/28/2026 03:28 PM] |
| 11/03/2026 | 1 pg, 39.54 KB | CLERK'S ORDER [2201535] filed granting motion to permit pro se electronic filing [2198440-2]; dismissing as moot motion for other relief [2200739-2] [26-5358] [Entered: 11/03/2026 11:42 AM] |

**Exhibit C. OpenAI Press Announcement re: Dan Driscoll (November 2, 2026)**

OpenAI

November 2, 2026 Company Global Affairs

# OpenAI appoints Dan Driscoll as Senior Counselor for National Security Modernization

Listen to article 1:57

Share

Dan Driscoll will join OpenAI as Senior Counselor for National Security Modernization, working with senior leadership and external partners to advise on how advanced AI can strengthen national and cyber security, with a particular focus on working with U.S. allies to advance its responsible use.

In this newly created role, Dan will work with OpenAI teams and leaders across governments, industry, academia, and allied institutions to advance practical modernization initiatives that support the buildout of democratic AI. He will also help internal OpenAI teams understand the operational needs of global national security institutions.

Dan previously served as the 26th Secretary of the Army, overseeing the service's operations, modernization, and resources. He brings experience spanning military service, senior government leadership, and the private sector.

OpenAI

and strategy choices to unlock practical uses of AI to improve national security and help ensure the world is building AI to support democratic principles. He will work to identify where operational needs, institutional change and emerging AI capabilities come together. Dan's appointment reflects our commitment to helping democratic institutions use advanced AI responsibly to strengthen shared security, and builds on OpenAI's work with allies and partners to strengthen cyber resilience and protect essential services under its Daybreak program.

"AI should give people more power over their lives and people should have a say in how it's developed. The US has an extraordinary opportunity to work with other countries to spread the adoption of democratic AI and I'm excited to welcome Dan Driscoll to OpenAI to strengthen American leadership and help us do that."

Sam Altman

"I've spent much of my career in public service, first as a Soldier and most recently as Secretary of the Army and Acting Director of ATF. The people who serve deserve the very best tools we can put in their hands. National security requirements are changing faster than at any time in the past fifty years. This technology will help them keep pace by cutting through paperwork, making sense of more information, and getting the right answer to the right person faster. I'm joining OpenAI to help the United States and our allies put this technology to work responsibly, for the people who keep us safe."

Dan Driscoll

OpenAI

operations, modernization, and resource allocation for nearly one million Active, Guard, and Reserve Soldiers and more than 265,000 Army Civilians. He drove Army transformation focused on accelerating the fielding of new technology, reforming acquisition, and building a more capable force. A former Army officer and business leader, Dan has experience spanning military service, law, and the private sector.

2026 Global Affairs

Author

OpenAI

## Keep reading

View all



Strengthening Democratic Oversight in National Security

Global Affairs Aug 18, 2026



Democratic governance of frontier AI, part II: Empowering cyber defenders

Global Affairs Oct 21, 2026



Expanding AI access across every level of US government

Global Affairs Sep 10, 2026

OpenAI

Research
Research Index
Research Overview
Economic Research

Latest Advancements
GPT-6.1 Sol
GPT-6 Astra
GPT-5.6
GPT-5.5

Safety
Safety Approach
Deployment Safety ↗
Security & Privacy
Trust & Transparency

Products
ChatGPT ↗
ChatGPT Business ↗
ChatGPT Enterprise ↗
ChatGPT for Education ↗
Codex
Dots ↗
Release Notes

API Platform
Overview
API Log In ↗
Docs ↗

Business
Overview
Solutions
Resources
Plugins
Customer Stories
Partner Network
Contact Sales

Developers
Plugins ↗
Models ↗
Docs ↗
Resources ↗
Developer Forum ↗

Company
About Us
Our Charter
Careers
News

Support
Help Center ↗
OpenAI Status ↗

More
Stories
Academy
Supply Co.
Livestreams
Podcast
RSS

Terms & Policies
Terms of Use
Privacy Policy
Other Policies

OpenAI © 2015–2026
Your privacy choices

English United States

**Exhibit D. OpenAI–Department of War Agreement (February 28, 2026).**

ARTIFICIAL INTELLIGENCE

# OpenAI alters deal with Pentagon as critics sound alarm over surveillance

CEO Sam Altman tried to ease worries about domestic surveillance as opposition builds over rival Anthropic's labeling as a national security risk.

Listen to this article with a free profile

00:00 10:47 1x



Sam Altman; Dario Amodei. Getty Images

March 3, 2026, 4:00 PM EST

**By Jared Perlo, Kevin Collier and David Ingram**

OpenAI CEO Sam Altman unveiled a reworked agreement with the Pentagon on Monday night governing the Defense Department's use of its AI services, which he says provides stronger guarantees that the military won't use OpenAI's systems for domestic surveillance.

The new agreement states that "the AI system shall not be intentionally used for domestic surveillance of U.S. persons and nationals," according to a post on OpenAI's website. OpenAI had faced some backlash as news of an initial agreement between the leading AI company and the Pentagon emerged Friday. Many observers claimed the original language shared on OpenAI's website provided ample loopholes for the government to surveil Americans.

The move comes after weeks of intense debate between rival AI company Anthropic and the Pentagon over how the military can use advanced AI systems. While the Defense Department had wanted Anthropic to agree to let the department use its systems for "any lawful purpose," Anthropic maintained its systems could not be used for domestic surveillance or to control deadly autonomous weapons. Until last week, Anthropic was the only major AI company whose services were cleared for use on classified networks.

Researchers argue that without guardrails, AI could allow authorities to monitor individuals with unprecedented speed and accuracy, combing through mountains of digital data to track people's movement and behavior.

"It is critical to protect the civil liberties of Americans," Altman wrote in a post on X on Monday night announcing the new contract language that he said better limits domestic surveillance. "The Department also affirmed that our services will not be used by Department of War intelligence agencies (for example, the NSA)."

Katrina Mulligan, head of national security partnerships for OpenAI, added in another post on X on Tuesday morning that "defense intelligence components are excluded from this contract," stipulating that she would be open to future work with the NSA "if the right safeguards were in place."

OpenAI did not respond to a request for comment.

Many observers remained unswayed Tuesday, concerned that the snippets of OpenAI's contract with the Pentagon published by the company remained purposefully vague and provided carve-outs for domestic surveillance by various intelligence agencies within the Defense Department. The full text of the contract has not been released publicly.

"OpenAI has said that the Department of War contractually agreed not to use ChatGPT in agencies that surveil American people," said Brad Carson, a former congressman and general

counsel of the Army who now leads the Washington, D.C., policy group Americans for Responsible Innovation. “They have been happy to show contract language when it benefited them, but they refuse to release to the public this contractual provision.”

“I’ve reluctantly come to the conclusion that this provision doesn’t really exist, and they are just trying to fake it,” Carson told NBC News. Carson recently founded an AI-focused super PAC that has received $20 million from OpenAI rival Anthropic.

Several legal experts agreed that greater transparency about the entire contract and any other key clauses is necessary to properly evaluate the company’s claims.

“We still need to see the whole contract to say anything with a reasonable level of confidence,” said Brian McGrail, senior counsel at the Center for AI Safety, a nonprofit research and advocacy group. “It’s definitely a step in the right direction, and I do want to give OpenAI some credit.”

OpenAI’s agreement with the Pentagon was announced shortly after Defense Secretary Pete Hegseth said he would label Anthropic, which had long been in contract negotiations with the Pentagon, a supply chain risk to national security. Anthropic said the designation, which would force the Pentagon and contractors to stop using Anthropic’s services for defense purposes, has never before been publicly applied to an American company.

At an event in Sausalito, California, on Monday, retired Gen. Paul Nakasone, the former director of the National Security Agency and U.S. Cyber Command, said that the Pentagon should work to incorporate all leading American AI companies’ technology into national defense.

“We need Anthropic, we need OpenAI, we need all of our large language model companies to be partnering with our government,” Nakasone, who is a member of OpenAI’s board of directors, said at a conference sponsored by the Aspen Institute. “I think the supply chain piece is not good. The discussions over the weekend and the tenor of those discussions were tough for me to listen to. As an American citizen, someone who served in government, I just think that it’s not right, OK? This is not a supply chain risk.”

**Trump administration slams AI giant Anthropic**

01:51




Anthropic had long maintained that the Defense Department could not use its AI systems for domestic mass surveillance or for direct use in autonomous weapons, though it added concessions for the military to use its systems for cyber and missile defense purposes in December. After a meeting between Anthropic CEO Dario Amodei and Hegseth last Tuesday, the Defense Department issued an ultimatum for Anthropic to reach an agreement by 5 p.m. ET that Friday.

However, on Thursday, an Anthropic spokesperson told NBC News that the Defense Department's latest "language framed as compromise was paired with legalese that would allow those safeguards to be disregarded at will."

But as Anthropic's relationship with the Defense Department broke down, OpenAI's deepened, with Friday's announcement of a contract adding a fresh round of intrigue to a story that had already captivated much of the tech and defense community. In his post Monday night, Altman said the rush to ink a deal made the negotiations look "opportunistic and sloppy" even though OpenAI was "genuinely trying to de-escalate things and avoid a much worse outcome."

Throughout the weekend and early this week, an army of legal experts have examined the latest public contract language from OpenAI, trying to determine whether the company's terms had actually added any substantive protections beyond the Defense Department's "any

lawful use” standard.

“I am confused about why the Pentagon would accept this language when they just tried to nuke Anthropic for asking for something very similar to this,” Charlie Bullock, senior research fellow at the Institute for Law and AI think tank, wrote on X after the updated language emerged.

**For Subscribers**



* The battlegrounds our journalists are reporting from



* The midterms are over, and Trump is over the midterms



* What is rha condition linke death

Many legal experts argue that each word in the contract carries significant weight, as they say the government will take the widest possible reading of the contract’s terms.

“The pattern we’ve seen play out time and again in these surveillance debates is that the intelligence and national security community ends up interpreting exceptions in an extremely broad fashion, far more broadly than any normal reasonable person,” McGrail said. “And because so much of it is secret, there’s limited visibility for the public to push back.”

“So could there be some new loophole to be exploited here that we aren’t predicting? It’s totally possible,” McGrail added.

Experts have also focused on whether the contract is permanently anchored in today’s notions of legality, as they worry the government could alter the boundaries of “any lawful use” by issuing new executive orders or legal opinions.

The recent debate over military use of AI for domestic surveillance has particularly focused on the government’s ability to use commercially available data in its operations, as other methods for surveilling Americans can prove more difficult to gain legal approval.

For years, companies providing or displaying ads on phones or laptops have been able to

compile targeted data about users, including precise location data, and sell that information to various government agencies to identify individuals' travel and behavioral patterns.

Mulligan, OpenAI's national security leader, said in a Monday night X post that the contract's "new language reinforces that domestic surveillance is disallowed under this agreement, including involving commercially acquired information."

Sen. Ron Wyden, D-Ore., who in recent years has repeatedly warned that the federal government buys commercially available data on Americans for surveillance purposes, criticized the Pentagon for not acquiescing to Anthropic's privacy concerns.

"The Defense Department is throwing a fit over Anthropic asking for the bare minimum ethical guardrails on how DOD uses its product," Wyden said in an emailed statement. "That's serious cause for alarm, given AI's ability to turn disparate pieces of public or commercial data into highly revealing profiles of Americans. Location data, web browsing records, and information about mental health, political activities and religious affiliations are all available for pennies on the open market and could make Americans targets for doing things that are completely legal."

"Creating AI profiles of Americans based on that data represents a chilling expansion of mass surveillance that should not be allowed, regardless of what the current, outdated laws on the books say," he said.

Amodei, the Anthropic CEO, has repeatedly remarked that firmer commitments from the Defense Department to not use AI to surveil Americans are necessary because the law has not caught up to AI's increasingly powerful capability to analyze or parse vast troves of data. Recent research has also shown that individuals can be identified by today's AI systems, even if the underlying data has purportedly been anonymized.

Protesters of OpenAI's initial deal with the Pentagon surrounded OpenAI's San Francisco headquarters this weekend with chalk messages encouraging employees to remain skeptical of the company's terms, while uninstalls of OpenAI's ChatGPT app surged following news of the agreement.

Michael Horowitz, former deputy assistant secretary of defense for emerging capabilities and current professor of political science at the University of Pennsylvania, told NBC News that the dispute between the Pentagon and Anthropic went beyond the simple contract terms.

"This dispute reflects a breakdown in trust between Anthropic and the Pentagon, where Anthropic does not trust that the Pentagon will use their tech responsibly, and the Pentagon

doesn’t trust that Anthropic will allow its tech to be used for what the Pentagon views as important national security use cases,” Horowitz said. “Part of that is cultural differences, part of that is politics, part of that is personalities.”

---



Jared Perlo

Jared Perlo is a technology reporter focused on AI for NBC News Digital.



Kevin Collier

Kevin Collier is a reporter covering cybersecurity, privacy and technology policy for NBC News. He can be reached on Signal at kevincollier.01.

David Ingram

David Ingram is a tech reporter for NBC News.

X

Post

Log in Sign up

**Ram Altman**
@sama

Tonight, we reached an agreement with the Department of War to deploy our models in their classified network.

In all of our interactions, the DoW displayed a deep respect for safety and a desire to partner to achieve the best possible outcome.

AI safety and wide distribution of benefits are the core of our mission. Two of our most important safety principles are prohibitions on domestic mass surveillance and human responsibility for the use of force, including for autonomous weapon systems. The DoW agrees with these principles, reflects them in law and policy, and we put them into our agreement.

We also will build technical safeguards to ensure our models behave as they should, which the DoW also wanted. We will deploy FDEs to help with our models and to ensure their safety, we will deploy on cloud networks only.

We are asking the DoW to offer these same terms to all AI companies, which in our opinion we think everyone should be willing to accept. We have expressed our strong desire to see things de-escalate away from legal and governmental actions and towards reasonable agreements.

We remain committed to serve all of humanity as best we can. The world is a complicated, messy, and sometimes dangerous place.

9:56 PM · Feb 27, 2026 · **38.4M** Views

15K

firoz @firozkhx
"the DoW displa
achieve the best



Conti

Scan to get the app

**Exhibit E. CAFC No. 26-1721, Dkt. 60 (December 8, 2026 submission date)**

# Patent Trial and Appeal Case Tracking System (P-TACTS)

## Search P-TACTS

AIA review #

Patent #

Application #

Party name: SOLOS TECHNOLOGY LIMITED

AIA review/case type: IPR (1)

Tech center

Clear Search

Additional filter(s)

Showing 1-5 of 5 records

| AIA review # | Filing date (mm/dd/yyyy) | Institution decision date (mm/dd/yyyy) | Termination date (mm/dd/yyyy) | Petitioner application # | Petitioner patent # | Petitioner | Petitioner tech center | PO/Respondent application # | PO/Respondent patent # | PO/Respondent | PO/Respondent tech center | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IPR2026-0… | 09/29/2026 | | | | | Luxottica … | | 16399867 | 10651866 | Solos Tech… | 2800 | Pending |
| IPR2026-0… | 08/14/2026 | | | | | Luxottica … | | 16781897 | 11871174 | Solos Tech… | 2600 | Pending |
| IPR2026-0… | 08/07/2026 | | | | | Meta Platf… | | 16851044 | 11082055 | Solos Tech… | 2800 | Pending |
| IPR2026-0… | 08/07/2026 | | | | | Luxottica … | | 16851044 | 11082055 | Solos Tech… | 2800 | Pending |
| IPR2026-0… | 06/18/2026 | | | | | Luxottica … | | 18517910 | 12216339 | Solos Tech… | 2800 | Pending |

25 per page — Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC
Patents
Trademarks
Learning & Resources
About the USPTO
Glossary
Jobs
Contact Us

ABOUT THIS SITE
Accessibility
Privacy Policy
Terms of Use
Security
Systems Status
Site Map

USPTO BACKGROUND
Federal Activity Inventory Reform Act (FAIR)
Performance and Planning
Freedom of Information Act
Information Quality Guidelines

FEDERAL GOVERNMENT
Regulations.gov
StopFakes.gov
USA.gov
Department of Commerce
Strategy Targeting Organized Piracy

# Patent Trial and Appeal Case Tracking System (P-TACTS)

## Search P-TACTS

AIA review #: IPR2027-00019

Patent #

Application #

Party name

AIA review/case type

Tech center

Clear Search

Additional filter(s)

Showing 1-1 of 1 records

0

| AIA review # | Filing date (mm/dd/ | Institution decision date (mm/dd/yyyy) | Termination date (mm/dd/yyyy) | Petitioner application # | Petitioner patent # | Petitioner | Petitioner tech center | PO/ Respondent application # | PO/ Respondent patent # | PO/ Respondent | PO/ Respondent tech center | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IPR2027-0… | 10/26/2026 | | | | | Meta Platf… | | 14886077 | 10306389 | -- | 2600 | Petition file |

25 per page | Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC
Patents
Trademarks
Learning & Resources
About the USPTO
Glossary
Jobs
Contact Us

ABOUT THIS SITE
Accessibility
Privacy Policy
Terms of Use
Security
Systems Status
Site Map

USPTO BACKGROUND
Federal Activity Inventory Reform Act (FAIR)
Performance and Planning
Freedom of Information Act
Information Quality Guidelines

FEDERAL GOVERNMENT
Regulations.gov
StopFakes.gov
USA.gov
Department of Commerce
Strategy Targeting Organized Piracy

**Exhibit F. October 13, 2026 Order (Dkt. 21) and October 14, 2026 Minute Order.**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## SCHEDULED CASES
## December 2026
## (Revised October 29, 2026)

**Panel B: Monday, December 7, 2026, 10:00 A.M., Courtroom 201**

| | | | |
|---|---|---|---|
| 24-1817 | MSPB | Messal v. MSPB | [argued] |
| 25-1435 | PTO | Sony Interactive Entertainment LLC v. Quantum Imaging LLC | [argued] |
| 25-1740 | DCT | Broadcom Corporation v. Netflix, Inc. | [argued] |
| 25-1761 | CFC | Price v. US | [argued] |
| 24-1850 | MSPB | Messal v. Department of Agriculture | [on the briefs] |
| 26-2067 | CAVC | Wright v. Collins | [on the briefs] |

**Panel C: Monday, December 7, 2026, 10:00 A.M., Courtroom 402**

| | | | |
|---|---|---|---|
| 25-1576 | ITC | Nice North America LLC v. ITC | [argued] |
| 25-1848 | CAVC | Mazur v. Collins | [argued] |
| 25-1903 | PTO | DBR Finance, Inc. v. Rugged Cross Hunting Blinds, LLC | [argued] |
| 26-1828 | DCT | 9878866 Canada Inc. v. Intake Breathing Technology, LLC | [argued] |
| 26-1757 | CFC | Dhital v. HHS | [on the briefs] |
| 26-1826 | MSPB | Steward v. DHS | [on the briefs] |

**Panel D: Monday, December 7, 2026, 10:00 A.M., Courtroom 203**

| | | | |
|---|---|---|---|
| 25-1434 | CFC | Vanda Pharmaceuticals Inc. v. US | [argued] |
| 25-1646 | PTO | Omni MedSci, Inc. v. Apple Inc. | [argued] |
| 25-2070 | DCT | Palmetto State Armory, LLC v. Shield Arms, LLC | [argued] |
| 25-2123 | DCT | SilcoTek Corp. v. Waters Corporation | [argued] |
| 26-1388 | CAVC | Bynum v. Collins | [on the briefs] |
| 26-1587 | MSPB | Koroma v. DVA | [on the briefs] |

**Panel E: Tuesday, December 8, 2026, 10:00 A.M., Courtroom 201**

| | | | |
|---|---|---|---|
| 25-1405 | CIT | Shanghai Tainai Bearing Co., Ltd. v. US | [argued] |
| 25-1737 | DCT | Dynamics Inc. v. Samsung Electronics Co., Ltd. | [argued] |
| 25-1795 | ITC | NJOY, LLC v. ITC | [argued] |
| 25-2018 | PTO | NJOY, LLC v. JUUL Labs, Inc. | [argued] |
| 26-1137 | MSPB | Strong v. SBA | [on the briefs] |
| 26-1324 | PTO | In Re Joseph | [on the briefs] |

**Panel F: Tuesday, December 8, 2026, 10:00 A.M., Courtroom 402**

| | | | |
|---|---|---|---|
| 24-2377 | MSPB | Baptiste v. DHS | [argued] |
| 25-1667 | CAVC | Valencia v. Collins | [argued] |
| 25-1790 | PTO | Ouster, Inc. v. Hesai Technology Co., Ltd. | [argued] |
| 25-2000 | DCT | Cellulose Material Solutions, LLC v. SC Marketing Group, Inc. | [argued] |
| 26-1721 | DCT | Solos Technology Ltd. v. Meta Platforms, Inc. | [on the briefs] |
| 26-1940 | CFC | Riepe v. US | [on the briefs] |

**Panel G: Tuesday, December 8, 2026, 2:00 P.M., Courtroom 201**

| | | | |
|---|---|---|---|
| 24-2194 | DCT | Novartis Pharmaceuticals Corporation v. Accord Healthcare, Inc. | [argued] |

**Panel H: Wednesday, December 9, 2026, 10:00 A.M., Courtroom 201**

| | | | |
|---|---|---|---|
| 25-1245 | MSPB | Litton v. DOJ | [argued] |
| 25-1756 | PTO | ModernaTX, Inc. v. BioNTech SE | [argued] |
| 25-1816 | DCT | Globalprivatequity.com, Inc. v. The Debt Exchange, Inc. | [argued] |
| 25-2085 | CFC | Dotson v. HHS | [argued] |
| 26-1445 | DCT | Millennium Outdoors, LLC v. Leader Accessories LLC | [on the briefs] |
| 26-1938 | CAVC | Stinson v. Collins | [on the briefs] |

**Panel I: Wednesday, December 9, 2026, 10:00 A.M., Courtroom 402**

| | | | |
|---|---|---|---|
| 25-1689 | CIT | Asia Wheel Co., Ltd. v. US | [argued] |
| 25-1694 | CIT | Asia Wheel Co., Ltd. v. US | [argued] |
| 25-1743 | DCT | LaVoult.com, LLC v. Meta Platforms, Inc. | [argued] |
| 25-2052 | PTO | Sutter Home Winery, Inc. v. Roar Spirits, LLC | [argued] |
| 26-1065 | CFC | Monbo v. US | [on the briefs] |
| 26-1664 | MSPB | Green v. MSPB | [on the briefs] |

# Exhibit G. PTAB IPR Dockets (6 pending)

| | | |
|---|---|---|
| 10/14/2026 | | MINUTE ORDER granting Plaintiff's 23 Cured Motion for CM/ECF Username and Password. Plaintiff Daitona Carter is hereby approved to access the court's electronic case management system. Plaintiff shall be responsible for monitoring their e-mail account and, upon receipt of notice of an electronic filing, for retrieving the noticed filing. Signed by Judge Amit P. Mehta on 10/14/2026. (lcapm1) (Entered: 10/14/2026) |
| 10/14/2026 | | MINUTE ORDER denying Plaintiff's 22 Emergency Renewed Motion for Temporary Restraining Order. The court treats Plaintiff's motion as one for reconsideration under Federal Rule of Civil Procedure 54(b). Motions for reconsideration of interlocutory orders under Rule 54(b) are "within the discretion of the trial court." *Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 21 (D.D.C. 2007) (citation omitted). The court may enter reconsideration "as justice requires." *Id.* (citation omitted). "Justice may require revision when the Court has 'patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court.'" *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)). None of these grounds applies to Plaintiff's renewed motion. Plaintiff's claim of irreparable harm remains speculative, and her insistence that the Massachusetts district court wrongly denied her intervention motion is unconvincing. Moreover, having concluded that Plaintiff failed to establish irreparable harm, the court was not required to evaluate the merits of Plaintiff's claims. Signed by Judge Amit P. Mehta on 10/14/2026. (lcapm1) (Entered: 10/14/2026) |

**Exhibit H. Kopin IBAS Awards**

**(SAM.gov: $34M total, MicroLED display configurations)**

# KOPIN SECURES ADDITIONAL $18.6 MILLION U.S. ARMY IBAS AWARD FOR COLOR MICROLED TECHNOLOGY

10/08/26 | SHARE

**Cumulative IBAS funding reaches $34 million as Kopin accelerates U.S.-based development and manufacturing of next-generation military MicroLED displays**

WESTBOROUGH, Mass. – Kopin Corporation (NASDAQ: KOPN), a leading provider of application-specific optical systems, optical interconnect devices for data centers and high-performance microdisplays for defense, training, enterprise, industrial, consumer and medical products, today announced it has secured an $18.6 million sole source award from the Office of the Secretary of War (OSW) through the U.S. Army Contracting Command (ACC) under the Industrial Base Analysis and Sustainment (IBAS) program.

The award represents the second major US Government investment dedicated to advancing Kopin's color MicroLED microdisplay technology. The latest award brings Kopin's total IBAS funding to $34 million. The additional funding will support development of **two more MicroLED display configurations** designed for specific ground-soldier and pilot applications while accelerating Kopin's efforts to establish and expand U.S.-based MicroLED manufacturing capabilities.

## Continued and Accelerating U.S. Government Investment in Kopin MicroLED Technology

The additional $18.6 million award represents continued U.S. government investment in Kopin's MicroLED technology and its potential role in next-generation military visual systems while enabling Kopin to accelerate onshoring the MicroLED manufacturing processes, ensuring that the advanced display components essential to future defense and commercial systems are designed and built, in the United States.

"Securing additional IBAS funding represents significant continued validation of Kopin's MicroLED technology and its importance to next-generation U.S. defense systems. Combined with our previous IBAS investment, the U.S. government has now committed $34 million through IBAS to advance MicroLED technology. This enables Kopin to accelerate the development and U.S.-based manufacturing of additional high-performance MicroLED displays designed for next-generation soldier and pilot systems while separately enabling the foundational MicroLED platform technology for our AI Interconnect products," said Michael Murray, Kopin's CEO.

## Supporting More Army Programs of Record

With the expanded funding, Kopin will develop two additional MicroLED displays purpose-built for specific ground soldier equipment and missions and for pilot HUDs. With this support, Kopin can meet the specific and demanding requirements of the advanced MicroLED displays for next generation visual systems that demand exceptional brightness, rugged durability, power efficiency, and, reliable performance in all operational environments. These capabilities improve situational awareness for soldiers in the field and also open the door for wider integration into future weapon sights, helmet mounted systems, and augmented reality platforms-ultimately helping shape the Army's modernization roadmap for years to come.

## Strengthening Kopin's Strategic Growth Path

This second round award validates Kopin's advanced position and roadmap for MicroLED displays for U.S. military applications and programs, and underscores the company's commitment to advancing U.S.-made displays and optical solutions. With expanding program awards across defense, medical, enterprise, and AI infrastructure markets, Kopin is expanding its position as a trusted, critical technology supplier-delivering breakthrough visual and optical components that enable customers to innovate faster, operate more efficiently, and meet the rising demands of modern systems.

## Forward Looking Statements

This press release includes statements that constitute forward looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward looking statements may be identified by the use of words such as “forecast,” “guidance,” “plan,” “estimate,” “will,” “would,” “project,” “maintain,” “intend,” “expect,” “anticipate,” “prospect,” “strategy,” “future,” “likely,” “may,” “should,” “believe,” “continue,” “opportunity,” “potential,” and other similar expressions that predict or indicate future events or trends or that are not statements of historical matters.

Forward looking statements are only predictions and are subject to risks, uncertainties, and assumptions that are difficult to predict and, in many cases, outside of our control. Actual results may differ materially from those expressed or implied in any forward looking statements. All forward looking statements are qualified in their entirety by these cautionary statements. We undertake no obligation to update forward looking statements except as required by law. Important factors that could cause actual results to differ materially from those described in forward looking statements are detailed in the Company’s most recent form 10-K and other filings with the Securities and Exchange Commission.

This press release includes forward looking statements regarding Kopin’s receipt of a $18.6 million order for Color MicroLED Technology, including expectations of meeting requirement of next-generation visual systems, delivering on customer needs and demands, and furthering Kopin’s onshoring efforts of U.S. manufacturing. Forward looking statements are based on current assumptions and expectations and are subject to risks and uncertainties that could cause actual results to differ materially, including changes in customer demand, program schedules, manufacturing performance, and broader conditions in the defense market.

**About Kopin**

Kopin Corporation (Nasdaq: KOPN) is a leading developer and provider of innovative display, Optical Interconnect devices and application-specific optical solutions sold as critical components and subassemblies for defense, enterprise, professional and consumer products. Kopin’s portfolio includes microdisplays, display modules, eyepiece assemblies, image projection modules and vehicle mounted and head-mounted display systems that incorporate ultra-small high-resolution Active Matrix Liquid Crystal displays (AMLCD), Ferroelectric Liquid Crystal on Silicon (FLCoS) displays, MicroLED displays (µLED) and Organic Light Emitting Diode (OLED) displays, a variety of optics and low-power ASICs and optical interconnect devices for data centers.

**CERTIFICATE OF SERVICE**

I hereby certify that this document has been filed electronically with the Clerk of the Court for ex parte consideration. No service has been made on the Defendants due to the immediate emergency and the upcoming November 14, 2026 deadline.

Dated: November 4, 2026

Respectfully submitted,

Daitona Carter, Plaintiff

| | |
|---|---|
| DAITONA CARTER,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN A. FEINBERG, in his official capacity as Deputy Secretary of Defense;<br><br>PETE HEGSETH, in his official capacity as Secretary of Defense; and<br><br>WALTER JAY CLAYTON, in his official capacity as Director of National Intelligence,<br><br>Defendants. | Case No. 1:26-cv-03318-APM<br>Judge Amit P. Mehta |

**[PROPOSED] PRELIMINARY INJUNCTION ORDER**

Upon consideration of Plaintiff's Standalone Motion for Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a), it is hereby:

**ORDERED** that Plaintiff's Motion is GRANTED; and it is further

**ORDERED** that Defendants are ENJOINED from implementing the CAS-to-GAAP transition for SBMC Phase Two data generation pending final adjudication of this matter; and it is further

**ORDERED** that Defendants shall issue a litigation hold preserving all CAS cost-accounting records for SBMC contracts from 2008 to the present, all PPBE budget records related to Project ARIA (Team Gray, Team Black, Team Yellowstone), and all records of the September 2025 AI tabletop exercise; and it is further

**ORDERED** that the 60-day CASB proposal window is TOLLLED pending further order of this Court.

**SO ORDERED.**

Dated: ______________, 2026

_____________________________________________

AMIT P. MEHTA,

United States District Judge